Adam C. Silverstein
William M. Moran
Andrew S. Halpern
OTTERBOURG P.C.
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100 (tel.)
Fax:  (212) 682-6104 (fax)
asilverstein@otterbourg.com
wmoran@otterbourg.com
ahalpern@otterbourg.com
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------------- X

MELANIE L. CYGANOWSKI, AS EQUITY RECEIVER FOR PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND LP, PLATINUM PARTNERS CREDIT OPPORTUNITIES FUND (TE) LLC, PLATINUM PARTNERS CREDIT OPPORTUNITIES FUND LLC, PLATINUM PARTNERS CREDIT OPPORTUNITIES FUND INTERNATIONAL LTD., PLATINUM PARTNERS CREDIT OPPORTUNITIES FUND INTERNATIONAL (A) LTD., and PLATINUM PARTNERS CREDIT OPPORTUNITIES FUND (BL) LLC,

Plaintiff,

- against -

BEECHWOOD RE LTD., BEECHWOOD RE INVESTMENTS, LLC, B ASSET MANAGER LP, B ASSET MANAGER II LP, BEECHWOOD RE HOLDINGS, INC., BEECHWOOD BERMUDA INTERNATIONAL, LTD., BEECHWOOD BERMUDA LTD., BAM ADMINISTRATIVE SERVICES LLC, BRE BCLIC 2013 LTC PRIMARY, BRE BCLIC 2013 LTC SUB, BRE WNIC 2013 LTC PRIMARY, BRE WNIC 2013 LTC SUB, MOSHE M. FEUER a/k/a MARK FEUER, FEUER FAMILY TRUST, TAYLOR-LAU FAMILY TRUST, SCOTT A. TAYLOR, SENIOR HEALTH INSURANCE COMPANY OF PENNSYLVANIA, FUZION ANALYTICS, INC., BANKERS CONSECO LIFE INSURANCE COMPANY, WASHINGTON NATIONAL INSURANCE COMPANY, CNO FINANCIAL GROUP, INC., 40/86 ADVISORS, INC., and JOHN DOES 1-100,

Defendants.

--------------------------------------------------------------------------------

Case No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

5520108.6

Plaintiff Melanie L. Cyganowski, as Receiver (the "**Equity Receiver**" or "**Plaintiff**") for, among other entities, the above-captioned Platinum funds (the "**Receivership Entities**"), for her Complaint against the above-captioned defendants (the "**Defendants**"), alleges, on knowledge as to her own status and actions, and otherwise upon information and belief, as follows:

I.    <u>**NATURE OF THE ACTION**</u>

1.     By this action, the equity receiver for those Platinum funds commonly referred to as the "Platinum Partners Credit Opportunities Funds" (the "**PPCO Funds**" or "**PPCO**") joins the chorus of complaints seeking redress for the massive fraudulent scheme masterminded by the now indicted and/or convicted insiders of Platinum (collectively consisting of the PPCO Funds, the PPVA Funds (defined below) and affiliated entities) – *e.g.,* Mark Nordlicht, Murray Huberfeld and David Levy.  The scheme was fueled by the money ploughed into Platinum and its portfolio companies that were frequently speculative, unprofitable or distressed by their self-created, fraudulent vehicle (thinly veiled as a reinsurance company), "Beechwood," fronted by fellow fraudsters, Moshe M. Feuer and Scott Taylor, and eagerly funded by long term care insurance carriers with few, if any, other options, "BCLIC," "WNIC" and "SHIP".  BLIC, WNIC and SHIP were saddled with legacy long-term care portfolios.  Other complaints filed in this district alleging the same fraudulent scheme (and which corroborate the allegations of the Equity Receiver based on her own investigation) include:  *Trott, et al.  v. Platinum Management (NY) LLC, et al.,* 18 Civ. 10936- JSR (the "**PPVA Complaint**"); *Senior Health Insurance Co. of Pa. v. Beechwood Re Ltd., et al..,*18 Civ. 10936-JSR (as amended, the "**SHIP Complaint**"); and *Bankers Conseco Life Ins. Co., et. al.*  v. *Moshe M. Feuer, et al.,* 16 Civ. 07646-ER (stayed) (the "**BLIC Complaint,**" and, with the PPVA Complaint, the SHIP Complaint, and this Complaint, the "**Complaints**").

2

2.      As all of the Complaints agree, the object of the fraudulent scheme – indeed, what everyone now agrees was a racketeering enterprise – was the personal enrichment of the Platinum and Beechwood insiders, who collectively generated for themselves tens of millions of dollars in management fees, incentive fees, false profits and other remuneration over the years to the detriment of the innocent Platinum Investors.  The complaints are further in unison that, at the heart of the scheme, was the wild overvaluation of illiquid and increasingly distressed assets, primarily at the "Platinum Partners Value Arbitrage Funds" (or "PPVA") but also at PPCO. Investments in, and loans to, portfolio companies that were under increasing duress, even in bankruptcy, consistently were valued at or above original book value.  Emblematic of Platinum's fraudulent practices was PPCO's increasing the value on its books of its position in portfolio company LC Energy Operations LLC ("LC Energy"), even while PPCO had to infuse equity into that distressed company to enable it to continue making required interest payments that it otherwise would have defaulted on under its pre-existing credit facility from Beechwood.

3.      The Complaints further agree that, in or around 2012, the fraudulent scheme metastasized due to a run of redemption requests on the illiquid PPVA.  Internal e-mails like this one from Nordlicht in 2012 admitting that redemptions were "daunting" an "relentless" and in 2014, "[i]t can't go on like this or practically we will need to winddown . . . . this is code red" privately acknowledged the lie regarding the stellar performance and multi-billion valuations publicly touted to investors.

4.      According to all of the aforementioned Complaints, the insiders' desperate need for capital to stave off redemption requests and to fund increasingly cash-thirsty portfolio companies led to the creation of Beechwood in or around 2013.  Poorly masqueraded as a reinsurance company fronted by two previous reinsurance professionals, Feuer and Taylor,

Beechwood was conceived as the solution to primarily PPVA's growing liquidity crisis: By obtaining access to hundreds of millions of dollars in insurance assets, the insiders would be able to channel into PPVA (and to a lesser extent PPCO) and its distressed portfolio companies the much-needed cash to fund redemptions and meet portfolio company demands without having to worry about redemption requests that inevitably would follow the procurement of new investor money or having to sell distressed, illiquid assets in order to generate liquidity. At the same time, the insiders would continue to earn millions of dollars in management fees thereby lining their pockets to the detriment of the funds' investors. None of the funds from the fraudulent scheme benefitted PPC and PPLO.

5.     Hidden in plain sight was the now universally acknowledged fact that Beechwood was capitalized and staffed by PPVA and PPCO and insiders and employees. Thus, as the SHIP Complaint states: "Beechwood Advisors and their related entities were formed as a mechanism to funnel money into Platinum [], a Manhattan-based hedge fund founded by Mark Nordlicht[], Murray Huberfeld[], and David Bodner [] to prolong their existing Ponzi-like scheme." (Ship Complaint, ¶ 15) Everyone except the fraudsters agrees.

6.     Having procured BCLIC's, WNIC's and SHIP's funds, Beechwood – exactly according to plan – proceeded to channel hundreds of millions of dollars, often through PPCO, primarily into investments in PPVA, and to a lesser extent PPCO, and their flagging portfolio companies to meet redemption requests and other operating needs of PPVA. The Complaints filed in this district agree on all, or virtually all, of the foregoing facts.

7.     Where this Complaint departs is by asserting that (i) contrary to their portrayal as unwitting victims of the scheme, BCLIC, WNIC and SHIP – along with their current or (in the case of SHIP) former parent company, CNO, and administrative agent, Fuzion, were willing

4

participants, turning a blind eye from multiple red flags of fraud to transact with Beechwood in the hope that Beechwood would rescue them from being detrimentally burdened by the long term care insurance portfolios that were albatrosses around their necks, and (ii) that, in the final analysis, the ultimate victim of the fraudulent scheme was PPCO's direct and indirect investors. Eventually jettisoning any hope of salvaging PPVA as its liquidity crisis deepened and under pressure from the insurance carriers to reinvest and/or return their principal, the participants engaged in a massive offloading to PPCO of Beechwood's distressed and wildly-overstated investments, in return for cash and security interests in PPCO's more valuable assets.  Thus, when the music stopped with the simultaneous filings of the SEC civil enforcement action and the US Government criminal proceeding against the Platinum Insiders on December 19, 2016, it was with PPCO where many of the distressed assets that had contributed to PPVA's liquidity crisis had landed.

8.      The Receiver, standing in the shoes of the specific Receivership Entities for which she acts identified below, asserts claims to recover for the benefit of the innocent investors in and creditors to PPCO tens of millions of dollars, if not more, in damages that PPCO, and/or its individual funds, incurred by virtue of the common law fraud, aiding and abetting of common law fraud, aiding and abetting of breach of fiduciary duty, fraudulent conveyances, federal securities fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act that it suffered.  The Receiver also seeks to invalidate the security interests claimed by Beechwood, BCLIC, WNIC and SHIP in all of PPCO's and its affiliates' assets as a result of what the insurance carriers themselves now admit were fraudulent transactions.

II.      **THE BASES FOR THE RECEIVER'S INFORMATION AND BELIEF**

9.     Those allegations made herein on information and belief are based on a variety of sources, and follow an extensive investigation by the Receiver's professionals into the pre-receivership business and affairs of PPCO,  including with respect to Beechwood.   Whenever possible, the Receiver cites to one or more sources in the body of, or immediately following, the allegations based on information and belief set forth below .  In many cases, the allegations are corroborated by corresponding allegations by several of the defendants, BCLIC, WNIC and SHIP, as well as by the joint liquidators of PPVA, the SEC and United States Government, and the Litigation Trustee of Black Elk Energy Offshore Operations, LLC (the "**Black Elk Trustee**").

10.     Sources of information on which the Receiver's allegations are based include: internal e-mails and other documents on Platinum's server; PPCO's and PPVA's audited and unaudited financial statements; PPCO's and to a limited extent PPVA's books and records; third-party asset valuations procured by Platinum; the transaction documents between Beechwood, on the one hand, and BCLIC and WNIC or SHIP, on the other; BCLIC's, WNIC's, SHIP's and, where available, Beechwood's respective statutory filings; earnings and guidance calls with the management of BCLIC's and WNIC's parent, and SHIP's former parent, CNO; CNO investor presentations; rating agency statements regarding CNO; other publicly-available information concerning the long term care insurance industry; public proceedings concerning SHIP; transaction documents between Platinum, on the one hand, and Beechwood, on the other; transaction documents concerning the transfer of assets and other transactions referenced herein; statutory filings concerning Agera Energy LLC; filings in the bankruptcy proceedings of Platinum portfolio companies; and articles in established newspapers and periodicals on Platinum and its principals.

### III.      **THE PARTIES**

11.      Plaintiff, the Equity Receiver, following the resignation of a prior equity receiver,[1] was appointed successor "equity receiver" of the Receivership Entities,, effective July 6, 2017, at the request of the United States Securities and Exchange Commission (the "**SEC**"), by the United States District Court for the Eastern District of New York (Cogan, U.S.D.J.) (the "**Receivership Court**").   By order, the Receivership Court empowered the Equity Receiver to, among other things, recover, liquidate, marshal, and preserve all assets of the Receivership Entities (the "**Receivership Orders**").

12.      Receivership Entity Platinum Partners Credit Opportunities Master Fund LP ("**PPCO Master Fund**") is and, at all material times hereinafter mentioned, was a limited partnership organized under Delaware law with its principal place of business in New York, New York.

13.      Receivership Entity Platinum Partners Credit Opportunities Fund (TE) LLC ("**PPCO Fund TE**") is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

14.      Receivership Entity Platinum Partners Credit Opportunities Fund LLC ("**PPCO Fund**") is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

---

[1] The prior equity receiver, Bart Schwartz, was appointed as receiver on December 19, 2017, but requested permission to resign as receiver and was replaced by the current receiver, Judge Cyganowski.  (ECF Nos. 6 and 59-2, 170 and 226 at 4:11 in the receivership case)

5520108.6

15.     Receivership Entity Platinum Partners Credit Opportunities Fund International Ltd. ("**PPCO Fund International**")is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

16.     Receivership Entity Platinum Partners Credit Opportunities Fund International (A) Ltd. ("**PPCO Fund International A**") is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

17.     Receivership Entity Platinum Partners Credit Opportunities Fund (BL) LLC ("**PPCO Blocker Company**")is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

18.     As set forth herein, the Receivership Entities were among three families of funds fraudulently marketed and operated under the name "Platinum" by a group of now indicted, convicted and/or otherwise malfeasant individuals, including Mark Nordlicht, Murray Huberfeld, David Bodner, David Levy, Daniel Small, Uri Landesman and Joseph SanFilippo (the "**Platinum Insiders**").

19.     Defendant Beechwood Re Ltd. ("**Beechwood Re**") is and, at all material times hereinafter mentioned, was a stock life reinsurance company domiciled in the Cayman Island with its principal place of business in New York, New York.

20.     Defendant Beechwood Investments LLC ("**Beechwood Investments**") is and, at all material times hereinafter mentioned, was a Delaware limited liability company with its principal place of business in New York, New York.

21.     Defendant B Asset Manager LP ("**BAM I**") is and, at all times hereinafter mentioned, was a Delaware limited partnership with its principal place of business in New York, New York.

22.     Defendant B Asset Manager II LP ("**BAM II**") is and, at all material times hereinafter mentioned, was a Delaware limited partnership with its principal place of business in New York, New York.

23.     Defendant Beechwood Re Holdings, Inc. ("**Beechwood Holdings**") is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in New York, New York.

24.     Defendant Beechwood Bermuda International Ltd. ("**Beechwood Bermuda Int'l**") is and, at all material time hereinafter mentioned, was an entity

25.     Defendant Beechwood Bermuda Ltd. ("**Beechwood Bermuda**") is and, at all material time hereinafter mentioned, was an entity organized under Bermuda law, with its principal place of business in Bermuda and a place of business in New York.  Beechwood Bermuda was a reinsurance company that was licensed as an insurer located in Hamilton, Bermuda and regulated by the Bermuda Monetary Authority.

26.     Defendant BAM Administrative Services LLC ("**BAM Administrative**") is and, at all times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

27.     Defendants BRe BCLIC 2013 LTC Primary, BRe BCLIC 2013 LTC Sub, BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub (collectively, the "**Beechwood Reinsurance Trust**s") are and, at all material times hereinafter mentioned, were insurance trusts

organized under Delaware law that, at all relevant times, were managed by BAM Administrative and administered in New York, New York.

28.     Defendants Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood Holdings, Beechwood Bermuda Int'l, Beechwood Bermuda, BAM Administrative, and the Beechwood Reinsurance Trusts, are hereinafter collectively referred to as the "**Beechwood Entities"** and, individually or collectively, as "**Beechwood**."  As described herein (and in the other complaints), Beechwood was a fraudulent vehicle posing as a reinsurance company created by the Platinum Insiders, in conjunction with Moshe Feuer and Mark Taylor (collectively with the Platinum Insiders, the "**Beechwood Insiders**"), to gain access to insurance reserves that would then be channeled into the Platinum Funds, which, in varying degrees, required liquidity to meet redemption requests and continue funding its distressed portfolio.

29.     Defendant Moshe M. Feuer a/k/a Mark Feuer ("**Feuer**") is and, at all material times hereinafter mentioned, was a resident of Lawrence, New York.

30.     Defendant Feuer Family Trust ("**Feuer FT**") is a trust organized under New York law for the benefit of Feuer and/or his family members.

31.     Defendant Scott A. Taylor ("**Taylor**") is and, at all material times hereinafter mentioned, was a resident of New York, New York.

32.     Defendant Taylor-Lau Family Trust  ("**Taylor-Lau FT**")is a trust organized under New York law for the benefit of Taylor and/or his family members.

33.      Feuer and Taylor are hereinafter collectively referred to as the "**Individual Beechwood Defendants**" and, together with the Beechwood Entities Feuer FT and Taylor-Lau, as the "**Beechwood Defendants**."

34.     Defendant Senior Health Insurance Company of Pennsylvania ("**SHIP**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

35.     Defendant Fuzion Analytics, Inc. ("**Fuzion**") is a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

36.     Defendant Bankers Conseco Life Insurance Company ("**BCLIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in New York with its principal place of business in Carmel, Indiana.

37.     Defendant Washington National Insurance Company ("**WNIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

38.     Defendant CNO Financial Group, Inc. ("**CNO**") is and, at all material times hereinafter mentioned, was a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

39.     Defendant 40/86 Advisors, Inc. ("**40/86 Advisors**") is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in Carmel, Indiana.

40.     Defendant John Does 1-100 are entities and individuals, whose identities are not, at this time, known, who were involved in, or otherwise liable for, the fraudulent activities described herein.  Does 1-100 may include the trustees of Beechwood Trust No. 1, Beechwood Trust No. 2, Beechwood Trust No. 3, Beechwood Trust No. 4, Beechwood Trust No. 5, Beechwood Trust No. 6, Beechwood Trust No. 7, Beechwood Trust No. 8, Beechwood Trust No. 9, Beechwood Trust No. 10, Beechwood Trust No. 11, Beechwood Trust No. 12, Beechwood

5520108.6

Trust No. 13, Beechwood Trust No. 14, Beechwood Trust No. 15, Beechwood Trust No. 16, Beechwood Trust No. 17, Beechwood Trust No. 18, Beechwood Trust No. 19 and Beechwood Trust No. 20.

## IV.   JURISDICTION AND VENUE

41.     This Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1331, 18 U.S.C. §§ 1961 and 1962(a), (c) and (d) *et seq.*, Sections 10(b) and 20(a) of the Securities Exchange Act of 1936 (the "**Exchange Act**") [15 U.S.C. §§78j(b) and 78t(a)], Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], Section 20 and Section 27 of the Exchange Act.

42.     This Court has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367, as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

43.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

## V.   FACTS COMMON TO ALL CLAIMS

### A.   The Platinum Funds

44.     The Receivership Entities are members of the "PPCO Funds," one of the three groups of funds that were managed by several entities led by Nordlicht and sometimes collectively referred to as "Platinum Partners."

45.     The investment managers of "Platinum Partners" operated three groups of distinct investment funds:  the "PPVA Funds," created in 2003; the "PPCO Funds," created in 2005; and

"the PPLO Funds," created in 2009.  Each of these three groups of funds was structured to include a master fund, a management entity and several feeder funds.

46.      The PPVA Funds, the PPCO Funds and the PPLO Funds and the entities that operated them – sometimes collectively referred to as "Platinum Partners" – were founded by three individuals; Nordlicht, Murray Huberfeld ("**Huberfeld**") and David Bodner ("**Bodner**").

47.      By the time Nordlicht, Huberfeld and Bodner founded the Platinum Funds, each of them, individually and sometimes jointly, already had a long history of unscrupulous conduct. In 1992, for example, Bodner and Huberfeld pled guilty to a misdemeanor for sending an imposter to take his Series 7 brokerage licensing exam.  Each was sentenced to two years' probation and paid a substantial fine to the SEC.  In 1996, the SEC issued a cease and desist order against Huberfeld and Broad Capital Associates in which Huberfeld and Broad Capital Associates agreed to cease and desist from committing or causing securities violations and to disgorge $356,782 representing profits gained as a result of transactions in certain unregistered securities and to pay interest of $69,917.30.   In 1998, Huberfeld and Bodner settled civil allegations with the SEC that they improperly sold more than 513,000 shares of restricted stock in Broad Capital Associates.

48.      Nordlicht likewise has a checkered past. According to published reports, both Huberfeld and Nordlicht and their wives were sued in connection with the notorious Rothstein Ponzi scheme.  In addition, one of Nordlicht's previous ventures, Optionable Inc., collapsed in a trading scandal in 2007 when another of its cofounders, Kevin Cassidy, was arrested for deliberately misstating the value of natural gas derivatives.  Cassidy, who served two prior stints in prison, was sentenced to months in prison. When he was released, Platinum hired him as the

managing director of Agera Energy, a Platinum portfolio company.  At the time, David Levy ("**Levy**") (Huberfeld's nephew) served as Beechwood's Chief Investment Officer.

1.      **The PPCO Funds**

49.     The PPCO Funds were marketed as a single-strategy group of funds whose business was to "originate short and medium term, high yield, debt secured by collateral, and/or equity investments."  (PPCO Marketing Presentation - December 1 2015)  The PPCO Funds originated loans and made equity investments in various industries, including, among others, consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

50.     According to the PPCO Funds' marketing materials, the PPCO Funds' investment strategy was to identify and finance companies closed out of traditional financing markets. PPCO would offer to provide such companies with capital infusions on certain terms.  Marketing materials further stated that the PPCO Funds "understand[] that these loans require: Specialized skills to properly structure and negotiate a transaction; Added layers of due diligence and legal review; Extensive niche industry experience; Advanced monitoring capabilities; and Sophisticated controls to minimize fraud risk suited to minimize fraud risk."  (PPCO Marketing Presentation - December 1 2015).  As a result of the PPCO Funds' stated investment strategy, the majority of the PPCO Funds' positions were in investments without a ready market.

51.     The PPCO Master Fund invested substantially all of the funds received into its four feeder funds.  Credit Management served as portfolio manager for the Master Fund. Investors from the United States invested in one of those feeder funds.  Investors from outside the United States invested in the other three feeder funds, which were based outside of the United States.  For tax purposes, the PPCO feeder funds did not invest directly in PPCO Master

14

Fund.  Instead, they invested substantially all of their capital in the PPCO Blocker Company, which, in turn, invested substantially all of its capital in the Master Fund.

52.     PPCO Fund TE is one of the three feeder funds in PPCO Master Fund.  PPCO Fund TE holds a partnership interest in the net assets of the PPCO Master Fund, indirectly through the PPCO Blocker Company, of approximately 15% at December 31, 2014.

53.     PPCO Fund International is another feeder fund in PPCO Master Fund.  PPCO Fund International holds a partnership interest in the net assets of the Master Fund, indirectly through the PPCO Blocker Company, of approximately 19% at December 31, 2014.

54.     From at least 2007 through 2016, PPCO Fund International was managed by a board of three independent directors.  Those directors owed nondelegatable fiduciary duties to PPCO International.  If fraud had been brought to their attention they would have had a nondelegatable duty to stop that fraud by, among other things, reporting that fraud.

55.     PPCO Fund International A is also a feeder fund in PPCO Master Fund.  PPCO Fund International A holds a partnership interest in the net assets of the Master Fund, indirectly through the PPCO Blocker Company, of approximately 21% at December 31, 2014.

56.     From at least 2012 through 2016, PPCO Fund International was managed by a board of three independent directors.  Those directors owed nondelegable fiduciary duties to PPCO International.  If fraud had been brought to their attention they would have had a nondelegatable duty to stop that fraud by, among other things, reporting that fraud.

57.     The fourth feeder fund of PPCO Master Fund is PPCO Fund.  PPCO Fund had U.S. investors and invested substantially all of its capital directly into the Master Fund.  PPCO Fund's partnership interest in the net assets of the PPCO Master Fund was approximately 41% at December 31, 2014.

15

58.     Nordlicht and Levy as co-chief investment officers of PPCO were jointly and solely responsible for the investment decisions of PPCO Master Fund. While Murray Huberfeld and David Bodner did not have a role in investment decision making, they were active behind the scenes in raising money for the PPCO Funds and maintaining relationship with PPCO Investors. Nordlicht, Bodner and Huberfeld were limited partners of Platinum Credit Management LP and members of Platinum Credit Holdings, LLC, the Investment Manager and General Partner of PPCO, giving them substantial responsibility and direct management power over all decision making of the PPCO Funds. As such, at all relevant times, these Platinum insiders owed fiduciary duties to each of the PPCO Funds, which duties as set forth below and in each of the other Complaints they breached.

59.     According to the financial statements of PPCO Master Fund for the year ended December 31, 2014 (the "**2014 PPCO Master Fund Financial Statements**"), as of December 31, 2014, $459,250,674 (or 97.6%) of the PPCO Master Fund's $470,287,139 in reported total assets consisted of "[i]nvestments, at fair value."

60.     According to its financial statements and marketing materials, the PPCO Funds recorded positive returns in a period that covered a number of major market dislocations, including the financial crisis of 2008 and 2009 and the correction to the oil markets in 2014 and 2015.  In fact, energy investments were a significant portion of the PPCO portfolio, making up 38.8% of purported valuations as of December 2014. As is now known, underpinning the track record were highly inflated valuations on illiquid "Level 3 assets" (discussed below) that gave rise to the purported unrealized gains.

61.     In a presentation dated December 1, 2015, net monthly returns for PPCO's Class B for the period from October 2005 through November 2015, with the exception of a negative -

5520108.6

1.20% for April 2009, always were reported to be positive, with a range from 0.36% to 3.58%. According to the marketing materials PPCO never had a down year, with annualized positive returns ranging from 3.41% to 18.95%, with a net average annualized return of 13.37% for the ten year period from 2005 through 2015. Management touted PPCO's ever increasing returns, claiming that "PPCO (onshore) had higher monthly returns vs. HedgeFund.net Asset Based Lending Average index for 102 out of 122 months since inception."

62.     The PPCO Funds were primarily owned by outside investors, rather than insiders. In this regard, as of October 26, 2018, a total of $338,769,726 in investor claims had been recorded by PPCO Master Fund, out of which $292,559,247.83 came from what appear to be unaffiliated investors, including $224,843,285.13 from unaffiliated institutional investors and $67,715,962.70 from unaffiliated noninstitutional investors.

63.     The feeder funds issued a variety of share classes that established different types of membership interests for investors with different types of rights. As of December 31, 2014:

(a)     PPCO Fund (TE) had Class A, B and C interests at $8.7 million, $5.9 million and $49.3 million respectively;

(b)     PPCO Fund had Class A, B and C interests of $103.4 million, $67.4 million and $6.9 million respectively;

(c)     PPCO Fund International (A). had Class A and Class B interests of $26.9 million and $63.1 million respectively;  and

(d)     PPCO Fund International, Ltd. had Class A, B, C and D interests of $24.1 million, $62.1 million, $288,000 and $177,000 respectively..

64.     The underlying limited partnership, operating agreements and private placement memoranda ("**PPMs**") for the PPCO Funds gave investors the right to redeem their investments.

17

65.     Class A interests were subject to a lock-up period and could only be redeemed after being held for a minimum of 25 months from the date of issuance.  Investors were required to give 90 days' notice to redeem.

66.     There was no lock-up period for Class B or Class C Interests.  However, Class B and Class C Interests were required to give at least six months' prior written notice of any redemption.

67.     Once redemptions were effective, the PPCO Funds pledged to pay 90% of their good faith estimate of the redemption within 30 days following the applicable Redemption Date, with the balance of such amount to be paid within 30 days of the completion and receipt of the annual audit. The PPCO Funds intended to make "all redemption payments in cash… [though some redemptions] may be made in kind, in whole or in part."  Most investments were in illiquid, Level 3 assets that had no ready market.

68.     The 25-month lock-up period and 90-day notice period for Class A shares, and six-month notice period for Classes B and C shares were designed to provide adequate time for the PPCO Funds to realize fair market value for even its most illiquid Level 3 investments in order to satisfy redemption requests and fund operations.

69.     Yet, as it is now known, most of the PPCO Funds' investments were so illiquid, so overvalued, and had no ready market, thereby rendering PPCO's lock-up and notice periods to be insufficient to generate the requisite liquidity for the funds.

## 2.     **The PPLO Funds**

70.     The PPLO Funds, certain of which also are in receivership under the control of the Receiver, were marketed as a group of funds that invested in U.S. and non-U.S. equity and debt securities (both public and private), currencies, futures, forward contracts, and other

5520108.6

commodity interests, options, swap contracts and other derivative instruments and other investments.

71.     PPLO Master Fund is a Cayman Islands exempted limited partnership that is registered under the Mutual Funds law of the Cayman Islands.

72.     As of December 31, 2014, excluding derivative contracts and securities purchased under agreements to resell, $37,481,139 (or $77.9%) of the $48,132,623 in total assets shown on PPLO Master Fund's Consolidated Statement of Financial Condition of PPLO Master Fund were "[i]nvestments in securities, at fair value."

### 3.     The PPVA Funds

73.     The PPVA Funds were marketed as a group of multi-strategy funds that included long/short fundamental equity trading, asset-based financing in energy, mining, and other industries; energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

74.     PPVA Master Fund is a Cayman Islands exempted limited partnership that was managed by Platinum Management.

75.     Platinum Management was PPVA Master Fund's general partner and certain feeder funds referred to below were limited partners in it.

76.     Platinum Partners Value Arbitrage Fund (USA) L.P. ("**PPVA Onshore Feeder Fund**") is a limited partner in PPVA Master Fund, with investors within the United States serving as limited partners of the PPVA Onshore Feeder Fund.

77.     Platinum Partners Value Arbitrage Fund (International) Limited ("**PPVA International Feeder Fund**") was a vehicle to attract non-U.S. investors and served as a limited partner of PPVA until June 22, 2010, when PPVA International Feeder Fund ceased to be a

limited partner of PPVA and Platinum Partners Value Arbitrage Intermediate Fund Ltd. ("**PPVA Intermediate Feeder Fund**" and, collectively with PPVA International Feeder Fund and the PPVA Onshore Feeder Fund, the "**PPVA Feeder Funds**") took its place as a limited partner of PPVA Master Fund.

78.     Beginning in late 2015, the PPVA Feeder Funds ceased honoring most redemption requests.  In August 2016, PPVA Master Fund and PPVA International Feeder Fund were placed in liquidation by order of the Grand Court of the Cayman Islands.  On October 18, 2016, the liquidators of PPVA Master Fund and PPVA International Feeder Fund commenced a proceeding under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. (Case No. 16-12925 (Bankr. S.D.N.Y.)).  That case remains pending.

79.     On or about February 14, 2017, PPVA Intermediate Fund was placed in liquidation.  On October 17, 2017, its liquidators commenced a proceeding under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York. (Case No. 17-12269 (Bankr. S.D.N.Y.)).  That case remains pending.

80.     Consistent with the PPVA Feeder Funds' limited partnership agreements, their PPMs set out a fixed, orderly redemption process for all investors:  quarterly redemptions, upon 60 or 90 days' advance notice (depending on the version of the PPM), with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  (*See* PPVA Complaint at Ex. 6)

81.     The time frames set for redemptions appeared feasible because the PPVA Funds represented that a substantial portion of their portfolios consisted of securities that were liquid.  For example, according to the Platinum Insiders' representations, investments in the listed liquid

investment strategies represented as much as 61% of PPVA's portfolio.  *See*  PPVA Action, ECF No. 11-1, Ex. 4 at 2 .  In this regard, a "Due Diligence Questionnaire" dated September 2015 prepared by Platinum Management (NY) LLC stated, in part:

> How long does it take to exit the most liquid positions in the portfolio?  The Fund's most liquid positions could, under normal market conditions, typically be liquidated in less than a week, including assets in the Energy and Power Arbitrage, Long/Short Fundamental Equity, Event Driven, Quantitative and Asia Based Arbitrage strategies.

(*See* PPVA Complaint at Ex. 5.)

82.     In the same vein, a December 2015 Presentation created by certain of the defendants stated that the PPVA would target "30% risk allocation to short term trading and relative value strategies, 30% to event driven strategies and 40% to asset-based finance strategies."  (*See* PPVA Complaint at Ex. 7)

### 4.     Other Entities Involved in the Management and Control of the PPVA Funds, the PPCO Funds and the PPLO Funds

83.     PPVA Master Fund, PPCO Master Fund and PPLO Master Fund were each structured as a general limited partnership and each had a separate portfolio manager.

84.     Platinum Management (NY) LLC ("**Platinum Management**") was the general partner in PPVA Master Fund, served as its investment manager, and was responsible for managing, trading, investing and allocating its assets.  Platinum Management, an investment adviser previously registered with the SEC and a Delaware limited liability company headquartered in New York, New York, was the portfolio manager of various funds, including the PPVA Funds.  As of March 30, 2016, PPVA Master Fund claimed to have approximately $1 billion in assets under management.

85.     As set forth above, Platinum Credit Holdings LLC (**"Credit Holdings"**), a limited liability company organized under Delaware law, served as the general partner of PPCO

Master Fund and the managing member of PPCO Fund TE, PPCO Fund International, PPCO Fund International A and PPCO Fund.

86.     Platinum Credit Management, L.P. ("**Credit Management**" or the "**Portfolio Manager**"), a limited partnership headquartered in New York and organized under Delaware law, served as the portfolio manager of PPCO Master Fund, PPCO Fund International, PPCO Fund (TE), PPCO Fund International A and PPCO Fund. Credit Management was a "relying adviser" of Platinum Management, meaning that it was included within Platinum Management's umbrella adviser registration with the SEC.

87.     Platinum Liquid Opportunity GP LLC, a limited partnership organized under Delaware law, served as the general partner of PPLO Master Fund.

88.     Platinum Liquid Opportunity Management (NY) LLC served as the investment manager of the PPLO Master Fund and was responsible for the PPLO Master Fund's day-to-day operations.  It was a "relying advisor" included within Platinum Management's umbrella adviser registration with the SEC.

### 5.     Innocent Insiders at the PPCO Funds

89.     While the Platinum Insiders were engaged in fraud, at all relevant times there were individuals in place who could have stopped the wrongdoing.  For example, Daniel Mandelbaum ("**Mandelbaum**") was the Chief Financial Officer of Platinum Credit from January 2015 through at least October 2015.  He also performed services for the PPCO Funds. Mandelbaum was not engaged in the Platinum Insiders' fraudulent activities and did take, or would have taken, steps to report and/or end such fraudulent activities.

90.     In addition, Saurabh Shah ("**Shah**") was the Chief Legal Officer of Platinum Management from November 2014 until through at least April 30 2015. In this position, Shah

22

also effectively functioned as in-house legal counsel for the PPCO Funds.  Likewise, Shah was not engaged in the Platinum Insiders' fraudulent activities and did take, or would have taken, steps to report and/or end such fraudulent activities.

**B.**     **The Fragile Financial Position of the PPCO Funds and the Liquidity Issues Experienced by the PPVA Funds**

91.     Beginning in 2012, the PPVA Funds faced a liquidity crisis that would consume the Platinum Funds' eco-system.  The PPCO Funds were not far behind.

**1.     The Fragile Financial Position of the PPCO Funds**

92.     By the end of 2013, the PPCO Funds were in a fragile financial position because of the need to fund portfolio working capital requirements, a systematic overvaluing of assets over time, a concentration in Level 3 assets, and requests for redemptions.

93.     The PPCO Master Fund had $5.7 million of cash on hand at the end of 2013. The PPCO Funds were not able to meet increased redemptions while funding working capital requirements, absent a large cash infusion from investments or subscriptions. This situation was exacerbated by the thin cushion of assets for which there was an active market and from which cash could be easily realized.

94.     Under Generally Accepted Accounting Principles, there are three types of assets:

- "Level 1" assets have "[v]aluations based on quoted prices in active markets for identical investments."

- "Level 2" assets, which have "[v]aluations based on (i) quoted prices in markets that are not active; (ii) quoted prices for similar investments in active markets; and (iii) inputs other than quoted prices that are observable or inputs derived from or corroborated by market data."

23

- "Level 3" assets, which have "[v]aluations based on inputs that are unobservable, supported by little or no market activity, and that are significant to the overall fair value measurement."

(*Financial Statements of PPCO Master Fund and Subsidiaries as of December 31, 2014 at 11*)[2]

95.     According to the PPCO Master Fund and its subsidiaries' Consolidated Condensed Schedule of Investments as of December 31, 2012, as of that date, "PPCO Master Fund and Subsidiaries" held investments having a total fair value of $306,588,145, including Level 3 assets having a total value of $270,251,902, Level 2 assets having a total value of $36,336,243, and Level 1 assets having a value of $0.  (*PPCO Master Fund and Subsidiaries' Financial Statements as of December 31, 2012 at 6*)

96.     According to the PPCO Master Fund and its subsidiaries' Consolidated Condensed Schedule of Investments for the year ended December 31, 2013, as of that date, "PPCO Master Fund and Subsidiaries" held investments having a total fair value of $317,371,713, including Level 3 assets having a value of $241,528,703, Level 2 assets having a value of $56,944,082, and Level 1 assets having a value of $18,898,928.  (*PPCO Master Fund and Subsidiaries' Financial Statements as of December 31, 2013 at 6*)

97.     Not only were the PPCO Funds' assets primarily made up of illiquid Level 3 assets, but some of the largest positions were significantly overvalued..

98.     During 2012 and 2013, the PPCO Funds began to experience increasing withdrawals (*i.e.*, redemptions). In 2012, the $55.9 million of contributions (subscriptions) barely eclipsed the $50.8 million of redemptions. In 2013, the $67.7 million of withdrawals

---

[2] PPCO Master Fund and Subsidiaries' Financial Statements for earlier periods included slightly different definitions for "Level 1," "Level 2" and "Level 3" assets.

24

(redemptions) exceeded the contributions (subscriptions) of $43.6 million.  However, PPCO also needed to invest in securities. The net effect of the fund's investment and capital activity was a net decrease in the cash balance from $7.2 million to $5.7 million.

99.     Around the end of 2013, Nordlicht also was not meeting some of the funding requests from PPCO's portfolio companies.  In an email to Nordlicht, dated November 26, 2013, Zach Weiner, a portfolio manager asked:  "Mark, Can you please give us an update on when we can expect some liquidity in PPCO for this week. We've pushed off everyone for a month now, but we really do need 80k for greentown, 50k for alcor… and 200k for daybreak… In addition, we need to pay 72K of receivership fees on RCKE prior to transferring the note to AYN.  We have knocked this down as much as possible but we are kind of at the end of that game now." These requests were occurring in a period when investors were increasingly redeeming.

100.    Thus, by the end of 2013, the financial condition of the PPCO Funds was fragile. The PPCO Funds were not in a state that also could  support the increasing demands from the PPVA Funds.

### 2.      The Liquidity Crisis at the PPVA Funds

101.    Beginning in 2012, the PPVA Funds faced a much more severe liquidity crisis than the liquidity issue experienced at the PPCO Funds.  That liquidity crisis was caused by several factors:  (a) the PPVA Funds' investments were concentrated in certain highly illiquid investments, including equity and debt positions in non-operating, unprofitable or distressed companies many of which were not publicly traded; (b) many of those investments were overvalued and could not be sold without realizing large losses; (c) many of these companies in which the PPVA Funds had invested required large infusions of capital; and (d) the PPVA Funds faced growing redemption requests from investors.

25

102.    Like the PPCO Funds' assets, the PPVA Funds' assets were highly illiquid Level 3 assets.

103.    According to PPVA Master Fund and Subsidiaries' Financial Statements for the year ended December 31, 2012, as of that date, PPVA Master Fund and its subsidiaries had held assets valued at $902,835,645, which included investments in securities valued at $787,846,738, $572,401,712 of which were described as Level 3 assets, $105,782,380 of which were described as Level 2 assets, and $109,662,646 of which were described as Level 1 assets.  (Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries Consolidated Financial Statements Year Ended December 31, 2012 at 4, 13)

104.    According to PPVA Master Fund and Subsidiaries' Financial Statements for the year ended December 31, 2013, PPVA and its subsidiaries had $1,000,181,360 in assets, which included investments in securities valued at $883,499,287, $669,742,575 of which were described as Level 3 assets.  (Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries Consolidated Financial Statements Year Ended December 31, 2013 at 7, 19, 32)

105.    According to PPVA Master Fund's and its subsidiaries' financial statements dated as of December 31, 2014, as of that date, PPVA and its subsidiaries had $1,036,530,945 in assets, which included investments in securities valued at $872,158,921, $756,432,286 of which were described as Level 3 assets.  (Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries Consolidated Financial Statements Year Ended December 31, 2014 at 7, 19, 32)

106.    Moreover, the lack of liquidity in the PPVA Master Fund's investment portfolio was exacerbated by the fact that many of the NAV's shown on its financial statements were greatly overstated and the companies in which it invested required constant and significant infusions of capital.

107.    As a result, despite the PPVA Funds' representations in their PPMs that the funds were liquid, the PPVA Funds routinely relied upon funds invested by new investors to pay redemptions, as PPVA's assets were concentrated in illiquid Level 3 assets that were grossly overvalued by the Platinum Defendants and did not provide PPVA with a source of readily available and adequate liquidity to meet its needs.

108.    Further, PPVA Master Fund's largest securities positions were in highly illiquid (and overvalued) limited liability companies and debt interests in overvalued companies in the volatile energy industry. For example, according to its financial statements for 2013 and 2014, as of December 31, 2013, $469,299,082, or 46.9%, of PPVA Master Fund's total assets, which were valued at $1,000,181,360, was concentrated in the energy industry, and as of December 31, 2014, $426,718,554, or 41.1%, of PPVA Master Fund's total assets, which were valued at *$1,036,530,945*, was concentrated in the energy industry – making its portfolio even more illiquid.

109.    As of December 31, 2012, approximately 37% to 43% of PPVA Master Fund's reported NAV consisted of its investments in two energy companies – Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator, and Golden Gate Oil LLC ("**Golden Gate**"), a California-based onshore oil operation.  *See* PPVA Action ECF No. 11-3, Ex. 22 .

110.    As of the fourth quarter of 2012, PPVA's investment in Black Elk was its single largest position.  However, after an explosion on an oil rig operated by Black Elk killed several Black Elk employees in 2012, the value of Black Elk dramatically decreased.  Nevertheless, PPVA Master Fund actually *increased* its valuation of PPVA Master Fund's investment in Black Elk during this same period.  At the time of the Black Elk explosion, approximately 40% of

PPVA Master Fund's total portfolio was worth significantly less than reported by the PPVA Master Fund, and the remaining "assets" were speculative and early-stage investments that would have required significant capital unavailable to PPVA for any hope of profitability. In the wake of the Black Elk explosion, Black Elk faced increasing liquidity problems throughout 2013.

111.    PPVA Master Fund also greatly overrepresented the value of its debt and equity positions in Golden Gate Oil. *See* PPVA Complaint at ¶¶ 170-190.

112.    According to PPVA Master Fund's 2014 financial statements, 28% of its entire NAV consisted of investments in two oil and gas exploration and production companies: $9,552,560 in debt securities and $140,000,000 in limited liability company interests in Golden Gate, and $5,000,000 in debt securities and $138,111,795 in limited liability company interests in Northstar Offshore Group, LLC ("**Northstar Offshore**"). While the true value of companies in the oil and gas industry was highly volatile, because it fluctuated with the prices of oil and gas on world markets[3], according to PPVA Master Fund's financial statements, the value of its investment in Golden Gate lost just over 21% of its value from 2013 to 2014. In addition, their valuations did not differentiate between proven reserves and unproven reserves.

113.    The liquidity pressures on the PPVA Funds were further exacerbated because they overreported their income, resulting in larger management fees than was justified. From 2012 through 2015, PPVA Master Fund reported that it had annualized returns of 11.58% (2012) to 8.76% (2015), with the lowest annualized return during that time period being 7.11% for FY 2013. It also reported that it had a return of 2.6% for the first three months of 2016, and a

---

[3] For example, on January 2, 2014, the WTI spot price (dollars to barrel) was $95.14; it then peaked in 2014 around $107/barrel in June 2014; by the end of 2014 it had fallen to approximately $53 per barrel; and thereafter it continued to decline.

cumulative return since PPVA's inception of 687.40%. The PPVA Funds also represented that their assets under management had increased steadily from $688 million on January 1, 2012 to $789 million as of October 1, 2015. *See* November 2012 PPM for the PPVA Offshore Feeder Fund, *Trott v. Platinum Management (NY) LLC*, No. 18-cv-10936, ECF No. 1-1, at Ex. 6 (S.D.N.Y.) Moreover, the principals of Platinum Partners paid themselves distributions, fees and other compensation from the PPVA Fund based, in part, upon returns.

114.     The illiquid nature of the PPVA Funds' investments, which were overvalued and underwater investments in need of constant infusions of capital, created severe problems for the PPVA Funds when investors sought to redeem their investments within the relatively short timeframes permitted under the PPVA Funds' limited partnership agreements and PPMs.

115.     Beginning in 2012, the PPVA Funds' capital withdrawals significantly exceeded contributions, and by 2014, the PPVA Funds' redemptions exceeded the sum of their liquid Level 1 and Level 2 assets, so that further redemptions would have required forced sales of illiquid Level 3 assets.  In this regard:

- During 2012, investors made $78.1 million in capital contributions in the PPVA Funds and made capital withdrawals of $170.6 from the PPVA Funds, so that capital withdrawals by investors from the PPVA Funds exceeded capital contributions by $92.5 million.

- According to PPVA Master Fund's financial statements, as of December 31, 2012, the PPVA Funds had Level 1 assets valued at $109.7 million, Level 2 assets valued at $105.8 million, and Level 3 assets of $572.4 million.  During 2013, investors made $60.3 million in capital contributions in the PPVA Funds and made capital withdrawals of $114.0 million, so that capital withdrawals by

29

investors from the PPVA Funds exceeded capital contributions by a total of $53.7 million.

- According to PPVA Master Fund's financial statements, as of December 31, 2013, the PPVA Funds had Level 1 assets valued at $104.2 million, Level 2 assets valued at $108.4 million, and Level 3 assets valued at $669.7 million. During 2014, investors made $95.6 million in capital contributions in the PPVA Funds, made capital withdrawals of $163.3 million from the PPVA Funds, so that capital withdrawals by investors exceeded capital contributions by $67.7 million in 2014. However, $16.5 million of the $95.6 million was SHIP money.

116.   The liquidity and solvency issues were far more serious at PPVA than at PPCO. By late 2012, Nordlicht and Landesman admitted that redemptions were "daunting" and "relentless," and in June 2014, Nordlicht wrote Landesman that "It can't go on like this or practically we will need to winddown....this is code red...We can't pay out 25 million in reds [redemptions] per quarter and have 5 come in." New subscriptions could not fund the gap and selling its concentrated illiquid positions would have exposed their serious and significant overvaluations. PPCO was used to prop up PPVA through a combination of intercompany transfers and asset purchases from PPVA at inflated valuations. PPVA used the proceeds it received to make redemptions and margin calls, and to prop up its own portfolio companies.

117.   The Platinum Insiders relied increasingly on wildly inflated valuations, and funds from PPCO to conceal the growing liquidity crisis at PPVA and to prop it up, while the insiders collected significant management fees (third-party advisors were also paid substantial fees).

### 3.   __Management Fees__

118.    For the period from 2014 through 2016, the PPCO Funds recorded more than $25.6 million of management fees. Management fees were levied on the Net Asset Value ("NAV') of the PPCO Master Fund. For example, according the PPCO Onshore Class B PPM, "The Master Fund will pay … a monthly management fee equal to 1/12th of 2% of the total aggregate month-end Net Asset Value of the Master Fund (2% per annum) before deduction of any accrued Management Fees or Performance Allocations and before any distributions or redemptions made during the month (and after adjustment for reduced fees, if any, charged to Special Members) (the "Management Fee")." [PPCO Fund LLC April 2013 PPM].

119.    The highly inflated valuations increased the PPCO Master Fund NAV, and resulted in ever increasing management fees. Management fees rose from $5.9 million in 2012, to $6.5 million in 2013, $7.9 million in 2014, reaching a high of $10.0 million in 2015, before dropping to $8.1 million in 2016. The management fees were excessive as they were based on highly inflated valuations.

120.    The Platinum Insiders took advantage of the excessive management fee to pay themselves while their investors were facing longer periods to receive redemption payments. In 2014, the Platinum Insiders distributed nearly $2 million from the management fees to themselves through guaranteed payments, distributions of profits, and allocations of charitable contributions. In 2015, the Insiders distributed another $2 million to themselves through allocations of charitable distributions and expenses.

121.    Moreover, as partners in the management company, the Platinum insiders benefited from the tax benefits flowing from the discretionary charitable contributions.

4.    **Incentive Fees**

122.    Furthermore, management received an incentive fee "at the end of each fiscal year, the General Partner … [will be paid] equal to 20% of the net income that would otherwise be credited to the capital account of limited partners...If there is a loss for the fiscal period, such loss is carried forward to future periods and no incentive allocation will be made to the General Partner until prior fiscal losses have been recovered." According to the 2014 PPCO Master Fund LP financial statements, incentive fees earned on 'performance' were allocated to the General Partner's capital account.

123.    The fraudulent valuations and ever increasing NAV's resulted in the accrual of substantial incentive fees of $8.1 million in 2012, to $8.4 million in 2013, $8.2 million in 2014, and $11.4 million in 2015. The Platinum Insiders were able to extract millions from these incentive fees through distributions and transfers to their capital accounts, amounting to $5.5 million in 2014, $11.5 million in 2013 and $3.0 million in 2014. The Platinum Insider reinvested a portion of the ill-gotten gains in capital accounts, permitting them to enrich themselves by redeeming in the future at higher valuations. The 2015 incentive fees were not paid out as the music stopped in 2016.

124.    The accrual and payments of management and incentive fees to the management company and the Platinum Insiders based on inflated valuations approved by the Platinum Insiders epitomize the self-dealing and conflicts disregarded by the Platinum Insiders. The PPCO Funds were harmed as the Platinum Insiders enriched themselves through millions of dollars of excessive management and unduly earned incentive fees.

**C.    The Creation of Beechwood**

**1.    Purposes of Beechwood**

32

125.    By 2013, in a severe liquidity crisis,  the PPVA Funds, as set forth above, needed constant cash infusions to prop them up and support growing redemptions from outside investors they could not control, as well as overvalued and illiquid assets that required increasing capital infusions.  (*See* SHIP Complaint, ¶ 17)[4]  As SHIP has alleged, Nordlicht, Huberfeld, Levy and Bodner could not attract investments directly from institutional investors because of their history of criminal convictions and civil liability.  (SHIP Complaint ¶¶ 17, 18)  As BCLIC has further explained, "'[f]or years, Platinum had little success attracting insurance-company money and considered starting a reinsurer to do so . . .'" (BCLIC Complaint, ¶ 6).

126.    To overcome these obstacles, in BCLIC's words, "Huberfeld and Nordlicht partnered and conspired with Defendants Moshe M. Feuer, Scott Taylor and David Levy to form a reinsurance company, Beechwood Re Ltd. ('Beechwood')," and "[t]he co-conspirators established Beechwood with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets and use those assets to benefit Platinum, thereby enriching Platinum's and Beechwood's owners." (BCLIC Complaint, ¶ 5)  In this manner, the Beechwood Insiders hoped to create a permanent source of capital that, unlike capital from the PPVA Funds' and the PPCO Funds' current investors, was unlikely to be withdrawn, in order to shore up the PPVA Funds and the portfolio companies in which the PPVA Funds had invested.

127.    As SHIP puts it, Beechwood was "formed as a mechanism to funnel money into Platinum Partners, L.P., a Manhattan-based hedge fund founded by [Nordlicht, Huberfeld and Bodner] to prolong their existing Ponzi-like scheme."  (SHIP Complaint, ¶ 15)  "In 2013, co-conspirators Nordlicht, Huberfeld, Bodner, Levy, Feuer, and Taylor formulated a scheme to

---

[4] Citations to the "SHIP Complaint" are to the original filed complaint.

create a new entity that would present the false appearance of being unrelated to Nordlicht, Huberfeld, or Bodner in order the attract institutional investors that Platinum itself could not attract directly." (SHIP Complaint, ¶ 48)

128.    As SHIP further has admitted, "[i]n addition to Beechwood's undisclosed role in propping up Platinum Partners, Feuer, Taylor, and Levy personally profited from the artificial and fraudulent valuation of Beechwood's asset holdings." (SHIP Complaint, ¶ 18)  For these purposes, Beechwood was established with both reinsurance and investment advisory businesses.

129.    Beechwood was a perfect vehicle:

    (a)    to prop up the PPVA Funds and prevent them from failing, by funneling money into them in order to enable them to keep pace with ongoing requests for investor redemptions and funding needs for portfolio investments;

    (b)    to act as a buyer of last resort;

    (c)    to enable the PPCO Funds to engage in further transactions designed to prop up the PPVA Funds;

    (d)    to falsely inflate the reported net value of the PPVA Funds and the PPCO Funds in order to justify overcharging the PPVA Funds and the PPCO Funds for unearned partnership shares and fees to insiders;

    (e)    to provide a new business into which to transfer the assets of the PPVA Funds, the PPCO Funds and the PPLO Funds, if those funds failed; and

    (f)    to prioritize the interests of the Beechwood Entities over the interests of the PPCO Funds, by, among other things, consistently subordinating the PPCO Funds' prior rights in common collateral to those of the Beechwood

Entities, and grating the Beechwood Entities put rights against the PPCO

Funds.

### 2.       The Beechwood Entities and Affiliated Individuals

130.    The effort to create Beechwood was coordinated by Nordlicht, Levy, Huberfeld,

Taylor, Feuer and Bodner, working out of Platinum Management's offices.  According to BCLIC

and WNIC, which later engaged with Beechwood, Huberfeld and Nordlicht "found Feuer and

Taylor, two professionals with excellent reputations who could serve as front men for a

purported reinsurance company and which could, through reinsurance agreements, obtain control

of trust assets for the benefit of furthering the Platinum fraud scheme and enriching scheme

participants," and "[t]hat company was Beechwood."  (BCLIC Complaint, ¶ 72)

131.    As BCLIC and WNIC have revealed:

> "Feuer had long known some at Platinum, whose executives were
> active in the same religious community on New York's Long
> Island.  He and Huberfeld served at a charity together, and Feuer's
> sister went to the same school as Platinum co-founder Mark
> Nordlicht . . . ."  The ties between them ran deep.

(BCLIC Complaint, ¶ 7 (quotation omitted)

132.    The majority ownership in, and ultimate control of, Beechwood was in fact held by

Nordlicht, Huberfeld, Bodner and Levy (in part through trusts), while Taylor and Feuer

maintained ostensible and nominal management authority, with Levy.

As BCLIC and WNIC put it:

> Beechwood was in substantial part owned by a series of family
> trusts in the names of Huberfeld and Nordlicht, as well as their
> family members (including spouses and children). Levy and his
> family trusts owned another 5%. Together, Huberfeld and
> Nordlicht controlled over 35% of Beechwood's equity, and with
> Levy's interest, they controlled 40%.

(BCLIC Complaint, ¶¶ 68)

35

5520108.6

133.    Moreover, Beechwood's investment professionals were a revolving door of Platinum Management personnel.  There were numerous other ties between Beechwood and Platinum Partners, including, among others:

(a)    Huberfeld's son and son-in-law worked for Beechwood and BAM;

(b)    Many of Platinum's employees (in addition to Levy) also worked for Beechwood, or consulted with Beechwood about significant matters;

(c)    Rick Hodgdon was on Platinum Partners' payroll through June 2015 and simultaneously was Beechwood's Chief Underwriting Officer;

(d)    Daniel Saks, a former Platinum Partners employee, served as BAM's CIO after Levy "resigned";

(e)    Naftali Manela, then CFO of Platinum Partners, performed services for Beechwood related to general operations; and

(f)    Eli Rakower, director of valuation at Platinum Partners, provided consulting services to Beechwood related to interaction with valuation firms that would value Trust assets.

134.    Beechwood included a complex web of entities related to an insurance and investment advisory business that were, at all relevant times, owned and controlled primarily by Nordlicht, Bodner, Huberfeld, Feuer and Levy.  The Beechwood Entities were devoted to the purposes of obtaining a more permanent source of capital for the PPVA Funds and getting monies to insiders of Beechwood and Platinum Partners.

135.    Initially formed in 2013, Beechwood Re was and is a reinsurer domiciled in Grand Cayman and regulated by the Cayman Islands Monetary Authority (the "**CIMA**"). On July 25, 2017, after this scheme was exposed, the CIMA placed Beechwood Re in

36

Controllership.   Approximately 68% of the beneficial ownership of Beechwood Re was beneficially held by various Beechwood Trusts created by Nordlicht, Bodner, Huberfeld and Levy.

### 3.       Roles and Ownership of Beechwood Entities and Affiliates

136.   Beechwood Capital Group LLC ("**Beechwood Capital**") is a New York limited liability company with its principal place of business in Lawrence, New York at the same address as Feuer's principal residence.

137.   Beechwood Investments was used as a vehicle by the founders of Platinum Partners (Nordlicht, Huberfeld and Bodner) to purchase all the preferred shares in Beechwood Re and Beechwood Bermuda.   The managing member of Beechwood Investments was N Management, LLC, a Nordlicht-controlled entity, and the other members of Beechwood Investments were entities owned or controlled by Nordlicht, Bodner, Levy or Huberfeld through various Beechwood Trusts. Beechwood Investments, an entity owned and controlled by Nordlicht, Bodner Huberfeld and Levy through trusts, owned all preferred shares of Beechwood Re.

138.   BAM I and BAM II served as investment advisors for Beechwood Re, Beechwood Bermuda and (by agreement) SHIP, and were controlled by Nordlicht, Bodner, Huberfeld and Levy through trusts.

139.   Beechwood Bermuda is a reinsurance company domiciled in Bermuda.

140.   BAM Administrative served as agent for the Beechwood Reinsurance Trusts and as agent and signatory on behalf of the Beechwood Re and Beechwood Bermuda in connection with certain transactions.

37

141.    BBLN-PEDCO Corp. and BHLN-PEDCO Corp. are special purpose vehicles that were managed by BAM Administrative.

142.    BRe BCLIC 2013 LTC Primary, BRe BCLIC 2013 LTC Sub, BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub (*i.e.*, the Beechwood Reinsurance Trusts) are insurance trusts that were managed by BAM Administrative.

143.    Beechwood Trust Nos. 1 through 20 (*i.e.*, the "**Beechwood Trusts")** are owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families.   The Beechwood Trusts, in turn, owned approximately 70% of the common stock of Beechwood Re.

144.    Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I (*i.e.*, the "**Beechwood Series LLCs**") were owned and controlled by Nordlicht, Bodner, Huberfeld and Levy through their families.   The Beechwood Series LLCs owned all of the membership interests in Beechwood Investments, which owned preferred stock in Beechwood Re.

145.    Taylor (through trusts) owned common stock in Beechwood and had managerial authority over the Beechwood Entities.   Until five years before forming Beechwood, Taylor had been an executive of Marsh & McLennan and COO for Merrill Lynch Wealth Management's Private Banking and Investments Group.   (During the immediately preceding five years, he was out of the insurance business.)

146.    Levy served as co-chief investment officer of Platinum Management together with Nordlicht.   Beginning in 2013, Levy was instrumental in the creation of Beechwood and served as chief financial officer and secretary of Beechwood Re and Beechwood Bermuda.   He was also chief investment officer of BAM I, the Beechwood asset management entity until 2014. Beechwood marketed Levy to potential clients as a member of its management team and

38

specifically highlighted Levy's eight years of experience with Platinum Management as key to Beechwood's future success.  In late 2014, in the wake of the "Black Elk" scheme, described below, Levy returned to Platinum Management, yet remained an owner of Beechwood.

147.    At all relevant times, Feuer (through trusts) owned common stock in various Beechwood Entities and had managerial authority over the Beechwood Entities.

148.    The common stock of Beechwood Re was held by Beechwood Holdings.

149.    Beechwood Holdings' equity, and the share capital of Beechwood Bermuda, was in turn owned by Feuer, Taylor, Levy, Nordlicht, Bodner and Huberfeld

150.    Nordlicht, Bodner and Huberfeld together owned nearly 70% of the common stock in Beechwood Holdings and Beechwood Bermuda, and held their shares through Trusts No. 1-19, in which each of their children were the beneficiaries.

151.    Levy held his common stock in Beechwood Holdings and Beechwood Bermuda as the beneficiary of Beechwood Trust No. 20.

152.    The principals of Platinum Partners and Beechwood Defendants also created BAM to manage and invest the assets obtained through reinsurance agreements with the Beechwood Reinsurance Companies.

153.    Nordlicht, Bodner, Huberfeld and Levy owned a controlling interest in BAM.

154.    Nordlicht, Huberfeld, Bodner, Levy, Feuer and Taylor caused the creation of another Delaware limited liability company, Beechwood Investments.

155.    The managing member of Beechwood Investments was N Management LLC, an entity controlled by Nordlicht.

156.    The other nine members of Beechwood Investments were denominated as Beechwood Re Investments, LLC Series A through Beechwood Re Investments, LLC Series I.

39

157.    Each Beechwood Series LLCs, in turn, was beneficially owned by Nordlicht, Bodner, Huberfeld, Levy and their families.

158.    In connection with the wrongdoing described herein, each of the Beechwood Defendants, the Beechwood Trusts, and the Beechwood Series LLCs, had a complete, or nearly complete, identity of managers, failed to adhere to any corporate formalities (such as meetings of the members or managers) and were alter egos of each other, and the Beechwood Insiders, with the Feuer FT and Taylor-Lau FT, completely disregarded the corporate separateness of, and were alter egos of, the entities in order to distribute proceeds to themselves that otherwise should have been paid to PPCO and its innocent investors.

### 4.    **Capitalization of Beechwood**

159.    To attract reinsurance business and also satisfy the requirements of regulators, Beechwood required a source or sources of capital.

160.    In the materials used to market the Beechwood reinsurance companies, the Beechwood Insiders indicated that they were capitalized with cash provided by Feuer, Taylor, Levy and certain investors.

161.    For example, Levy, Feuer and Taylor created and showed potential clients an "Unaudited Balance Sheet September 1, 2013," which stated that the Beechwood Reinsurance Companies held assets totaling $114,801,585, including over $37 million in shares issued by a publicly traded company and over $10 million in "cash and cash equivalents," but no liabilities. *See* PPVA Complaint ECF No. 1-5 at Ex. 41 (S.D.N.Y.).

### 5.    The Actual Form**ation of Beechwood**

151.    In or about February 2013, Levy and Nordlicht commenced working with Taylor and Feuer to create Beechwood

152.    That Beechwood was a Platinum Insider creation (in conjunction with Feuer and Taylor) is beyond question.  It is documented.

153.    On February 26 to 28, 2013, writing from "beechwoodcapitalgroup.com" email domains, Taylor and Feuer, copying Levy at his Platinum Management email address, discussed the execution of an NDA between Beechwood Capital and Alpha Re Limited, another reinsurance company.  *See* PPVA Complaint at Ex. 29.

154.    On or around April 17, 2013, Taylor drafted a memorandum intended to provide Beechwood's captive managers with an overview of Beechwood's corporate.  *See* PPVA Complaint at Ex. 31.

155.    On or about May 15, 2013, Levy executed initial due diligence documents for Beechwood Re as required by CIMA.  *See* PPVA Action, ECF No. 1-4 at Ex. 32 (S.D.N.Y.).

156.    On or about May 30, 2013, Levy emailed Nordlicht a draft term sheet for Beechwood Re.  *See* PPVA Complaint at Ex. 33.

157.    On or about May 31, 2013, Crystal O'Sullivan sent Levy an invoice for $25,000 for filing, licensing, legal, and administrative services in connection with the creation of the Beechwood Reinsurance Companies, so that Platinum Management could pay such fees on behalf of Beechwood.  *See* PPVA Complaint at Ex. 34.

158.    On June 4, 2013, Taylor emailed Levy under the subject "when you have a set of sample investment guidelines, please send them."  The text of the email states "I am creating our Beechwood Re [Beechwood Re] 'document.'" *See* PPVA Complaint at Ex. 35.

159.    On June 12, 2013, Taylor emailed Nordlicht, seeking Nordlicht's approval in regard to several potential "deal" opportunities for the Beechwood Reinsurance Companies.  See PPVA Complaint at Ex. 36.

41

160.   Also on June 12, 2013, Taylor sent Levy a general management and strategy document to assist Levy in drafting an unspecified "investment document."  *See id.*

161.   On June 16, 2013, Taylor emailed Levy a PowerPoint Presentation that he prepared entitled "Beechwood Re Investment Strategy & Guidelines Discussion Document" (the "**Beechwood Re Presentation**").  *See id.* At Ex. 37.

162.   The Beechwood Re Presentation identifies Levy as a key member of the management team, and touts his 8 years of experience with Platinum Management as a strategy for Beechwood's future success.  *See id.* at 12.

### 6.   Management and Operation of Beechwood

163.   From the time they were formed and at all relevant times thereafter, Feuer was Chief Executive Officer and Taylor was President of the Beechwood reinsurance companies.

164.   Levy served as BAM's Chief Investment Officer and Chief Financial Officer until the end of 2014, when he was replaced by Saks, another Platinum Management executive.

165.   At certain times, the management teams of Beechwood served and worked at the sole discretion of Beechwood's ultimate beneficial owners – Nordlicht, Bodner, Huberfeld and Levy -- and functioned as the alter ego of Platinum Management to the PPVA Funds' detriment.

166.   The management team of Beechwood was largely comprised of personnel employed by or otherwise connected to Platinum Management.

167.   For example, the Beechwood team included, from time to time, the following persons: (i) Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer"; and (iii) David Ottensoser, as "General Counsel"; and (v) Small, as the "Senior Secured Collateralized Loans PM."

42

168.    Although each of the foregoing persons had titles at the Beechwood, Entities they also were full-time officers or employees of Platinum Management.

169.    During the following two years, additional Platinum Management employees also worked at Beechwood or otherwise directed the activities of Beechwood.

170.    Stewart Kim, an employee of Platinum Management, simultaneously worked for Beechwood as its Chief Risk Officer until January 2015, when he became a full-time employee of Beechwood, having been hired by Feuer and Taylor as the Beechwood reinsurance companies' Chief Risk Officer.

171.    Ezra Beren, Huberfeld's son-in-law, was hired in January 2014 to be a portfolio manager at Beechwood after serving in a similar capacity at Platinum Management.

172.    After Levy left Beechwood to return to Platinum Management, Saks was hired to replace Levy as CIO of BAM.

173.    Manela and Eli Rakower, both employees of Platinum Management, provided extensive and regular consulting services to Beechwood while also employed by Platinum Management.

174.    BAM and the remainder of Beechwood operated out of Platinum Management's office space until at least the end of February 2014.

175.    Even after separate office space was set up, Levy maintained an office at Beechwood through at least 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

### D.    Beechwood's Obtaining Control of BCLIC's, WNIC's and SHIP's Funds

### 1.    Problems Experienced by Long-Term Care Insurers

176.    Beechwood needed investors to fuel the fraud that was created by the Beechwood Insidersto.  Because it was a startup reinsurer, and it would likely not have been able to transact with established life insurers, Beechwood targeted reinsurance with life insurance companies with limited, if any, options available to them.  Beechwood initially settled on long-term care ("**LTC**") insurers with troubled legacy portfolios.

177.    LTC carriers with legacy portfolios originated had long faced an environment in which claims payments kept increasing, and, in turn, the profitability of these legacy policies kept decreasing, while capital requirements kept multiplying.  These legacy policies were generally the early generation of long-term care policies with benefits and lower premiums that were no longer offered in the market. LTC carriers had already discontinued this line of business.

178.    A survey of LTC insurers revealed that faulty underwriting assumptions were the primary cause of the decline in the industry.  *See The State of LTC Insurance, the Market, Challenges and Future Innovations* ("The State of LTC Insurance"), published in May 2016 by the National Association of Insurance Carriers ("**NAIC**") and the Center for Insurance Policy Research. These faulty assumptions included:

(a)    Lower than anticipated interest rates: Over the life of the LTC policies, premiums are fixed while projected claims increase. Because long-term rates decreased in comparison to those assumes at policy origination, investment income earned from invested premiums, which was critical to profitability and capital generation, was lower than projected;

(b)    Lower than expected voluntary lapse rates: LTC policies are guaranteed renewable, *i.e.* they can only be cancelled for non-payment of premiums.

Because lapse rates were lower than anticipated, insurers had to keep making claim payments; and

(c)    Lower than expected morbidity and mortality of policy holders (actual vs. expected).

179.    Various industry experts and publications repeatedly emphasized the difficulty LTC insurers historically faced and continued to face, and how few options were available to them to manage their long-term care exposure.  Notable statements to this effect include:

(a)    "LTC insurers have been subject to a perfect storm in recent years, with claims costs higher than expected, lapse and mortality rates much lower than the carriers expected, and interest rates dramatically below what was priced into the product,"  Dawn Helwig, Director of Milliman Inc., (August 24, 2013);

(b)    "We're not aware of a single company that has consistently earned targeted rates of return (referring to insurers with LTC business)," Pressures Still Present in Long-Term-Care Insurance, RBC Report (August 26, 2013);

(c)    "If LTC carriers had used a mortality table used to price individual annuities as opposed to the table that they did use (1994 Group Annuity Mortality table)... they would have come up with mortality rates 36% to 40% less than what the carriers ultimately ended up using. This factor alone amounting to premium shortfalls of ~14%," Life and Health Insurance, RBC Report (January 26, 2015); and

(d)     "Society of Actuaries Presentation in 2014 Seemed to Suggest LTC Reserves Understated by as Much as 50% and Several Industry Experts Agree," US Life Insurance Report, Credit Suisse (April 10, 2017).

180.    By 2012, having been burned by legacy LTC portfolios, had become increasingly unprofitable for insurers to write, and insurers had been exiting the business of writing new LTC policies on masse, while attempting to manage their increasingly costly legacy portfolios and searching for ways to underwrite new LTC policies amid increasing concern about their claims uncertainty.  In fact, according to *The State of LTC Insurance*, between 2002 and 2012, due to the factors discussed above, new sales of LTC policies declined by approximately 70%.  During that same approximate time period, in the absence of any appetite for opportunistic acquisitions of legacy LTC companies, the number of carriers writing LTC policies declined by over 90%. (*See The State of LTC Insurance*; and the 2002 and 2015 *Broker World Surveys.*)

181.    Confronted with increasing risk, declining profitability and growing capital requirements, LTC insurers also struggled with minimal to non-existent means of offloading risk, especially for their legacy portfolios.  Reinsurance for such risks was scarce.

182.    Reinsurance is the transfer of part or all of the risks that a direct insurer (referred to as the cendant) of a single policy or pool of insurance to a second insurance carrier, the reinsurer, who typically has no direct contractual relationship with the insured. The transfer of risk involves the contractual transfer of all or an agreed upon portion of future claims liabilities to the reinsurer (referred to as the process of ceding policies and related anticipated claims liabilities by the insurer to the reinsurer; the reinsurer in turn assumes the policies and related claims from the insurer) in exchange for a negotiated cash consideration.

46

183.     The cash consideration begins with an assessment by the reinsurer of the anticipated future claims for the portfolio of insurance policies, which may diverge from the actual anticipated future claims of the primary insurer. The cash consideration could also include adjustments including a ceding commission (paid typically by the reinsurer back to the insurer as compensation for originating the policies) as well as consideration for other balance sheet statutory liabilities transferred to the reinsurer. In certain transactions, such as with legacy LTC policies, uncertainty around claims could be so extreme that the transaction can only be consummated with a negative ceding commission. Put another way, the reinsurer expects to be compensated for assuming the policies.

184.     This reinsurance risk transfer permits the ceding insurance company to write and assume individual risks that are greater than its capital size would allow. Reinsurance also protects insurers against catastrophic losses or volatile loss forecasts. It permits the insurer to smooth out its financial results of an insurance company, making them more predictable to reinsurance facilitates long term business planning. Rating agencies tend to view this reduction in volatility and loss uncertainty more favorably.  High ratings (especially investment grade) are critical to insurance companies both for originating new business and to lower borrowing costs.

185.     Due to the extreme challenges facing LTC carriers, by 2012, reinsurance was available only under extremely onerous terms in which the ceding insurance company would have to make significant payments (negative ceding commissions) to reinsurers to complete such transactions.

186.     Comments from various reinsurance executives regarding the problems with reinsuring legacy LTC lines are revealing:

(a)     "Okay. So U.S. long-term care is a very difficult line to write. Historically, we wrote a little bit of it and, quite frankly, our experience was not absolutely fantastic. So we -- a while ago, we have stopped writing it. We still have a little bit reserves left, long-term care reserves left in our book, but it is absolutely immaterial right now. We do not actively write this line of business... it's potentially also very tricky for insurers to write it. And right now, I feel we have not yet cracked the codes related to coming up with a solution that would make sense…,"  Swiss Re Ltd, 3Q14 Earnings Call on November 7, 2014;

(b)     "So we've looked at a number of in-force legacy LTC blocks over the years, and I think we've been reporting that we just haven't been able to find a legacy block and a transaction that works for us. So we concluded, after a few years, that the likelihood of finding a deal where we could be successful was pretty low. So we essentially stopped pursuing those type of deals. However, we may, from time to time, look at blocks that either don't have all of the risk characteristics of those typical legacy blocks that we've explored time and time again or, perhaps, where a solution may involve the transfer of some of the elements and not all of the elements of the underlying risk, but what I will say is that we've taken a conservative approach at looking at legacy blocks. And we're going to continue to take that conservative approach to any opportunities that arise, and that's not going to change going forward," Reinsurance Group of America (RGA), 1Q17 Earnings Call on April 28, 2017; and

48

(c)    We're not particularly looking to buyblocks of business just to keep growing in that particular marketplace unless we can fund them…priced", RGA 1Q2013 Earnings Call on April 26, 2013.

187.    In sum, as one reinsurance industry expert put it, "[m]utually agreeable transactions [were] becoming increasingly difficult to craft.  Even as recently as ten years ago, insurers that sought to cede their legacy LTCI risk expected to be paid outright to do so at little cost to them.  That is no longer the case:  an LTCI cendant now must be willing to pay to offload the risk."  Stahl, *To Cede or Not to Cede: Overcoming the Hurdles to Ceding Legacy LTCI Risk* (2017), at p. 18.

188.    Similarly, the then head actuary at Beechwood described the overall environment as:  ". . .And not only were the carriers dropping out of the business, but reinsurance was not exactly attainable, either.  No reinsurer wanted this business that many viewed as being challenging.  For the same reasons the issuing companies didn't want it, the reinsurers weren't lining up to take it away from them."  Keslowitz, *LTC Transactions:  After So Many Years of No Interest, Why Now?* (April 2015), at p. 9.

189.    With few affordable reinsurance options, incumbents in the market attempted to mitigate their LTC risk by drastically changing underwriting guidelines for new policies on the one hand, and on the other hand, creating discontinued lines of business out of their legacy LTC portfolios (referred to in the industry as closed blocks of business), gradually acknowledging the reality of increasing future claims on their balance sheets, and then requesting state insurance regulators for permission (though not always successfully) to raise premiums on the legacy LTC policy holders.

190.    State regulators, in turn, expressed increasing reluctance to permit such large required rate increases. Despite rate increases, industry experts believe that these legacy LTC policy portfolios were under-reserved by as much as 50% *See* Credit Suisse US Life Insurance Industry Presentation, April 10, 2017.  These industry issues also directly led to LTC insurance companies filing for rehabilitation and then liquidation.  Penn Treaty was a notable large liquidation which had over $1 billion in assets prior to going into rehabilitation proceedings. Penn Treaty policy holders are not expected to be able to collect the full amount of their claims.

### 2.    CNO's Hemorraghing LTC Portfolio: Its Spin Off of SHIP, the Creation of Fuzion, and the Runoff of BCLIC and WNIC with the Assistance of Fuzion

191.    Against this backdrop, CNO was struggling to manage its sizable LTC portfolio.

192.    CNO had long expressed a desire to find ways to mitigate its exposure to legacy LTC policies.   Similar to other industry players, CNO was primarily concerned with the uncertain and increasing claims projections (due to higher morbidity, lower mortality and lower lapse rates for policy holders than projected when the policies were underwritten) for these LTC policies. For example, in an earnings call in April 2008 (CNO Financial Group, Inc. FQ4 2007 Earnings Call, Apr 01, 2008), Edward Bonach, then CFO of CNO stated:

> When we talked about decreasing our weight in long-term care that was a long-term objective, it was sort of a strategic objective because too great a proportion of the company's earnings were coming from long-term care. And it's a very volatile business, and it doesn't make sense for a company of our size to have as much as we have."

(Exiting the Market: Understanding the Factors Behind Carriers' Decision to Leave the Long-Term Care Insurance Market, U.S. Department of Health and Human Services Assistant Secretary for Planning and Evaluation Office of Disability, Aging and Long-Term Care Policy, July 2013)**.**

50

193.    The investment income from premiums collected on these policies was also lower than projected in an environment of low interest rates.  CNO provided more than $915 million to SHIP over a ten year period.  These events led CNO to spin off SHIP, formerly Conseco Health Insurance Company, which held a closed-block book of legacy LTC policies, in November 2008 (Conseco Inc., Q4 2008 Earnings Call, March-31-2009).

194.    In the months leading up to this spinoff, during an earnings call, CNO stated: "We (CNO) have talked about looking at and considering strategic alternatives while there may be other strategic moves that we make, there is unlikely to be any single strategic move in the near term that approaches the significance of transferring the bulk of the run-off block to a trust for a contribution of $175MM."  (CNO Financial Group, Inc. NYSE:CNO FQ2 2008 Earnings Call Transcripts Tuesday, August 12, 2008)

195.    As CNO's rating agencies observed, CNO's goal in spinning off SHIP was to reduce the strain on CNO from the continued ongoing support of SHIP's underwriting losses. For example, in August 2007, Standard & Poor's opined that "[i]f the CSHI run-off block continues to generate significant losses, further affecting interest coverage, the ratings on Conseco, Inc. and the core operating companies will likely be lowered."  (Plan to Transfer Conseco Senior Health Insurance Company to Independent Trust, August 11, 2008)  Similarly, A.M. Best wrote:  "Conseco has contributed roughly $220 million of capital to CSHI over the last year … The recurrence of these charges has exceeded A.M. Best's expectations; as a result A.M. Best remains highly cautious on the future performance of the LTC block and has diminished confidence in Conseco's ability to generate consistent operating results in the near to medium term."

51

196.   During and after the financial crisis of 2008, CNO faced significant liquidity issues at the holding company level as well as losses in its investment portfolio.  These problems caused CNO to delay filing its 2009 Form 10-K in order to satisfy its auditors' concerns about the ability of the company to continue as a going concern.   Given the financial support the company had provided to one of its LTC carriers, SHIP, over the years, including over $220 million in the course of the immediately preceding years (Plan to Transfer Conseco Senior Health Insurance Company to Independent Trust, August 11, 2008), CNO determined a spinoff of SHIP was critical to CNO's financial well-being.

### 3.   CNO's Spinoff of SHIP

197.   At the time of the spinoff, SHIP was the solvent run-off of a diminishing closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into, Conseco Senior Health Insurance Company (as SHIP was then known) between 1997 and 2000.  Conseco Health Insurance Company was originally a wholly-owned subsidiary of Conseco, Inc. (CNO's predecessor).   Following substantial and ongoing underwriting losses, SHIP stopped underwriting new business in 2003 and began working with the Pennsylvania Insurance Department to develop a run-off strategy, paying off claims of policyholders until the policies terminated.  This had the effect of restricting access to capital and sources of income to fixed policyholder premiums and investment income.

198.   From 2008 through 2017, CNO and its subsidiaries made approximately $915 million in capital contributions to SSHI (SHIP's predecessor under CNO), including approximately $220 million in capital contributions from January 1, 2006 through June 30, 2007. (Plan to Transfer Conseco Senior Health Insurance Company to Independent Trust, August 11, 2008                ("SHIP                Plan,"                at                7,                11,

52

http://s1.q4cdn.com/448338635/files/doc_presentations/CSHI_Separation_Transaction_8.10.08.
pdf)

199.    In November 2008, ownership of SHIP was transferred from a wholly-owned
subsidiary of Conseco, Inc. to the Senior Healthcare Trust, which was then merged into an
independent oversight trust, the Senior Healthcare Oversight Trust ("SHOT"), and the
company's name was changed to "Senior Health Insurance Company of Pennsylvania."  The
Trustees of SHOT serve as SHIP's directors and are primarily former insurance regulators.

200.    At the time of the transfer, CNO and its subsidiaries contributed $164 million of
capital to SHIP to add to SHIP's existing $125 million of adjusted statutory capital, reflecting
concerns that SHIP would need additional capital to sustain itself on a standalone basis.  *See
SHIP Plan.*

201.    Today, spun off from CNO, SHIP is a LTC care insurance company that remains
in runoff.  SHIP is domiciled in Pennsylvania and is licensed in every state except Connecticut,
New York, Rhode Island and Vermont. (Report of Examination of Senior Health Insurance
Company of Pennsylvania, Harrisburg, PA, As of December 31, 2013; Senior Health Insurance
Company of Pennsylvania, Statutory Financial Statements, December 31, 2014 and 2013)   It is
operated from the same site in Carmel, Indiana as it operated while under CNO's control, along
with CNO's other LTC legacy portfolios, BCLIC and WNIC.

202.    SHIP is responsible for funding the covered long-term care expenses of its elderly
policyholders.  When all of SHIP's policies and other obligations have been satisfied, proceeds
from the liquidation of SHIP, if any, will be disbursed by SHOT to a common law trust, which at
that time will select an ultimate beneficiary.

5520108.6

203.    Both SHIP and SHOT operate for the exclusive benefit of policy holders.  SHOT is a business trust organized under the laws of the state of Pennsylvania and is governed by a Board of Trustees.

### 4.      The Creation of Fuzion

204.    Fuzion, a wholly-owned subsidiary of SHOT, was formed in 2012 to provide insurance data analytics capabilities to LTC insurance companies, including SHIP.  In or about December 2013, pursuant to a comprehensive master services agreement, SHIP transferred its employees (former employees of CNO) and physical assets to Fuzion to provide comprehensive management services to SHIP. (Report of Examination of Senior Health Insurance Company of Pennsylvania, Harrisburg, PA, as of December 31, 2013)

205.    This agreement replaced an administrative services agreement that had been in place with Fuzion until that time.  Fuzion's employees were formerly CNO employees, who moved to SHIP following its spinoff from CNO.  According to SHIP's statutory financial statements for the years 2014 to2017, as consideration for its services, upon information and belief, Fuzion received substantial payments in the range of approximately $15 million to 18 million during the years from 2014 through 2017 for managing SHIP (SHIP's payments to affiliates) (SHIP Statutory Financial Statements for 2014-2017). SHIP is entirely staffed by Fuzion employees, located in the same office complex in Carmel, Indiana as SHIP, BCLIC and WNIC.

206.    Fuzion also "act[ed] as a third-party policy and claims administrator for policies of long-term care business issued by various insurers," (SHIP Complaint, ¶ 11), including, as set forth below, BCLIC and WNIC.

### 5.      CNO's Continued LTC Struggles with BCLIC and WNIC

54

207.    Even after spinning off SHIP, CNO's legacy LTC lines continued to flounder, dragging down CNO's financial performance.  Consequently, CNO continued to devise ways to remove its subsidiaries' – BCLIC's and WNIC's -- legacy LTC business from its balance sheet and mitigate further risk.

208.    At CNO, a common set of holding company board members and executive management directed the financial and risk-management decisions of individual insurance companies in the group. Further, the operations of individual insurance companies were integrated across entities, including common marketing operations. The holding company received dividends from its subsidiaries to fund its operations including operating expenses and interest expense on debt issued at the holding company level. The debt issued at the holding company level was guaranteed by its subsidiaries.

209.    CNO was being run for the benefit of its shareholders and its executives were incentivized as such. The value of CNO stock derived from its ownership of the insurance subsidiaries. All earnings calls are directed and addressed by the executive management of CNO – they addressed business and financial strategy across all operating insurance companies. The rating agencies in their assessments of CNO acknowledged this unified management of CNO. In their credit and ratings reviews for the holding company, they frequently assessed transactions undertaken at the insurance company level.

210.    40|86 Advisors, a registered investment advisor and wholly owned subsidiary of CNO, manages the investment portfolios of CNO's insurance subsidiaries.  Upon information and belief, the chief investment officer of 40|86 also served as an executive officer of the insurance subsidiaries, WNIC and BCLIC.

211.   In view of the direct impact on CNO's ratings, and, therefore, access to capital, CNO, and its wholly-owned subsidiary, 40/86 Advisors, directed the activities of BCLIC and WNIC, described below, with respect to efforts to reduce and mitigate its LTC exposure, particularly, though contracting with Beechwood.  The actions that BCLIC and WNIC undertook with respect to Beechwood alleged herein were directed by, and for the benefit of, CNO by executive management of CNO.

212.   In May 2010, CNO announced that it would be segregating its legacy LTC (BCLIC and WNIC) and other interest-rate sensitive life insurance, annuity and supplemental policies into a separate subsidiary, called Other CNO Businesses ("**OCB**").  The purpose of this action was to provide a sharper focus on improving the results of these legacy policies and to bring transparency to relatively better performance of the rest of the company's operations, which were profitable while OCB was not.

213.   CNO also continued to make rate filings with insurance regulators requesting increases in premiums on its legacy LTC policies in order to offset increasing losses in CNO's legacy LTC portfolio, which had now been mostly segregated into its OCB segment. (3Q 2010 Earnings Presentation)  As discussed on the year-end 2012 earnings call, the OCB segment continued to be volatile and the company continued to add modest reserves to this segment. (Earnings transcript for Q4 2012)  The company also disclosed in its year-end 2012 investor presentation that it was reviewing reinsurance strategies for its OCB segment. CNO also continued to make rate filings with insurance regulators requesting increases in premiums on its legacy LTC policies.  (December 2012 Investor Presentation)

214.    At a J.P. Morgan Insurance Conference presentation in March 2013 Frederick J. Crawford, the then EVP of CNO, in response to a question regarding his "comfort level" with CNO's long-term care business, described it as follows:

> Yes, so long term care, we sometimes like to call it a 4-letter word at the company, because it's certainly dealt with that way by both rating agencies and investors, and for good reason. The track record is anything but stellar, and it's proving to be one of the more complicated businesses to manage consistently and profitably overtime.  And a couple of things to recall about CNO, one is don't lose sight of the fact that we took $3 billion of the truly longer and fatter tail long-term care business, and walled that off completely from the company in a trust. We effectively mutualized it, we have no risk on that business or even affiliation with that business, and so that was a very important move that was made back a number of years ago, pre-crisis.

(CNO Financial Group, Inc. Presents at JPMorgan 2013 Insurance Conference, Mar-21-2013)

215.    CNO also discussed accelerating the runoff of the OCB business through sales or reinsurance, because the business produced "zero return."  (CNO Financial Group, Inc. Presents at Citigroup US Financial Services Conference, Mar-06-2013)

216.    At the same conference, Edward Bonach, in response to a question about the state of the long-term care business responded: "To my earlier comment, any industry that isn't attracting capital eventually dies.  We don't see that as good that the long-term care industry is retracting or that the number of companies actively selling in it is reducing."  He also expressed concern that not all regulators were permitting premium increases on long-term care policies even though he believed that many middle income Americans would need it, stating "[s]o we hope that it doesn't continue on that vein, but it needs some regulatory cooperation and certainly interest rates being above where they are now would also help the industry in general."  During this call, he further indicated that he was going to continue to request regulators for premium

increases and was hopeful that the industry would attract new capital in the form of "re-insurance M&A."

217.    By 2013, CNO was managing its business through the four operating segments: BCLIC, WNIC, Colonial Penn, and Other CNO Business. BCLIC marketed and distributed Medicare supplement insurance, interest-sensitive life insurance, traditional life insurance, fixed annuities and LTC insurance products to the middle-income senior market. WNIC marketed and distributed supplemental health (including specified disease, accident and hospital indemnity insurance products) and life insurance to the middle-income market. The Colonial Penn segment marketed graded benefit and simplified issue life insurance directly to customers. The Other CNO Business segment consisted of blocks of interest-sensitive life insurance, traditional life insurance, annuities, long-term care insurance and other supplemental health products.  These blocks of business were not actively marketed.

218.    While CNO continued to focus on finding ways to runoff its OCB segment, it gradually shifted its LTC in-force mix towards shorter duration, limited benefit products, as compared to legacy policies. In an earnings update call in December 2013, Bonach, the then CEO of CNO discussed the rating agency perspective of the long-term business and legacy long-term care, stating "..the reality is that long-term care is a very low-rated product on the scales of the rating agencies...I would say they watch carefully our run-off blocks of business. They have proven to be a historic level of volatility and earnings surprises, and so they realize that the management of those run-off blocks and how we entertain strategies around that, play off so into their view of the forward beta of the company." (CNO Financial Group, Inc., 2014 Guidance Update Call, December 18, 2013)

219.    In an earnings call on February 12, 2014, Scott Perry, CNO's then Chief Business

Officer, described  CNO's overarching goal for its LTC line of business as follows:

> Having a robust marketplace that includes private long-term care
> options is important for our country as it will reduce the burden on
> already-strapped state Medicaid programs.  Despite this growing
> need, long-term care presents many challenges as insurers work to
> balance the need to price products profitably with providing
> affordable solutions for consumers.  While new products currently
> offered in the marketplace are significantly different than products
> of the past, older blocks of the business continued to be a challenge
> in recognizing that re-rate actions are becoming increasingly more
> difficult than the current regulatory environment.  At CNO, we
> continue to actively work our in-force block via rate actions and
> diligent claims management. Our current long-term care products
> generally provide limited benefit periods, and this is slowly
> shifting our in-force to a lower overall risk profile.  Over the long
> range, we are focused on working with the regulators, legislators
> and industry partners to address this important need, and CNO
> remains committed to serving the needs of its customers by
> offering long-term care products.

(CNO Financial Group, Inc., Q4 2013 Earnings Call, February 12, 2014)

220.    Thus, by 2014, CNO, for its own benefit and that of BCLIC and WNIC, already

had a lengthy history of trying to reduce its LTC exposure due to concerns about the uncertain

and increasing claims projections (due to higher morbidity, lower mortality and lower lapse rates

for policy holders than projected when the policies were underwritten) for those policies, and

that investment income from premiums collected on these policies was lower than projected in

an environment of low interest rates.  This made its subsidiaries, BCLIC and WNIC, prime

candidates to furnish the assets that Beechwood's founders would need to fuel the fraud they

planned to perpetrate.

### 6.    SHIP's Continued Struggles

221.    After CNO spun off SHIP, SHIP's financial condition continued to decline and

SHIP's LTC portfolio continued to incur significant unforeseen increases in claims (in insurance

industry parlance, claims due to adverse development) totaling over $200 million in the five-year period from 2009 through 2013.  During this period, SHIP's loss ratio, *i.e.*, the ratio of claims to premiums, steadily increased, an indication of declining operating performance.  (2009-2013 SHIP Statutory Financial Statements)  Net investment income also declined, and was likely to continue to decline as SHIP's portfolio shrank from the need to make claims payments, in an environment of flat to declining interest rates from reinvestment at lower investment yields. Consequently, SHIP's financial condition continued to deteriorate.

222.    SHIP had long had adverse loss experience in its LTC portfolio, which negatively affected its regulatory surplus.  If its regulatory surplus were to decline below a certain threshold level, the Indiana Department of Insurance could exercise certain enforcement powers, including placing the company into receivership and ordering liquidation.

223.    Following its spinoff from CNO, SHIP continued to be financially distressed. For instance, in 2013, SHIP's statutory reserves of $2.7 billion were over 30 times its statutory surplus of $90 million, implying that it was extremely vulnerable to further unexpected losses in its runoff portfolio.

224.    Thus, by 2014, SHIP was in dire straits.  It also had no, or virtually no, options for obtaining reinsurance or other arrangements for offloading any of its LTC risk, and, accordingly, it was a prime candidate to furnish the funds that would be used in Beechwood's fraud.

### 7.    BCLIC and WNIC's Introduction to Beechwood

225.    In 2013, CNO and 40/86 began to look for reinsurance CNO's legacy LTC policies at BCLIC and WNIC.

226.    As part of that process, Rick Hodgdon (then an employee of Willis Re Inc. ("*Willis Re*") and later a Platinum and Beechwood employee) and Michael Kaster (a former

CNO employee with familiarity with the LTC portfolio) of Willis Re, a reinsurance subsidiary of Willis Group Holdings plc, introduced CNO to Beechwood Re, which, by all appearances, was a new insurance company with no existing business at this time, domiciled in the Cayman Islands. (BCLIC Complaint, ¶¶ 53, 54)

227.    BCLIC and WNIC allege that they "went to the reinsurance marketplace to seek certain long-term care blocks of business," that "[s]everal reinsurers were interested in the business, including Beechwood," and that "Hodgdon purportedly joined Beechwood while Plaintiffs were evaluating competing reinsurance proposals."  (BCLIC Complaint, ¶¶ 10, 54)  In actuality, as forth above, by 2013, reinsurance capacity for books of legacy LTC business, such as those of BCLIC and WNIC, was unavailable or virtually unavailable.

228.    In November 2013, CNO, BCLIC and WNIC began conducting due diligence on Beechwood.  (BCLIC Complaint, ¶ 66)    BCLIC and WNIC claim that, as part of that due diligence, they "made several inquiries to Feuer and Taylor about Beechwood's ownership structure and capitalization," but that "Feuer and Taylor repeatedly told Plaintiffs that Beechwood was mostly owned by them personally, as well as Levy, and that they had capitalized Beechwood with their families' investments and with monies earned during their successful careers."  BCLIC further claims that "[w]hen Feuer and Taylor asked Beechwood about these family trusts, Beechwood refused to identify the investors, citing to 'confidentiality agreements,'" at which point BCLIC and WNIC claim that they accepted Feuer and Taylor's "represent[ations] to [them] that these minority interests represented purely "passive" investments."  (BCLIC Complaint, ¶¶ 66, 67)

229.    In marketing materials that were provided to CNO, for itself and BCLIC and WNIC, Beechwood Re was described as being formed to provide offshore reinsurance capacity

to Life, Accident and Health Insurance companies "seeking improved capital efficiency through reallocations of surplus." (Beechwood Re, Investment Strategy & Guidelines, Discussion Document, September 2013) Those materials also indicated that Beechwood would manage investments directly and through third-party managers across multiple strategies.

230.   BCLIC and WNIC further allege that "Defendants repeatedly advised [BCLIC and WNIC] in writing, that the reinsurance trust assets would be managed responsibly, with proper risk management, for the benefit of policyholders" at a time when "Beechwood was a new reinsurance company with no existing business." (BCLIC Complaint, ¶¶ 55, 60) No prudent insurer would have accepted all these representations at face value.

231.   Further, while BCLIC and WNIC claim that the insiders "*hid* Beechwood's deep ties to Platinum" (BCLIC Complain, ¶ 27), the connection between the two groups was hidden in plain sight. BCLIC and WNIC themselves acknowledge that Beechwood had "deep ties to Platinum." (BCLIC Complaint, ¶¶ 27, 36) These "deep ties" would have been readily apparent to any prudent insurer who investigated. In its marketing materials, Beechwood cited Levy's track record as the basis for investment returns for funds invested with Beechwood Re. Yet Levy's biography, which was included in the marketing materials provided to CNO, BCLIC and WNIC, described his extensive experience as a portfolio manager, which had been at PPVA Master Fund and was easily determinable. Moreover, this fact would have been obvious from even a cursory background check on him. The investment strategies that Beechwood Re described for its reinsurance clients closely matched Levy's own experience at the PPVA Funds.

232.   As BCLIC and WNIC acknowledge in their pleadings, "no insurance company would invest in Platinum or enter into a reinsurance agreement with a reinsurer tied to Platinum."

(BCLIC Complaint, ¶ 41)  Yet that is exactly what BCLIC and WNIC chose, with eyes wide open, to do.

233.    In November 2013, BCLIC and WNIC sent a team to meet with Beechwood.  As BCLIC acknowledges, in connection with that meeting, Hodgdon … sent [BCLIC and WNIC] an email dated November 5, 2013, identifying the representatives from Beechwood who would be attending the BCLIC and WNIC." (BCLIC Complaint, ¶ 63)   As BCLIC has acknowledged:

> Beechwood, through Hodgdon, advised Plaintiffs that the following Beechwood personnel would join the meeting: Feuer and Taylor; Will Slota, who was designated as the "COO" of Beechwood; Paul Poteat, who was designated as the "CTO" of Beechwood; David Ottensoser, who was designated as the "General Counsel" of Beechwood; Dan Small, who was designated as the "Senior Secured Collateralized Loans PM" of Beechwood; and David Leff, who was designated as the "US Fixed Income PM" of Beechwood.

(BCLIC Complaint, ¶ 64)

234.    Although BCLIC and WNIC claim to have only recently discovered that "Slota, Poteat, Ottensoser and Small were at that time employees of Platinum, not Beechwood" (BCLIC Complaint, ¶¶ 65, 66), most, if not all of, of these individuals' ties to Platinum Partners were discoverable online, and still are.

235.    Meanwhile, Beechwood was anxious to get BCLIC and WNIC's money into Platinum Partners.  For example, in an e-mail dated 2013, Nordlicht informed Naftali Manela: "Hoping for beechwood money by then," to enable him to pay a $2 million redemption by December 15, 2013.

236.    On February 1, 2014, Fuzion, entered into a Master Services Agreement with Beechwood Re pursuant to which Fuzion agreed to administer the LTC insurance policies that had been reinsured with Beechwood Re by WNIC and BCLIC with the approval of their respective regulators. (SHIP Complaint, ¶¶ 11, 43)   By February 1, 2014, the task of

administering the long-term BCLIC and WNIC policies in the Reinsurance Agreement was delegated to Fuzion, whose employees (as employees of SHIP under the CNO umbrella) had long been providing that service to SHIP.

### 8.     The BCLIC and WNIC Reinsurance Agreements

237.    Effective October 1, 2013, BCLIC and WNIC ceded substantially all of their long-term care business to Beechwood Re Ltd. in a 100% reinsurance transaction.   The transaction closed on February 18, 2014.  As part of the transaction, WNIC ceded $357 million of statutory reserves, and paid $394 million in cash to Beechwood Re.  (WNIC Statutory Basis Financial Statements for the Years Ended December 31, 2014 and 2013)  This amount mainly consisted of $357 million to cover the future losses from the policies plus a "negative ceding commission" of $42.2 million as additional cushion less certain transaction true up payments. (BCLIC Complaint, ¶ 74)

238.    Similarly, BCLIC ceded $196 million of statutory reserves, and paid $198 million in cash to Beechwood Re.  This amount mainly consisted of $196 million to cover the future losses from the policies plus a negative ceding commission of $1 million as additional cushion less certain transaction true-up payments.  The transaction was approved by the appropriate state insurance regulators.

239.    Because Beechwood Re was an unauthorized offshore reinsurer (*i.e.* domiciled outside the states of New York and Indiana where BCLIC and WNIC were domiciled), it was required to create on-shore reinsurance trusts (the Reinsurance Trusts) to manage the assets received in the reinsurance transaction.  Wilmington Trust was the trustee for each of the Reinsurance Trusts. BAM was the asset manager. Fuzion was chosen to be the administrator of the reinsurance policies.

240.    As BCLIC and WNIC have explained in the BCLIC Complaint:

> BCLIC and WNIC are cedents under two reinsurance agreements with reinsurer Beechwood. Under the Reinsurance Agreements, BCLIC and WNIC transferred certain long term care liabilities to Beechwood and paid Beechwood over $42 million as a negative ceding commission (that is, BCLIC and WNIC paid Beechwood $42 million to enter into the Reinsurance Agreements).
>
> Beechwood assumed control over claims administration, and BCLIC and WNIC deposited approximately $550 million into reinsurance trusts ("Trusts") to be invested and managed by Beechwood, subject to investment guidelines prescribed by the Reinsurance Agreements and the insurance laws of New York and Indiana. The assets in the Trusts were intended to serve as reliable (*i.e.*, safe and liquid) collateral for Beechwood's obligations to reimburse BCLIC and WNIC for claims on the transferred liabilities and for Plaintiffs to obtain reserve credits.

(BCLIC Complaint, ¶¶ 74, 75)

241.    Pursuant to the reinsurance agreements, Beechwood was required to deposit assets into the Reinsurance Trusts accounts with an aggregate fair market value of 102% of the statutorily required reserves (*i.e.*, policy liabilities) as collateral for Beechwood's obligation to pay future claims on the reinsured policies.  (New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd;  Indemnity Reinsurance Agreement by and between Washington National Life Insurance Company and Beechwood Re Ltd)  Only trust assets in compliance with the reinsurance agreements' investment guidelines qualified as countable. The Reinsurance Agreements defined qualifying trust assets to include cash, certificates of deposit, or specific kinds of investments permitted under New York and Indiana insurance laws, not including investments in which either party or its affiliates had an interest, or investments in insolvent entities. In addition, Beechwood Re was required to setup supplemental trusts to provide additional collateralization to cover reinsurance liabilities.

65

242.     The reinsurance agreements also required Beechwood to top-up the Reinsurance Trusts in the event that the market value of the assets in the trusts fell below 102% of the amount of the statutory liabilities.  The reinsurance agreements permitted Beechwood to withdraw excess amounts if the aggregate fair market value of Reinsurance Trust assets exceeded 102% of the statutorily required reserves at the end of a quarter and the aggregate fair market value of the assets in certain supplemental trust accounts exceeded 5% of the trust amount.

243.     Conversely, Beechwood was required to cover any shortfalls in the Reinsurance Trusts. Such shortfalls could occur if claims payments exceeded projections.  Claim payment uncertainty and volatility was the principal reason for CNO's desire to reinsure this legacy portfolio.  In effect, Beechwood Re was assuming CNO's risk through the reinsurance transaction. However, WNIC and BCLIC would still be responsible for claims if Beechwood Re were unable to do so through its replenishments of the Reinsurance Trusts. (BCLIC Complaint, ¶¶ 81-83)

244.     The reinsurance agreements also established supplemental trust accounts to be maintained as overcollateralization of Beechwood's obligations.  The supplemental trusts were to hold assets with an aggregate fair market value equal or greater than of 5% of the statutorily required reserves of the LTC policies.

245.     Beechwood Re could request and withdraw excess funds from the supplemental trusts if the market value of the assets in them exceeded 5% of the statutorily required reinsurance reserves and the value of assets in the Reinsurance Trust exceeded 102% of the statutorily required reserves.   Beechwood Re was required to make contributions to the supplemental trusts if the trusts were not in compliance with the 5% overcollateralization requirement.  (BCLIC Complaint, ¶ 85)

66

246.    As BCLIC and WNIC admit, the Reinsurance Agreements also included "audit provisions" which permitted BCLIC and WNIC to initiate an audit of the investments in certain circumstances."  (BCLIC Complaint, ¶ 212)

247.    The steps that CNO took to reduce and/or mitigate its LTC exposure, including its announced arrangement with Beechwood, were rewarded by its ratings agencies, exactly as CNO had hoped and precisely why CNO, and its subsidiary 40/86 Advisors, directly involved itself and directed the activities of BCLIC and WNIC in connection with their dealings with Beechwood:

> (a)     "A.M. Best views the recent long-term care reinsurance agreement with Beechwood Re and this current transaction, pending its closing, as a credit positive for CNO Financial," *A.M. Best Places Ratings of Conseco Life Insurance Company Under Review With Positive Implications*, A.M. Best Press Release, March 3, 2014 ;

> (b)     "…The ratings also reflect the success CNO Financial has had in executing its business strategy, which included exiting/de-emphasizing non-core product lines through divestiture and reinsurance. This included the sale of Conseco Life Insurance Company and its closed block of interest-sensitive life and annuity products to Wilton Reassurance Company and reinsuring some of its legacy blocks of long-term care (LTC) to Beechwood Re Ltd, both announced earlier this year," *A.M. Best Upgrades Issuer Credit Rating Outlook to Positive for CNO Financial (and subsidiaries BCLIC and WNIC)*, A.M. Best Press Release, August 14, 2014;

(c)      "…Fitch's primary concern is CNO's large, albeit reduced, exposure to the individual long-term care (LTC) insurance business. The company has actively managed down the exposure to its LTC exposure through disposals, reinsurance, product design and systematic price increases over the last several years," *Fitch Affirms CNO Financial's Ratings; Outlook Positive*, Fitch Ratings Press Release, December 19, 2014.

### 9.   SHIP's Introduction to Beechwood

248.    SHIP was introduced to Beechwood Re in late 2013.  According to SHIP, it "was aware of the BCLIC and WNIC reinsurance arrangements through SHIP's affiliate, Fuzion…" (SHIP Complaint, ¶ 11)

249.    Following SHIP's introduction to Beechwood in 2013, Brian Wegner ("**Wegner**") the-then President and CEO, Paul Lorentz ("**Lorentz**"), the CFO of SHIP and others met with Feuer, Taylor and Levy to discuss SHIP's financial condition.

250.    In November, 2013, in a blatant conflict of interest, Wegner attempted to personally profit from SHIP's prospective relationship with Beechwood, asking Feuer and Rick Hodgdon of Beechwood about the possibility of Beechwood taking part in a side deal with a separate business which he owned, in which Beechwood would provide that business with some or all of a $1 million investment.

251.    A series of meetings and communications between Fuzion, for SHIP, and Beechwood ensued in 2014, when SHIP was evaluating Beechwood as a potential investment manager, Beechwood – primarily through Feuer, Taylor, and Levy.  (SHIP Complaint, ¶ 64)

252.    According to SHIP, it did not perform its own due diligence and instead relied on due diligence conducted by CNO.

253.   Discussions between SHIP and Beechwood continued for some time.  In 2014, Wegner met with Feuer, Taylor and Levy, and was informed that because of the distressed condition SHIP was in, Beechwood would not take on such liabilities in a reinsurance agreement. But instead, it was proposed that SHIP enter into an investment management agreement that would allow SHIP to participate in the same investments in which Beechwood was investing the trust assets held in the Reinsurance Agreements with BCLIC and WNIC.

254.   SHIP has acknowledged that, given the distressed nature of its book of business, Beechwood Re indicated that it was unwilling to enter into a similar reinsurance arrangement with SHIP pursuant to which Beechwood would, in essence, take SHIP's reserves and then assume the financial obligation to pay policy claims. Beechwood nevertheless advised SHIP that it could gain access to the same kinds of allegedly high-quality, high-yield investments that supported the BCLIC and WNIC agreements by entering into investment management agreements with the Beechwood Advisors.   (SHIP Complaint, ¶ 12)

255.   Indeed, SHIP has alleged:  "In 2014 and 2015, Wegner and Lorentz, and others again met with and otherwise communicated with Feuer, Taylor, and Levy electronically, by telephone, and in person to discuss SHIP's unique status as a run-off insurer and the particular challenges it faced with respect to its surplus. Feuer, Taylor, and Levy advised SHIP that Beechwood Re was unable to enter into a reinsurance agreement with SHIP. They proposed, however, to assist SHIP in improving its capital and surplus status by offering SHIP the opportunity to participate in the same investments in which Beechwood Re invested the reserves associated with the WNIC and BCLIC policies and certificates that were reinsured by Beechwood Re." (SHIP Complaint ¶ 45)

256.    Unable to obtain reinsurance in the market, SHIP was highly motivated to enter into the IMAs.  Moreover, one of Fuzion's primary functions was to provide all of SHIP's administrative services.  Consequently, Fuzion, like SHIP, was highly motivated to enter into the IMAs with Beechwood.  Indeed, keeping SHIP in runoff and out of insolvency proceedings – even by entering into what was, on its face, questionable arrangements – was the motivation of Fuzion and its management, which,  otherwise, would have been without significant income and out of existence.

257.    An examination of SHIP's expense history demonstrates Fuzion's parasitism.  During the period 2012 to 2017, the number of SHIP's outstanding policies requiring administration declined by 40% to 50%.  Yet, during that same period, its payments to Fuzion – for managing SHIP – *increased* by 20%.  The dependency of Fuzion on the continued existence of SHIP led Fuzion to manage SHIP into arrangements with Beechwood that, on their face, presented risk of malfeasance.

### 10.    The SHIP Investment Management Agreements

258.    SHIP, acting by and through the Fuzion personnel that staffed SHIP, entered into three investment management agreements ("**IMAs**") with Beechwood entities with broadly similar terms that promised a guaranteed rate of return.  Over time, SHIP invested approximately $270 million with Beechwood and its affiliates pursuant to the three IMAs.

259.    All three IMAs contain the same basic structure, with minor exceptions:  (a)  upon SHIP depositing the funds into a designated trust account and granting Beechwood discretion over investments, Beechwood guaranteed an annual investment return equal to 5.85% (non-compounded) (the "**Benchmark Percentage**") of the net asset value of the assets contributed to the account; (b) this guaranteed payment was then immediately reinvested in the custody account

managed by Beechwood, which effectively made the guaranteed annual return "compounded;" (c) in the event that SHIP's investments under the IMAs did not achieve an annual Investment Return of 5.85%, Beechwood was obligated to "(i) pay the Client [SHIP] any Investment Return shortfall from its own account and (ii) as necessary, contribute assets to the Account from its own account such that the net asset value of the Account equals the Initial NAV."

260.    This "True-Up Payment" provision effectively required Beechwood to pay the guaranteed investment return and maintain the asset base, whether the investments performed as Beechwood represented they would or not.    The IMAs also permitted Beechwood to retain investment returns above the 5.85% guaranteed Investment Return as a "Performance Fee."[5]

261.    On May 22, 2014, SHIP entered into its first IMA with Beechwood Bermuda (the "**BBIL IMA**"), which, as noted above, was a Beechwood entity domiciled in Bermuda.  Pursuant to this IMA, SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood Bermuda on SHIP's behalf.    Beechwood Bermuda "appointed … as SHIP's investment adviser and manager to invest and manage the funds on behalf of SHIP and 'subject at all times to the fiduciary duties imposed upon it by reasons of its appointment to invest and manage the assets.'"  (SHIP Complaint, ¶¶ 82-85)

262.    SHIP executed its second IMA (the "**BRe IMA**") with Beechwood Re on June 13, 2014 in which it invested an additional $80 million (estimated upon information and belief to be $50 million) with Beechwood Re for a guaranteed return of 5.85%.    SHIP claims that it deposited that amount "into a custody account at Wilmington Trust for investment by Beechwood Re on SHIP's behalf." (SHIP Complaint, ¶ 100)  In fact, SHIP originally made two

---

[5] Two of the IMAs set forth these terms in the body of the agreement, while the third sets forth the guarantee of the Benchmark Percentage in a side letter, which also included for that third IMA a 1% of the net asset value Performance Fee even if the Benchmark Percentage is not achieved.

$25 million deposits and transferred $30 million from the BBIL IMA account, replenishing the BBIL IMA account only later in connection with or after its third transaction with Beechwood.

263.     As SHIP has admitted, in the BRe IMA, "the BRe IMA appointed Beechwood Re as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties.  Beechwood Re agreed to 'use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers under this Agreement.'  BRe IMA, ¶ 1."   (SHIP Complaint, ¶ 101)

264.     The third and final IMA was signed by SHIP with BAM I (the "**BAM IMA**"). SHIP invested $110 million with BAM I pursuant to this IMA.

265.     According to SHIP:  "Contemporaneous with execution of the BAM IMA, in January 2015, SHIP deposited an initial $50 million into a custody account at Wilmington Trust to be invested and managed by BAM, subject to investment guidelines prescribed by the IMAs and the insurance laws of Pennsylvania.  Subsequently, in March 2015, SHIP deposited an additional $60 million into the same account and subject to the same investment guidelines and legal limitations, for a total investment of $110 million to be managed by BAM under the BAM IMA.  This $110 million was in addition to the $160 million invested with Beechwood pursuant to the other two IMAs."  (SHIP Complaint, ¶ 116)

266.     In SHIP's further words, "[s]imilar to the other two IMAs, the BAM IMA appointed BAM as an investment adviser and manager to invest and manage the funds on behalf of SHIP and subject at all times to fiduciary duties. BAM agreed to 'use all proper and professional skill, diligence and care at all times in the performance of its duties and the exercise of its powers under this Agreement.' BAM IMA, ¶ 1."  (SHIP Complaint, ¶ 117)

267.    In contrast to the BBIL and BRe IMAS, "[t]he language of the BAM IMA . . . did not expressly guarantee a specific investment return."  (SHIP Complaint, ¶ 118)  Rather, SHIP, by its account, " entered into a side letter with BRILLC, which was commonly controlled along with the other Beechwood Advisors, and in the side letter BRILLC guaranteed an annual investment return of 5.85% (non-compounded) of the net asset value of the assets contributed by SHIP under the BAM IMA (the 'Side Letter')."  (*Id.*)

268.    By SHIP's account,"[t]he method of calculating BAM's Performance Fee was slightly different under the BAM IMA as compared with the other two IMAs," in that, under the BAM IMA, "BAM's Performance Fee was to be the greater of the following:

> 1% of the net asset value of the Assets in the Account as of the last day of each measuring Year, or (2) 100% of the cash value reflected in the Net Profit Yield (as defined below). For purposes hereof, (a) "Net Profit Yield" shall be defined as the Total Portfolio Yield (as defined below) minus 5.85% and (b) "Total Portfolio Yield" shall be defined as the investment return (based on both realized and unrealized trading profit) on the Account for each respective measuring Year…."). BAM IMA, Exhibit B at ¶ 1.

(SHIP Complaint, ¶ 119)

269.    According to SHIP, under all three IMAs, Beechwood "promised to make all investment decisions and to manage SHIP's invested funds "consistent with the general investment policy, guidelines and restrictions" of Beechwood Bermuda, Beechwood Re Ltd. and BAM.  (SHIP Complaint, ¶¶ 91)   Further each of BBIL's, Beechwood Re Ltd.'s and BAM's "Adviser Investment Policy, Guidelines and Restrictions" and "Guidelines for Senior Secured Credit Opportunities expressly provide that Beechwood "must invest in a manner permitted by "SHIP's corporate investment guidelines 'Senior Health Insurance Company of Pennsylvania: Investment Objectives, Policies and Guidelines, Version 1.6.'  ('SHIP's Investment Policies')."  (SHIP Complaint, ¶¶ 92)

73

270.     SHIP asserts that its "Investment Policies begin by emphasizing that '[c]ognizant of the fiduciary character of the insurance business, [SHIP] seeks to achieve investment returns commensurate with the protection of invested capital while minimizing the risk of impairment of investment assets to provide financial stability for its policy holders.' SHIP's 'general investment objective' was specified to be 'to seek current income consistent with the preservation of capital and prudent investment risk. Long-term growth is an important secondary consideration.'" (SHIP Complaint, ¶ 109)   Further, according to SHIP, each of Beechwood Bermuda's, Beechwood Re Ltd.'s and BAM's "investment guidelines likewise required, among other things, that Beechwood . . . would 'engage in transactions in which there is a well-known and understood counterparty risk, and liquid/valuable collateral to secure any such loan.  Controls are always in place to secure the movements of cash and proceeds such that Beechwood always has a first right to monies.'"   (SHIP Complaint, ¶¶ 111).

271.     In fact, by their very nature, especially in view of SHIP's financial condition and the low-interest rate environment (the 30 year treasury was 3.77% of January 1, 2014 while historically it had been 5%), the Beechwood investment contracts, with their non-investment yield guarantees, were not appropriate for a distressed insurance company such as SHIP. Any prudent insurance company in SHIP's poor financial condition should have been investing in investment grade securities. SHIP, on the other hand, knowingly took a significant financial risk by seeking a high non-investment grade yield.

272.     A prudent company in SHIP's poor financial condition should have been investing in investment grade securities.  Yet in order to achieve a contractual return of 5.85% in May 2014 when the contract was signed, Beechwood would have had to invest SHIP assets into non-investment grade securities with a B rating or below. (2014 SHIP Statutory Financial

74

Statements; SHIP Investment Management Agreement (IMA) dated 5/22/14)   B-rated securities, at this time, were yielding approximately 5.3% and CCC-rated securities were yielding 8.5% (Bloomberg Market Data). With this investment contract, in addition to ongoing issues with accelerating insurance claims payments, SHIP was now exposed to the heightened risk of principal loss.

273.    But given the economics of the line of business, the fact that BCLIC and WNIC were already invested by Beechwood in Platinum Partners investments, and the fact that at that point Platinum Partners was boasting outsized returns, SHIP knowingly took the risk and either allowed and turned a blind eye toward the investment in non-investment yield securities related to Platinum Partners.

E.    **The Investment of BCLIC's and WNIC's Monies in the Beechwood Reinsurance Trusts and SHIP's Monies in the IMAs into the PPVA and PPCO Funds, and CNO's, BCLIC's and WNIC's Knowledge of Same**

274.    BCLIC and WNIC transferred a total of approximately $592 million to Beechwood pursuant to the Reinsurance Agreements, and SHIP transferred another $270 million over time to Beechwood pursuant to the IMAs (collectively, the "**Insurance Company Funds**") – for a total of approximately $912 million.

275.    After entering into the Reinsurance Agreements and taking control of the assets in the Beechwood Reinsurance Trusts and IMAs, Beechwood immediately began using the Insurance Company Funds to prop up the PPVA and, to a lesser extent, PPCO Funds.

1.    **CNO's, BCLIC's and WNIC's Knowledge and Actions Following Execution of the Reinsurance Agreements**

276.    The Reinsurance Agreements required Beechwood to provide reports, at least on a quarterly basis, in which a value was established for each of these investments, so as to determine whether the Benchmark Percentages were being maintained.  Beechwood provided

these reports to BCLIC and WNIC using the mails and wires of interstate commerce, and applied artificial values for these and other investments of the trust assets that overinflated true values so as to avoid having to "top off" any shortfalls with its own funds, and further so as to withdraw sums as "surplus" for its own benefit.

277.    These reports identified the trust investments, some of which included the Platinum Partners' name, and some of which were easily associated with Platinum Partners by basic due diligence.  BCLIC and WNIC knew Beechwood was investing trust assets with the PPVA Funds and/or the PPCO Funds.

278.    BCLIC and WNIC quickly became suspicious of how the assets in the Beechwood Reinsurance Trusts were being reinvested.  Indeed, they admit that:

> As Levy began investing the Trust assets in 2014, BCLIC and WNIC began receiving quarterly reports from Beechwood. Upon receiving these reports, BCLIC and WNIC began questioning a number of the investments into which Beechwood directed Trust assets. Among other things, BCLIC and WNIC learned that Beechwood:
>
> - purchased a loan to George Levin, who was a principal in the Rothstein Rosenfeldt Adler PA Ponzi scheme (the "Rothstein Ponzi scheme"). Platinum apparently obtained a large judgment against Levin, forcing him into bankruptcy. . . .
>
> - loaned money to a Platinum-controlled entity which was run by Moshe Oratz and Aaron Elbogen. Oratz was jailed in connection with a gambling ring, and Elbogen settled charges brought by the Securities Exchange Commission ("SEC") over fraudulent trade executions; and loaned money to Cashcall Inc., which was sued by the Consumer Financial Protection Bureau and 17 states for violating consumer protection and usury laws providing interest-rate caps.
>
> These investments were objectionable to [BCLIC and WNIC] because they are not suitable investments for reinsurance trust funds, which should be conservative investments to ensure that there are sufficient assets to pay policyholder claims. Additionally, for reputational reasons, Plaintiffs could not possibly be seen as doing business with such disreputable firms and individuals.

(BCLIC Complaint, ¶ ¶ 86-87)

279.    BCLIC and WNIC also specifically discussed with Beechwood the millions of dollars of trust assets being invested with Platinum Funds and their portfolio entities, leaving no doubt that BCLIC and WNIC had specific knowledge that trust assets were being invested by Beechwood in very aggressive Platinum Partners-related investments as of March 2014.

280.    Internal Beechwood/Platinum e-mails reflect that BCLIC's, WNIC's and CNO's questions resulted in a meeting with Beechwood at BCLIC's and WNIC's offices in Carmel, Indiana to address the insurers' concerns on March 25, 2014.  In an e-mail to Levy, Nordlicht and Manela on March 10, 2014, Taylor called for an all-hands meeting to prepare for the March 25 meeting to respond to the questions of CNO Chief Investment Officer Eric Johnson regarding "Platinum" and Platinum investments, including Black Elk, ALS and Golden Gate (all discussed below).  Five days later, in advance of the meeting, CNO's Johnson told Levy that "Platinum" fit CNO's (BCLIC's and WNIC's) investment guidelines only if "we treat it on a look through basis as to the fund's individual holdings."   A slide presentation shows that during the March 25th meeting, the Beechwood representatives reviewed specific Platinum portfolio positions in which BCLIC's and WNIC's money was invested, including Golden Gate and Bradley (also discussed below).

281.    BCLIC and WNIC also concede that they "raised questions concerning how Beechwood characterized and valued assets in the Trusts. For example, Beechwood made numerous investments of Trust assets in notes collateralized not by assets, but rather by the borrowers' equity or other borrowers' debt instruments. Yet, Beechwood inflated the value of these tenuous forms of collateral to conclude that the Trusts were over-collateralized. In addition,

Beechwood had invested assets in risky businesses, including start-up and severely distressed companies." (BCLIC Complaint, ¶ 89)

282.    Thus, as the BCLIC Complaint (like Beechwood's and CNO's e-mails) makes clear, BCLIC and WNIC, and for that matter CNO, *knew* that the assets they (or in the case of CNO, its subsidiaries) invested were being invested with funds managed by Platinum Partners. That is why, according to BCLIC and WNIC, in response to BCLIC's and WNIC's purported demands:

> In late 2014, Feuer and Taylor promised [BCLIC and WNIC] that Beechwood would begin to unwind Beechwood's significant investments in companies controlled by Platinum. Plaintiffs were thus led to believe that Beechwood would take steps to divest itself of such investments. Beechwood partially redeemed its direct investments in the Platinum funds, but found other ways to support Platinum, namely, by investing in companies that Platinum owned or controlled.

(BCLIC Complaint, ¶ 97)

283.    However, this divestment – despite additional Beechwood meetings at BCLIC's and WNIC's offices in Indiana, including in November 2014 --  according to BCLIC and WNIC, "did not occur" fully (BCLIC Complaint, ¶ 99)   While Beechwood may have disposed of certain Platinum-related assets by 2015, it continued to hold and/or acquire others  -- all without CNO, BCLIC or WNIC taking the steps they only later took when Platinum, due to the very public indictment of Huberfeld, became a public relations liability.  Rather, according to BCLIC and WNIC, "Beechwood made investments with Trust assets through 2015 and 2016 totaling tens of millions of dollars in Platinum-related companies, including after Huberfeld was arrested" [as described below] and "[i]n 2016, Beechwood again invested Trust assets directly into Platinum's funds." (BCLIC Complaint, ¶ 99)  Since BCLIC and WNIC were receiving statements and were already hyper-focused on Platinum, they knew or must have known this.

78

284.    The Reinsurance Agreements also contained audit provisions, permitting BCLIC and WNIC the right to analyze the trusts investments for compliance with the Reinsurance Agreements themselves, for the reasonableness of the values given for them, and for any conflicts that may be an issue, among other things.   After specifically discussing with Beechwood the millions of dollars of trust assets being invested in the PPVA Funds, the PPCO Funds and their portfolio entities, leaving no doubt that BCLIC and WNIC had specific knowledge that trust assets were being invested by Beechwood in very aggressive investments, BCLIC and WNIC did not then invoke these audit provisions.

285.    Rather, for the next two years, BCLIC and WNIC maintained the *status quo* with Beechwood, and allowed the investments to continue in the same vein, which resulted in at least $325.2 million to be invested in the PPVA Funds and their portfolio entities, and approximately $108.9 million to be invested in the PPCO Funds and their portfolio entities.

286.    Because they had no real alternatives to mitigate their LTC risk, BCLIC, WNIC and CNO were incentivized to continue their relationship with Beechwood for more than two years.

**2.    SHIP's Knowledge and Actions Following Execution of the Reinsurance Agreements**

287.    According to SHIP, "[r]ather than adhering to their representations and promises made in the IMAs and otherwise, the Beechwood Advisors, in concert with the Individual Defendants, used most of the SHIP funds entrusted to them to acquire high-risk, complex, inadequately collateralized, and often distressed investments tied to Platinum that were purposely structured by Beechwood, the Individual Defendants, and the co-conspirators to enrich themselves and their related parties at the expense of investors like SHIP."   (SHIP Complaint,

¶ 130)  Yet, it is clear that all along SHIP knew, or willfully blinded itself to the fact, that Beechwood was entrusting its money to Platinum Partners.

288.    Events both before and after the creation of the IMAs confirm that the Beechwood Entities invested the funds in the SHIP IMAs into limited partnership interests in the PPCO Funds and the PPVA Funds, purchased securities from the PPVA Funds at inflated valuations and made direct investments into portfolio companies of the PPCO Funds and the PPVA Funds.  (SHIP Complaint, ¶ 131)

289.    According to SHIP, "Beechwood invested SHIP's money in direct and indirect interests in numerous loans that had been made by Platinum-related entities, including PPCO and PPVA" and "[w]hen they purchased these investments on SHIP's behalf, typically from PPCO, PPVA, or an entity managed by or related to Beechwood, the Individual Defendants knew, or were grossly negligent in not knowing, that the investments were severely distressed, defaulting, or about to default."  (SHIP Complaint, ¶ 131)

290.    However, SHIP admits that "Beechwood also provided monthly valuation reports to SHIP that purported to show the value of the assets under management."  (SHIP Complaint, ¶ 133)  In fact, the IMAs required monthly and quarterly holdings reports, with valuations prepared by independent appraiser, Lincoln International, with information obtained from Platinum Management regarding the portfolio companies, as described in a November 13, 2013 agreement between Lincoln Partners and Platinum Management.  These holdings and valuation reports made clear that the assets being purchased in the accounts had significant connections to the funds of Platinum Partners.  In addition, these holdings reports would also have revealed if the Beechwood funds were adhering to SHIP's investment management guidelines.

291.    SHIP's knowledge that Beechwood was no typical reinsurer, and could not possibly have been guaranteeing SHIP's returns with legitimate, investment grade investments, became apparent upon a series of transactions in February 2015.

292.    At that time, SHIP transferred $50.2 million in cash from its IMA with Beechwood Bermuda to Beechwood Investments in exchange for a note issued by Beechwood Investments to Beechwood Bermuda for SHIP's account (the "**Beechwood Investments Note**").

293.    On the same day, in what appears to be a quid pro quo, round-trip arrangement, SHIP borrowed $50 million in funds from Beechwood Investments to shore up its balance sheet and issued a 6% junior surplus note due to Beechwood Investments in five years, in exchange. (SHIP and N Management (sole management of Beechwood Investments) $50 million Surplus Note Agreement dated 2/2/15).

294.    This surplus note was critical to insurance regulators' approval of SHIP's continued operations outside of rehabilitation and therefore SHIP's survival.  Between 2008, when CNO spun off SHIP, to 2015, when the surplus note was issued, SHIP's statutory surplus fell from $193 million to $56 million.  However, because, the surplus note was junior to SHIP's policyholders' claims, it immediately increased SHIP's regulatory surplus by $50 million (2015 SHIP Statutory Financial Statements).  This was important because interest and principal payments on the surplus note (or other debt) required approval of the Commissioner of the Indiana Department of Insurance, and debt that was ahead of policyholder claims was highly unlikely to be approved by the Commissioner because of SHIP's poor financial condition. Ultimately, no interest or principal payments were ever approved by the Commissioner.

295.    Without this injection of $50 million in capital, all else equal, SHIP statutory surplus would have been below zero by year end 2015.

296.     Another unusual aspect of the surplus note was its below market pricing.  In 2009, before its credit ratings were discontinued entirely, SHIP was a CCC+ rated company with a deteriorating outlook.  SHIP was likely worse off by the time of the surplus note issuance.  Five-year CCC yields at this time were approximately 11%, which was 5% above the 6% coupon on the surplus note that was issued at par.  The interest rate on the surplus note should have been even higher at the time of its issuance.  At that time, given SHIP's poor financial condition, state regulators would almost certainly have not permitted SHIP to make any cash interest payments in the future.  In fact, as mentioned earlier, SHIP has made no cash interest payments to date.  Had this been a real transaction, rather a round-tripping of funds, the interest rate would have been much higher.

297.     The surplus note transaction was a sweetheart deal for SHIP that encouraged it to look the other way and ignore the fact that its monies were being invested in funds of Platinum Partners, which it knew was laden with fraud and breaches of fiduciary duty.  It also demonstrates SHIP's willingness to engage in questionable transactions in an attempt to survive.  More than that, with $50 million of a total of $270 million that SHIP invested through the Beechwood IMAs now backed by the creditworthiness of SHIP (through the surplus note), SHIP had every reason to believe that Beechwood could not legitimately generate a guaranteed return of 5.85% on SHIP's funds.  Put another way, to compensate for the substantial investment in SHIP debt, the Beechwood IMAs would have otherwise generate returns well in excess of 7%.  This was proof positive that the arrangement between SHIP and Beechwood was a marriage of convenience – not legitimate risk mitigation – that SHIP eagerly embraced for its own survival, turning a blind eye from obvious red flags regarding Beechwood.

298.    Indeed, by December 31, 2015, for purposes of its own statutory financial statements, SHIP had determined the fair value of the surplus note to be $37.3 million. Tellingly, by year-end 2017, SHIP valued this surplus note at only $1.8 million (2015 and 2017 SHIP Statutory Financial Statements).

F.    **The Specific Investments of the Insurance Company Funds in Platinum and Its Portfolio Companies**

1.    **PPCO and the Insurance Company Funds**

302.    With respect to PPCO, between February 2014 and December 2015, the Beechwood Insiders caused the Beechwood Entities to use funds transferred by BCLIC or WNIC into the Beechwood Reinsurance Trusts to make certain investments including:

(a)    to purchase LP interests in the PPCO funds for $36 million in February 2014;

(b)    to make a $25 million loan to Credit Strategies, LLC ("**Credit Strategies**"), an entity owned by PPCO (an existing investor, Aaron Elbogen provided another $4 million and two other investors provided $1 million, bringing the total of the loan facility to $30 million) in February 2014, followed by a $19.8 million loan to Credit Strategies in February 2016.  Credit Strategies, a Delaware LLC, was a subsidiary of PPCO and was formed to hold PPCO's membership interests in ALS Capital Ventures ("**ALS**"), a company that managed life settlement policies; and

(c)    to make a $5 million loan (the "LC Energy Term Loan") to another portfolio company, LC Energy Operations LLC ("LC Energy") in June 2014.

2.    **Credit Strategies**

83

303.   The business model of ALS was to manage life insurance policies that it purchased from insured individuals at a discount to the policy death benefit, in exchange for making future insurance premium payments and the rights to receive the death benefit. Prior to 2014, ALS was majority owned jointly by PPCO and PPVA (with certain third parties holding a small interest). PPVA and PPCO were jointly responsible for paying the premiums for the life insurance policies.

304.   The $36 million cash infusion from the Beechwood Reinsurance Trusts on or around February 19, 2014 enabled the Platinum Insiders to cause PPCO to purchase PPVA's membership interests in ALS for $24.5 million in cash.  PPCO also purchased ALS interests from PPLO and other minority interest holders a few months later.

305.   Through its purchase of ALS membership interests from PPVA for $24.5 million in cash, PPCO therefore ended up being the sole provider of financial and operating support to ALS – an entity that required substantial liquidity in order to make premium payments on the life insurance policies -- of over $41 million from 2014 until 2016 (2014-2016 PPCO Audited Financial Statements).  Specifically, PPCO, by being made to buy the ALS interests from PPVA, became responsible for the entirety of ALS' funding needs (*i.e.*, premium payments) and thereby relieving the pressure on PPVA's liquidity from the need to fund a portion of the ALS premiums.

306.   The 2014 financial statements for PPCO estimated premium funding needs at ALS of approximately $10 million to $12 million each year for the next 5 years (2014 PPCO Audited Financial Statements). Had PPCO not made these premium payments, the value of the ALS investment, which at $85 million was also significantly inflated, would have declined dramatically because of policy cancellations (Sterling Valuation Group, PPCO Valuation Opinion 12/31/14). As an alternative to perpetually funding ALS's needs, PPCO could have

84

attempted to sell the ALS investment (20% of total assets at year-end 2014) to third parties, likely at a significant discount to its inflated carrying value. As such, PPCO was harmed by the Platinum Insiders causing it to  purchase PPVA's investment in ALS to the amount of approximately $23 million.

307.    On or around March 19, 2014, the Beechwood Reinsurance Trusts loaned $25 million to Credit Strategies. PPCO used approximately $15.5 million of the proceeds to certain third parties on account of the Black Elk transactions.   The Platinum Insiders caused approximately $3 million to be used to redeem certain insiders, and approximately $8 million was transferred to certain unprofitable PPCO portfolio companies, including LC Energy, Daybreak Oil and Gas, and Greentown Oil and Gas, and other PPCO companies including, ALS Capital Ventures, and Milberg LLP.

308.    Furthermore, in February 2016, the Platinum Insiders caused Credit Strategies to enter into a loan and security agreement with certain the Beechwood Reinsurance Trusts. The Platinum Insiders further caused Credit Strategies to draw down more than $20 million under this facility in 2016. The majority of the $20 million funded ALS's life insurance premiums and $5.5 million was transferred to PPVA to help it conceal its liquidity crisis. The remainder was used to pay management fees ($1.5 million), fund Northstar ($1.2 million), and to fund Desert Hawk ($600,000), another failing portfolio company that had been put back to PPCO as part of the PPCO Loan transaction (described below). The Platinum Insiders' orchestration of this transaction harmed PPCO because the loan proceeds were used to sustain PPVA, pay management fees, and to prop up failing portfolio companies, Northstar and Desert Hawk.

### 3.    LC Energy

309.    LC Energy, a Delaware LLC, was formed as a shell by the Platinum Insiders in February 2014 was the assignee for PPCO to acquire the assets of the Lily Group through a Chapter 11 bankruptcy process (LC Energy APA dated 1/27/14). The Platinum Insiders then caused LC Energy to acquire substantially all of the assets of the Lily Group for a purchase price consisting of a $9 million credit bid (against PPCO's pre-petition secured claim of $18 million) and up to an additional $9 million in production payments to be made by December 2025 (Buyer's Closing Statement dated 4/7/14).

310.    The major mining asset of Lily was the Landree mine, located in Greene County in Jasonville, Indiana in the Illinois Coal Basin. The mine had reserves of approximately 25 million tons and was not operational. After the successful bankruptcy bid, LC Energy restarted operations in May 2014. Prior to various accidents including a roof collapse, the mine was operating below full capacity and was producing approximately 15,000 tons/month, which was then sold for $61/ton. It had not yet reached cash flow breakeven. However, the company, controlled by the Platinum Insiders, claimed that it was working on several operational strategies to increase profitability and to optimize production (Platinum LC Energy Valuation Memo dated February 2014).

311.    On June 3, 2014 the Platinum and Beechwood Insiders caused LC Energy to borrower $5 million from the Beechwood Reinsurance Trusts.  The LC Energy Term Loan had an annualized interest rate of 18%, payable quarterly. LC Energy forwarded $3.5 million to PPCO, and retained $1.5 million immediately after the loan was made, LC Energy was unable to make interest payments on it. Nevertheless, from June 2014 to December 2015, the Platinum Insiders caused PPCO to advance a total of $12 million of Beechwood money to LC Energy, of

which $1.4 million was used to pay interest on the indebtedness to the Beechwood entities that held the LC Energy loan.

312.    The Equity Receiver's financial analysis indicates that the LC Energy Term Loan was worth well below par. As discussed in more detail later, this loan was transferred back to PPCO in a fraudulent transfer that directly harmed PPCO.

### 4.    PPVA and the Insurance Company Funds

313.    As to PPVA, between February 2014 and December 2015, the Beechwood Insiders caused the Beechwood Entities to use funds transferred by BCLIC and WNIC into the Beechwood Reinsurance Trusts or by SHIP pursuant to the IMAs:

(a)    to make $132.5 million of direct loans to portfolio companies of the PPVA Funds, $62.9 million of which were made with monies from BCLIC or WNIC and $69.6 million of which were made with monies from SHIP and (the "**Direct PPVA Portfolio Company Loans**");

(b)    to pay approximately $176.2 million to the PPVA Funds to purchase investments in portfolio companies of the PPVA Funds directly from the PPVA Funds at inflated values, $110 million of which was made with monies from SHIP and $65.5 million of which were made with monies from BCLIC and WNIC (the "**Beechwood-PPVA Investment Purchases**"); and

(c)    to pay approximately $16.5 million to the PPVA Funds to purchase limited partnership in them, all of which originated with SHIP (the "**PPVA Limited Partnership Purchases**," together with the   Direct

87

PPVA Portfolio Company Loans and the PPVA Investment Purchases, collectively, the "**PPVA Infusions**").

314.    In the aggregate, the Beechwood Insiders caused the Beechwood Reinsurance Trusts and the SHIP IMA accounts to invest $308 million in PPVA portfolio companies, through direct loans to portfolio companies and purchases of portfolio companies' securities from PPVA. Among others, these portfolio companies, included Black Elk Energy Energy Offshore Operations, LLC, Golden Gate Oil, LLC, PEDEVCO, Implant Sciences, Northstar Offshore Group, Montsant, Desert Hawk and China Horizon.

315.    In many situations, these companies were either non-operating, unprofitable or financially distressed. All the parties to transactions involving these securities, notably Beechwood, CNO, BCLIC, WNIC and SHIP, were aware of these facts. Yet Beechwood, CNO, BCLIC, WNIC and SHIP orchestrated the eventual transfer to PPCO of a portion of their exposure to these companies, which they had previously acquired from PPVA in what amounted, as alleged below, to fraudulent transfers and securities fraud. In exchange, CNO, BCLIC, WNIC and SHIP siphoned away the most valuable asset of PPCO – its interests in Agera Energy LLC or acquired security interests in all of PPCO assets, including Agera Energy LLC.

### 5.    Black Elk Energy Offshore Operations, LLC

316.    The Platinum Insiders' manipulation of PPCO to participate in the Black Elk investment scheme depended on the use of funds from the Beechwood Reinsurance Trusts and the SHIP IMA accounts, and directly led to the damages claims of $24.6 million claim by the Black Elk Trustee against the PPCO Receivership.

317.    Black Elk Energy, LLC ("**BEE**") was an independent oil and gas company headquartered in Houston, Texas. BEE was formed as the holding company for Black Elk, an

independent oil and gas company. Black Elk acquired distressed properties at deep discounts, improved production and decline rates, reduced operating costs, and then sold the assets at a premium. Black Elk focused its interests within the Mid-West and Southern Gulf Coast states. From 2008 to 2011, Black Elk employed an acquisition strategy to expand its holdings and further develop its business. (2014 Black Elk 10-K; Platinum Black Elk Investment Memo)

318.     In 2009, PPVA invested in Black Elk.  The investment initially appeared very successful. For instance, in 2011, the *Wall Street Journal* reported that, aided in part by the ban on drilling in the Gulf of Mexico after the BP Macondo explosion and oil spill, Platinum's Black Elk investment strategy "was Platinum's most successful last year, having contributed a significant portion of its high-teens return."  To finance its operations, on November 23, 2010, Black Elk issued $150 million of 13.75% Senior Secured Notes (the "***Black Elk Bonds***"), with holders granted a first priority lien on substantially all of Black Elk's assets (2010 Black Elk 10-K).

319.     A November 16, 2012 explosion and fire on an offshore Black Elk platform damaged the platform and caused the deaths of three workers.  This incident combined with deteriorating investment and market conditions caused Black Elk's business to suffer and decline (2012 Black Elk 10-K).  At year-end 2013, the company was not in compliance with its credit facility covenants (2013 Black Elk 10-K).

320.     By year-end 2013, the approximately $209 million fair market value (according to PPVA's own financial statements) of PPVA's Black Elk position represented almost 24% of its investments in securities. Black Elk's collapse would have precipitated a collapse of PPVA given its own liquidity issues. (Platinum Partners Value Arbitrage Fund L.P. And Subsidiaries,

89

Consolidated Financial Statements, Year Ended December 31, 2013). At year-end 2013, PPVA controlled 85% of the voting interests of Black Elk.

321.    By early 2014, Black Elk was effectively insolvent, with missed payments to creditors and increasing concerns about its impact on the closing of the Beechwood reinsurance transaction. For instance, in an email to Levy, then a portfolio manager at PPVA, Nordlicht told him: "We cant effect smooth transition to beechwood unless we straighten out black elk!!!!".

322.    The Beechwood Insiders caused the Beechwood Reinsurance Trusts and SHIP IMA accounts also to provide support to Black Elk.  In February 2014, the Beechwood Reinsurance Trusts were made to provide Black Elk with a $27 million line of credit.

323.    PPCO, under the control of the Platinum Insiders, and SHIP also purchased Black Elk bonds during this time (2014 PPCO Audited Financial Statements). The SHIP IMA accounts purchased approximately $37 million in Black Elk bonds, while, by the hand of the Platinum Insiders, PPCO purchased approximately $32.9 million (Prime broker statement, Nomura, PPCO, March 01, 2014-March 31, 2014).

324.    On April 1, 2014, PPCO was made by the Platinum Insiders to enter into an exchange agreement with PPBE. In this exchange, PPCO exchanged (at a price of $96.75 of par) $32.9 million of the Black Elk Bonds for a cash payment of $8.5 million and $23.3 million of Black Elk Series E preferred equity. With this exchange, PPCO was left with approximately $24 million in Series E preferred equity.

325.    The Black Elk scheme, orchestrated by the Platinum Insiders, involved selling off Black Elk's prime assets to Renaissance Offshore, LLC (the "**Renaissance Sale**"), and diverting the proceeds from that sale to redeem the Series E Preferred equity.  PPVA and Beechwood, controlled by the Platinum and Beechwood Insiders, implemented a scheme to fraudulently

claim that a majority of unaffiliated and disinterested holders of Black Elk Notes voted to permit the use of the proceeds of the Renaissance Sale to redeem the Series E preferred equity.

326.     The lynchpin to the fraudulent transfer scheme was to secure an amendment of the indenture governing the Black Elk Bonds (the "**Indenture**") to permit use of the Renaissance Sale proceeds to redeem Series E preferred equity ahead of the Black Elk Notes.   Securing such an amendment required the consent of a majority of disinterested holders.

327.     As explained in the Offer to Purchase and Consent Solicitation Statement: "Pursuant to Section 316(a) of the Trust Indenture Act of 1939, Notes owned by the Company or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the Company shall be disregarded for purposes of determining the majority." Because PPVA controlled Black Elk, this statement meant that the sum of all Notes held by Platinum, Platinum-affiliated entities and entities controlled by Platinum were to be subtracted from the $150 million Notes otherwise entitled to vote (On August 18, 2014, the Platinum Insiders caused PPCO to purchase Black Elk Notes from PPBE and Platinum Partners Black Elk Opportunities Fund International Ltd with a combined face value of $32.9 million). Of the remainder, a majority had to consent.

328.     It was obvious that no rational unaffiliated and disinterested Black Elk Note holder would consent to the proposed Indenture amendment, as it would effectively deprive the holder of the senior security interest the Indenture otherwise afforded them in Black Elk's assets.   The most obvious way – to the fraudsters -- to secure that consent was to use a Trojan horse "friendly" consenter:   secure the votes of a company or companies holding a substantial number of Notes that looked independent, but were in fact controlled by Platinum.

329.    The "friendly" consenters that the Platinum Insiders mustered up were a group of Beechwood Entities. As described earlier, in early 2014, Levy directed certain SHIP IMA accounts at Beechwood to obtain approximately $37 million of the Black Elk Senior Notes. The Beechwood Entities voted to consent in favor of the scheme.   Shortly after engineering Beechwood's purchase of the Senior Secured Notes and voting those in favor of the Platinum scheme, Levy left his CIO position at Beechwood to return full time to PPVA.

330.    Based on a fraudulent vote count that included both Notes owned by Platinum affiliates and the Platinum-controlled Beechwood entities, PPVA, at the hand of the Platinum Insiders, caused Black Elk to adopt a Second Supplement to the Indenture, which purported to permit use of the Renaissance Sale proceeds to redeem Black Elk Series E preferred equity ahead of the Senior Secured Notes.   On the basis of this fraudulently secured supplement to the Indenture, Black Elk's PPVA-controlled Board of Managers directed that $98 million-virtually the entire remaining cash balance from the Renaissance Sale-be diverted to the redemption of Series E preferred equity that was either owned by Platinum or that Platinum would have been obligated to repurchase absent the redemption.

331.    These fraudulent transfers also included a transfer of more than $80,000 to Chardan based on its role as broker of the put agreement that obligated PPVA to repurchase Series E preferred equity owned by a third party. PPCO was also redeemed by the Platinum Insiders out of its $24 million position in the Series E Preferred Equity. By virtue of the fraudulent scheme, PPCO transferred $25.3 million to PPBE (comprised of the $24 million received and another $1.3 million) to buy the 13.75% Black Elk Bonds previously exchanged with PPBE on April 1, 2014. (Black Elk Complaint dated 8/31/17).  PPVA, too, by the hand of the Platinum Insiders, was redeemed of its position in the Series E Preferred Equity, and

promptly transferred approximately $42 million received directly from Black Elk to PPBEO and PPBOI to buy the 13.75% Black Elk Bonds it had previously exchanged with PPBE.

332. There are numerous emails evidencing the intimate involvement of Levy, Small and the Platinum Insiders in the Black Elk Scheme. For example, in an email from Mark Nordlicht to Zach Small dated May 13, 2014, Nordlicht instructed: "Beechwood is buying 8 million black elk from PPVA. What is the best way to cross? Can we do it today please." Similarly, on June 23, 2014, Nordlicht emailed, "I want to move/sell 10 million of black elk bonds to bbil the nomura account. Please take care of it."

333. In December 2014, PPCO was made to exchange the 13.75% Black Elk Bonds for Northstar Offshore debt (that was later converted to preferred equity) in a separate transaction involving the acquisition of certain Black Elk assets by the Northstar Offshore Group. (Black Elk and Northstar Exchange Agreement dated January 9, 2015)

### 6.   Golden Gate

334. In April 2012, Golden Gate was formed for the purpose of acquiring and developing interests in certain oil and gas properties. The company was engaged in the acquisition, exploitation, development, and production of oil and gas reserves in the United States. (Golden Globe Form S-1). At the time of PPVA and Beechwood entities' investments, the company's current and planned development was located primarily in the Niobrara Shale play in Colorado, the Monterey Shale play in California, the Mississippian Lime play in Kansas, and the Pre-Caspian Basin in the Republic of Kazakhstan. The company was not producing oil nor was it expected to generate positive free cash flow for the foreseeable future. The company operated an independent reserve report for the company prepared in in December 2014 estimated

that the company had 17.5 million barrels of proved reserves, of which approximately 17.3 million barrels were undeveloped.

335.    On April 10, 2012, Golden Gate issued $31.6 million of Senior Secured Promissory Notes to Precious Capital LLC, a wholly owned subsidiary of PPVA (Golden Gate Oil Advance Request to Precious Capital dated 4/18/12). Since PPVA's initial investment, due to the capital-intensiveness of the Company's business combined with the significant decline in oil prices, Golden Gate has consistently operated at a loss, burned through cash and has barely produced oil. [Golden Gate 2014 10-K; A&M 4Q15 valuation memo]. In 2013, Golden Gate generated only $1 million of revenue, but reported a net loss and operating cash burn of more than $6 million.

336.    Neverthelss, on February 26, 2014, the Platinum Insiders caused PPVA sell its ownership in the Senior Secured Promissory Notes to CNO, BCLIC and WNIC through the Beechwood Reinsurance Trusts for $28.4 million, with Precious Capital LLC retaining $3.2 million of the note. The notes were secured by all of GGO's oil and gas assets, as well as all deposit, security and commodity accounts of GGO. (Golden Gate Oil Note Sale Agreement dated 2/26/14). Since issuance, GGO has failed to make a single interest payment on the Notes. (Golden Gate 2013 and 2014 10-K; PPVA Complaint).  This would have been obvious to the holders of the Notes; *i.e.* CNO, BCLIC, WNIC and Beechwood.

337.    On January 26, 2017, through the 2016 Agera Note Sale Class C Preferred Stock Redemption (described more fully below), the Beechwood Insiders caused the Beechwood Entities to redeem $35.4 million of the Agera Class C preferred shares, through which, Principal Growth Strategies ("**PGS**") was assigned $14.1 million of the GGO loan. While the $14.1 million GGO loan was exchanged for $14.1 million of Class C shares, the fair market value of

the GGO loan ranged from only $0.3 million to $0.7 million.  CNO, BCLIC, WNIC and Beechwood misrepresented the value of these securities.

338.    The Golden Gate loan was worth well below par.   As discussed in more detail later, this loan was transferred back to PPCO in a fraudulent transfer that directly harmed PPCO.

### 7.    PEDEVCO

339.    PEDEVCO is an energy company engaged in the acquisition and development of high growth energy projects primarily in shale oil and gas in the United States. PEDEVCO's main assets are located in the DJ Basin in Colorado, in Comanche, Harper, Barber, and Kiowa Counties in Mississippi, Kansas, and in the North Sugar Valley in Texas. As of February, 2015, PEDEVCO had interest in 53 different wells, which produced approximately 994 bpd. The company was founded in 2011 and is publically traded. It is headquartered in Danville, California.

340.    In March 2014, PEDEVCO issued Secured Promissory Notes ("PEDEVCO Notes") in the aggregate amount of $34.5 million, with total capacity of $50 million, in which both, at the hands of the Beechwood and Platinum Insiders, the Beechwood Reinsurance Trustsand RJ Credit LLC (a subsidiary of PPVA) participated. The PEDEVCO Notes held by PPVA's subsidiary were deliberately subordinated in priority to those held by the Beechwood Reinsurance Trusts. In October 2014, certain SHIP IMA accounts acquired a $2.4 million participation in the PEDEVCO Notes from the Beechwood Reinsurance Trusts.

341.    As of year-end 2015, PEDEVCO had negative working capital, negative operating cash flows and had suffered recurring losses from operations. It had no history of generating any operating income and the auditors raised substantial doubt about its ability to continue as a going concern (2016 PEDEVCO 10-K)

342.    By year-end 2015, the company's auditors expressed substantial doubt about its ability to continue as a going concern because of declining oil prices and the company's working capital deficit and the need for additional funding to continue operations. Further the company disclosed that if it ceased operations, all of its investors, including the Beechwood Reinsurance Trusts and the SHIP IMA accounts would lose their investments.

343.    Beechwood, CNO, BCLIC, WNIC and SHIP knew or should have known about the dire financial condition of their PEDEVCO investment and looked for ways to alleviate their exposure over time. On May 12, 2016, following a series of deferrals of principal and interest payments to the Beechwood Reinsurance Trusts and SHIP on the Secured Promissory Notes, PEDEVCO undertook a senior debt restructuring and new series of secured notes, namely the Tranche A Notes and the Tranche B Notes. (2017 PEDEVCO 10-K; Amended and Restated Secured Promissory Note dated 5/12/16). The investor group for these Tranche A Notes consisted of RJC and two Beechwood entities, BHLN-Pedco and BBLN-Pedco, that were unaffiliated with either SHIP or the Beechwood Reinsurance Trusts. The Tranche A Notes (maturing in May 2019) had a maximum aggregate principal amount of $25.9 million, of which $6.4 million was initially funded by BBLN--Pedco and BHLN-Pedco. The existing investors, including SHIP, had their existing PEDEVCO Notes replaced with Tranche B Notes (the "**Amended PEDEVCO Notes**") that were subordinated to Tranche A Notes that PEDEVCO issued to BBLN-Pedco and BHLN-Pedco. Given the company's dire financial condition, the 15% interest on both series of notes was to accrue until 2017 and payable at maturity.

344.    Given the poor financial prospects for the company, SHIP and the Beechwood Reinsurance Trusts controlled by the Beechwood Insiders were anxious to offload these securities. Within a month, in June 2016, approximately $8 million in face value of these

96

Amended PEDEVCO Notes were used as part of its consideration by AGH Parent (discussed below) in its acquisition of a valuable convertible note issued by Agera Holdings LLC, from PGS. AGH Parent was an entity set up specifically for this acquisition and was owned at the time by SHIP and the Beechwood Reinsurance Trusts. After completing this fraudulent transfer, in January 2017, AGH Parent then used a further $5.7 million of these Amended PEDEVCO Notes as part of its consideration for the forced redemption of $35.4 million of its Class C preferred units, which damaged PPCO. In both cases, the Amended PEDEVCO Notes were contributed to AGH Parent by the SHIP IMA accounts and the Beechwood Reinsurance Trusts. For purposes of these transactions, the Amended PEDEVCO Notes were mispresented by SHIP, CNO, BCLIC, WNIC and Beechwood as if they were worth par, despite all the evidence to the contrary.

### 8.    Northstar Offshore

345.    Northstar Offshore was formed in 2012 as an oil and gas exploration company headquartered in Houston, Texas and strategically focused in the Gulf of Mexico. Northstar GOM Holdings LLC ("**Northstar Holdings**"), a Delaware LLC, was formed on September 18, 2014 by PPVA, by the Platinum Insiders, for the purpose of acquiring Northstar Offshore from Natural Gas Partners, an energy private equity firm. (Northstar Offshore Group, LLC, Financial Statements with Independent Auditor's Report, December 31, 2014 and Northstar GOM Holdings LLC as Issuer and Each of the Guarantors Party Hereto, 12% Second Priority Senior Secured Notes Due 2019, (the "12% Secured Notes") Indenture, Dated September 18, 2014). The acquisition was partially funded by $80 million of 12% Second Priority Senior Secured Notes (the "**Northstar Indenture Debt**") issued by Northstar Holdings. Northstar Offshore served as a guarantor of this debt.

97

346.    SHIP, through its accounts at Beechwood, purchased $31 million of the Northstar Indenture Debt. (Purchase Agreements with SHIP for $10.8 million and $20.2 million, March 31, 2015)  One of the Beechwood Reinsurance Trusts, BRe WNIC 2013 LTC Primary, purchased $19 million of this debt.  (Purchase Agreement with BRe WNIC 2013 LTC Primary, March 31, 2015) New Mountain Finance Holdings purchased the remaining $30 million of the debt. (Securities Purchase Agreement and Put Agreement, November 17, 2014).   The Northstar Indenture Debt held by the Beechwood entities was further collateralized by PGS' ownership stake in Agera Energy LLC. *See* PPVA Complaint Ex. 60.

347.    In December 2014, Northstar Offshore acquired a 14 field package of operating and non-operating properties from Black Elk Energy. In this transaction, PPCO was caused by the Platinum Insiders to exchange its remaining interest in the 13.75% Black Elk Bonds for notes issued by Northstar Offshore.

348.    Northstar Offshore was affected by the dramatic decline in commodity prices that began in the second half of 2014 and was unable to raise additional capital. Northstar Holdings could not service its debt including paying interest when due. PPVA was caused to fund a portion of the interest due from mid-2015 through the March 22, 2016 Transaction. For example PPVA purchased $770,000 of Class A Preferred Units of Northstar Holdings on or around June 15, 2015, $905,000 of Class A Preferred Units of Northstar Holdings on or around August 15, 2015, $1 million of Class A Preferred Units of Northstar Holdings on or around September 2015, and later $1.8 million of Class A Preferred Units of Northstar Holdings.

349.    PPVA also provided Northstar with a term loan, of which $1,000,000 was advanced in December 2015. This support from PPVA, at the hand of the Platinum Insiders, was not able to meet the total interest due under the loan and millions of interest remained

outstanding.  As holders of the debt, WNIC, SHIP and Beechwood were by this time fully apprised that the Northstar Indenture Debt was non-performing.

350.    On March 22, 2016, PPCO borrowed $52.8 million from SHIP and the Beechwood Reinsurance Trusts to effectuate the following transactions.

351.    PPCO was made to use $31.45 million of the loan from SHIP and the Beechwood Reinsurance Trusts to buy the 12% Secured Notes from their lenders, SHIP and the Beechwood Reinsurance Trusts on that date.  WNIC, SHIP and Beechwood knew that the 12% secured notes were not worth $31.45 million yet they executed at that price.  Accordingly, the sale of that security necessarily involved the misrepresentations by WNIC, SHIP and Beechwood that $31.45 million was a fair price. The $31.45 million consisted of $30.8 million of principal and $1.65 million of accrued and unpaid interest.

352.    The remaining $21.35 million was 'loaned' to PPVA by PPCO to purchase the remaining 12% Secured Notes from SHIP. The $21.35 million consisted of $20.2 million of principal and $1.15 million of accrued and unpaid interest.

353.    However, no cash was moved.  These series of transactions caused SHIP and WNIC, through the Beechwood Reinsurance Trust, to harm PPCO by obtaining secured priority over PPCO's assets, and saddling PPCO with the twin yokes of an interest in a company on the verge of bankruptcy and a receivable from an equally financially precarious PPVA.

354.    As part of a March 2016 restructuring, PPVA, at the hand of the Platinum Insiders, attempted to satisfy its outstanding loans to PPCO. In order to do so, the Platinum Insiders had PPVA transfer to PPCO 40.59 shares of Urigen for $17.2 million.  According to the PPVA complaint, PPVA had repeatedly failed to meet its lending obligations to Urigen. (PPVA Complaint,  ¶123). In effect, the Platinum Insiders used PPVA to transfer an investment that had

99

been starved of capital to PPCO at par. The Platinum Insiders also caused PPVA to transfer to PPCO interests in Navidea for $7.0 million, including $461,800 of accrued interest, and interests in Airdye for $13.5 million consisting of $11.65 million of principal and $1.8 million of accrued interest. (PPCO Assignment Agreements for Airdye and Urigen).   Each of these transfers assumed a significantly inflated valuation for the securities transferred and essentially reduced the loans payable to PPCO on a dollar-for-dollar basis.

355.    The magnitude of oil price declines, along with the Northstar Offshore's inability to raise capital, eventually led the Company to file for Chapter 11 on December 2, 2016.

### 9.    Montsant

356.    Montsant appears to have been a shell company with no operating assets of its own interests in various Platinum portfolio companies including Black Elk and Implant Sciences Corporation ("**Implant**").

357.    Due to public reports and their own inside knowledge of Black Elk, the Platinum Insiders and Beechwood Insiders were well aware that Black Elk would be unable to meet its obligations under the 13.75% Senior Secured Notes. Despite this, on or about January 31, 2015, the Platinum Insiders and Beechwood Insiders caused a subsidiary of PPVA, Montsant Partners LLC ("**Montsant**"), to purchase all of the 13.75% Senior Secured Notes held by the Beechwood Entities at 93.5% of par, and to pay interest on the Golden Gate Oil Loan.

358.    To finance these transactions, the Platinum Insiders and Beechwood Insiders caused Montsant to "borrow" $35.5 million at 12% interest from SHIP, via a loan administered by Beechwood (the "**2015 Montsant Loan**") (Montsant Disbursement Letter and Funds Flow dated 1/30/15; Montsant Loan Agreement dated 1/30/15).   Although the 2015 Montsant Loan initially was made on an unsecured basis, the transaction documents required that collateral be

100

posted to secure the loan post-closing (Montsant Loan Pledge and Security Agreement). Thereafter, Platinum Management, transferred equity securities and notes belonging to PPVA and DMRJ to an account pledged as collateral to secure amounts due under the 2015 Montsant Loan (the "**Montsant Collateral Account**"), under transactions and circumstances that are the subject of continuing investigation (Montsant Loan Pledge and Security Agreement).

359.    Implant develops, manufactures, and sells sensors and systems for the security, safety, and defense industries, primarily in the United States and internationally. Implant was founded in 1984 and is headquartered in Wilmington, MA. (Platinum Implant Investment Memo; A&M 1Q16 PPVA valuation report).

360.    PPVA's subsidiary DMRJ Group, LLC ("*DMRJ*") began investing in Implant Sciences in late 2008, when it subscribed to a $5.6 million Senior Secured Convertible Note. PPVA made several more investments in a variety of loan facilities and convertible stock and warrants. In the period from 2008 through 2014, Implant defaulted on the loan facilities at various times and agreed to several amendments and additional capital contributions with PPVA. By the end of 2013, PPVA controlled the company (Platinum Implant Investment Memo; A&M 1Q16 PPVA valuation report)

361.    According to the PPVA Complaint, on or about March 19, 2014, the Platinum Insiders and the Beechwood Insiders caused BAM Administrative to refinance $20 million of the revolving loan issued by DMRJ to Implant Sciences Corporation ("**IMSC**"). The revolving loan and certain existing term loans also held by DMRJ were secured by liens on and security interests in all of the assets of IMSC and its affiliates. DMRJ subordinated all of its liens on IMSC's assets, including the lien securing DMRJ's revolving loan to IMSC to the liens securing repayment of BAM Administrative's term loan. The intercreditor agreement between DMRJ and

BAM Administrative also ceded to BAM Administrative significant rights in the event of an IMSC bankruptcy, even though DMRJ held much larger loans to that company. PPVA paid down margin calls and meet other operational needs with the $20 million cash infusion from Beechwood. (Implant Intercreditor Agreement dated 3/19/14).

362.    As part of the PPVA Restructuring in March of 2016, the Platinum Insiders caused PPVA to pledge to repay the Montsant Loan with the first $20 million PPVA would receive from repayment of any PPVA's other holdings in Implant Sciences Corp. Levy was the CIO of both Beechwood and PPVA.

363.    By mid-2016, PPVA had significant ownership of Implant's Senior Secured Promissory Notes, line of credit, First, Second and Third Senior Secured Promissory Notes, as well as the Company's common equity. PPVA's debt investments were carried at par, totaling nearly $86 million (Platinum Implant Investment Memo; A&M 1Q16 PPVA valuation report).

364.    On or around October 10, 2016 Christen Thomas, Beechwood's general counsel, sent a letter via email to the PPVA liquidators attaching a one-page letter signed by Nordlicht on January 13, 2016 and addressed to Beechwood, whereby Nordlicht promised to use all the cash proceeds which PPVA would receive from its stake in Implant Sciences towards the repayment of the Montsant Partners and Golden Gate Oil loans owed to Beechwood. Feuer signed this letter as the witness.

365.    Implant was pledged as collateral for the Monsant loan, which in turn was transferred back to PGS as part of the consideration for the January 2017 forced redemption of $35.4 million of Class C preferred stock of AGH Parent, held by PGS.

    **10.    China Horizon**

102

366.     China Horizon Investments Group ("**China Horizon**") is an early stage privately-held company engaged in the wholesale and retail distribution of packaged foods, household products, agricultural products, animal feed, cosmetics and related items to both Company operated convenience stores in three Chinese provinces. China Horizon built a network of convenience stores by partnering with the China Post, the postal service of China. (Platinum China Horizon Investment Memo dated 12/31/13)

367.     PPVA initially invested in the Company in 2007 through the purchase of the Company's $5 million issuance of the Series A Preferred Shares (Platinum Updated Investment Memo).

368.     PPVA participated in subsequent rounds of financing for China Horizon, with the company raising tens of millions of dollars from additional outside unaffiliated investors, including John Mack (from Morgan Stanley) and Howard Shultz (from Starbucks) (Platinum China Horizon Investment Memo dated 12/31/13)

369.     From November 2013 through June 2015, the Platinum Insiders caused PPVA to make approximately $350,000 of principal loans in the form of Secured Promissory Notes and $4.8 million in Demand Promissory Notes to China Horizon. (Platinum Demand Promissory Note dated 8/3/16)

370.     In May, September and December 2015, the Beechwood Insiders caused the Beechwood Reinsurance Trusts to make an additional $12 million of loans to China Horizon. (Beechwood Notes Amended and Restated Promissory Note dated 4/1/16).

371.     In January 2016, China Horizon filed a lawsuit against China Post in the New York State Supreme Court in regards to confusion surrounding market rights of the two entities, effectivity ending the joint venture with China Post. As a result, a restructuring occurred and

Yellow River was created.  Yellow River was a standalone entity that was set up as a parallel structure to China Horizon. Ownership interests in Yellow River were distributed to China Horizon stakeholders.  (Yellow River Investor Presentation dated 4/1/16). As part of this restructuring, equity holders of China Horizon received a 65% interest in Yellow River and debt holders of China Horizon received a 35% interest in Yellow River.

372.    From that point forward, Yellow River was a standalone entity that no longer had the benefit of partnership with China Post.

373.    On June 9, 2016, Beechwood, SHIP and the Beechwood Reinsurance Trusts caused PGS to accept approximately $8.9 million of the Beechwood loans at par as part of the $170 million purchase consideration for Agera. Given the fall off in the business model, China Horizon was significantly overvalued at the time the assignment.

**11.    The Fraudulent Securities Transactions**

374.    Each of the above-described investments in the PPCO Funds and the PPVA Funds, and in the companies in which they made investments, constitute securities transactions.

375.    These securities transactions were made, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, wire services, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.

376.    Beechwood used funds transferred by SHIP pursuant to the IMAs to purchase $16.5 million in limited partnership or membership interests in the PPVA Funds.

377.    The PPVA Infusions masked the performance failures at the operating companies in which the PPVA Funds had invested, and were used to justify ever increasing valuations that defied market realities, and thereby pay management unearned fees.

378.    But for the PPVA Infusions, the PPVA Funds certainly would have failed by 2014, because they would have been unable to cover an approximately $100 million cash deficit in 2014.  Moreover, liquidating the PPVA Funds' investments to cover this deficit would have exposed that the investments were worth only a fraction of the valuations at which they were being carried.

379.    But for the purchase by PPCO of these securities, at overly inflated value, misrepresented by the Beechwood Entities, BCLIC, WNIC and SHIP as fair value, PPCO would not have continued to operate at a time when it was actually or nearly insolvent and should have been winding down it business.

380.    In order to prop up the PPVA Funds and prevent them from failing, the Beechwood Principals and other Platinum Partners insiders (i) caused the Beechwood Entities to use funds transferred by BCLIC or WNIC into the Beechwood Reinsurance Trusts or by SHIP pursuant to the IMAs to purchase securities in or loan monies to the PPCO Funds (Credit Strategies) and to purchase limited partnership interests in the PPCO Funds, and (ii) thereafter caused the PPCO Funds to enter into transactions in which such monies were used, including as follows:

(a)    The PPCO Funds provided PPVA with $77.8 million in cash of which PPVA repaid $46.5 million, leaving more than $31 million unpaid. PPVA Funds used to pay down redemptions and conceal its liquidity crisis.

(b)     On February 19, 2014, PPCO Master Fund received $36 million from Beechwood (including $1,000,000 from BRe BCLIC Sub, $1,7500,000 from BRe WNIC 2013 LTC Sub and $33,250,000 from BRe WNIC 2013 LTC Primary) to purchase limited partnership interests in the PPCO Funds.  PPCO Master Fund used $24.5 million to purchase membership interests in ALS from PPVA.  The Equity Receiver has not found any evidence that a valuation was performed for this transaction.  As a result, the PPCO Funds ended up being the sole provider of financial and operating support to ALS, to the tune of over $16 million between 2014 and 2016.     In other words, PPCO Master Fund, by buying the membership interests from interests from PPVA Master Fund, became solely responsible for the entirety of ALS' future funding needs, thereby relieving the pressure on the PPVA Funds' liquidity from the need to fund a portion of the ALS premiums. The 2014 financial statements for PPCO estimated premium funding needs at ALS of approximately $10 million to $12 million each year for the next five years.  Had PPCO Master Fund not made these premium payments, the value of the ALS investment, which at $85 million was also significantly inflated, would have declined dramatically.  Alternatively, PPCO Master Fund could have attempted to sell its investment in ALS (20% of total assets at year-end 2014) to third parties likely at a significant discount to its inflated carrying value of the purchase of membership interests.

106

(c)     Using funds that Beechwood had obtained from SHIP, BCLIC and WNIC, PPCO Master Fund made a temporary purchase bonds in Black Elk Energy Offshore Operations, LLC ("**Black Elk**") – a transaction from which the PPCO Funds received no benefit but which later resulted in a $24 million damages claim against the Receivership estate by the bankruptcy trustee of Black Elk. The Platinum Insiders caused PPCO to be ensnared in the Black Elk Scheme for the benefit of PPBE, PPVA and the Beechwood Reinsurance Trusts.

381.    The above-described investments in the PPCO Funds and the PPVA Funds and in the companies in which they made investments, constitute securities transactions.

382.    These securities transactions were made, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, wire services, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this District.

### 1.     The Worsening Liquidity Problems at the PPCO Funds and the PPVA Funds

383.    Meanwhile, the liquidity problems of the PPVA Funds and the PPCO Funds continued, with both groups of funds holding highly illiquid and overvalued "Level 3" assets, and the PPVA Funds facing growing redemption requests.

384.    According to PPVA Master Fund's financial statements dated as of December 31, 2014, as of that date, PPVA Master Fund and its subsidiaries had $1,000,181,360 in assets, which included investments in securities valued at $872,158,921, $756,432,286 of which were described as "Level 3" assets.  (Platinum Partners Value Arbitrage Fund L.P. and Subsidiaries

107

Consolidated Financial Statements Year Ended December 31, 2014 at 7, 19, 32)  The lack of liquidity in the PPVA Master Fund's investment portfolio was exacerbated by the fact that many of the NAVs shown on PPVA Master Fund's financial statements were greatly overstated and the companies in which it invested required constant and significant infusions of capital.

385.    Even those numbers do not reflect the full extent of the PPVA Funds' liquidity crisis because:  (a) Beechwood provided over $100 million in assistance to the PPVA Funds by purchasing approximately $100 million of their assets at significantly inflated valuations and by purchasing approximately $16 million in limited partnership subscriptions in the PPVA Feeder Funds; (b) Beechwood provided indirect liquidity support to the PPVA Funds by making a $29 million loan to Pedeveco, in which PPVA Master Fund had invested, funding $50 million of the $80 million under a secured note that enabled PPVA Master Fund to fund PPVA Master Fund's acquisition of Northstar, and orchestrating a transaction involving Black Elk; and (c) the PPVA Funds received nearly $40 million in additional liquidity support from the PPCO Funds in sales at inflated valuations to the PPCO Funds of membership interests in ALS Capital Ventures, LLC ("**ALS**"), which the PPVA Funds used to satisfy redemptions, and to purchase certain securities in Black Elk, which the PPVA Funds used to meet margin calls.

386.    Similarly, according to PPCO Master Fund and its subsidiaries' Consolidated Condensed Schedule of Investments for the year ended December 31, 2014, as of December 31, 2014, PPCO Master Fund and Subsidiaries had investments having a total fair value of $459,250,674, including "Level 3" assets having a value of $448,488,499, "Level 2" assets having a value of $2,110,231, and "Level 1" assets having a value of $8,651,944.  (PPCO Master Fund and Subsidiaries' Financial Statements as of December 31, 2014 at 6)

387.    The PPCO Funds also required funds from Beechwood to sustain themselves. Had insiders at Platinum Partners not continued to support the PPCO Funds through purchases of limited partnership interests, a limited set of assets from the PPCO Funds and directly funding certain portfolio companies, and had the Beechwood Entities, CNO, BCLIC, WNIC and SHIP not misrepresented the value of these securities as fair value, rather than its true negligent value, the PPCO Funds would likely have been wound down as well, and over $75 million in subsequent investments into failing portfolio companies could have been avoided. Indeed, most of these investments were carried at significantly elevated valuations; these values were unlikely to be realized in an orderly disposition of these assets as the Receivership has determined through its sale process.

388.    The insiders at Platinum Partners became more creative and began to obtain cash infusions and loans from Beechwood, insiders and affiliated entities in the Platinum funds.  For example, in or about September 2014, the Platinum Insiders caused PPVA to issue a promissory note with a maximum principal amount of $36 million and an interest rate of 1.333% per month (the "16% PPNE Note"). The 16% PPNE Note enabled insiders to make loans to PPVA. [PPVA Complaint ¶¶ 491-501].

389.    In October 2014, PPCO loaned $10 million to PPVA.  According to the SEC, the PPM's of both PPCO and PPVA prohibited lending or borrowing other than to facilitate an investment.  This loan was repaid by December 2014.

390.    PPVA's financial condition continued to worsen throughout 2015 and 2016 and it became increasingly difficult to pay out redemptions.  For example, PPVA was unable to meet the June 30, 2015 redemption request of PPVA Offshore Feeder Fund investor Kismetia Ltd.

("**Kismetia**"), instead opting to issue a promissory note dated as of that date but effective as of December 31, 2015 for the redemption balance.  (PPVA Complaint, ¶¶ 502-505)

391.    According to the PPVA Complaint, "[b]y December 2015, cash redemption payments to PPVA's investors had ceased. During the first six months of 2016, PPVA's financial condition continued to worsen…PPVA was unable to comply with its ongoing obligations to its investments, which caused the value of those investments to deteriorate significantly. It also faced numerous demands and lawsuits from creditors. Likewise, PPVA repeatedly failed to meet its lending obligations to Urigen Pharmaceuticals, Inc. ("Urigen"), a pharmaceutical startup in which it had invested. In a series of emails from March 29-April 1, 2016, the president of Urigen informed Nordlicht and Levy that, as a result of PPVA's failure to provide the agreed-upon financing, Urigen had missed payroll and monthly overhead and had failed to pay creditors." (PPVA Complaint at paragraph 119, 120, 124)  Faced with an ever-expanding hole that could not be met by the insiders or Beechwood direct infusions into PPVA, the insiders at Platinum caused PPCO to be raided by PPVA.

392.    Beginning on or about January 1, 2015, PPCO provided two lines of credit to PPVA with interest rates of 12% and 16% (the "12% Line of Credit" and the "16% Line of Credit", collectively the "2015 Lines of Credit").  Over the next two years, PPVA was advanced more than $31 million in cash than it repaid to PPCO under these facilities. The cash enabled PPVA to meet a portion of the many cash needs.  Insiders at Platinum also caused PPCO and PPVA to engage in a variety of non-cash transactions under lines of credit from 2015.

393.    Not only did the Platinum Insiders cause PPCO to send cash to PPVA through a line of credit for uses not permitted by the PPM's, they caused harm to PPCO by offloading a series of non-performing and impaired investments to PPCO.

394.    For example, as part of the PPCO Loan transactions, on or about December 31, 2015, the Platinum Insiders caused PPCO to purchase the remaining Desert Hawk position from PPVA for $9.0 million.  Desert Hawk was a non-performing investment, yet the $9.0 million par value was credited as a repayment by PPVA. Further, PPVA could not meet the cash infusions needed by Desert Hawk, a capital intensive mining investment. [PPVA Complaint at paragraph 121 and 122] leading the Desert Hawk operator to complain to Levy that that Desert Hawk was "an absolute living hell … It is not possible to run … without proper capitalization." [January 8, 2016 Desert Hawk email]. On February 18, 2016, a Desert Hawk representative emailed Levy that the company could not complete its audit because of insufficient funding. [February 18, 2016 Desert Hawk email]. PPCO was harmed by both a reduction in the amount owed by PPVA, but also by the millions of dollars it spent subsequently to prop up Desert Hawk.

395.    Numerous discrepancies existed with respect to PPVA Funds' financial records. As a result, the PPVA Funds' audited financial statements for the year ended December 31, 2013 were delivered on February 11, 2015, more than 287 days after the due date of April 30, 2014. This prolonged delay caused Platinum Management to violate the custody rule promulgated under the Investment Advisers Act of 1940 (the "Advisers Act") under which Platinum Management was required to either engage an independent public accountant to conduct a surprise examination once per year, or to circulate audited financial statements to investors within 120 days of the end of its fiscal year. The late delivery of audited financial statements was a "red flag" that was indicative of financial distress or other problems that arose during the audits. Indeed, CohnReznick's audit of PPVA's 2014 financial statements was not rendered until September of 2015, so CohnReznick also had firsthand knowledge of those indicators of distress

or other problems.  This was an obvious "red flag" of fraud that BCLIC, WNIC, CNO, SHIP and Fuzion should have heeded.

396.    By December 2015, cash redemption payments to the PPVA Funds' investors had ceased, with the notable exception of select redemption payments to insiders of Platinum Management and certain principals.

397.    As limited partnership investors in the PPVA Funds and the PPCO Funds, BCLIC and was entitled to receive audited financial statements from the funds.  However, the audits of the PPVA Funds for the fiscal year ended December 31, 2013 were not finalized until February 2015.  This extensive delay was caused by the auditors, BDO's ongoing concerns with valuation issues.  This huge delay in the audit no doubt raised substantial doubts about the nature of the valuation issues well before CNO, SHIP and BCLIC claimed to have been aware of Platinum Partners' deep involvement with Beechwood.

398.    During the first six months of 2016, the PPVA Funds' financial condition continued to worsen.  As a result, the PPVA Funds were unable to comply with their ongoing obligations to its investments, which caused the value of those investments to deteriorate significantly.

399.    During this time, the PPVA Funds also faced numerous demands and lawsuits from creditors.  As just a few examples:

> (a)    On January 8, 2016, Levy received an email from the operator of Desert Hawk Gold Corp. ("**Desert Hawk**") – a gold mining operation and a company in which a PPVA subsidiary had invested – claiming that Desert Hawk was "an absolute living hell … It is not possible to run … without proper capitalization." *See* January 8, 2016 Desert Hawk email.  *See Trott*

112

*v. Platinum Management (NY) LLC*, No. 18-cv-10936, ECF No. 1-1, at Ex. 8 (S.D.N.Y.).

(b)     On February 18, 2016, a Desert Hawk representative emailed Levy that the company could not complete its audit because of insufficient funding. *See* Feb. 18, 2016 Desert Hawk e-mail, *Trott v. Platinum Management (NY) LLC*, No. 18-cv-10936**,** ECF No. 1-1, at Ex. 9 (S.D.N.Y.),.

(c)     PPVA Master Fund repeatedly failed to meet its lending obligations to Urigen Pharmaceuticals, Inc. ("Urigen"), a pharmaceutical startup in which it had invested.  In a series of emails from March 29-April 1, 2016, the president of Urigen informed Nordlicht and Levy that, as a result of PPVA's failure to provide the agreed-upon financing, Urigen had missed payroll and monthly overhead and had failed to pay creditors.  *See* Urigen emails, *Trott v. Platinum Management (NY) LLC*, No. 18-cv-10936, ECF No. 1-1 at Ex. 10 (S.D.N.Y.).

(d)     On June 15-22, 2016, a Platinum Management representative exchanged a series of email with a representative of Golden Gate Oil (an investment marketed at various times as worth more than $100 million according to the Platinum Defendants), whereby Golden Gate Oil complained that, due to PPVA's inability to fund working capital, Golden Gate Oil was unable to meet payroll expenses for the second month in a row.  See Golden Gate Oil emails *Trott v. Platinum Management (NY) LLC*, No. 18-cv-10936 ECF No. 1-2 at Ex. 11. (S.D.N.Y.).

**G.      The Defendants' Movement of Assets Out of the PPCO Funds.**

113

400.    By the fall of 2015, PPCO Master Fund, PPCO Fund TE, PPCO Fund, PPCO Fund International and PPCO Fund International A as well of each of the PPVA Funds were insolvent in that each of their liabilities exceeded each of their assets.

401.    Beginning in late 2015 and continuing until early 2017, the Defendants conspired to transfer or encumber nearly all of the remaining PPCO Fund assets to or for the benefit of BCLIC, WNIC, SHIP, Beechwood and the select insiders of Platinum Partners.

### 1.    The PPCO Loan Transactions and Securities Purchases

402.    BCLIC, WNIC, SHIP, acting through Beechwood affiliates that invested the funds deposited by them, caused PPCO Master Fund to issue a secured loan to them in exchange for assets worth only a fraction of their value.

403.    Between December 21, 2015 and March 21, 2016, PPCO Master Fund entered into a series of transactions in which it borrowed $69,153,626.82 from SHIP (through BAM Administrative, which as SHIP's nominee) and from the Beechwood Reinsurance Trusts (through the BAM Administrative) (collectively, the "**PPCO Loan Transactions**"), in order to purchase certain securities from Beechwood (which held assets as nominee of SHIP), SHIP and the Beechwood Reinsurance Trusts (which held assets of BCLIC and WNIC) worth only a fraction of that amount (the "**Purchased Securities**") in a series of non-cash transactions (collectively, the "**PPCO Loan Transactions and Securities Purchases**").  As part of the PPCO Loan Transactions and Securities Purchases, BAM Administrative  (as agent for SHIP and the Beechwood Reinsurance Trusts, which held assets for the benefit of BCLIC and WNIC)  also purportedly received security interests securing PPCO Master Fund's obligations under PPCO Loan Transactions and Security Purchases, in PPCO Master Fund's assets and its subsidiaries' assets, including equity interests.

114

404.    The PPCO Loan Transactions and Securities Purchases included several agreements and transfers which are summarized below.

405.    Under a Delayed Draw Demand Note, dated December 23, 2015, SHIP (through BAM Administrative, as SHIP's agent) loaned PPCO approximately $14,198,750 (the "**SHIP Note**"). The principal amount of the SHIP Note was  $15,500,000 and it was made payable by PPCO Master Fund to the order of SHIP and issued solely to SHIP.  In conjunction with the SHIP Note, PPCO Master Fund and thirty-five of its subsidiaries (the "**MSA PPCO Subsidiaries**") entered into a Master Security Agreement, dated December 23, 2015 (the "**MSA**"). Under the MSA, PPCO Master Fund and each of the MSA PPCO Subsidiaries granted security interests to BAM Administrative, as agent on behalf of SHIP in substantially all of their respective assets to secure PPCO Master Fund's obligations under the SHIP Note.

406.    In addition, the MSA Subsidiaries also entered into a Subsidiary Guarantee, dated December 23, 2015 (the "**MSA Subsidiary Guarantee**"), pursuant to which the MSA Subsidiaries guaranteed payment of the SHIP Note.

407.    On December 23, 2015, $9,1978,750 funded by SHIP under the SHIP Note was disbursed by BAM Administrative (as agent for SHIP) as follows:

(a)     $1,711,989.58 to Beechwood Bermuda (as SHIP's nominee) for PPCO Master Fund to purchase Desert Hawk debt held in SHIP's IMA account at Beechwood Bermuda;

(b)     $3,398,427.08 to Beechwood Bermuda (as SHIP's nominee) for PPCO Master Fund to purchase additional Desert Hawk debt held in SHIP's IMA account Beechwood Bermuda; and

115

(c)     $4,088,333.34 to Beechwood Re (as SHIP's nominee) for PPCO Master to purchase certain Desert Hawk debt.

408.    On December 30, 2015, $5,000,000 of the funds loaned under the SHIP Note were disbursed by BAM Administrative for full repayment of all indebtedness owing by LC Energy under:

(a)     June 3, 2014 Secured Term Note issued by LC Energy to originally BRe WNIC 2013 LTC Primary in the original principal amount of $3,091,292.00;

(b)     June 3, 2014 Secured Term Note issued by PPCO originally to BRe WNIC 2013 LTC Sub in the original principal amount of $151,425.00;

(c)     June 3, 2014 Secured Term Note by LC Energy originally to BRe BCLIC 2013 LTC Primary in the original principal amount of $1,675,167.00; and

(d)     June 3, 2014 Secured Term Note by LC Energy originally to BRe BCLIC 2013 LTC Sub in the original principal amount of $82,116.00.

409.    SHIP (through BAM Administrative as its agent) subsequently loaned an additional $2,000,000 to PPCO Master Fund pursuant to an Amended and Restated Delayed Draw Demand Note, dated January 20, 2016 (the "**First A&R SHIP Note**"), increasing the outstanding amount loaned by SHIP to approximately $16,017,788.55.  The First A&R SHIP Note amended and restated the SHIP Note such that the principal amount increased to $18,500,000.

410.    In conjunction with the First A&R SHIP Note, PPCO Master Fund and the MSA PPCO Subsidiaries entered into a Reaffirmation and Ratification Agreement, dated January 20, 2016 (the "**Ratification Agreement**").  Under the Ratification Agreement, the MSA PPCO

Subsidiaries reaffirmed and ratified the MSA Subsidiary Guaranty.  The Ratification Agreement also confirmed that the obligations under the MSA and MSA Subsidiary Guarantee included the First A&R SHIP Note.

411.    On March 21, 2016, PPCO Master Fund, BAM Administrative, as agent, and various purchasers, including SHIP and the Beechwood Reinsurance Trusts entered into a Note Purchase Agreement, dated March 21, 2016 (the "**NPA**").   Under the NPA, the purchasers, which included SHIP and the Beechwood Reinsurance Trusts (collectively, the "**Creditor Parties**"), agreed to extend additional loans to PPCO pursuant to five secured term notes up to $70,000,000 (the "**NPA Notes**").

412.    In conjunction with the NPA, PPCO Master Fund entered into an Amended and Restated Master Security Agreement, dated March 21, 2016 (the "**A&R MSA**."). While the MSA PPCO Subsidiaries executed both the MSA and the Ratification Agreement, no subsidiaries of PPCO Master Fund executed the A&R MSA.  In fact, the MSA expressly did not amend or restate the security interest granted by the MSA PPCO Subsidiaries as collateral for the obligations of these subsidiaries under the MSA Subsidiary Guarantee.  Rather, according to SHIP, under the A&R MSA, PPCO Master Fund granted security interests to BAM, as agent, on behalf of the Creditor Parties, in substantially all of PPCO Master Fund's assets.  Schedule C of the A&R MSA purports to list all of the equity interests owned by "each Assignee" (without expressly defining the term "**Assignee**") and the percentage ownership of each "Assignee." Schedule C lists twenty-nine subsidiaries of PPCO Master Fund but contains no information below the headings "Class," 'Certificate No.," "Par Value" or "Number of Interests." Specifically, according to SHIP, the A&R MSA provides that the MSA "shall be amended and restated in its entirety by [the A&R MSA] except for the liens and security interest granted

pursuant to the [MSA], which liens and security interests shall continue in full force and effect during the term of this [A&R MSA] and any renewals or extensions thereof and shall continue to secure the Obligations."

413.   SHIP has claimed that the A&R MSA defines the term "Obligations" to include the NPA and related agreements. Under the A&R MSA, PPCO Master Fund reaffirmed "the liens and security interests granted to [BAM Administrative as] the Agent" under the MSA.  In other words, according to SHIP, under its express terms, the A&R MSA did not extinguish or otherwise affect the security interests granted by PPCO Master Fund under the MSA.  Rather, according to SHIP, PPCO Master Fund, on its own behalf, granted additional security interests to the Creditor Parties, including SHIP, under the A&R MSA.  Likewise, according to SHIP, the A&R MSA did not extinguish or otherwise affect the security interests granted by the MSA PPCO Subsidiaries only to SHIP under the MSA, nor could it since the MSA PPCO Subsidiaries' were not parties to the A&R MSA.

414.   Also in conjunction with the NPA, thirty-five PPCO subsidiaries and Platinum Partners Credit International LP (collectively, the "**NPA Guarantors**") entered into a Subsidiary Guaranty, dated March 21, 2016 (the "**NPA Guaranty**"). Pursuant to the NPA Guaranty, the NPA Guarantors guaranteed to the Creditor Parties, including SHIP, the payment of Obligations, including the NPA Notes.  The NPA Guaranty, however, does not contain any term in which it purports to amend or otherwise modify the MSA Subsidiary Guaranty.

415.   First, as SHIP had already loaned money to PPCO Master Fund, however, it did not enter into a new note with PPCO Master Fund like the other purchasers.  Rather, under the NPA, the SHIP Note was amended pursuant to a Second Amended and Restated Secured Note, dated March 21, 2016 (the "**Second A&R SHIP Note**").  The Second A&R SHIP Note amended

118

and restated the SHIP Note such that the face principal amount increased from $18,500,000 to $42,963,949.04. Pursuant to the NPA and the Second A&R SHIP Note, SHIP loaned PPCO Master Fund an additional $26,590,877.78, increasing the total amount loaned which, with accrued interest from the SHIP Note (as amended and restated by the A&R SHIP Note), totaled the face principal amount of the Second A&R SHIP Note. BAM Administrative, as agent for SHIP, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd.

416.    Second, on or about March 21, 2016, PPCO Master Fund and BRe BCLIC 2013 LTC Primary entered into a $10 Million Secured Term Note dated March 21, 2016 in which BRe BCLIC 2013 LTC agreed to loan $10 million to PPCO Master Fund.

417.    Third, on or about March 21, 2016, PPCO Master Fund and BRe BCLIC 2013 LTC Sub entered into a $500,000 Secured Term Note dated March 21, 2016 in which BRe BCLIC 2013 LTC Sub agreed to loan $500,000 to PPCO Master Fund.

418.    Fourth, on or about March 21, 2016, PPCO Master Fund and BRe WNIC 2013 LTC Primary entered into a $14,989,677.78 Secured Term Note dated March 21, 2016 in which BRe BCLIC 2013 LTC Sub agreed to loan $14,989,677.78 to PPCO Master Fund.

419.    Fifth, on or about March 21, 2016, PPCO Master Fund and BRe WNIC 2013 LTC Sub entered into a $700,000 Secured Term Note dated March 21, 2016 in which BRe WNIC 2013 LTC Sub agreed to loan $700,000 to PPCO Master Fund.

420.    On or about March 21, 2016, BAM Administrative, as agent for BReWNIC 2013 LTC Primary and SHIP, executed an Assignment Agreement dated as of March 21, 2016, in which (a) BRe WNIC 2013 LTC Primary purported to assign $20,056,611.11 to PPCO Master Fund, and (b) SHIP purported to assign $11,400,600.00 to PPCO Master Fund ("**Assignment**

**Agreement No. 1**").  This assignment was used for PPCO Master Fund to purchase (a) $20,056,611.11 of 12% Second Priority Senior Secured Notes (the "Northstar Indenture Debt") from BRe WNIC 2013 LTC Primary, including $19,000,000.00 of principal indebtedness and $1,056,611.11 in accrued and unpaid interest, and (b) $11,400,600.00 in Northstar Indenture Debt from SHIP, including $11,400,600.00 in principal indebtedness and $1,056,611.11 in interest.

421.    On or about March 21, 2016, BAM Administrative, as agent for SHIP, executed an Assignment Agreement dated as of March 21, 2016, in which SHIP purported to assign $21,323,344.44 to PPVA Oil and Gas, LLC ("**Assignment Agreement No. 2**").  This assignment was used for PPVA Oil and Gas, LLC to purchase $21,323,344.44 of Northstar Indenture Debt, including $20,200,000.00 in principal indebtedness and $1,123,344.44 in accrued and unpaid interest purchased, from SHIP (through BAM Administrative, as agent).  None of those amounts were paid to the assignees and instead were paid to the assignors.

422.    PPCO Master Fund loaned the PPVA Oil and Gas, LLC $21,323,344.44 from the proceeds of the Secured Term Note.  On the same day, PPVA Oil and Gas, LLC transferred several investment securities to PPCO Master Fund to repay the "loan" for the Northstar Indenture Debt.  In actuality, no cash was exchanged in the transactions.

423.    Instead, the monies under those assignment agreements were paid to the assignees in a transactions in which PPCO Master Fund purchased $50,000,000 of Northstar Indenture Debt and paid approximately $2.9 million in interest under that debt from the assignors under Assignment Agreement No. 1 and Assignment Agreement No. 2.

424.    The Purchased Securities included (a) assets transferred by Beechwood (for the account of SHIP) to PPCO Master Fund and/or PPVA Oil & Gas, LLC assigned a par value of

approximately $43 million, and (b) assets transferred by the Beechwood Reinsurance Trusts to PPCO Master Fund assigned a par value of approximately $26 million.  Moreover, over $21 million of those assets were transferred to PPVA Oil & Gas, LLC.

425.    On or about the dates on which the PPCO Loan Transactions and Securities Purchases were consummated, SHIP, Beechwood, BCLIC and WNIC represented that these were the true values of the Purchased Securities, which representations were false and were known by these defendants to be false when made.

426.    These securities transactions were made, directly or indirectly, by use of the means of instruments of transportation or communication in interstate commerce, or of the mails, or in service of or a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which accrued in this District.

427.    However, the actual value of the securities and other assets transferred by Beechwood (for the account of SHIP) and the Beechwood Reinsurance Trusts in connection with the PPCO Loan Transactions and Securities Purchases was actually a fraction of the par value assigned for purposes of the transactions.

428.    For example, the Northstar Indenture Debt was valued at par for purposes of the PPCO Loan Transactions and Securities Purchases, but that valuation substantially overstated the true value of those securities for several reasons.  First, Northstar had unusually high levels of undeveloped reserves (approximately 70% of total proved reserves). Therefore, any valuation of the reserves as a measure of the enterprise value of the company must be adjusted for the probability that production from these reserves would never be realized. For instance, the Society of Petroleum Engineers ("**SPEE**") in its 34th annual survey recommended significant haircuts (50% and higher) to expected production volumes from undeveloped reserves and probable

reserves. Per SEC guidelines, the PV-10 for a company is not a valuation measure; it is meant to be solely used as a relative measure of reserves across operations. Upon information and belief, the company and the Beechwood entities used a multiple of PV-10 applied to all reserves, proved, developed and producing or non-producing or if they were undeveloped. Second, upon information and belief, the assessment of the fair market value of the assets did not take into consideration the dire financial condition of Northstar at this time including its inability to make interest payments. An appropriate approach to value such a speculative oil and gas company would be use to a discounted cash flow approach using the most current reserve report projections with appropriate haircuts for likelihood of actual production and a discount rate that reflected the level of risk inherent to such an enterprise. In the Receiver's estimation, the estimated fair market value of the Northstar Indenture was well below par that it was purported to be.

429.    Similarly, the LC Energy Term Loan was worth well below par.  In order to estimate the fair market value of the LC Energy Term Loan, the Receiver estimated the enterprise value of LC Energy using a discounted cash flow ("**DCF**") approach and a comparable companies' precedent transactions approach.  In preparing the DCF valuation, the Receiver made multiple adjustments to the LC Energy's financial projections to reflect more reasonable operating assumptions and a discount rate (cost of capital) more reflective of a development-stage mining company. For instance, the company's projections did not appear to take into account these additional funding needs. The financial projections also relied upon unreasonable volume and pricing assumptions.  The Receiver adjusted the company's reserve estimates down to reflect the uncertainty of extraction, as indicated in its own reserve reports. Further, the Receiver adjusted the company's unreasonable pricing assumptions.  And finally, the Receiver

applied a discount rate to the adjusted projections that reflected more appropriately the high cost of capital for development-stage mining companies. In preparing an transactions analysis, the Receiver relied on an assessment of the value ascribed to proven and provable reserves in recent precedent transactions.

430.   In determining the estimated fair market value of the $9 million Desert Hawk Senior Secured Term Loan that PPCO Master Fund received as part of the PPCO Loan Transactions and Securities Purchases, the Receiver relied on an multiple approaches including a discounted cash flow approach, and market based analyses including, a comparable companies analysis and a precedent transactions analysis. In the market-based analyses, the Receiver assessed the enterprise value of Desert Hawk from a market-based assessment of the value of its reserves. Based on this analysis, the Receiver concluded that the Desert Hawk Senior Secured Term Loan had an estimated fair market value that was well below the par value implied by the PPCO Loan Transactions and Securities Purchases.

431.   The value of the loans and liens that PPCO Master Fund transferred in those transactions was at least $69 million.

432.   PPCO Master Fund did not "fair consideration" for the securities it transferred in connection with the PPCO Loan Transactions and Securities Purchases.

## 2.   The Agera Transactions

433.   The defendants Beechwood, SHIP and Fuzion engineered the June 9, 2016 transfer of one of PPCO Master Fund's most valuable assets – its interest in Agera Energy.

434.   Agera Energy LLC ("Agera Energy") is an energy company that supplies electricity and natural gas to businesses and residents, while offering efficiency services (demand management and utility audits) for businesses and residents. Until June 2016, PPCO and PPVA

123

owned Agera Energy through their membership interests (45% and 55%, respectively) in PGS. PGS held a secured convertible note issued by Agera Energy LLC (the "Agera Note"). The convertible note, issued in May 2014, could be converted into 95.0% of the outstanding securities of Agera Energy. The Agera Note was one of PPCO's most valuable positions.

435.    In 2016, Nordlicht and prior management initiated a series of transactions that fraudulently transferred the Agera Note to AGH Parent LLC, a company owned and controlled by SHIP, the Beechwood Reinsurance Trusts and other Beechwood Entities, and Starfish Capital, Inc. ("Starfish Capital") Starfish Capital was a company whose principal was Kevin Cassidy. Prior to his involvement with Starfish Capital and Agera, Cassidy was convicted for a fraudulent mark-to-market scheme when he was CEO of Optionable Inc. ("Optionable"). Optionable was a company founded by Nordlicht. [Forbes article dated April 26, 2012]

436.    On May 31, 2016, Nordlict formed AGH Parent LLC ("Agera Parent") with the specific intent of purchasing the Agera Note from PGS. In fact, the CNO Complaint alleges that Feuer and Taylor approached CNO about the Agera Note transaction with the reasoning that it would be a way for CNO to offload some of its "bad assets".

437.    On June 8, 2016, in preparation for the sale of the Agera Note, Nordlicht and Cassidy caused PGS to admit Starfish Capital as a "profits member". Starfish Capital was given 8% ownership of PGS. Upon information and belief, no valuation was performed at this date and no consideration was given to PPCO in exchange for giving up equity to accommodate Starfish Capital. According to a one sentence letter signed by Nordlicht, purportedly dated August 19, 2015, this ownership grant was compensation to Cassidy for his work overseeing Agera Energy [Starfish Consulting Agreement, Cassidy Ownership Letter].

438.   On June 9, 2016, in order to fund the purchase of the Agera Note for $170 million SHIP, the Beechwood Reinsurance Trusts and other Beechwood entities capitalized AGH Parent with $108.9 million in cash and assets in exchange for a Class A, Class B, Class B-1, Class B-2, Class C preferred shares and B-1 debt securities.

439.   The details of the funding transactions and capitalization of AGH Parent were as follows  [Agera Funds Flow Memo dated 6/9/16]:

(a)   Assets contributed for 350,000 Class A Preferred Units:

(i)   SHIP contributed $35 million in cash in exchange for 350,000 Class A Preferred Units

(b)   Assets contributed for 220,000 Class B-1 Preferred Units:

(i)   BRe WNIC 2013 LTC Primary contributed $3.1 million of principal indebtedness outstanding under that certain Secured Term Note, dated as of March 21, 2016, issued by PPCO.

(ii)   BBLN-Agera Corp. contributed $60,000 in cash in exchange for 600 Class B-1 Preferred Units and contributed 50% of its right title and interest under that certain Amended and Restated Assignment of Note and Liens ("**Repo Agreement**"), entered into as of May 12, 2016 by and among Principal Growth Strategies LLC, BBIL ULICO 2014, Beechwood Bermuda Investment Holdings Ltd., linked to its Segregated Accounts, Beechwood Bermuda International Ltd. and BBLNAgera Corp. (the "Repo Agreement") for 50,000 Class B-1 Preferred Units. BBLN-Agera Corp.'s 50%

125

Interest in the Repo Agreement had a purported value of $5,000,000.

(iii)   BBIL ULICO 2014 contributed $90,000 in cash in exchange for 900 Class B-1 Preferred Units and contributed 100% of its right title and interest under the Repo Agreement for 75,000 Class B-1 Preferred Units.  BBIL ULICO 2014's 100% interest in the Repo Agreement had a purported value of $7,500,000.

(iv)   BHLN-Agera Corp. contributed $60k in cash in exchange for 600 Class B-1 Preferred Units and contributed 100% of its right title and interest under the Repo Agreement, for 50,000 Class B-1 Preferred Units.  BHLN-Agera Corp.'s 100% interest in the Repo Agreement had a purported value of $5,000,000.

(v)   BOLN-Agera Corp. contributed $1.2 million in cash in exchange for 11,721 Class B-1 Preferred Units.

(c)   Assets contributed for $52 million AGH B-1 Debt:

(i)   SHIP (through its SHIP-BAM Account) contributed $0.3 million in cash in exchange for $0.3 million AGH B-1 Debt and $12.9 million of principal indebtedness  outstanding under that certain Second Amended and Restated Secured Term Note, dated as of March 21, 2016, issued by PPCO in exchange for $12.9 million AGH B-1 Debt

(ii)   SHIP also contributed $15.0 million in cash in exchange for $15.0 million of AGH B-1 Debt

(iii)     BBLN-Agera Corp. contributed $4.1 million in cash in exchange for $4.1 million of AGH B-1 Debt and contributed 49.7% of its right title and interest under the Repo Agreement in exchange for $5.0 million AGH B-1 Debt

(iv)     BOLN-Agera Corp. contributed $2.5 million in cash in exchange for $2.5 million AGH B-1 Debt, contributed its $12.3 million of participation interest in the PPCO Loan in exchange for $12.3 million AGH B-1 Debt and contributed an additional $1.7 million of participation interest in the PPCO Loan in exchange for $1.7 million AGH B-1 Debt

(v)     B Re WNIC 2013 LTC Primary contributed $4.6 million of Amended PEDEVCO Notes in exchange for $3.0 million AGH B-1 Debt, and contributed $0.6 million of principal and $31,000 of accrued and unpaid interest under the Secured Promissory Note issued by China Horizon in exchange for $0.7 million AGH B-1 Debt, and contributed $0.6 million of principal and $23k of accrued and unpaid interest under the China Horizon Secured Promissory Note in exchange for $0.7 million AGH B-1 Debt, contributed $4.2 million of principal and $0.2 million of accrued and unpaid interest under the China Horizon Amended and Restated Convertible Note, in exchange for $4.4 million AGH B-1 Debt and contributed $0.6 million of cash in exchange for $0.6 million AGH B-1 Debt

127

(vi)    B Re WNIC 2013 LTC Sub contributed $0.7 million of cash in exchange for $0.7 million AGH B-1 Debt

(vii)   BRe BCLIC Sub contributed $0.5 million of cash in exchange for $0.5 million AGH B-1 Debt

(d)    In summary, the Beechwood Reinsurance Trusts and other Beechwood entities provided $10 million in cash and $48.9 million of assets in exchange for 220,000 AGH B-1 Preferred Units and $37 million of AGH B-1 Debt

(e)    SHIP contributed $50 million of cash in exchange for 350K Class A Preferred Units and $15 million AGH B-1 Debt

(f)    Beechwood Investments contributed $100 in cash for 5,730 AGH Parent Common Shares, representing 100% of AGH Parent Common Equity

(g)    The remaining $61.1 million of the $170 million purchase price consideration was funded by issuing 590,400 AGH Parent Class C Units for an purported value of $59.1 million and 3,438 AGH Parent Class B-2 preferred Units representing a $2.0 million in value

440.   On June 9, 2016, PGS sold the Agera Note (the Agera Note was amended just prior to the transaction to be issued by Agera Holdings LLC, the parent holding company of Agera Energy) to AGH Parent for a purported consideration of $170 million.

441.   The $170 million of consideration was comprised of the following.

(a)    $8.9 million of China Horizon Secured Promissory Notes

(b)    $8.0 million of Pedevco Notes

(c)    $59 million in Class C Preferred Units

(d)     $26.8 million of Participation in the PPCO Loan

(e)     $65.3 million of cash.

(f)     $2 million in class B-2 Preferred Limit

442.    Using proceeds from the transaction, Nordlicht and Cassidy caused PGS to repurchase Starfish Capital's 8% ownership interest in PGS for $7 million in cash, $2 million in AGH Parent Class B-2 preferred units and $4.6 million of AGH Parent Class C preferred units [Agera Note Purchase Agreement; Final Funds Flow].

443.    On January 26, 2017, AGH Parent redeemed $35.4 million of the AGH Parent Class C preferred units (336,928 Class C Preferred Units) helf by PGS by assigning the $14.1 million Golden Gate Oil loan, $15.6 million Montsant loan and $5.7 million Pedevco notes to PGS. PGS did not receive any cash consideration from the redemption but was left with approximately 207,970 Class C Preferred Units. [Agera Note February 2018 Conversion Application pg.23-26)]

444.    At a time when it was insolvent, PGS did not receive reasonably equivalent value in the sale of the Agera Note to AGH Parent.  Therefore, the Agera Note sale was a fraudulent transfer and PGS is owed damages of at least $100 million.

445.    At a time when it was insolvent, PGS did not receive reasonably equivalent value in the $35.4 million forced redemption of the AGH Parent Class C preferred units.  Therefore, the AGH Parent Class C note redemption was a fraudulent transfer and PGS is owed damages of at least $15 million.

446.    The Equity Receiver prepared an estimated fair market value of the Agera Note first by estimating the enterprise value of Agera Energy and then estimating the value of the Agera Note, which is dependent on this enterprise value. The Equity Receiver estimated the

enterprise value of Agera Energy using the three generally accepted approaches to business valuation – the discounted cash flow approach, and by reference to valuations implied by comparable companies and comparable transactions. In determining the enterprise value of Agera Energy using the discounted cash flow approach, the Equity Receiver relied primarily on the company's own business plan and projections with some adjustments to reflect its recent historical performance, and applied a discount rate derived from comparable companies.

447.    According to PPVA cash accounts, on June 9, 2016 PPVA only received $58.8 million in cash upon the close of the Agera Note sale. Of the cash PPVA received, only $3.0 million was advanced to PPCO, which only represented 5.1% of the cash distributed to PGS, despite its 45% membership interest in PGS.

448.    Nevertheless, these Defendants orchestrated these series of transactions referred to as the Agera Note Sale for cash and noncash consideration supposedly worth a total of $l70 million.  This was then known by SHIP, AGH Parent, PGS, Beechwood and the Platinum Insiders to be at least $40 million below the actual value of the Agera Note at a time when the PPVA Funds and the PPCO Funds were insolvent.

449.    As described, the consideration actually received by PGS in the Agera Note Sale was actually far less than $170 million because the noncash assets were knowingly misrepresented by SHIP, AGH Parent, Beechwood and the Platinum Insiders at the time of execution of the sale of the security to be at fair value, when in fact it was not.

450.    In particular, these transactions were designed or implemented in a manner in which they defrauded PPCO Master Fund, which subsequently received only $3.0 million in cash (5.1% of the cash consideration paid by Beechwood), together with noncash consideration consisting of overvalued investment in the Agera Note Sale, while PPVA Master Fund received

$55.3 million of the cash consideration in that transaction.  As part of that transaction, the Agera Note was also transferred to AGH Parent, and benefitted SHIP which owned 100% of AGH Parent.

451.    Tellingly, in a complaint they filed against Feuer, Taylor and Levy in this Court, BCLIC and WNIC admitted, among other things, that "[t]he Agera restructuring was represented by Feuer and Taylor to Plaintiffs as a mechanism to allow the Trusts to divest other bad Platinum-related investments."  *Bankers Conseco Life Ins. Co. v. Feuer, et al.*, No. 16-cv-7646 ¶ 125(b) (S.D.N.Y. Sept. 29, 2016).

452.    These transactions were made, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, wire service or of a facility of a national securities exchange, in connection with the transactions, acts, practices or courses of business alleged herein, certain of which accrued in this District.

453.    Further, the noncash consideration received by PGS in the AGH Note Sale included, among other assets, AGH Parent Class C Preferred Units which were assigned a "par value" of $59.0 million in the Agera Note Sale, meaning that they were deemed to represent $59.0 million of the $170 million supposedly received by PGS in the Agera Note Sale. However, if AGH Parent were to deliver a redemption notice of the Class C Preferred Shares before October 31, 2016, the shares could be redeemed for non-cash consideration with the remainder delivered in cash.  On October 28, 2016, AGH Parent delivered a redemption notice and Beechwood Re redeemed $35.4 million of the Agera Class C Preferred shares (336,928 of the Class C Preferred Shares, leaving PGS with 207,970 of Class C Preferred Shares) by assigning certain overvalued securities, which were then represented by SHIP, Beechwood and AGH Parent to be at fair value when each knew they were overvalued (a $14.1 million loan note

to Golden Gate, a $15.6 million loan note to Montsant, and $5.7 million in Tranche B Notes from Pedveco), causing further damage to PPCO Master Fund (the "**Class C Redemption**").

454.     These securities transactions were made, directly or indirectly, by use of the means of instrumentalities of transportation or communication in interstate commerce, or of the mails, or in service of or a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which accrued in this District.

## VI.     The Collapse of the PPVA Funds and the PPCO Funds

455.     On June 8, 2016, Huberfeld was arrested and criminally charged by the U.S. Attorney for the Southern District of New York in connection with his bribing a union official to make a $20 million investment in a fund owned and operated by Platinum Partners.[6]

456.     As described in the numerous media reports following that arrest, this included not only the bribery scheme to the union official, but also paying reported investment gains with money from incoming ones in the fashion of a Ponzi scheme, and obtaining further investments from new investors by deception to continue to prop up the hedge fund.

457.     On December 19, 2016, an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York charging seven Platinum Partners defendants, including Nordlicht and Levy, and commencing the criminal action against them (the "**Criminal Action**").

458.     Nordlicht, Levy and other insiders of Platinum Partners were criminally charged with securities fraud, investment adviser fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors through, among other

---

[6] On May 25, 2018, Huberfeld pled guilty to wire fraud conspiracy.

things, the overvaluation of their largest assets, the concealment of severe cash flow problems at the PPVA Funds, and the preferential payment of redemptions.

459.    Upon announcing the Criminal Action, Robert L. Capers, United States Attorney for the Eastern District of New York stated: "As alleged, Nordlicht and his cohorts engaged in one of the largest and most brazen investment frauds perpetrated on the investing public, earning Platinum more than $100 million in fees during the charged conspiracy.  Platinum Partners purported to be a standard bearer in the hedge fund industry, reporting annual average returns of more than 17 percent since inception in 2003.  In reality, their returns were the result of the overvaluation of their largest assets, which eventually led to Nordlicht and his co-conspirators operating Platinum like a Ponzi scheme, where they used loans and new investor funds to pay off existing investors."

460.    On the same day, December 19, 2016, the SEC commenced an enforcement action against Nordlicht, Levy, other individuals and Platinum Partners entities for securities laws violations (the "Enforcement Acton").   Upon announcing the Enforcement Action, the Director of the SEC's Division of Enforcement, Andrew J. Ceresney, stated: "As alleged in our complaint, investors were repeatedly presented a false picture of the performance of the Platinum funds and their overall liquidity situation.  As investors sought redemptions, the defendants engaged in numerous improper measures in an attempt to meet redemption requests, including taking out high-interest rate loans, commingling monies among funds, and raising money from new investors through fraudulent misrepresentations."

461.    Both the Criminal Action and the Enforcement Action are still pending.

**VII.    The RICO Enterprise**

462.     The Beechwood Entities, including Beechwood Re, BBIL, BAM, Beechwood Investments and the Reinsurance Trusts are enterprises within the meaning of the Racketeer Influenced and Corrupt Organizations Act of 1970, 18 U.S.C. § 1961 ("**RICO**").  Moreover, Beechwood – the association-in-fact of Beechwood Re, BBIL, BAM, Beechwood Investments, Beechwood Holdings, Beechwood Investments, and the Beechwood Reinsurance Trusts – constitutes a second RICO enterprise. And the association-in-fact of these entities and their co-conspirators, including, but not limited to, Feuer, Taylor, Levy, Nordlicht and others at or associated with Platinum Partners, as well as BCLIC, WNIC, SHIP, CNO and Fuzion constitutes a third RICO enterprise. As set forth in this Complaint, as well as in the pleadings set forth in the Criminal Action and the SEC Action, the Defendants and their co-conspirators functioned as a unit and conducted the affairs of each of these three RICO enterprises through a pattern of racketeering activity.

463.     These RICO enterprises shared common purposes and a structure. The primary purpose was to use the vehicles of Beechwood Re, BBIL, BAM, Beechwood Investments and the Beechwood Trusts to obtain funds from institutional investors, particularly insurance companies desperate to get unprofitable LTC business off their books, including BCLIC, WNIC and SHIP, and to use them as co-conspirators in the fraudulent scheme.

464.     Defendants' and their co-conspirators' use of the mails and wires of interstate commerce was integral to their perpetration of their common purposes and fraudulent schemes. Each of the co-conspirators agreed and committed to participate in these RICO enterprises and their common purposes and fraudulent schemes through two or more predicate acts of racketeering activity.

465.     These RICO enterprises had an ascertainable structure and organization that existed apart from the predicate acts of racketeering activity, as is demonstrated by: (a) the ownership and management structure of Beechwood Re, BBIL, BAM, Beechwood Investments, Beechwood Holdings, Beechwood Investments, and the Beechwood Reinsurance Trusts; (b) the roles the co-conspirators played in the establishment of, acquisition of interests in, and operation and management of Beechwood Re, BBIL, BAM, Beechwood Investments, Beechwood Holdings, Beechwood Investments, and the Beechwood Reinsurance Trusts; (c) many of the co-conspirators' often overlapping roles and positions at Beechwood Re, BBIL, BAM, Beechwood Investments, Beechwood Holdings, Beechwood Investments, the Beechwood Reinsurance Trusts and the various Platinum Partners entities; and (d) the participation and advancement of the scheme by CNO, BCLIC, WNIC, SHIP and Fuzion.

466.     As is demonstrated not only by each of the Defendants' roles and positions, but also by the facts set forth in this Complaint, the pleadings set forth in the Criminal Action and Enforcement Action, the co-conspirators functioned as a unit, with each of the Defendants participating in the operation or management of the RICO enterprises and playing vital roles in directing the enterprises' affairs through a pattern of racketeering activity.

467.     On May 25, 2018, a Department of Justice press release announced that Huberfeld pled guilty to conspiracy to commit wire fraud in connection with at least one aspect of his Platinum-related activities.

468.     The co-conspirators' pattern of racketeering activity has been continuous and ongoing.  The pleadings set forth in the Criminal Action and Enforcement Action as well as the complaints filed by BCLIC, WNIC, SHIP and PPVA confirm the pattern of racketeering, as it relates to insurers, that commenced at least by 2013 and remains ongoing and open-ended. For

135

example, Beechwood Re's and BBIL's reinsurance relationships with other insurers apart from

BCLIC, WNIC and SHIP appear to be continuing at present, and Beechwood Re still maintains

control of reinsurance trust assets. The predicate acts of racketeering activity are all related, as all

are tied to the enterprises' central purposes, as identified in this Complaint, and all have had the

same or similar results (*e.g.*, inducing institutional investors such as insurers to entrust

assets to Beechwood), participants (*e.g.*, the co-conspirators, including those identified as

Defendants in this action), victims (*e.g.*, the Platinum Investors), methods of commissions (*e.g.*,

deceptive schemes and promises, misrepresentations, fraudulent concealment of material facts,

and over- valuation of assets), personally profiting Defendants and Platinum-related participants

(*e.g.*, Nordlicht, Huberfeld, Levy, Feuer, and Taylor), and other distinguishing characteristics

such as using Platinum's designees to serve as Beechwood managers. The predicate acts of

racketeering activity have been an integral part of the enterprises' regular way of doing business.

## CLAIMS FOR RELIEF

### First Claim for Relief

**Aiding and Abetting Breach of Fiduciary Duty**
**Against the Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion**

469.    The Equity Receiver repeats and realleges each of the above paragraphs as if fully

set forth herein.

470.    Nordlicht, Huberfeld and Levy oversaw the management, operation, valuation and

administration of the PPCO Funds and their subsidiaries.  In addition, Credit Holdings was the

general partner of PPCO Master Fund.  Accordingly, Nordlicht, Huberfeld, Levy and Credit

Holdings (together with Nordlicht, Huberfeld and Levy, collectively, the "**Fiduciaries**") owed

fiduciary duties to the PPCO Funds.

136

471.    The Fiduciaries (a) were obligated and bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to the PPCO Funds; (b) were obligated to exercise due care and diligence to preserve, invest, value, manage, operate, and administer the PPCO Funds, their subsidiaries, their property and their assets; (c) owed the PPCO Funds duties of full and candid disclosure of all material facts relevant to the PPCO Funds, to deal fairly, honestly and in good faith with the PPCO Funds, and not to omit any material facts; (e) were obligated to ensure that they did not engage in any fraudulent, unsafe, unlawful or unsound investment, operational, administrative or management practices; owed the PPCO Funds fiduciary duties of loyalty and good faith; and (f) were duty bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to the PPCO Funds.

472.    By engaging in the fraudulent scheme described herein – including (i) causing PPCO Master Fund to make nearly $30 million in transfers and/or loans to the PPVA Funds which were never repaid; (ii) causing PPCO Master Fund to purchase membership interests in ALS, an unprofitable entity, at the wildly inflated price of $24.5 million, which then required the PPCO Funds to provide millions of dollars of additional funds to ALS annually; (iii) causing PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership estate by the bankruptcy trustee of Black Elk; (iv) the systematic misrepresentation and overvaluation of the PPCO Funds' NAV for the purpose of paying the Beechwood Principals and other select insiders of the PPCO Funds unearned fees, resulting in the payment of, among other amounts, unearned management and professional fees believed to be at least $35 million, and tens, if not hundreds, of millions of unnecessary investments by the PPCO Funds in underwater investments; and (v) the transfer or encumbrance of the PPCO

Funds' assets for the sole benefit of Beechwood, the Beechwood Principals, BCLIC, WNIC, CNO, SHIP, Fusion, the PPVA Funds and select insiders of Platinum Partners and to the detriment of the PPCO Funds in connection with, among other transactions, the PPCO Loan Transactions and Securities Purchases, the Agera Note Sale and the Class C Redemption – the Fiduciaries repeatedly breached their fiduciary obligations of due care and loyalty to the PPCO Funds.  In this regard, set forth in the Complaint in the SEC Action, the Fiduciaries managed the PPCO Funds in an unlawful manner and failed to manage the PPCO Funds in good faith.

473.    As a direct and proximate result of the Fiduciaries' breaches of their fiduciary duties, the PPCO Funds were injured and sustained damages.

474.    The Fiduciaries engaged in a consistent pattern of self-dealing and breaches of their duty of loyalty throughout the course of the schemes.

475.    As a direct and proximate result of the Fiduciaries' self-dealing and breaches of their duty of loyalty to the PPCO Funds, the PPCO Funds were injured and sustained damages.

476.    The Beechwood Entities initially shared offices and several senior staff members of the Platinum Partners entities (including Credit Holdings) were current or seconded employees of the Beechwood Entities, including Levy, who was named as BAM's initial CIO and was marketed as part of the Beechwood Entities' senior executive team.

477.    BCLIC, WNIC, SHIP, CNO, Fuzion and the Beechwood Defendants, on one hand, communicated regularly by e-mail and in person with the Fiduciaries in their capacities and insiders at Platinum Partners entities including Credit Holdings, on the other, regarding the statements and transactions comprising the schemes.

478.    BCLIC, WNIC, SHIP, CNO, Fuzion and the Beechwood Defendants substantially assisted and participated in the Fiduciaries' breaches of their fiduciary obligations to the PPCO

Funds in connection with the schemes by, *inter alia* − − including, without limitation, (i) engaging in transactions that caused PPCO Master Fund to make nearly $30 million in transfers and/or loans to the PPVA Funds which were never repaid; (ii) engaging in transactions that caused PPCO Master Fund to purchase membership interests in ALS, an unprofitable entity, at the wildly inflated price of $24.5 million, which then required the PPCO Funds to provide millions of dollars of additional to ALS annually; (iii) engaging in transactions that caused PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership estate by the bankruptcy trustee of Black Elk; (iv) engaging in transactions that resulted in the transfer or encumbrance of the PPCO Funds' assets, in the scheme, for the sole benefit of Beechwood, the Fiduciaries, BCLIC, WNIC, CNO, SHIP, Fusion, the PPVA Funds and select insiders of Platinum Partners and to the detriment of the PPCO Funds in connection with, among other transactions, the PPCO Loan Transactions and Securities Purchases, the Agera Note Sale and the Class C Redemption.  In the aggregate, over the period from 2014-2016, the Platinum Insiders caused PPCO to make net investments off approximately $75,000,000 into their failing portfolio companies.

479.    Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion had actual knowledge that the Fiduciaries were engaging in the actions comprising the schemes.

480.    As a direct and proximate result of the Fiduciaries' actions and substantial participation, the PPCO Funds were damaged.

481.    The actions of the Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion caused harm on which the primary liability of breach of fiduciary duties is predicated.

482.   By reason of the foregoing, the Equity Receiver is entitled to a judgment awarding her compensatory damages in an amount to be determined at the trial to this action, together with interest at the statutory rate.

483.   In addition, because the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fusion acted in a manner that was willfully, grossly, recklessly and wantonly negligent, and without regard for the PPCO Funds' rights and interests, the Equity Receiver is further entitled to punitive damages for the misconduct alleged herein.

**<u>Second Claim for Relief</u>**

**Common Law Fraud**
**(Against the Beechwood Entities,**
**<u>BCLIC, WNIC, SHIP, CNO and Fuzion)</u>**
**[By the PPCO Master Fund]**

484.   The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

485.   Prior to and at the time of execution of the transaction documents in connection with the PPCO Loan Transactions and Securities Purchases, the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fuzion knowingly made numerous false representations of material fact to the PPCO Funds, including misrepresentations that the value of the Purchased Securities was the par value ascribed to them in the transaction documents for the PPCO Loan Transactions and Securities Purchases.

486.   The Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion made those misrepresentations knowing that they were false and with the intent of inducing the PPCO Funds to enter into those transaction documents.

487.   The Beechwood Defendants, acting on behalf of themselves and as agent for BCLIC, WNIC, SHIP, CNO and Fuzion, also knowingly omitted and concealed from PPCO

140

Master Fund material information, even though they knew such information was material, as detailed in this Complaint that the value of the Purchased Securities was only a fraction of the par value ascribed to them in the transaction documents for the PPCO Loan Transactions and Securities Purchases, and they did so with the intent of inducing PPCO Master Fund to enter into those transaction documents.

488.   The PPCO Funds were thereby induced to believe that the value of the Purchased Securities was the par value ascribed to them in such transaction documents.

489.   The PPCO Master Fund justifiably relied upon such misrepresentations and omissions or concealments to its detriment in entering into the transaction documents for the PPCO Loan Transactions and Securities Purchases and in borrowing $42.963 million from SHIP through the IMAs, and $26.2 million from the Beechwood Reinsurance Trusts in order to purchase the Purchased Securities, which were worth only a fraction of that amount.

490.   As a proximate result of the fraudulent misrepresentations, omissions, and concealments, by the Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion, the PPCO Fund sustained damages because the value of PPCO Loan Transactions and Securities Purchases and the liens purportedly transferred to the Beechwood Defendants for the account of SHIP was worth over $69 million whereas the value of the assets transferred to the PPCO Funds was only a fraction of their par value.

491.   The Beechwood Entities' misrepresentations and omissions or concealments in inducing the PPCO Master Funds to enter into and consummate the transactions in connection with the PPCO Loan Transactions and Securities Purchases were intentional and deliberate, evidence a high degree of moral turpitude, and demonstrate the Beechwood Entities', BCLIC's,

WNIC's, SHIP's, CNO's and Fuzion's wanton dishonesty or reckless disregard for the rights of PPCO Master Fund.

492.     As a result of the foregoing wrongful conduct of the Beechwood Entities, the Individual Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion's wrongful conduct, PPCO Master Fund has sustained damages in an amount to be determine at trial, not less than the difference between (a) the value of the loan payments due to, and liens purportedly received by, the Beechwood Entities, BCLIC, WNIC and SHIP in connection with the PPCO Loan Transactions and Securities Purchases, believed to be at least $69 million, and (b) the actual value of the Purchased Securities.

493.     Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, PPCO Master Fund is entitled to punitive damages.

### Third Claim for Relief

**Common Law Fraud**
**(Against the Beechwood Defendants,**
**BCLIC, WNIC, SHIP, CNO and Fuzion)**
**[By PPCO Blocker Company, PPCO Fund TE, PPCO Fund International and PPCO Fund**
**International A (the "Feeder Funds)]**

494.     The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

495.     Prior to and at the time of execution of the transaction documents in connection with the PPCO Loan Transactions and Securities Purchases, the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fuzion knowingly made numerous false representations of material fact to the PPCO Funds, including misrepresentations that the value of the Purchased Securities was the par value ascribed to them in the transaction documents for the PPCO Loan Transactions and Securities Purchases.

496.     The Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion made those misrepresentations knowing that they were false and with the intent of inducing the PPCO Funds to enter into those transaction documents.

497.     The Beechwood Defendants, acting on behalf of themselves and as agent for BCLIC, WNIC, SHIP, CNO and Fuzion, also knowingly omitted and concealed from PPCO Master Fund material information, even though they knew such information was material, as detailed in this Complaint that the value of the Purchased Securities was only a fraction of the par value ascribed to them in the transaction documents for the PPCO Loan Transactions and Securities Purchases, and they did so with the intent of inducing PPCO Master Fund to enter into those transaction documents.

498.     The PPCO Funds were thereby induced to believe that the value of the Purchased Securities was the par value ascribed to them in such transaction documents.

499.     The Feeder Funds justifiably relied upon such misrepresentations and omissions or concealments to its detriment in entering into the transaction documents for the PPCO Loan Transactions and Securities Purchases and in borrowing $42.963 million from SHIP through the IMAs, and $26.2 million from the Beechwood Reinsurance Trusts in order to purchase the Purchased Securities, which were worth only a fraction of that amount.

500.     As a proximate result of the fraudulent misrepresentations, omissions, and concealments, by the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fuzion, the Feeder Fund sustained damages because the value of PPCO Loan Transactions and Securities Purchases and the liens purportedly transferred to the Beechwood Entities for the account of SHIP was worth over $69 million whereas the value of the assets transferred to the PPCO Funds was a fraction of their par value.

501.    The Beechwood Entities' misrepresentations and omissions or concealments in inducing the Feeder Funds to enter into and consummate the transactions in connection with the PPCO Loan Transactions and Securities Purchases were intentional and deliberate, evidence a high degree of moral turpitude, and demonstrate the Beechwood Entities', BCLIC's, WNIC's, SHIP's, CNO's and Fuzion's wanton dishonesty or reckless disregard for the rights of PPCO Master Fund.

502.    As a result of the foregoing wrongful conduct of the Beechwood Entities, the Individual Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion's wrongful conduct, PPCO Master Fund has sustained damages in an amount to be determine at trial, not less than the difference between (a) the value of the loan payments due to, and liens purportedly received by, the Beechwood Entities, BCLIC, WNIC and SHIP in connection with the PPCO Loan Transactions and Securities Purchases, believed to be at least $69 million, and (b) the actual value of the Purchased Securities.

503.    Because of the intentional, deliberate, and malicious nature of Beechwood's acts, as set forth in this Complaint, PPCO Master Fund is entitled to punitive damages.

## Fourth Claim for Relief

### Aiding and Abetting Common Law Fraud
### Against the Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion

504.    The Equity Receiver repeats and realleges each of the above paragraphs as if fully set forth herein.

505.    By engaging in the fraudulent scheme described herein, Nordlicht, Huberfeld, Bodner and Levy caused: (i) PPCO Master Fund to make nearly $30 million in transfers and/or loans to the PPVA Funds which were never repaid; (ii) PPCO Master Fund to purchase membership interests in ALS, an unprofitable entity, at the wildly inflated price of $24.5 million,

which then required the PPCO Funds to provide millions of dollars of additional funds to ALS annually; (iii) PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership estate by the bankruptcy trustee of Black Elk; (iv) the systematic misrepresentation and overvaluation of the PPCO Funds' NAV for the purpose of paying unearned fees, resulting in the payment of, among other amounts, unearned management and professional fees believed to be at least $35 million, and tens, if not hundreds, of millions of unnecessary investments by the PPCO Funds in underwater investments; and (v) the transfer or encumbrance of the PPCO Funds' assets for the sole benefit of Beechwood, the Beechwood Principals, BCLIC, WNIC, CNO, SHIP, Fusion, the PPVA Funds and select insiders of Platinum Partners and to the detriment of the PPCO Funds in connection with, among other transactions, the PPCO Loan Transactions and Securities Purchases, the Agera Note Sale and the Class C Redemption.

506.    BCLIC, WNIC, SHIP, CNO, Fuzion and the Beechwood Defendants each provided substantial assistance in connection with the schemes by, *inter alia* − − including, without limitation, (i) engaging in transactions that caused PPCO Master Fund to make nearly $30 million in transfers and/or loans to the PPVA Funds which were never repaid; (ii) engaging in transactions that caused PPCO Master Fund to purchase membership interests in ALS, an unprofitable entity, at the wildly inflated price of $24.5 million, which then required the PPCO Funds to provide millions of dollars of additional to ALS annually; (iii) engaging in transactions that caused PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership estate by the bankruptcy trustee of Black Elk; (iv) engaging in

145

transactions that resulted in the transfer or encumbrance of the PPCO Funds' assets, in the scheme, for the sole benefit of Beechwood, the Fiduciaries, BCLIC, WNIC, CNO, SHIP, Fusion, the PPVA Funds and select insiders of Platinum Partners and to the detriment of the PPCO Funds in connection with, among other transactions, the PPCO Loan Transactions and Securities Purchases, the Agera Note Sale and the Class C Redemption.

507.    Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fuzion had actual knowledge that Nordlicht, Huberfeld, Bodner and Levy were engaging in the actions comprising the schemes.

508.    As a direct and proximate result of the actions and substantial participation of the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fuzion, the PPCO Funds were damaged.

509.    By reason of the foregoing, the Equity Receiver is entitled to a judgment awarding her compensatory damages in an amount to be determined at the trial to this action, together with interest at the statutory rate.

510.    In addition, because the Beechwood Defendants, BCLIC, WNIC, SHIP, CNO and Fusion acted in a manner that was willfully, grossly, recklessly and wantonly negligent, and without regard for the PPCO Funds' rights and interests, the Equity Receiver is further entitled to punitive damages for the misconduct alleged herein.

### Fourth Claim for Relief

### Violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 Promulgated Thereunder (Against the Beechwood Defendants, the Individual Beechwood Defendants, BCLIC, WNIC and SHIP)

511.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

512.    In connection with the sale of the Purchased Securities to the PPCO Funds, the Beechwood Entities, BCLIC, WNIC and SHIP, each materially misrepresented to the PPCO Funds that the true value of the Purchased Securities was their par value as set forth in the transaction documents for the PPCO Loan Transactions and Securities Purchases, and knowingly omitted or concealed that the true value of the Purchased Securities was only a fraction of par value set forth in the transaction documents.

513.    Each such misrepresentation, omission or act of concealment was made with the intent to deceive the PPCO Funds and with knowledge that the representation, omission or act of concealment was false or with willful blindness as to its truth or falsity, and was made in connection with the purchase and sale of a security, namely the Purchased Securities.

514.    The PPCO Funds reasonably and justifiably relied upon such misrepresentations and omissions or concealments to their detriment in entering into the transaction documents for the PPCO Loan Transactions and Securities Purchases and in borrowing approximately $42.963 million from SHIP through the IMAs, and approximately $26.2 million from the Beechwood Reinsurance Trusts in order to purchase the Purchased Securities for approximately $69 million, when in fact the actual value of the Purchased Securities was a fraction of their par value.

515.    Each such representation was reasonably relied upon by the PPCO Funds, in causing PPCO Master Fund to enter into the PPCO Loan Transactions and Securities Purchases and the purchase the Purchased Securities thereunder.

516.    The purchase by PPCO Funds of the Purchased Securities at overly inflated value, mispresented by the Beechwood Entities, BCLIC, WNIC and SHIP as fair value, caused PPCO to continue to operate at a time when it was actually or nearly insolvent and should have been winding down its business.

517. By reason of the foregoing, the PPCO Funds sustained damages in an amount not less than $48 million.

518. By committing the foregoing acts the Beechwood Defendants, BCLIC, WNIC and SHIP:

(a) engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon the Platinum Investors;

(b) obtained money or property by means of various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(c) employed devices, schemes and artifices to defraud in connections with the purchase and sale of securities.  Such scheme was intended to, and did, deceive investors as alleged herein.

**Fifth Claim for Relief**

**Violations of Section 20 of the Exchange Act**
**(Against  Individual Defendants Feuer and Taylor)**

519. The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

520. Individual Defendants Feuer, Taylor and Levy participated in the operation and management of the Beechwood Entities, and conducted and participated, directly and indirectly, in the conduct of the business affairs of the Beechwood Entities.

148

5520108.6

521.    Because of their senior positions in the Beechwood Entities, the Individual Defendants knew of the plan, scheme, conspiracy and course of conduct to defraud the PPCO Funds in connection with the purchases of the Purchased Securities in connection with the PPCO Loans and Securities Purchases.

522.    As officers of the Beechwood Entities, Individual Defendants acted as controlling persons of Beechwood.  By reason of their senior management positions at the Beechwood Entities, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Beechwood Entities to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the financial operations of Beechwood and possessed the power to control specific activities that comprise the primary violations about which the Equity Receiver complains.

523.    By reason of the above conduct, Individual Defendants Feuer, Taylor and Levy are liable pursuant to Section 20(a) of the Exchange Act for violations committed by Beechwood in an amount not less than $48 million.

## Sixth Claim for Relief

### Violation of RICO – 18 U.S.C. § 1962(c)
### (Against All Defendants)

524.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

525.    Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

526.    Each of the PPCO Funds is a "person" as defined in 18 U.S.C. § 1961(3).

527.    Each of the Defendants is a "person" as that term is defined in 18 U.S.C. § 1961(3).

528.    The Equity Receiver and the PPCO Entities are "person[s]" as that term is defined in 18 U.S.C. § 1961(3).

529.    Each of the Defendants was employed by, an owner of, or associated with certain enterprises: (a) Beechwood Re, BBIL, BAM, Beechwood Investments, or the Beechwood Reinsurance Trusts; (b) Beechwood – the association-in-fact of Beechwood Re, BBIL, BAM, Beechwood Investments, Beechwood Holdings, Beechwood Investments, and the Beechwood Reinsurance Trusts; (c) the association-in-fact of Defendants and their co-conspirators, including, but not limited to, Nordlicht, Huberfeld, and the other Platinum Partners-related persons; (d) SHIP;  (e) BCLIC; (f) WNIC; (g) CNO; (h) Fuzion and (i) the association-in-fact of SHIP, BCLIC, WNIC, CNO and Fuzion.

530.    Each of these entities or associations-in-fact constitutes an "enterprise" within the meaning of RICO, 18 U.S.C. § 1961(4).  Each of these RICO enterprises had an ascertainable structure, organization, and common purposes and existed apart from the predicate acts perpetrated by these Defendants.  At all relevant times, each enterprise engaged in, and its activities affected, interstate commerce. Each of the Defendants participated directly or indirectly in the management, direction, or operation of each enterprise.

531.    As set forth in detail in this Complaint, the Defendants conducted or participated in the conduct of affairs of each of these RICO enterprises through a pattern of racketeering activity, as set forth in 18 U.S.C. § 1961(5).  That is, each of the Defendants, knowingly perpetrated and agreed to perpetrate numerous predicate acts of racketeering activity identified

under 18 U.S.C. § 1961(1), specifically mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

532.    Each of the Defendants knowingly perpetrated and agreed to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent (i) to defraud the PPCO Funds into believing that they and the PPVA Funds were solvent, were being operated in a lawful manner that was in their interests, and to obtain money and property by means of false pretenses, representations and promises, and (ii) to cause to be transferred the PPCO Funds' most valuable assets from the PPCO Funds to the Beechwood Entities for itself and as agent for SHIP, and to the Beechwood Reinsurance Trusts for the benefit of SHIP in the PPCO Loan Transactions and Securities Purchases, the Agera Note Sale and the Class C Redemptions.

533.    Predicate acts of racketeering include, but are not limited to, using the mails and wires of interstate commerce to:

> (a)    transmit communications and documents among the Beechwood Defendants, Beechwood, SHIP, BCLIC, WNIC, CNO and Fuzion that contained inflated, and in some cases fraudulent, valuations of the PPVA Fund and PPCO Fund and their investments, so as to perpetuate the scheme which involved enriching the Beechwood Entities, the Beechwood Defendants, SHIP, BCLIC, WNIC, CNO and Fuzion and to collect unearned performance fees;

> (b)    make e-mail communications furthering the fraudulent scheme to cause the PPVA Funds, the PPCO Funds and their subsidiaries to sell securities

to Beechwood Entities, as agent for BCLIC, WNIC, SHIP, CNO and Fuzion at artificial and inflated prices;

(c)     make numerous email communications in between December 21, 2015 and March 21, 2016, to negotiate, close and implement the PPCO Loan and Securities Purchase;

(d)     make email communications in June 2016 and October 2016 in connection with the Agera Note Sale and the Class C Redemption in order to deprive the PPCO Funds of tens of millions of dollars of value; and

(e)     transmit communications among Beechwood, SHIP, BCLIC and WNIC concerning investments in Platinum Partners and maintaining the *status quo* even after the arrest of Huberfeld.

534.     These predicate acts of racketeering activity are all related, as the Defendants have perpetrated the predicate acts from the common purpose of furthering their fraudulent schemes, as identified and discussed in detail in this Complaint. Their predicate acts of racketeering activity have all had common (a) results (furthering their fraudulent schemes to induce institutional investors trust assets to Beechwood that could be used to prop up the PPVA Funds and to cause the transfer assets of the PPCO Funds to the PPVA Funds and cause the PPCO Funds to engage in transactions for the benefit of the PPVA Funds, (b) participants (Defendants and their co-conspirators), (c) victims (the PPCO Funds), (d) methods of commission (the false and fraudulent over-valuation of assets, entry into transactions involving the PPCO Funds to prop up the PPVA Funds and cause the PPCO Funds to make loans to and transfer assets for the benefit of the PPVA Funds and to enter into transactions for the benefit of the PPCO Funds, and to transfer assets of the PPCO Funds to the Beechwood Entities, BCLIC,

152

WNIC, SHIP, CNO and Fuzion) and (e) other distinguishing characteristics (such as using Platinum-associated individuals as purported Beechwood managers and maintaining the *status quo* after the arrest of Huberfeld).

535.    The predicate acts of racketeering have also been continuous.  The Defendants began perpetrating predicate acts of racketeering in furtherance of their fraudulent schemes in August 2013 at the latest, when they established Beechwood and then began negotiating with BCLIC and WNIC, and continued after they entered into the Reinsurance Agreements with BCLIC and WNIC and after they entered into the IMAs with SHIP, and by the Defendants have perpetrated the scheme continuously for several years.

536.    Their predicate acts of racketeering remain ongoing and open-ended, as the Defendants retain millions in funds or assets from and owing to many investors, which the Defendants misappropriated and misused over a period of several years.  The predicate acts of racketeering activity have been an integral part of the enterprises' regular way of doing business. The Defendants thus have engaged in a "pattern" of racketeering activity, as that phrase is defined in 18 U.S.C. § 1961(5).

537.    Each of the Defendants has violated 18 U.S.C. § 1962(c) by conducting or participating in the conduct of the enterprises' affairs through a pattern of racketeering activity.

538.    The PPCO Funds have been injured in their business and property by reason and a proximate result of each of Defendants' violations of 18 U.S.C. § 1962(c), in at least the following ways: (a) by being fraudulently induced to believe that the PPCO Funds and the PPVA Funds were solvent and operating lawfully; (b) by reducing the value of PPCO Funds' assets through investments that are speculative, risky, or simply sham transactions, all of which were made to benefit the Defendants but in fact further increased the damage to the PPCO Funds;

(c) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into the PPCO Funds and related securities; and (d) by the need to hire legal counsel to pursue the claims on behalf of Platinum Investors.

539.    By virtue of the Defendants' violations of 18 U.S.C. §1962(c), the Equity Receiver is entitled to recover on behalf of the PPCO Funds three times the damages sustained by reason of the Defendants' actions, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

### Seventh Claim for Relief

### Violation of RICO – 18 U.S.C. § 1962(a)
### (Against All Defendants)

540.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

541.    Under 18 U.S.C. § 1962(a), it is "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

542.    Each of the Defendants have received income derived, directly or indirectly, from the pattern of racketeering set forth above, including, but not limited to: (a) the assets transferred from PPCO Master Fund to Beechwood for itself and as agent of SHIP, and to the Beechwood Reinsurance Trusts for themselves and as agent of BCLIC and WNIC, and ultimately in part to CNO and Fusion, which assets were used to enrich the Defendants; (b) the unearned performance fees that Defendants collected as a result of the fraudulent valuations of investments

154

provided by Beechwood; (c) the profits and transfers that Defendants received from the investments alleged herein.

543.    Although Defendants represented that they would invest assets conservatively, Defendants instead used SHIP, BCLIC, WNIC and other institutional funds to buy Beechwood-Platinum Partners related entities out of distressed and highly risky investments, and in some instances subordinated investors interests beneath their own. This enriched Defendants enriched themselves and former Platinum Partners insiders and allowed them to perpetuate their Ponzi-type scheme, which in turn further injured the PPCO Funds.

544.    Defendants used the above-mentioned racketeering income in furtherance of their above-mentioned RICO enterprises. Each enterprise was engaged in and affected interstate and foreign commerce. The racketeering income was reinvested in these enterprises as part of a scheme by Defendants to perpetuate more injurious and illegal acts.

545.    Each of the Defendants' violation of 18 U.S.C. §1962(a) has directly and proximately injured the PPCO Funds in their business and property in at least the following ways: (a) by being fraudulently induced to believe that the PPVA Funds and the PPCO Funds were solvent and operating in a lawful manner; (b) by reducing the value of the PPCO Funds' assets, all of which were made to benefit Beechwood, the Individual Beechwood Defendants; (c) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into Platinum Partners and related securities; and (d) by the need to hire legal counsel to pursue the administer the Receivership proceedings, to assess and maximize the Receivership estate, and to pursue claims on behalf of the PPCO Funds for the benefit of their investors.

546.    By virtue of Defendants' violations of 18 U.S.C. §1962(a), the Equity Receiver is entitled to recover on behalf of the PPCO Funds three times the damages sustained by reason of

the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

### Eighth Claim for Relief

### Violation of RICO – 18 U.S.C. § 1962(d)
### (Against All Defendants)

547.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

548.    Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [§ 1962(a), (b), or (c)]."

549.    As described in detail in this Complaint, the Defendants and their co-conspirators agreed and conspired with each other to violate 18 U.S.C. §§ 1962(a) and (c).

550.    The purposes of the conspiracy included obtaining funds from institutional investors via investment management agreements and reinsurance agreements, taking control of such funds, and using them to further and perpetuate the co-conspirators' ongoing Ponzi-type scheme to enrich Defendants and their co-conspirators to the detriment of their purported investors.

551.    Defendants, as co-conspirators, perpetrated and agreed to perpetrate numerous predicate acts of racketeering activity identified under 18 U.S.C. § 1961(1), specifically mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343. Each of the Defendants perpetrated and agreed to perpetrate two or more acts of racketeering activity in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud Platinum Investors and other institutional investors to enter into investment management agreements or reinsurance agreements and to obtain money and property by means of false pretenses, representations and

156

promises. Predicate acts of racketeering include, but are not limited to, using the mails and wires of interstate commerce to:

(a)    make representations that Defendants would provide secure, highly collateralized and well-protected investments, when instead Defendants intended to use investment assets to perpetuate a scheme that involved enriching Platinum Partners and/or committing trust assets in risky, speculative transactions, and subordinating investors interests to those of Beechwood-related entities;

(b)    transmit communications that contained inflated, and in some cases fraudulent, valuations of Beechwood's Platinum Partners-related investments, which in turn were  used by Defendants to collect unearned performance fees;

(c)    transmit communications, primarily statements by Feuer and Taylor, misrepresenting that Beechwood was well capitalized and would prudently invest investors assets, while concealing and affirmatively misrepresenting Beechwood Re's true ownership structure and purpose;

(d)    transmit communications that misrepresented Beechwood's management team, while concealing its ties to and control by Platinum Partners, Nordlicht, Huberfeld, and other Platinum-related persons;

(e)    orchestrate the use of funds invested by SHIP, BCLIC, WNIC and others to acquire highly risky debt assets, then subordinate investors' interests to those of Beechwood-related entities, thereby enriching Defendants; and

(f)     transmit communications among Beechwood, SHIP, BCLIC and WNIC concerning investments in Platinum Partners and maintaining the *status quo* even after the arrest of Huberfeld.

552.   Each of the Defendants' agreement can reasonably be inferred from the close ties to the other co-conspirators and their mutually dependent, coordinated efforts to achieve the common purposes of the co-conspirators and each enterprise. Specifically, the Individual Defendants, as the primary executives and Chief Investment Officer of Defendants Beechwood Re, BBIL and BAM, acted in concert with Beechwood Principals to create a fraudulent scheme to attract new, unsuspecting institutional investors, which included SHIP, BCLIC and WNIC, without revealing that such investors were being committed to investment through Platinum Partners, but which upon learning of the true nature of the investments SHIP, BCLIC and WNIC participated with the scheme and maintained the *status quo*.

553.   The Platinum Investors have been injured in their business and property by reason of the aforementioned conspiracy, and a proximate result of each of Defendants' violations of 18 U.S.C. §§ 1962(a) and (c), in at least the following ways: (a) by being fraudulently induced to believe Platinum Partners was solvent and operating in a lawful manner; (b) by reducing the value of the Platinum Investors' assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit Defendants and the former principals of Platinum; (c) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into Platinum Partners and related securities; and (d) by the need to hire legal counsel to pursue the claims on behalf of Platinum Investors.

554.   By virtue of the Defendants' violations of 18 U.S.C. §1962(d), the Equity Receiver is entitled to recover on behalf of the Platinum Investors three times the damages

158

sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**Ninth Claim for Relief**

**Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law §§ 273 and 278
(Against the Beechwood Entities, BCLIC, WNIC, SHIP, CNO and Fuzion)**

555.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

556.    PPCO Master Fund was insolvent when each transaction in connection with the PPCO Loan Transactions and Securities Purchases was entered into, when each transfer thereunder was made, when each lien thereunder was granted, and when each obligation thereunder was incurred, or that transaction, transfer, lien or obligation rendered PPCO Master Fund insolvent.

557.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP did not give PPCO Master Fund, and PPCO Master Fund did not receive, fair consideration for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and its subsdiaries in the PPCO Loan Transactions and Securities Purchases.

558.    The Equity Receiver is entitled to avoid the PPCO Loan Transactions and Securities Purchases pursuant to New York Debtor & Creditor Law § 273 and 278.

559.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is entitled to a judgment avoiding each transaction under the PPCO Loan Transactions and Securities Purchases, granting her recovery of the assets conveyed by PPCO Master Fund, and invalidating and avoiding the obligations undertaken in and the liens granted by PPCO Master Fund and its subsidiaries to the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP, in the PPCO Loan Transactions and

Securities Purchases, and to recover an amount not less than $70 million from the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP.

560.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP were not in good faith.

561.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is also entitled to statutory interest, attorneys' fees and costs incurred in this action.

## Tenth Claim for Relief

**Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law §§ 274 and 278 (By the Receiver on behalf of PPCO Master Fund and Against the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP)**

562.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

563.    When each transaction in connection with the PPCO Loan Transactions and Securities Purchases was entered into, when each transfer thereunder was made, when each lien thereunder was granted, and when each obligation thereunder was incurred, PPCO Master Fund was engaged in, or was about to engage in, a business or transaction for which the property remaining in the hands of each of the PPCO Funds was unreasonably small.

564.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP did not give PPCO Master Fund, and PPCO Master Fund did not receive, fair consideration for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and its subsdiaries in the PPCO Loan Transactions and Securities Purchases.

565.    The Equity Receiver is entitled to avoid the PPCO Loan Transactions and Securities Purchases pursuant to New York Debtor & Creditor Law § 274 and 278.

160

566.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is entitled to a judgment avoiding each transaction under the PPCO Loan Transactions and Securities Purchases, granting her recovery of the assets conveyed by PPCO Master Fund, and invalidating and avoiding the obligations undertaken in and the liens granted by PPCO Master Fund and its subsidiaries to the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP, in the PPCO Loan Transactions and Securities Purchases, and to recover an amount not less than $70 million from the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP.

567.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP were not in good faith.

568.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is also entitled to statutory interest, attorneys' fees and costs incurred in this action.

## Eleventh Claim for Relief

**Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law §§ 275 and 278
(By the Receiver on behalf of PPCO Master Fund and Against the Beechwood Reinsurance
Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP)**

569.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

570.    PPCO Master Fund and each of its subsidiaries entered into each of the transactions in connection with the PPCO Loan Transactions and Securities Purchases, made each transfer thereunder, incurred each obligation thereunder and granted each lien thereunder, while intending or believing that PPCO Master Fund and its subsidiaries would incur debts beyond their ability to pay as they matured.

161

571.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP did not give PPCO Master Fund, and PPCO Master Fund did not receive, fair consideration for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and its subsdiaries in the PPCO Loan Transactions and Securities Purchases.

572.    The Equity Receiver is entitled to avoid the PPCO Loan Transactions and Securities Purchases pursuant to New York Debtor & Creditor Law § 275 and 278.

573.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is entitled to a judgment avoiding each transaction under the PPCO Loan Transactions and Securities Purchases, granting her recovery of the assets conveyed by PPCO Master Fund, and invalidating and avoiding the obligations undertaken in and the liens granted by PPCO Master Fund and its subsidiaries to the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP, in the PPCO Loan Transactions and Securities Purchases, and to recover an amount not less than $70 million from the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP.

574.    The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP were not in good faith.

575.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is also entitled to statutory interest, attorneys' fees and costs incurred in this action.

## Twelfth Claim for Relief

**Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law §§ 276 and 278
(By the Receiver on behalf of PPCO Master Fund and Against the Beechwood Reinsurance
Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP)**

576.     The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

577.     Each transfer made, each obligation incurred, and each lien given to any of the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP in connection with the PPCO Loan Transactions and Securities Purchases, was made, incurred or given by PPCO Master Fund and its subsidiaries with an actual to hinder, delay and defraud their present and future creditors, in violation of New York Debtor & Creditor Law § 276.

578.     The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP did not give PPCO Master Fund, and PPCO Master Fund did not receive, fair consideration for the assets, liens and obligations transferred, incurred and given by PPCO Master Fund and its subsdiaries in the PPCO Loan Transactions and Securities Purchases.

579.     The Equity Receiver is entitled to avoid the PPCO Loan Transactions and Securities Purchases pursuant to New York Debtor & Creditor Law §§ 276 and 278.

580.     By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is entitled to a judgment avoiding each transaction under the PPCO Loan Transactions and Securities Purchases, granting her recovery of the assets conveyed by PPCO Master Fund, and invalidating and avoiding the obligations undertaken in and the liens granted by PPCO Master Fund and its subsidiaries to, the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP, in the PPCO Loan Transactions and Securities Purchases, and to recover an amount not less than $70 million from the Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP.

581.     The Beechwood Reinsurance Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP were not in good faith.

582.    By reason of the aforementioned fraudulent conveyances, without fair consideration, the Equity Receiver is also entitled to statutory interest, attorneys' fees and costs incurred in this action.

## Thirteenth Claim for Relief

**Invalidation of Liens under N.Y. Debtor and Creditor Law §§ 273, 274, 275, 276 and 278
(By the Receiver on behalf of PPCO Master Fund and Against the Beechwood Reinsurance
Trusts, the other Beechwood Entities, BCLIC, WNIC and SHIP)**

583.    The Equity Receiver repeats and realleges each and every allegation contained above as if set forth herein.

584.    By reason of the foreing, each of the PPCO Loan Transactions and Securities Purchases, the SHIP Note, the MSA, the MSA Subsidiary Guarantee, the First A&R SHIP Note, the Ratification Agreement, the NPA, the A&R MSA, the NPA Guaranty, the Second A&R SHIP Note, the $10 Million Secured Term Note dated March 21, 2016, the $500,000 Secured Term Note dated March 21, 2016, the $14,989,677.78 Secured Term Note dated March 21, 2016, and the $700,000 Secured Term Note dated March 21, 2016, Assignment Agreement No. 1 or Assignment Agreement No. 2, and its obligation, liability or lien thereunder, and each lien perfect with respect to thereot, should deemed avoided by PPCO Master Fund and each of its subsidiaries.

WHEREFORE, the Equity Receiver, on behalf of each of the PPCO Funds, demands judgment against each of the Defendants in the amount of actual damages proven at trial, including all direct or consequential damages, avoidance and recovery of the assets, obligations and liens referred to above, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under state law, damages for diminution of value, and restitution, plus all applicable

164

interest, attorneys' fees, costs of suit, and such other and further relief as this Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

585.    The Equity Receiver demands a trial by jury on all issues so triable.

Dated:  New York, New York
        December 19, 2018

                            OTTERBOURG P.C.


                            By: /s/Adam C. Silverstein
                                Adam C. Silverstein
                                William M. Moran
                                Andrew S. Halpern
                            OTTERBOURG P.C.
                            230 Park Avenue
                            New York, New York 10169
                            (212) 661-9100
                            (212) 682-6104 (fax)
                            wmoran@otterbourg.com
                            asilverstein@otterbourg.com
                            ahalpern@otterbourg.com
                            Attorneys for Plaintiff