**OTTERBOURG P.C.**
230 Park Avenue
New York, New York 10169
Tel.:  (212) 661-9100
Fax:  (212) 682-6104
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------------- X

IN RE PLATINUM-BEECHWOOD LITIGATION,

-------------------------------------------------------------------------------- :

MELANIE L. CYGANOWSKI, AS RECEIVER, BY AND FOR
PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER
FUND LP, PLATINUM PARTNERS CREDIT OPPORTUNITIES
FUND (TE) LLC, PLATINUM PARTNERS CREDIT
OPPORTUNITIES FUND LLC, PLATINUM PARTNERS CREDIT
OPPORTUNITIES FUND INTERNATIONAL LTD., PLATINUM
PARTNERS CREDIT OPPORTUNITIES FUND INTERNATIONAL
(A) LTD., and PLATINUM PARTNERS CREDIT OPPORTUNITIES
FUND (BL) LLC,

Plaintiffs,

-against-

BEECHWOOD RE LTD., BEECHWOOD RE INVESTMENTS, LLC,
B ASSET MANAGER LP, B ASSET MANAGER II LP,
BEECHWOOD RE HOLDINGS, INC., BEECHWOOD BERMUDA
INTERNATIONAL, LTD., BEECHWOOD BERMUDA
INVESTMENT HOLDINGS, LTD., BEECHWOOD BERMUDA
LTD., BAM ADMINISTRATIVE SERVICES LLC, BRE BCLIC
PRIMARY, BRE BCLIC SUB, BRE WNIC 2013 LTC PRIMARY,
BRE WNIC 2013 LTC SUB, MOSHE M. FEUER a/k/a MARK
FEUER, SCOTT A. TAYLOR, SENIOR HEALTH INSURANCE
COMPANY OF PENNSYLVANIA, FUZION ANALYTICS, INC.,
BANKERS CONSECO LIFE INSURANCE COMPANY,
WASHINGTON NATIONAL INSURANCE COMPANY, CNO
FINANCIAL GROUP, INC., 40|86 ADVISORS, INC., and JOHN
DOES 1-100,

Defendants.

-------------------------------------------------------------------------------- :

X

Civil Action No.
1:18-cv-06658

Civil Action No.
1:18-cv-12018

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL**
**DEMANDED**

# TABLE OF CONTENTS

**Page**

I.  NATURE OF THIS ACTION ................................................................................. 1

II.  EVENTS LEADING TO THIS ACTION ............................................................ 7

III.  THE BASES FOR THE RECEIVER'S INFORMATION AND BELIEF ...................... 9

IV.  THE PARTIES.................................................................................................. 10

    A.  The Plaintiffs.......................................................................................... 10

    B.  The Defendants ...................................................................................... 11

    C.  Other Relevant Individuals and Entities ................................................ 15

V.  JURISDICTION AND VENUE ........................................................................ 15

VI.  FACTS ............................................................................................................. 16

    A.  The Platinum Family of Funds ............................................................... 16

        1.  The PPCO Family of Funds.......................................................... 16

        2.  The PPVA Family of Funds.......................................................... 19

        3.  Innocent Insiders at the PPCO Family of Funds......................... 20

    B.  The PPVA Funds' Financial Condition through the End of 2013 ........................ 21

    C.  The PPCO Funds' Financial Condition through the End of 2013 ........................ 24

    D.  The Creation of the Platinum Insiders' White Knight:  Beechwood .................... 26

    E.  The Formation of the Beechwood, BCLIC, WNIC and SHIP Relationship ........ 29

        1.  Problems Experienced in the Long-Term Care Insurance Industry.......... 29

        2.  CNO's Spinoff of SHIP ............................................................... 29

        3.  The CNO, BCLIC and WNIC Relationship ............................... 32

        4.  BCLIC and WNIC's Introduction to Beechwood...................... 33

        5.  The BCLIC and WNIC Reinsurance Agreements .................... 35

i

6. SHIP's Introduction to Beechwood ........................................................... 37

7. The SHIP Investment Management Agreements ...................................... 39

F. Beechwood's Use of the Insurance Companies' Funds ........................................ 40

1. The Beechwood Defendants Provided Substantial Assistance to the Fraudsters ................................................................. 42

2. The CNO Defendants Provided Substantial Assistance to the Fraudsters ................................................................. 46

3. SHIP Provided Substantial Assistance to the Fraudsters ......................... 51

G. The December 2015 and March 2016 Fraudulent Conveyances .......................... 54

1. The December 2015 Fraudulent Conveyance .......................................... 56

2. The March 2016 Fraudulent Conveyance ............................................... 61

VII. THE RICO ENTERPRISES ............................................................................. 66

VIII. CLAIMS FOR RELIEF .................................................................................. 70

IX. PRAYER FOR RELIEF .................................................................................. 112

X. DEMAND FOR TRIAL BY JURY .................................................................. 113

Melanie L. Cyganowski, as Receiver (the "**Receiver**"), by and for the above-captioned plaintiffs, (i) Platinum Partners Credit Opportunities Master Fund LP, (ii) Platinum Partners Credit Opportunities Fund (TE) LLC, (iii) Platinum Partners Credit Opportunities Fund LLC, (iv) Platinum Partners Credit Opportunities Fund International Ltd, (v) Platinum Partners Credit Opportunities Fund International (A) Ltd and (vi) Platinum Partners Credit Opportunities Fund (BL) LLC, through her counsel, Otterbourg P.C., files this Amended Complaint (this "**Amended Complaint**") against the above-captioned defendants (collectively, the "**Defendants**") and alleges as follows:[1]

## I.

## NATURE OF THIS ACTION[2]

1.     The Receiver, for herself and the above-named Plaintiffs, brings this action seeking redress for the innocent investors and creditors of her estate damaged by Defendants' unlawful and tortious acts.   Among other relief, the Receiver seeks to avoid the various liens encumbering receivership assets as a result of the Defendants' self-help employed after they recognized their avoidable predicament because those liens are preventing a distribution of funds from monetized assets to innocents.

2.     The Receiver is not alone in concluding that a massive fraud was orchestrated by certain of the Platinum Fund insiders starting in or about 2012 and later expanded to include others named herein.   Indeed, even certain of the Defendants acknowledge and agree the fraud occurred.   *See* Amended Complaint in *Trott, et al.  v. Platinum Management (NY) LLC, et al.,* 18

---

[1]     For ease of reference, a timeline of material events forming the foundation of this Amended Complaint is attached hereto as **Exhibit A**, and a glossary of defined terms is attached hereto as **Exhibit B**.   The two exhibits are incorporated in their entirety into this Amended Complaint.

[2]     All capitalized terms not defined in Sections I - III shall be defined below.

1

Civ. 10936-JSR (the "**PPVA Complaint**"); (ii) the Second Amended Complaint in *Senior Health Insurance Co. of Pa. v. Beechwood Re Ltd., et al.,* 18 Civ. 6658-JSR (the "**SHIP Complaint**"); and (iii) the Complaint in *Bankers Conseco Life Ins. Co., et. al.* v. *Moshe M. Feuer, et al.,* 16 Civ. 07646-ER (stayed) (the "**BCLIC/ WNIC Complaint**," and collectively with the PPVA Complaint and the SHIP Complaint, the "**Fraud Complaints**").

3.      At its inception, the object of the fraudulent scheme was the personal enrichment of the Platinum Fund insiders through the extraction of significant management and incentive fees.  To achieve their goal, the Platinum Fund insiders overvalued illiquid and increasingly distressed assets held by the Platinum Funds.  Specifically, investments in, and loans to, portfolio companies that were under increasing duress were consistently valued above their fair market value.

4.      A run of redemption requests on the illiquid PPVA Fund beginning in 2012 soon required an expansion of the Platinum Fund insiders' scheme.  Recognizing that redemptions were "daunting" and "relentless," Mark Nordlicht and his cohorts desperately needed capital.  To stave off those redemption requests while procuring funds for increasingly cash-thirsty PPVA portfolio companies, Beechwood was created in or around 2013.

5.      Beechwood, a reinsurance company and investment advisor, was the vehicle for continuing the fraud, created by certain Platinum insiders, along with Moshe Feuer and Scott Taylor, to gain access to hundreds of millions of dollars in insurance assets that would then be channeled into the Platinum family of funds.  By obtaining access to these insurance assets, the Platinum insiders would be able to, and in fact did, infuse into the Platinum Funds and their distressed portfolio companies much-needed cash while also satisfying redemption requests.  For example, in an email dated in or about 2013, Mark Nordlicht wrote to Naftali Manela that he

"[h]op[ed] for beechwood money by then," to enable him to pay a $2 million-dollar redemption due by December 15, 2013.

6.     At the same time, the Platinum insiders, many of whom, if not all, were also owners of Beechwood, could charge millions of dollars in investment management fees, thereby assuring themselves of profits from both sides of each Beechwood/ Platinum transaction. Indeed, Beechwood appears to have charged SHIP approximately $30 million in performance fees, some of which was premised on assets that it held in the Platinum Funds and their overvalued portfolio companies.

7.     Where this Amended Complaint differs from others arises from the Receiver's determination that certain of the self-anointed victims of the fraud, (i) CNO, through its subsidiaries, BCLIC and WNIC, advised by 40|86 Advisors, and (ii) SHIP, advised by Fuzion, are not what they claim to be.  Rather, each of those entities substantially assisted, and participated with, Beechwood and the Platinum insiders to commit fraud and breach their fiduciary duties to the PPCO Funds.

8.     Certain of the insurers have challenged the Receiver's conclusion that they ignored, or knowingly participated in, the fraud in the first place.  In CNO's case, it chose to ignore the close ties binding the Platinum Funds and Beechwood entities because Beechwood not only offered terms that could not be refused, it was also the only game in town.  As such, it resolved many pressing problems.  In short, Beechwood provided a potential liberation from being detrimentally burdened by the long-term care insurance portfolios that were proverbial albatrosses around their necks.  For SHIP, Beechwood guaranteed a steady stream of income to stave off SHIP's insolvency.  Specifically:

- CNO was motivated to undertake the reinsurance transactions described herein with Beechwood because it enabled CNO to offload problematic legacy long-term care policies housed at BCLIC and WNIC and thereby cap the risk associated with them. CNO had long looked to offload this portfolio but had been unsuccessful. Beechwood was the only game in town.

- SHIP, a former CNO subsidiary, was a distressed long-term care insurer in runoff. It entered into three investment management agreements with Beechwood as a means of boosting its investment income at a time when its own legacy long-term care portfolio faced increasing challenges which it could not meet. Further, SHIP likely expected capital support from Beechwood going forward, just as it had received from CNO in years prior. SHIP in fact obtained that support from Beechwood in or about February 2015 (within one month of signing the third and last investment management agreement) when it received approximately $50 million from Beechwood to shore up its balance sheet. Were SHIP to go into rehabilitation or liquidation, policyholders would likely face significant impairment of their future claims on their policies. SHIP was hoping to avoid this scenario through entry into the investment management agreements with Beechwood. Fuzion, SHIP's manager, likewise needed SHIP to succeed as its contractual agreement with SHIP provided for above-market fees that were the bedrock of Fuzion's business.

9.     SHIP, BCLIC and WNIC quickly went from passive investors in Beechwood, which at that point was already operating as a RICO enterprise, to active participants in that enterprise. Multiple emails and documents establish: (i) SHIP and the CNO Defendants' knowledge of the deep ties between the Platinum Funds and Beechwood, including their common ownership and management and deep personal relationships; (ii) that SHIP, BCLIC and WNIC's funds were fueling the fraud; and (iii) that SHIP and the CNO Defendants substantially assisted Beechwood and certain of the Platinum insiders in carrying out their fraud and the Platinum insiders in breaching their fiduciary duties through their decisions and directives.

10.     In or about the fall of 2015, BCLIC, WNIC and SHIP knew they were holding nonperforming loans to certain Platinum Fund portfolio companies which they were desperate to rid themselves of. To do so, the insurers (and their managers/advisors/administrators, 40|86

4

Advisors and Fuzion) – acting through Beechwood – structured and implemented a series of transactions that ultimately saddled the PPCO Funds with approximately $69.1 million of debt owing to Beechwood, as agent for BCLIC, WNIC and SHIP, secured by liens on substantially all of the PPCO Funds' assets, including those of nearly all of their portfolio companies, in consideration for assets that were worth a fraction of that amount.

11.     Specifically, between December 2015 and March 2016, CNO (through its subsidiaries, BCLIC and WNIC, advised by 40|86 Advisors) and SHIP (advised by Fuzion), directed Beechwood, as their agent, to enter into several transactions with PPCO Master Fund <u>knowing</u> that the transactions were not arms-length commercial deals being structured by unconflicted officers, but rather transactions designed to extricate themselves and their affiliates from investments which had become toxic.  Many of the so-called "loan" transactions did not involve any actual cash infusions into PPCO Master Fund, but rather were plans or schemes designed to dump nonperforming instruments into PPCO Master Fund's portfolio.

12.     These transactions not only constituted constructive fraudulent conveyances on the PPCO Funds, but were actual fraudulent conveyances because the PPCO Funds did not receive fair consideration in these transactions and were, or were rendered, insolvent by those transactions.  Indeed, as set forth below, the flow of funds letters accompanying the transaction documents lay bare that the funds "loaned" to the PPCO Funds by BCLIC, WNIC and SHIP, through Beechwood, were paid right back to the lenders in consideration for PPCO Master Fund taking assignments of the nonperforming loans.

13.     These transactions confirm that Beechwood, through Feuer and Taylor, and Nordlicht and others, were not working for the companies that they were obligated to serve, but rather solely for themselves.  Clearly a decision had been made by all of the Defendants:  burden

the PPCO Funds with nonperforming assets in the hopes that the insiders could seek riches through Beechwood, while SHIP and the CNO Defendants achieved their goals described above with respect to their long-term care portfolios.  As demonstrated below, rather than stealing <u>for</u> the PPCO Funds, the insiders were stealing <u>from</u> the PPCO Funds.  At the same time, while the CNO and SHIP Defendants may have gotten burned in the end, they knew they were playing with fire.

14.     For these reasons, the Defendants are liable to the Plaintiffs for:

(i)      violations of the Racketeer Influenced and Corrupt Organizations Act ("**<u>RICO</u>**") and/ or federal securities fraud;

(ii)     aiding and abetting common law fraud;

(iii)    aiding and abetting breach of fiduciary duty;

(iv)     actual and constructive fraudulent conveyances; and

(v)      unjust enrichment.

15.     Defendants' actions damaged not only PPCO Master Fund but also the PPCO Feeder Funds, and the PPCO Blocker Fund, each of which is a creditor of PPCO Master Fund.  These entities were deceived by their respective management company and the individuals running it, the criminal and civil defendants amongst others, who both defrauded and abdicated their fiduciary duties to them.  The PPCO Feeder Funds and the PPCO Blocker Fund thus join in the relief sought herein to redress the harms inflicted upon them, both directly and indirectly, by the Defendants.

16.     In addition to monetary damages, the Plaintiffs seek the avoidance of certain loan transactions consummated with BAM Administrative Services LLC, as agent for SHIP, BCLIC, WNIC and/ or their related entities as described below, and the all-asset liens asserted by them in

6

substantially all of the PPCO Funds' and their affiliates' assets.  As a result of the fraudulent conveyances summarized above and discussed in detail below, the loan obligations and liens are now preventing the Receiver from making distributions to the innocent investors and creditors of the PPCO Funds.  Indeed, if those liens are not invalidated, all of the Receivership Estate's cash may have to be paid to SHIP and/or BCLIC and/or WNIC, and the innocent investors and creditors of the Receivership Entities may receive nothing.

## II.

## EVENTS LEADING TO THIS ACTION

17.     On or about June 8, 2016, Murray Huberfeld, a Platinum founder, was criminally charged by the United States Attorney for the Southern District of New York in connection with his bribing of a union official to make a $20 million investment into PPVA.[3]

18.     On December 19, 2016, an eight-count indictment was unsealed in the United States District Court for the Eastern District of New York commencing a criminal action against Platinum Management (NY) LLC, Platinum Credit Management, L.P., Mark Nordlicht, David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph Sanfilippo and Jeffrey Shulse (the "**Criminal Action**").

19.     The defendants in the Criminal Action were charged with securities fraud, investment adviser fraud, securities fraud conspiracy, investment adviser fraud conspiracy and wire fraud conspiracy for defrauding investors through, among other wrongdoing, the overvaluation of their largest assets, the concealment of severe cash flow problems at the PPVA Funds, and the preferential payment of redemptions.

---

[3]     On May 25, 2018, Huberfeld pled guilty to wire fraud conspiracy.

20.     On that same day, December 19, 2016, the Securities and Exchange Commission (the "**SEC**") commenced a civil action the United States District Court for the Eastern District of New York (the "**Receivership Court**") against the defendants named in the Criminal Action asserting certain securities laws violations. *See Securities and Exchange Commission v. PMNY (NY) LLC, et al.*, Case No. 16-06848 (the "**Receivership Action**").

21.     In connection with filing the Receivership Action, the SEC sought and obtained the appointment of Bart M. Schwartz as Receiver of Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC and Platinum Partners Liquid Opportunity Fund (USA) L.P. (collectively with the three Platinum Fund entities subsequently added to the Receivership Action, the "**Receivership Entities**").

22.     On July 6, 2017, the Receivership Court accepted the resignation of the original receiver and appointed Melanie L. Cyganowski as Receiver effective July 6, 2017.

23.     Pursuant to the October 16, 2017 *Second Amended Order Appointing Receiver* (the "**Receivership Order**"), the Receivership Court empowered the Receiver to, among other things, recover, liquidate, marshal, and preserve all assets of the Receivership Entities and to, *inter alia*: (i) "bring such legal actions based on law or equity in any state, federal, or foreign court as the Receiver deems necessary or appropriate in discharging the Receiver's duties as Receiver"; and (ii) "investigate, prosecute, defend, intervene in or otherwise participate in, compromise, and/or adjust actions in any state, federal or foreign court or proceeding of any kind as may in the Receiver's discretion, be advisable or proper to recover and/or conserve Receivership Property."  Receivership Order at ¶¶ 6J and 34.

## III.

## THE BASES FOR THE RECEIVER'S INFORMATION AND BELIEF

24.     The allegations made herein are based on a variety of sources and follow the Receiver's investigation into the pre-receivership business and affairs of the Receivership Entities, including their affiliations and transactions with or among Beechwood, SHIP and CNO. Sources of information on which the Receiver's allegations are based include, but are not limited to:  limited pre-litigation discovery, internal emails and other documents on the Receivership Entities' server; PPCO Master Fund's and PPVA's audited and unaudited financial statements; the Receivership Entities, and to a limited extent the PPVA Funds' books and records; third-party asset valuations procured by the Receivership Entities; the transaction documents between Beechwood, on the one hand, and BCLIC and WNIC and/ or SHIP, on the other; BCLIC's, WNIC's, SHIP's and, where available, Beechwood's, respective statutory filings; earnings and guidance calls with CNO, both BCLIC's and WNIC's parent and SHIP's former parent; CNO investor presentations; rating agency statements regarding CNO; other publicly-available information concerning the long-term care insurance industry; public proceedings concerning SHIP; transaction documents between certain Platinum Funds, on the one hand, and Beechwood, on the other; transaction documents concerning the transfer of assets and other transactions referenced herein; filings in the bankruptcy proceedings of certain Platinum Fund portfolio companies; and articles in established newspapers and periodicals on certain of the Receivership Entities, their affiliates and principals.

## IV.

## THE PARTIES

### A.    The Plaintiffs

25.    Melanie L. Cyganowski is the Receiver for the Receivership Entities and asserts the claims hereunder by and for the following plaintiffs.

26.    Receivership Entity Platinum Partners Credit Opportunities Master Fund LP ("**PPCO Master Fund**") is and, at all material times hereinafter mentioned, was a limited partnership organized under Delaware law with its principal place of business in New York, New York.

27.    Receivership Entity Platinum Partners Credit Opportunities Fund (TE) LLC ("**PPCO Fund TE**") is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

28.    Receivership Entity Platinum Partners Credit Opportunities Fund LLC ("**PPCO Onshore Feeder Fund**") is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

29.    Receivership Entity Platinum Partners Credit Opportunities Fund International Ltd. ("**PPCO Fund International**") is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

30.    Receivership Entity Platinum Partners Credit Opportunities Fund International (A) Ltd. ("**PPCO Fund International A**," and collectively with PPCO Fund TE, PPCO Onshore

Feeder Fund and PPCO Fund International, the "**PPCO Feeder Funds**") is and, at all material times hereinafter mentioned, was a Cayman Islands exempted company.

31.     Receivership Entity Platinum Partners Credit Opportunities Fund (BL) LLC ("**PPCO Blocker Fund**") is and, at all material times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

**B.**     **The Defendants**

32.     Defendant Beechwood Re Ltd. ("**Beechwood Re**") is and, at all material times hereinafter mentioned, was a stock life reinsurance company domiciled in the Cayman Island with its principal place of business in New York, New York.

33.     Defendant Beechwood Re Investments LLC ("**Beechwood Investments**") is and, at all material times hereinafter mentioned, was a Delaware limited liability company with its principal place of business in New York, New York.

34.     Defendant B Asset Manager LP ("**BAM I**") is and, at all times hereinafter mentioned, was a Delaware limited partnership with its principal place of business in New York, New York.

35.     Defendant B Asset Manager II LP ("**BAM II**") is and, at all material times hereinafter mentioned, was a Delaware limited partnership with its principal place of business in New York, New York.

36.     Defendant Beechwood Re Holdings, Inc. ("**Beechwood Holdings**") is and, at all material times hereinafter mentioned, was a Cayman Island entity with its principal place of business in New York, New York.

11

37.     Defendant Beechwood Bermuda International Ltd. ("**BBIL**") is and, at all material times hereinafter mentioned, was a reinsurance company domiciled in Bermuda with its principal place of business in New York, New York.

38.     Defendant Beechwood Bermuda Investment Holdings, Ltd. ("**BBIL Holdings**") is and, at all material times hereinafter mentioned, was a reinsurance company domiciled in Bermuda with its principal place of business in New York, New York.

39.     Defendant Beechwood Bermuda Ltd. ("**Beechwood Bermuda**") is and, at all material times hereinafter mentioned, was an entity organized under Bermuda law and regulated by the Bermuda Monetary Authority, with its principal place of business in Hamilton, Bermuda and a place of business in New York, New York.

40.     Defendant BAM Administrative Services LLC ("**BAM Administrative**") is and, at all times hereinafter mentioned, was a limited liability company organized under Delaware law with its principal place of business in New York, New York.

41.     Defendants (i) BRe BCLIC Primary, (ii) BRe BCLIC Sub, (iii) BRe WNIC 2013 LTC Primary and (iv) BRe WNIC 2013 LTC Sub (collectively, the "**Beechwood Reinsurance Trusts**") are and, at all material times hereinafter mentioned, were insurance trusts organized under Delaware and New York state law, managed by BAM Administrative, and administered in New York, New York.

42.     At all material times discussed herein, (i) BCLIC was and is the sole beneficiary of BRe BCLIC Primary and BRe BCLIC Sub and (ii) BRe BCLIC Primary and BRe BCLIC Sub were administered for the sole benefit of BCLIC.

43.     BRe BCLIC Primary and BRe BCLIC Sub were initially funded by BCLIC and, at BCLIC's demand, they were to, and did, return the funds invested therein back to BCLIC.

12

44.     At all material times discussed herein, (i) WNIC was and is the sole beneficiary of BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub and (ii) BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub were administered for the sole benefit of WNIC.

45.     BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub were initially funded by WNIC and, at WNIC's demand, they were to, and did return the funds invested therein back to WNIC or a trust of which WNIC was the sole beneficiary.

46.     Defendants (i) Beechwood Re, (ii) Beechwood Investments, (iii) BAM I, (iv) BAM II, (v) Beechwood Holdings, (vi) BBIL, (vii) BBIL Holdings, (viii) Beechwood Bermuda, (ix) BAM Administrative and (x) the Beechwood Reinsurance Trusts are collectively referred to as the "**Beechwood Entities**" and, individually or collectively, as "**Beechwood**."

47.     Defendant Moshe M. Feuer a/k/a Mark Feuer ("**Feuer**") is and, at all material times hereinafter mentioned was, a resident of Lawrence, New York.

48.     Defendant Scott A. Taylor ("**Taylor**") is and, at all material times hereinafter mentioned was, a resident of New York, New York.

49.     Feuer and Taylor are collectively referred to as the "**Individual Beechwood Defendants**" and, together with the Beechwood Entities, the "**Beechwood Defendants**."

50.     Defendant Senior Health Insurance Company of Pennsylvania ("**SHIP**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in the Commonwealth of Pennsylvania with its principal place of business in Carmel, Indiana.

51.     Defendant Fuzion Analytics, Inc. ("**Fuzion**" and together with SHIP, the "**SHIP Defendants**") is and, at all material times hereinafter was, a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

52.     Defendant Bankers Conseco Life Insurance Company ("**BCLIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in New York with its principal place of business in Carmel, Indiana.

53.     Defendant Washington National Insurance Company ("**WNIC**") is and, at all material times hereinafter mentioned, was an insurance company domiciled in Indiana with its principal place of business in Carmel, Indiana.

54.     Defendant CNO Financial Group, Inc. ("**CNO**") is and, at all material times hereinafter mentioned, was a corporation organized under Delaware law with its principal place of business in Carmel, Indiana.

55.     Defendant 40|86 Advisors, Inc. ("**40|86 Advisors**" and collectively with CNO, BCLIC and WNIC, the "**CNO Defendants**") is and, at all material times hereinafter mentioned, was a Delaware corporation with its principal place of business in Carmel, Indiana.

56.     Defendant John Does 1-100 are entities and/ or individuals whose identities are not known at this time who were, or may have been, involved in, or otherwise liable for, the unlawful or otherwise tortious activities described herein, including, but not limited to, any subsequent transferees of the fraudulent conveyance transactions complained of below and Beechwood Trust No. 1, Beechwood Trust No. 2, Beechwood Trust No. 3, Beechwood Trust No. 4, Beechwood Trust No. 5, Beechwood Trust No. 6, Beechwood Trust No. 7, Beechwood Trust No. 8, Beechwood Trust No. 9, Beechwood Trust No. 10, Beechwood Trust No. 11, Beechwood Trust No. 12, Beechwood Trust No. 13, Beechwood Trust No. 14, Beechwood Trust No. 15, Beechwood Trust No. 16, Beechwood Trust No. 17, Beechwood Trust No. 18, Beechwood Trust No. 19 and Beechwood Trust No. 20.

C.    **Other Relevant Individuals and Entities**

57.    Mark Nordlicht was one of the Platinum Funds' founding partners and its Chief Investment Officer for the relevant time periods discussed herein.  Nordlicht was primarily responsible for the Platinum Funds' investment decisions and the valuation of its assets.  In or about 2013, Nordlicht created and became a significant stakeholder in Beechwood.

58.    David Levy was a senior executive at the Platinum Funds.  In or about 2013, Levy worked closely with Nordlicht to create Beechwood in which he became a minority partner.  In or about 2014, Levy served as Beechwood's Chief Investment Officer.  In or about 2015, Levy officially rejoined the Platinum Funds as co-Chief Investment Officer.

59.    Murray Huberfeld was one of the Platinum Funds' founding partners.  In or about 2013, Huberfeld became a significant stakeholder in Beechwood.

60.    David Bodner was one of the Platinum Funds' founding partners.  In or about 2013, Bodner became a significant stakeholder in Beechwood.

**V.**

**JURISDICTION AND VENUE**

61.    This Amended Complaint is filed, and this Court has subject matter jurisdiction of the matters complained of, pursuant to 28 U.S.C. § 1331, 18 U.S.C. §§ 1961 and 1962(a), (c) and (d) *et seq.*, Sections 10(b) and 20(a) of the Securities Exchange Act of 1936 (the "**Exchange Act**").  15 U.S.C. §§ 78j(b) and 78t(a), Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5], Section 20 and Section 27 of the Exchange Act.

62.    This Court has supplemental jurisdiction over Plaintiffs' state law and common law claims pursuant to 28 U.S.C. § 1367, as the claims against Defendants are related to the claims upon which subject matter jurisdiction is based.

63. This Court also has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 754, 959, 1367, and 1692, Rule 66 of the Federal Rules of Civil Procedure because this action is ancillary to the Receivership Action, as well as pursuant to the provisions of the Receivership Order.

64. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events, actions, or omissions giving rise to the dispute occurred in this District.

## VI.

## FACTS

### A.    The Platinum Family of Funds

65. PPCO Master Fund, Platinum Partners Liquid Opportunity Master Fund, L.P. ("**PPLO**") and Platinum Partners Value Arbitrage Fund, LP ("**PPVA**") were New York City based hedge funds founded between 2003 and 2005.  Each of these funds was structured to include a master fund, several feeder funds and a management entity.  The PPCO, PPVA and PPLO family of funds are referred to as the "**Platinum Funds**."

#### 1.    The PPCO Family of Funds

66. The PPCO family of funds, (collectively, the "**PPCO Funds**") was marketed as a single-strategy group of funds whose business was to "originate short and medium term, high yield, debt secured by collateral, and/or equity investments."  *See* PPCO Marketing Presentation dated December 1, 2015 at 4.  The PPCO Funds originated loans and made equity investments in various industries, including consumer finance, litigation, metals and mining, oil and gas, alternative energy, retail energy, life settlements and asset-based finance.

67.     The PPCO Funds utilized a common investment strategy for hedge funds in structuring their operations:  a master-feeder structure, which, *inter alia*, is designed to maximize tax benefits for respective investors in the fund.

68.     The PPCO Onshore Feeder Fund invested substantially all of its assets directly into PPCO Master Fund through limited partnership interests it holds in PPCO Master Fund.

69.     The PPCO Onshore Feeder Fund is a creditor of PPCO Master Fund because (i) it holds claims for unpaid redemptions in the amount of $7,220,634.51 against it and (ii) PPCO Master Fund breached its fiduciary duty to that entity.

70.     PPCO Fund International, PPCO Fund International A and PPCO Fund TE each invested substantially all of their assets in PPCO Blocker Fund.

71.     In turn, PPCO Blocker Fund invested substantially all of its assets in PPCO Master Fund through limited partnership interests it holds in PPCO Master Fund.

72.     In consideration for PPCO Fund International, PPCO Fund International A and PPCO Fund TE investing their assets in PPCO Blocker Fund, PPCO Blocker Fund issued those investing entities debt and equity.

73.     By virtue of the foregoing, PPCO Fund International, PPCO Fund International A and PPCO Fund TE are creditors of PPCO Blocker Fund.

74.     PPCO Blocker Fund is a creditor of PPCO Master Fund in that it holds claims for unpaid redemptions in the amount of $17,596,800.61.

75.     The PPCO Feeder Funds, through PPCO Blocker Fund, are also creditors of PPCO Master Fund because (i) they hold claims for unpaid redemptions in the amount of $17,596,800.61 against it and (ii) PPCO Master Fund's portfolio manager breached its fiduciary duty to those entities.

17

76.     Platinum Credit Management LP (the "**PPCO Portfolio Manager**") served as portfolio manager for PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE.

77.     Pursuant to Investment Management Agreements with the aforementioned entities, the PPCO Portfolio Manager was obligated to manage and operate PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE.   Specifically, the PPCO Portfolio Manager was responsible for determining how, when, on what terms and in which contexts PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE would invest their capital and conduct their investment operations.

78.     By virtue of the foregoing, the PPCO Portfolio Manager owed PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE a duty of loyalty and care in addition to contractual obligations to each.

79.     The PPCO Portfolio Manager breached those duties as established below.

80.     During the time period specified herein, Nordlicht and Levy served as co-chief investment officers of PPCO Master Fund by virtue of their employment by, and the funds' contract with, the PPCO Portfolio Manager.   As a result, both were jointly and solely responsible for the investment decisions of PPCO Master Fund.   As such, at the times specified herein, they owed fiduciary duties to each of the PPCO Funds, which duties, as set forth below, they breached.

81.     The PPCO Funds were primarily owned by outside investors, rather than insiders. In this regard, as of October 26, 2018, approximately $338.7 million in investor claims had been recorded by PPCO Master Fund.

### 2.    **The PPVA Family of Funds**

82.    The PPVA family of funds (collectively, the "**PPVA Funds**") were marketed as a group of multi-strategy funds that included long/ short fundamental equity trading, asset-based financing in energy, mining, and other industries, energy-related and Asia-based arbitrage opportunities, and event-driven investing in corporations.

83.    PPVA was a Cayman Islands exempted limited partnership that was managed by Platinum Management (NY) LLC (the "**PPVA Portfolio Manager**"), a defendant in the Criminal and Receivership Actions.

84.    Much like the structure of the PPCO Funds, the PPVA Funds utilized a master-feeder structure such that all United States based investors' funds were invested in Platinum Partners Value Arbitrage Fund (USA) L.P. ("**PPVA Onshore Feeder Fund**") while Platinum Partners Value Arbitrage Fund (International) Limited ("**PPVA Offshore Feeder Fund**") and Platinum Partners Value Arbitrage Intermediate Fund Ltd. ("**PPVA Intermediate Feeder Fund**," and collectively with PPVA Offshore Feeder Fund and PPVA Onshore Feeder Fund, the "**PPVA Feeder Funds**") were used during the relevant time period to invest the funds of non-U.S. based investors.

85.    In or about June 2016, following the arrest of Murray Huberfeld, Mark Nordlicht announced that PPVA would be liquidated.  *See* PPVA Complaint, ¶ 14.

86.    Following Nordlicht's announcement that PPVA would be liquidated, PPVA's brokerage firms began to declare events of default, made margin calls, demanded additional collateral and sought the immediate unwinding of their relationships with PPVA.  *See* PPVA Complaint, ¶ 129.

19

87.     Shortly thereafter, liquidation proceedings in the Grand Court of the Cayman Islands (the "**Grand Court**") were commenced for PPVA and the PPVA Offshore Feeder Fund. *See* PPVA Complaint, ¶ 133, 134.

88.     On October 18, 2016, the liquidators of PPVA and PPVA Offshore Feeder Fund commenced a proceeding under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  *See* Case No. 16-12925 (Bankr. S.D.N.Y.).  That case remains pending.  *See* PPVA Complaint, ¶ 141.

89.     On or about February 14, 2017, PPVA Intermediate Feeder Fund was placed into liquidation before the Grand Court.  On October 17, 2017, its liquidators commenced a proceeding under Chapter 15 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York.  *See* Case No. 17-12269 (Bankr. S.D.N.Y.).  That case remains pending.

### 3.     **Innocent Insiders at the Platinum Family of Funds**

90.     While certain Platinum insiders were engaged in fraud, at all relevant times there were individuals with corporate authority who could have stopped the wrongdoing.  For example, the Receiver is currently aware of the following employees and/ or directors at the PPCO Funds who had the authority to stop the fraud had they been made aware of it:

> (i)     Brian Jedwab was the Managing Director of the PPCO Portfolio Manager from the inception of the PPCO Funds through early 2015.  Mr. Jedwab was not engaged in the fraudulent activities.  In his position, he had the corporate authority to stop any fraudulent activity he might have become aware of by reporting those activities to the relevant governmental authorities.

> (ii)    Daniel Mandelbaum was the Chief Financial Officer of the PPCO Portfolio Manager from January 2015 through at least October 2015.  He also performed services for the PPVA Funds.  In his position, he had the corporate authority to stop any fraudulent activity he might have become aware of by reporting those activities to the relevant governmental authorities.

20

      (iii)      Saurabh Shah was the Chief Legal Officer of the PPVA Portfolio Manager from November 2014 until through at least April 30, 2015.  In this position, Mr. Shah also effectively functioned as in-house legal counsel for the PPCO Funds.  In his position, he had the corporate authority to stop any fraudulent activity he might have become aware of by reporting those activities to the relevant governmental authorities.

      (iv)      From at least 2007 through 2016, PPCO Fund International was managed by a board of three independent directors, none of whom are named defendants in the Fraud Complaints or in the Criminal or Receivership Actions brought by the United States Government.  The independent directors owed nondelegable fiduciary duties to PPCO Fund International.  If the independent directors had detected any fraud they would have had a nondelegable duty to stop that fraud by, among other things, reporting that fraud to the proper regulatory and/or governmental authorities.

      (v)      From at least 2012 through 2016, PPCO Fund International A was managed by a board of three independent directors, none of whom are named defendants in the Fraud Complaints or in the Criminal or Receivership Actions brought by the United States Government.  The independent directors owed nondelegable fiduciary duties to PPCO International A.  If the independent directors had detected any fraud they would have had a nondelegable duty to stop that fraud by, among other things, reporting that fraud to the proper regulatory and/or governmental authorities.

**B.**     **The PPVA Funds' Financial Condition through the End of 2013**

91.     Beginning in or about 2012, the PPVA Funds faced a severe liquidity crisis caused by several factors, including:  (a) the concentration of the PPVA Funds' investments in certain highly illiquid investments, including equity and debt positions in non-operating, unprofitable or distressed companies many of which were not publicly traded; (b) the overvaluation of many of those investments which could not be sold without realizing large losses; (c) the large infusions of capital required by many of the PPVA Funds' portfolio companies and (d) growing redemption requests from investors.

92.     The PPVA Funds held primarily highly illiquid "Level 3" assets.[4]  According to PPVA Master Fund and Subsidiaries' Financial Statements for the year ended December 31, 2012 and 2013:

| Year | Total Asset Value | Level 3 Asset Value | % of Level 3 Assets |
|------|-------------------|---------------------|---------------------|
| As of December 31, 2012 | $787.8 million | $572.4 million | 72.6% |
| As of December 31, 2013 | $882.4 million | $669.7 million | 75.9% |

93.     Furthermore, PPVA's largest securities positions were in highly illiquid (and overvalued) limited liability companies and included debt interests in overvalued companies in the volatile energy industry.  For example, according to their financial statements as of December 31, 2013, approximately $469.3 million, or 46.9%, of PPVA Master Fund's total assets, which were valued at almost $1 billion, was concentrated in the energy industry.

94.     As of December 31, 2013, approximately 47% of PPVA's reported net asset value consisted of its investments in two energy companies:  (i) Black Elk Energy Offshore Operations, LLC ("**Black Elk**"), a Gulf of Mexico oil platform operator and (ii) Golden Gate Oil LLC ("**Golden Gate**"), a California-based onshore oil operation.

95.     As of the fourth quarter of 2013, PPVA's investment in Black Elk was its single largest position.  The Indictment filed in the Criminal Action details the explosion on an oil rig operated by Black Elk that killed several of its employees in 2012.  Following that tragedy, the

---

[4]     Under Generally Accepted Accounting Principles:

"Level 1" assets have "[v]aluations based on quoted prices in active markets for identical investments."

"Level 2" assets, which have "[v]aluations based on (i) quoted prices in markets that are not active; (ii) quoted prices for similar investments in active markets; and (iii) inputs other than quoted prices that are observable or inputs derived from or corroborated by market data."

"Level 3" assets, have "[v]aluations based on inputs that are unobservable, supported by little or no market activity, and that are significant to the overall fair value measurement."

value of Black Elk dramatically decreased.  Nevertheless, PPVA *increased* its valuation of PPVA's investment in Black Elk during this period.  At the time of the Black Elk explosion, approximately 40% of PPVA's total portfolio was worth significantly less than reported by PPVA, and the remaining "assets" were speculative and early-stage investments that would have required significant capital unavailable to the PPVA Funds for any hope of profitability.

96.     PPVA also greatly overrepresented the value of its debt and equity positions in Golden Gate.  According to PPVA Master Fund's 2013 financial statements, it held $191 million in securities in Golden Gate, despite the fact that Golden Gate was a non-operating company with mostly undeveloped reserves.  Yet, its valuation did not differentiate between developed and undeveloped reserves.

97.     The liquidity pressures on the PPVA Funds were further exacerbated because they overreported their income, resulting in higher fees paid to the PPVA Portfolio Manager. Because the payments made to the PPVA Portfolio Manager were then available for distribution to Platinum insiders, those insiders were incentivized to "keep up appearances" and ignore the melting ice cube they were holding.

98.     The foregoing issues created severe problems for the PPVA Funds when investors sought to redeem their investments within the relatively short timeframes permitted under the PPVA Funds' limited partnership agreements and private placement memorandums. Investments in the PPVA Feeder Funds were subject to a fixed, orderly redemption process: quarterly redemptions, upon 60- or 90-days' advance notice with the fund "intend[ing] to pay" to the investor at least 90% of the amount requested within 30 days, with the remaining 10% potentially held back for completion of the fund's audit.  *See* PPVA Complaint at Ex. 6.

99.     Beginning in 2012, the PPVA Funds' capital withdrawals significantly exceeded their contributions.

- In 2012, capital withdrawals by investors from the PPVA Funds exceeded capital contributions by $92.5 million.
- In 2013, capital withdrawals by investors from the PPVA Funds exceeded capital contributions by $53.7 million.

100.    By late 2012, Nordlicht and Uri Landesman, PPVA Portfolio Manager's President, worried that redemptions were "daunting" and "relentless," and in June 2014, Nordlicht wrote Landesman that "[i]t can't go on like this or practically we will need to windown … this is code red … We can't pay out 25 million in reds [redemptions to PPVA investors] per quarter and have 5 come in."  New subscriptions could not fund the gap and selling the PPVA Fund's concentrated illiquid positions would have exposed their serious and significant overvaluations.

### C.     The PPCO Funds' Financial Condition through the End of 2013

101.    At the end of 2013, PPCO Master Fund had just $5.7 million of cash on hand. Absent a large cash infusion from investments or subscriptions, it would likely have been unable to meet both the increased redemption requests it faced in 2014 and adequately fund its portfolio companies.  This dire situation was exacerbated because the majority of the PPCO Funds' assets were "Level 3," assets for which there was only a small active market.

102.    According to PPCO Master Fund and its subsidiaries' Consolidated Condensed Schedule of Investments as of December 31, 2012 and 2013:

| Year | Total Investment Asset Value | Level 1 Assets | Level 2 Assets | Level 3 Assets | % of Level 3 Assets |
|------|------|------|------|------|------|
| As of December 31, 2012 | $306.6 million | $0 | $36.3 million | $270.3 million | 88% |
| As of December 31, 2013 | $317.3 million | $18.9 million | $56.9 million | $241.5 million | 76% |

103.    Not only were the PPCO Funds' assets primarily made up of illiquid Level 3 assets but many of these assets were significantly overvalued.

104.    Much like other investment vehicles of the Platinum Funds' design, each share of classes issued to investors required a different "lock up" period, a time during which an investor could not redeem their investments. Given the significant percentage of PPCO Funds' shares with a relatively short lock-up period held by individual investors or families/trusts, there was significant redemption pressure – that is, a constant need to provide liquidity upon demand to investors.  As established herein, the short lock-up period created liquidity pressures at the PPCO Funds, which certain Platinum Fund insiders sought to solve by creating Beechwood, which had an ability to attract institutional investors who generally do not create as much short-term liquidity pressure.

105.    During 2012 and 2013, the PPCO Funds began to experience increasing redemptions.  In 2012, the $55.9 million of contributions (subscriptions) barely eclipsed the $50.8 million of redemptions.   In 2013, the $67.7 million of redemptions exceeded the contributions (subscriptions) of $43.6 million.  At the same time, the PPCO Funds' cash balance decreased from $7.2 million to $5.7 million.

106.    Around the end of 2013, Nordlicht (and certain other Platinum insiders) understood the funding requirements of certain of PPCO Master Fund portfolio companies were not being met.  In a November 26, 2013 email to Nordlicht, portfolio manager Zach Weiner asked:

> Mark, Can you please give us an update on when we can expect some liquidity in PPCO for this week.  We've pushed off everyone for a month now, but we really do need 80k for greentown, 50k for alcor … and 200k for daybreak ….  In addition, we need to pay 72K of receivership fees on RCKE prior to transferring the note to AYN.  We have knocked this down as much as possible but we are kind of at the end of that game now.

### D.    The Creation of the Platinum Insiders' White Knight:  Beechwood

107.    Facing a severe liquidity crisis at the Platinum Funds in or about 2013, the Platinum insiders were confronted with a choice:  wind down through liquidations and risk their fraudulent scheme being exposed or find alternative means to raise substantial capital outside of their friends and family.  As BCLIC and WNIC acknowledged, "'[f]or years, Platinum had little success attracting insurance-company money and considered starting a reinsurer to do so ….'" BCLIC/ WNIC Complaint, ¶ 6 (internal citation omitted).

108.    To overcome these obstacles, in BCLIC and WNIC's own words, "Huberfeld and Nordlicht partnered and conspired with Defendants Moshe M. Feuer, Scott Taylor and David Levy to form a reinsurance company, Beechwood Re Ltd." and "[t]he co-conspirators established Beechwood with the objective of entering into one or more reinsurance treaties with insurance companies, so that they could take control of reinsurance trust fund assets and use

those assets to benefit Platinum, thereby enriching Platinum's and Beechwood's owners."
BCLIC/ WNIC Complaint, ¶ 5.[5]

109.    In or about February 2013, Levy and Nordlicht, among other Platinum personnel,
commenced working with Taylor and Feuer - *out of the PPVA Portfolio Manager's office space -*
to create Beechwood.

110.    The ownership in and ultimate control of Beechwood was held by Nordlicht,
Huberfeld, Bodner and Levy (in part through trusts), while Taylor, as President, and Feuer, as
Chief Executive Officer, maintained ostensible and nominal management authority, with Levy.

111.    Beechwood's management team was largely comprised of personnel employed by
or otherwise connected to the Platinum Funds.  For example, the Beechwood team included,
from time to time, the following individuals who were former Platinum Fund employees: (i)
Levy, as "Chief Investment Officer"; (ii) Will Slota, as "Chief Operations Officer"; (iii) David
Ottensoser, as "General Counsel"; and (iv) Daniel Small, as the "Senior Secured Collateralized
Loans PM."

112.    Beechwood made no effort to hide its deep ties to the Platinum Funds from the
CNO Defendants and SHIP.  There were numerous, readily apparent or otherwise easily
discoverable ties between Beechwood and the Platinum Funds, including:

> (i)       Beechwood marketed Levy to potential clients as a member of its
> management team and specifically highlighted Levy's eight years of
> experience with the PPVA Portfolio Manager as key to Beechwood's
> future success.  Levy, the co-Chief Investment Officer of the PPVA
> Portfolio Manager together with Nordlicht, served as chief financial

---

[5]    Reinsurance is the transfer of part or all of the risks from an insurer (referred to as the cedant) of a single
policy or pool of insurance to a second insurance carrier, the reinsurer, who typically has no direct
contractual relationship with the insured.  The transfer of risk involves the contractual transfer of all or an
agreed upon portion of future claims liabilities to the reinsurer (referred to as the process of ceding policies
and related anticipated claims liabilities by the insurer to the reinsurer; the reinsurer in turn assumes the
policies and related claims from the insurer) in exchange for a negotiated cash consideration.

officer and secretary of Beechwood Re and Beechwood Bermuda.  He was also BAM I's Chief Investment Officer and Chief Financial Officer until the end of 2014, when he was replaced by Daniel Saks, a PPVA Portfolio Manager executive.

(ii)     Ezra Beren, Huberfeld's son-in-law, was hired in January 2014 to be a portfolio manager at Beechwood after serving in a similar capacity at the PPVA Portfolio Manager.

(iii)    Daniel Saks, a former Platinum employee, served as BAM I's Chief Investment Officer after Levy "resigned."

(iv)     Naftali Manela, then CFO of the PPCO Portfolio Manager, performed services for Beechwood related to general operations while still employed by the PPCO Portfolio Manager.

(v)      Eli Rakower, director of valuation at the Platinum Funds, provided consulting services to Beechwood related to interaction with valuation firms that would value assets of the Beechwood Reinsurance Trusts.

(vi)     Stewart Kim, an employee of the PPVA Portfolio Manager, simultaneously worked for Beechwood as its Chief Risk Officer until January 2015, when he became Beechwood's full time Chief Risk Officer.

(vii)    BAM I and the remainder of Beechwood operated out of the PPVA Portfolio Manager's office space until at least the end of February 2014.

(viii)   Even after separate office space was procured, Levy maintained an office at Beechwood through at least the end of 2014, and Huberfeld took over Nordlicht's office at Beechwood when Nordlicht moved out.

113.    Based on the foregoing, while the CNO Defendants and SHIP have asserted that they were in the dark about the nature of Beechwood and the Platinum Funds' relationship, the relationship was in plain sight.  Indeed, the facts set forth herein establish that after the CNO and SHIP Defendants could no longer deny the web of relationships between the two, they accepted those relationships, and then directed and actively participated in a series of transactions by and among Beechwood and the Platinum Funds to accomplish their goal of ridding themselves of nonperforming loans being held on their accounts at Beechwood.  As further explained in paragraph 200, internal emails show that the Defendants knew of and ignored the deep relationships between Beechwood and Platinum.

### E.    The Formation of the Beechwood, BCLIC, WNIC and SHIP Relationship

#### 1.    Problems Experienced in the Long-Term Care Insurance Industry

114.    Long-term care insurance carriers with legacy portfolios, like those of BCLIC, WNIC and SHIP, had long faced both increasing claims payments and increasing capital requirements.  The legacy policies comprising the portfolios were part of an early generation of long-term care policies, no longer offered in the marketplace because they had been underwritten with faulty assumptions.

115.    Due to the extreme challenges facing long-term care carriers, by 2012, reinsurance for legacy long-term care policies was available only under extremely onerous terms in which the ceding insurance company would have to make significant payments (negative ceding commissions) to reinsurers to complete such transactions.  It was against this backdrop that the CNO Defendants and SHIP found their white knight:  Beechwood, which targeted long-term care insurers with troubled legacy portfolios because it was a startup reinsurer, and as such was not likely to entice business from established insurers or insurers with other lines of business.

#### 2.    CNO's Spinoff of SHIP

116.    CNO had long expressed a desire to find ways to mitigate its exposure to legacy long-term care policies.  In or about November 2008, CNO's financial future was complicated because of its ownership of SHIP, which was the solvent run-off of a diminishing, closed block of primarily long-term care policies issued by insurance companies that had been acquired by, or merged into, Conseco Senior Health Insurance Company (as SHIP was then known) between 1997 and 2000.

117.    SHIP relied heavily on CNO for its liquidity needs.  From 2008 through 2017, CNO and its subsidiaries made approximately $915 million in capital contributions to SSHI (SHIP's predecessor under CNO), including approximately $220 million in capital contributions from January 1, 2006 through June 30, 2007.

118.    CNO sought ways to reduce the strain of supporting SHIP's underwriting losses. To that end, in November 2008 CNO transferred ownership of SHIP to the Senior Healthcare Trust, which was then merged into an independent oversight trust, the Senior Healthcare Oversight Trust (k/n/a Senior Health Insurance Company of Pennsylvania).  The Trustees of Senior Healthcare Oversight Trust serve as SHIP's directors and are primarily former insurance regulators.

119.    At the time of the transfer, CNO and its subsidiaries contributed $164 million of capital to SHIP to add to SHIP's existing $125 million of adjusted statutory capital, reflecting concerns that SHIP would need additional capital to sustain itself on a standalone basis.  *See* Plan to Transfer Conseco Senior Health Insurance Company to Independent Trust, August 11, 2008.

120.    Today, having been spun off from CNO, SHIP is a long-term care insurer that remains in runoff.  SHIP continues to operate out of the same site in Carmel, Indiana where it operated while under CNO's control, along with CNO's other long-term care legacy portfolios, BCLIC and WNIC.

121.    Fuzion, a wholly-owned subsidiary of Senior Healthcare Oversight Trust, was formed in 2012 to provide administrative and management services to long-term care insurance companies, including SHIP.  Fuzion is located in Carmel, Indiana, in the same office complex as SHIP, BCLIC and WNIC.

122.    In or about December 2013, pursuant to a comprehensive master services agreement, SHIP transferred its employees and physical assets to Fuzion to provide management services to SHIP.   *See* Report of Examination of Senior Health Insurance Company of Pennsylvania, Harrisburg, PA, as of December 31, 2013.   As consideration for its services, Fuzion has received substantial payments in the range of approximately $15 million to $18 million from 2014 through 2017 at rates that were considerably above market.   *See* SHIP Statutory Financial Statements for 2014-2017.

123.    Even after SHIP's spinoff, its financial condition continued to decline because, *inter alia*, SHIP's long-term care portfolio incurred significant unforeseen increases in claims totaling over $200 million in the five-year period from 2009 through 2013.   During this period, SHIP's loss ratio, *i.e.*, the ratio of claims to premiums, steadily increased, an indication of declining operating performance.   *See* 2009-2013 SHIP Statutory Financial Statements.   At the same time, SHIP was confronted with an economic environment of flat to declining interest rates, when higher rates had been projected.

124.    Both of the foregoing factors negatively affected SHIP's regulatory surplus.  If its regulatory surplus were to decline below a certain threshold, the Indiana Department of Insurance could exercise certain enforcement powers, including placing the company into rehabilitation and potentially ordering liquidation.

125.    By 2013, SHIP was in dire straits, with a statutory surplus of approximately $98 million (and rapidly declining every year) and loss reserves (i.e., the present value of future anticipated claims) of $2.7 billion (or 28 times the capital surplus cushion).  Thus, just a 4% increase in unanticipated claims filed by policyholders could wipe out SHIP's statutory surplus.

126.    SHIP therefore had no, or virtually no, options for obtaining reinsurance or other arrangements for offloading any of its long-term care risk, and, accordingly, was a prime candidate for the Beechwood/ Platinum Fund's to solicit.

### 3.    The CNO, BCLIC and WNIC Relationship

127.    After SHIP's spinoff, CNO's legacy long-term care business lines operated by CNO subsidiaries BCLIC and WNIC, continued to flounder, dragging down CNO's overall financial performance.

128.    At CNO, a common set of holding company board members and executive management oversaw the overall financial and risk-management decisions of its individual insurance companies.   Certain key functions at CNO were shared across the insurance subsidiaries, including insurance asset management, treasury, accounting and legal functions. For example, Eric Johnson ("**Johnson**"), the Chief Investment Officer and President of 40|86 Advisors, also served as an Executive Vice President of WNIC and BCLIC.  In this role, Johnson appears to have overseen the investment decisions at BCLIC and WNIC.  Similarly, Mathew Zimpfer, the general counsel of CNO, was also listed as an Executive Vice President of BCLIC and WNIC in their statutory filings.

129.    CNO, as the holding company, received dividends from its subsidiaries, including BCLIC and WNIC, to fund its operations.  The debt issued by CNO was guaranteed by its subsidiaries, including BCLIC and WNIC.

130.    The value of CNO stock derived from its ownership of its insurance subsidiaries, including BCLIC and WNIC.  Indeed, all earnings calls were, and are, directed and addressed by the executive management of CNO, who address business and financial strategy across all CNO's operating insurance companies.

131.   Based on the foregoing, in their assessments of CNO, the rating agencies acknowledge this unified management of CNO.  For example, in their credit and ratings reviews for CNO as the holding company, they frequently assess transactions undertaken at the insurance company subsidiary level.

132.   Taken together, these facts establish that CNO was highly incentivized to, and did, direct the actions of BCLIC and WNIC because its financial health was dependent on BCLIC and WNIC.  Indeed, CNO concedes that any harm suffered by BCLIC and WNIC in turn was suffered by CNO by asserting that it was the victim of the fraud perpetrated by and through Beechwood.  *See CNO Cross-Claims and Third-Party Claims*, Dkt. No. 204, ¶ 470.

133.   Thus, each and every action taken by BCLIC and WNIC discussed in this Amended Complaint was done in concert with, and at the direction of, CNO.

134.   Furthermore, because of the overlapping roles played by many of the employees of BCLIC, WNIC, CNO and 40|86 Advisors, such as Johnson's role as Chief Investment Officer and President of 40|86 Advisors while serving as the Executive Vice President of WNIC and BCLIC, each and every action taken by BCLIC and WNIC discussed in this Amended Complaint was done in concert with, or at the direction of, 40|86 Advisors.

### 4.   BCLIC and WNIC's Introduction to Beechwood

135.   CNO had long been searching for reinsurance for CNO's legacy long-term care policies housed at BCLIC and WNIC to reduce and mitigate their long-term care exposure.

136.   In connection therewith, two employees of Willis Re Inc., Rick Hodgdon (later a Platinum and Beechwood employee) and Michael Kaster (a former CNO employee with familiarity with the long-term care portfolio), introduced CNO to Beechwood, which appeared to

be a new reinsurance company with no existing business at the time.  *See* BCLIC/ WNIC Complaint, ¶¶ 53, 54.

137.    While BCLIC and WNIC allege at paragraphs 10 and 54 of the BCLIC/ WNIC Complaint that "[s]everal reinsurers were interested in the business," in reality, by 2013 reinsurance capacity was unavailable or virtually unavailable for books of legacy long-term care business, such as those of BCLIC and WNIC.

138.    In or about November 2013, BCLIC and WNIC met with Beechwood.   In connection with that meeting, "Hodgdon … sent [BCLIC and WNIC] an email dated November 5, 2013, identifying the representatives from Beechwood who would be attending …."  BCLIC/ WNIC Complaint, ¶ 63.  According to BCLIC:

> Beechwood, through Hodgdon, advised Plaintiffs [BCLIC] that the following Beechwood personnel would join the meeting:  Feuer and Taylor; Will Slota, who was designated as the "COO" of Beechwood; Paul Poteat, who was designated as the "CTO" of Beechwood; David Ottensoser, who was designated as the "General Counsel" of Beechwood; Dan Small, who was designated as the "Senior Secured Collateralized Loans PM" of Beechwood; and David Leff, who was designated as the "US Fixed Income PM" of Beechwood.

BCLIC/ WNIC Complaint, ¶ 64.

139.    Although BCLIC and WNIC claim that Beechwood and Platinum insiders "*hid* Beechwood's deep ties to Platinum" (BCLIC/ WNIC Complaint, ¶ 27), the relationship between them was readily apparent.   Indeed, it is impossible that BCLIC and WNIC only recently discovered that "Slota, Poteat, Ottensoser and Small were at that time employees of Platinum, not Beechwood" (BCLIC/ WNIC Complaint, ¶¶ 65, 66), when most, if not all, of these individuals' ties to the Platinum Funds were easily discoverable online, and still are.  As set forth in Section VI.D., *supra*, the "deep ties" were clear to any prudent insurer conducting due

34

diligence into Beechwood.  In fact, as set forth in paragraphs 112-113, even if CNO was unaware of these ties initially, it soon knew of and consciously ignored the ties.

140.    Waiting anxiously for BCLIC and WNIC's investment were the Beechwood/ Platinum insiders.  None more so than Nordlicht who, in an email dated in or about 2013, wrote to Naftali Manela that he "[h]op[ed] for beechwood money," to enable him to pay a $2 million-dollar redemption due by December 15, 2013.

### 5.    The BCLIC and WNIC Reinsurance Agreements

141.    Effective in or about October 2013, BCLIC and WNIC ceded a substantial portion of their legacy, runoff long-term care business to Beechwood Re pursuant to an (i) *Indemnity Reinsurance Agreement by and between Washington National Insurance Company and Beechwood Re Ltd*, as amended by Amendment No.1 to Indemnity Reinsurance Agreement and (ii) *New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd* (together, the "**Reinsurance Agreements**").

142.    As part of the transactions:

- WNIC ceded to Beechwood Re $357 million of statutory reserves to cover future losses from policies and paid $394 million in cash to Beechwood Re; and

- BCLIC ceded $196 million of statutory reserves to Beechwood Re to cover future losses from policies and paid $198 million in cash to Beechwood Re.

143.    The New York Indemnity Reinsurance Agreement by and between BCLIC and Beechwood Re is governed by New York State law and provides for New York courts to resolve any disputes arising thereunder.

144.    When negotiating the Reinsurance Agreements with Beechwood Re, CNO, and 40|86 Advisors through BCLIC and WNIC, interacted by both telephone and email with Beechwood's New York based employees.

145.     Because Beechwood Re was an unauthorized offshore reinsurer (*i.e.*, domiciled outside New York and Indiana where BCLIC and WNIC were domiciled), it was required to create on-shore reinsurance trusts, the Beechwood Reinsurance Trusts, to manage the assets received in the reinsurance transaction.

146.     The Beechwood Reinsurance Trusts were administered in the state of New York and Indiana.

147.     Wilmington Trust, N.A. was appointed the trustee for each of the Beechwood Reinsurance Trusts.

148.     BAM I was appointed the asset manager for the Beechwood Reinsurance Trusts.

149.     On or about February 1, 2014, the task of administering the long-term BCLIC and WNIC policies in the Reinsurance Agreements was delegated by BCLIC and WNIC to Fuzion pursuant to a February 1, 2014 Master Services Agreement.  *See* SHIP Complaint, ¶¶ 12, 13.

150.     Not coincidentally, Fuzion's employees (as employees of SHIP under the CNO umbrella) had long been providing that service to SHIP.

151.     While Beechwood Re assumed CNO's (through BCLIC and WNIC) risk through the reinsurance transactions, the entities would still be responsible for any unsatisfied claims to the extent Beechwood Re failed to replenish the Beechwood Reinsurance Trusts.  *See* BCLIC/ WNIC Complaint, ¶¶ 81-83.  This incentivized CNO to be an active participant, not a passive investor in or with Beechwood, in order to make certain it reduced BCLIC and WNIC's exposure to any claims that might be unsatisfied because of Beechwood's inability to pay.  To that end, the Reinsurance Agreements included "audit provisions" which permitted BCLIC and WNIC to initiate an audit of the investments in certain circumstances.  *See* BCLIC/ WNIC Complaint, ¶ 212.

152.     The fact that the CNO Defendants remained liable for any claims if the Reinsurance Trusts became underfunded also demonstrates why, as set forth below, the CNO Defendants failed to terminate the Reinsurance Agreements when the Beechwood-Platinum relationship became known: so long as the Reinsurance Agreements were in effect, the CNO Defendants were not liable for such claims.  Moreover, the CNO Defendants were agreeable to the valuation of the assets ascribed to them by Beechwood because so long as the Reinsurance Trusts appeared to satisfy the amounts required by Indiana and New York state law, they could stay in compliance with their regulations.

153.     The steps that CNO took to reduce and/or mitigate its long-term care exposure, including its announced arrangement with Beechwood as part of a broader business strategy to de-risk its legacy runoff business, were ultimately rewarded by its ratings agencies, exactly as CNO had hoped.

### 6.     SHIP's Introduction to Beechwood

154.     SHIP was introduced to Beechwood Re in late 2013.  According to SHIP, it "was aware of the BCLIC and WNIC reinsurance arrangements through SHIP's affiliate, Fuzion…" SHIP Complaint, ¶ 12.

155.     Following SHIP's introduction to Beechwood in 2013, Brian Wegner, the President and CEO of SHIP at the time, Paul Lorentz, the CFO of SHIP at the time, and others met with Feuer, Taylor and Levy to discuss SHIP's financial condition.

156.     Documentary evidence establishes that SHIP's CEO, Brian Wegner, was personally invested in forging a relationship with Beechwood. ███████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

157.   A series of meetings and communications between Fuzion, for SHIP, and Beechwood, primarily through Feuer, Taylor, and Levy, ensued in 2014, when SHIP was evaluating Beechwood as a potential investment manager.  *See* SHIP Complaint, ¶ 76.

158.   Given the distressed nature of SHIP's business, Beechwood Re, the Beechwood reinsurance entity, would not enter into agreements similar to the Reinsurance Agreements it consummated with BCLIC and WNIC.  Rather, Beechwood proposed that SHIP enter into investment management agreements with its investment advisory entity, Beechwood Advisors, so that SHIP could gain access to the same kinds of supposedly high-quality, high-yield investments that supported the Reinsurance Agreements with BCLIC and WNIC.  *See* SHIP Complaint, ¶ 14.

159.   As described above, unable to obtain reinsurance in the marketplace, SHIP was highly motivated to enter into the investment management agreements.

160.   Because Fuzion was highly dependent on SHIP for its financial survival, it too was highly motivated to keep SHIP out of rehabilitation proceedings.  As long as SHIP survived, Fuzion could expect to continue charging fees that were well above-market.  For example, from 2014 to 2017, the number of SHIP's outstanding policies requiring administration declined by

30%.  However, during that same period, SHIP's payments to Fuzion for its administrative services *increased* by 20%.

161.    Fuzion's dependency on the continued existence of SHIP establishes that it was highly incentivized to, and did, direct the actions of SHIP in most, if not all, investment decisions.  Thus, each and every action taken by SHIP discussed in this Amended Complaint was done in concert with, or at the direction of, Fuzion.

### 7.    The SHIP Investment Management Agreements

162.    SHIP, acting by and through Fuzion, entered into three investment management agreements (collectively, the "**IMAs**") with certain Beechwood entities, all of which contained roughly similar terms.

163.    All three IMAs contain the same basic structure:

(i)     Beechwood guaranteed SHIP a 5.85% annual investment return on the net asset value of the assets SHIP contributed.

(ii)    If SHIP's investments under the IMAs did not achieve a 5.85% return, Beechwood was obligated to pay SHIP any shortfall while also being obligated to contribute its own assets to make certain the net asset value of the account funded by SHIP was no less than that initially invested.

(iii)   Beechwood would retain investment returns above the 5.85% guaranteed investment return as a "Performance Fee."

164.    The foregoing terms were highly beneficial to SHIP:  it achieved a guaranteed return on its investment that it could not otherwise obtain in the market for the level of risk it was portrayed to be assuming in exchange.

165.    The IMAs were comprised of the following agreements:

(i)     A May 22, 2014 IMA with BBIL (the "**BBIL IMA**"), pursuant to which SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.  *See* SHIP Complaint, ¶ 97.

(ii)    A June 13, 2014 IMA with Beechwood Re (the "**BRe IMA**") pursuant to which it invested $80 million with Beechwood Re.  SHIP deposited that

amount into a custody account at Wilmington Trust for investment by Beechwood Re on SHIP's behalf.  *See* SHIP Complaint, ¶ 115.

(iii)   A January 15, 2015 IMA with BAM I (the "**BAM I IMA**") pursuant to which SHIP invested $110 million with BAM I.  *See* SHIP Complaint, ¶ 132.

166.   Over time, SHIP invested approximately $270 million with Beechwood and its affiliates pursuant to the three IMAs.

167.   While BAM was generally given authority to invest SHIP's funds as it saw fit, BBIL's, Beechwood Re's and BAM I's "*Adviser Investment Policy, Guidelines and Restrictions*" and "*Guidelines for Senior Secured Credit Opportunities*" provide that Beechwood must invest in a manner permitted by SHIP's corporate investment guidelines.  *See* SHIP Complaint, ¶¶ 105, 123 and 141.  Thus, SHIP reserved the right to make certain its funds were invested in "transactions in which there is a *well-known* and *understood* counterparty risk, and liquid/valuable collateral to secure any … loan."  SHIP Complaint, ¶¶ 108 and 126.

### F.   Beechwood's Use of the Insurance Companies' Funds

168.   Between 2014 and 2016, CNO directed BCLIC and WNIC to transfer a total of approximately $592 million to Beechwood pursuant to the Reinsurance Agreements while SHIP transferred approximately $270 million to Beechwood pursuant to the IMAs, for a total investment of approximately $912 million.

169.   Upon receipt of the funds, Beechwood immediately began investing into the Platinum Funds and/or their portfolio companies through a series of debt and equity transactions.

170.   The Beechwood Defendants and the Platinum insiders structured and implemented numerous non-arms' length non-commercial transactions through which Beechwood purchased certain PPVA Fund assets described below through the accounts held on behalf of the CNO Defendants and SHIP.  The sales and direct investments were intended to

generate much needed cash for the PPVA Funds while maintaining the fiction of inflated valuations.

171.    At the helm of the transactions for the Platinum Funds was Nordlicht, sitting in the hopelessly conflicted role he carved out for himself as Chief Investment Officer and equity holder in the Platinum Funds, while being one of the ultimate and most active owners of Beechwood.  By the very nature of those roles it was impossible for Nordlicht to fulfill his fiduciary duties and duties of loyalty to the PPCO Funds in any transaction with Beechwood.

172.    Steering these transactions for Beechwood was Levy, he too sitting in the hopelessly conflicted role he carved out for himself by being Chief Investment Officer and equity holder in Beechwood, while being a portfolio manager of the Platinum Funds.  By the very nature of those roles it was impossible for Levy to fulfill his fiduciary duties and duties of loyalty to Beechwood in any transaction with the Platinum Funds.[6]

173.    Sitting at Levy's side were Feuer and Taylor, who, while aware of the breaches of fiduciary duty being committed by Nordlicht and Levy, and the fraudulent scheme itself, substantially assisted in each of the Beechwood transactions with the Platinum Funds described in this Amended Complaint.

174.    As established below, the investments made by Beechwood into the Platinum Funds were made with the CNO Defendants' and SHIP's knowledge.  Indeed, the evidence below establishes that senior management and/or the agents of the CNO Defendants and SHIP were aware early on of the Beechwood/ Platinum ties.

---

[6]    Levy was subsequently replaced as Chief Investment Officer of Beechwood by Platinum employee Daniel Saks, thereby ensuring the continuity of the Platinum Funds' influence at Beechwood.

175.    Having offloaded a substantial portion of their future claims risk to Beechwood and confronted with a market that could not provide for those claims in the same advantageous manner anywhere else, the CNO Defendants made a conscious and calculated decision not to lose the white knight they had found.   SHIP too made that decision, having procured a guaranteed return on investment that it could not otherwise obtain.

176.    However, approximately two years later, when it was clear Beechwood's investments into the Platinum Funds were floundering, the CNO Defendants and SHIP directed Beechwood to consummate several fraudulent conveyance transactions with the PPCO Fund between 2015 and 2016, which had but one goal:  rid the insurers of bad assets by dumping them into the PPCO Funds and/or securitize the positions they were unable to dispose of by obtaining a lien in substantially all of the PPCO Funds' assets.

### 1.    The Beechwood Defendants Provided Substantial Assistance to the Fraudsters

177.    Beginning in early 2014 through 2016, the Platinum insiders and Beechwood directed the Beechwood Reinsurance Trusts and the SHIP IMA accounts to purchase limited partnership interests in the Platinum Funds and invest hundreds of millions of dollars mostly into PPVA portfolio companies that were being carried at inflated valuations.

178.    Without this funding, the portfolio companies would likely have collapsed, the fraudulent scheme would have been exposed and management and other fees paid to Platinum insiders payments would have ceased.   At the same time, without the sale of assets to Beechwood, (i) PPVA would have been unlikely to meet its redemption requests without selling its mostly illiquid portfolio and risk exposing its fraud and (ii) PPCO would have faced liquidity issues which would have led to an inability to satisfy any non-ordinary course redemption requests.

42

179.    To consummate these transactions, the Beechwood Defendants, led by Levy, working together with the Platinum Funds, led by Nordlicht, systematically utilized the funds infused by the insurers to prop up the Platinum Funds and their portfolio companies through a combination of debt and equity transactions, substantially all of which were consummated at inflated valuations.  Knowing full well that a fraud was afoot, and that Nordlicht and Levy were breaching their fiduciary duties, the Beechwood Defendants structured, negotiated and implemented several transactions to facilitate the fraud.

180.    For example:

- The insurance companies' funds were used to prop up portfolio companies of the PPVA Funds, through direct loans to portfolio companies and the purchases of portfolio companies' securities from PPVA.  These portfolio companies included, among others, Black Elk, Golden Gate, PEDEVCO Corp., Implant Sciences Corp., Northstar Offshore Group, LLC ("**Northstar Offshore**"), Montsant Partners LLC, Desert Hawk Gold Corp. ("**Desert Hawk**") and China Horizon Investments Group.

- In 2014, PPCO Master Fund used the insurance companies' funds to provide approximately $60 million in support to more than ten of its portfolio companies.  Among others, these investments included $10 million to Buffalo Lake Advanced Biofuels, LLC, a non-operational ethanol plant purchased out of bankruptcy, $8 million to Cleveland Mining Company Limited, a non-operating iron mine in Brazil that was nothing more than a business plan, and over $5 million to LC Energy Holdings LLC, a coal mine that was beset by operational issues.  Each entity had substantial business, operational and financial issues which called into question the very solvency of these companies at the time these investments were made.  However, no issues regarding these investments were raised.

- Beechwood acquired bonds issued by Black Elk in order to facilitate the now well-recognized "Black Elk scheme," a scheme from which the PPCO Funds derived no benefit, but which later resulted in a $24 million damages settlement against the Receivership Estate by the bankruptcy trustee of Black Elk.

181.    After certain of these portfolio companies failed to meet their debt service obligations and were otherwise exposed as blatantly nonperforming, the CNO and SHIP

Defendants directed that Beechwood transfer certain of these assets to PPCO Master Fund.  For example, as set forth in Section VI.G. below, the CNO Defendants and the SHIP Defendants subsequently directed Beechwood to dispose of:

- their loans to Desert Hawk in a December 2015 transaction with the PPCO Funds; and

- their loans to Northstar Offshore in a March 2016 transaction with the PPCO Funds.

182.    Each of these investments in the PPCO Funds and the PPVA Funds, and in the companies in which they made investments, constitute securities transactions.

183.    These securities transactions were made, directly or indirectly, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, wire services, or of a facility of a national securities exchange, in connection with the transactions, acts, practices, or courses of business alleged herein, certain of which occurred in this Judicial District.

184.    The transactions consummated by and between the Platinum Funds and Beechwood summarized above allowed the Platinum Fund insiders to continue to pay themselves millions of dollars through management and incentive fees "earned" by the PPCO Portfolio Manager.  Since as far back as 2012, the Platinum Fund insiders had used their ability to overvalue the PPCO Funds' assets to enrich themselves at the expense of the funds.

185.    Between 2014 and 2016, PPCO Master Fund paid the PPCO Portfolio Manager approximately $26 million in management fees, of which approximately $3.9 million was distributed to its owners or various charities on behalf of its owners (Mark Nordlicht, Murray Huberfeld, David Bodner, Gilad Galter, Uri Landesman and Ari Glass).

186.     Demonstrating that they had divorced their individual well-being from that of the Platinum Funds, certain Platinum Fund insiders took advantage of the excessive management fees paid to the PPCO Portfolio Manager by directing distributions to themselves or procuring significant tax advantage treatment on their accounts.

187.     For example, in 2014, the PPCO Portfolio Manager was compelled to distribute nearly $1 million of management fees to certain insiders through guaranteed payments and distributions of profits while allocating close to $1 million of the management fees to charitable contributions, thereby providing a significant tax savings for the insiders claiming the charitable deductions.  In 2015, the Platinum insiders caused the PPCO Portfolio Manager to specifically allocate to certain insiders nearly $2 million of charitable deductions so as to obtain significant tax savings for the insiders claiming the deductions.

188.     The PPCO Portfolio Manager was also entitled to an incentive fee at the end of each fiscal year.  According to the 2014 PPCO Master Fund LP financial statements, incentive fees earned on "performance" were allocated to the General Partner's capital account.

189.     The fraudulent valuations resulted in the accrual of substantial incentive fees and in many cases, the distribution of those fees to Platinum insiders, including Nordlicht, Huberfeld, Bodner, Gilad Galter, Uri Landesman and Ari Glass.

190.     Between 2014 and 2015, PPCO Master Fund's General Partner, Platinum Credit Holdings, LLC, earned approximately $11.4 million in incentive fees, of which it distributed $3 million to or for the benefit of its owners, Mark Nordlicht, Murray Huberfeld, David Bodner, Gilad Galter, Uri Landesman and Ari Glass.

191.     The accrual and payment of management and incentive fees for the ultimate benefit of certain Platinum insiders based on inflated valuations epitomizes the self-dealing and

conflicts disregarded by certain Platinum insiders.  Without any regard to their fiduciary duties to the PPCO Funds, the Platinum insiders enriched themselves through millions of dollars of excessive management and incentive fees, leaving the PPCO Funds cash poor.  Simply said, the Platinum insiders were stealing from the Platinum Funds.

192.    At the same time, many of the Platinum insiders were profiting from the performance fees charged by Beechwood, which charged over $30 million in such fees under the IMAs.

193.    Were it not for Beechwood, the house of cards built by the Platinum insiders would have collapsed.  But Beechwood, through Levy, with the substantial assistance of Feuer and Taylor, ably assisted the Platinum Funds in perpetrating the fraud that the Platinum Funds' assets were worth significantly more than in reality by entering into the transactions described above.

### 2.    The CNO Defendants Provided Substantial Assistance to the Fraudsters

194.    As established above, the CNO Defendants were highly motivated to transact with Beechwood.  And while they now complain of having been led astray, evidence establishes that the CNO Defendants were well aware of the deep ties binding Beechwood and Platinum. Indeed, despite knowing that the Platinum insiders, Nordlicht and Levy among others, owed duties of loyalty and care to the PPCO Funds, the CNO Defendants assisted those insiders in transactions that were specifically structured to the detriment of the PPCO Funds.

195.    In early 2014, Beechwood, for the ultimate benefit of the CNO Defendants, purchased $36 million of limited partnership interests in PPCO Master Fund.  And this fact was not hidden.

196.    For example, the Reinsurance Agreements required Beechwood to provide quarterly reports to the CNO Defendants setting forth the value for each investment.  These reports, reviewed by CNO at the highest levels, including by Johnson, CNO's Chief Investment Officer, were replete with references to Platinum Fund investments.

197.    Beechwood provided the quarterly reports to the CNO Defendants using the mails and wires of interstate commerce.

198.    The fact that the CNO Defendants received these reports, which identified certain investments using Platinum's name or names which were easily associated with the Platinum Funds through basic due diligence, establishes that the CNO Defendants knew that Beechwood was investing trust assets with the Platinum Funds and/or their portfolio companies.

199.    Furthermore, as early March 2014, the CNO Defendants began specifically discussing with Beechwood the millions of dollars of trust assets being invested with the Platinum Funds and their portfolio entities, leaving no doubt that the CNO Defendants had specific knowledge that trust assets were being invested by Beechwood in very aggressive Platinum Funds' related investments.

200.    For example:





201.    Confronted with the forgoing, BCLIC and WNIC now concede that they:

> raised questions concerning how Beechwood characterized and valued assets in the Trusts.   For example, Beechwood made numerous investments of Trust assets in notes collateralized not by

48

assets, but rather by the borrowers' equity or other borrowers' debt instruments. Yet, Beechwood inflated the value of these tenuous forms of collateral to conclude that the Trusts were over-collateralized. In addition, Beechwood had invested assets in risky businesses, including start-up and severely distressed companies.

BCLIC/ WNIC Complaint, ¶ 89.

202.    Notwithstanding their half-hearted protests and demand for an exit from Platinum Funds' related investments, Beechwood, for the benefit of the CNO Defendants and SHIP, continued to hold and/or more importantly, acquire other Platinum Funds related assets.  For example, on or about February 2, 2016, BAM Administrative, as agent for SHIP, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, and three other investors entered into a *Second Amended and Restated Loan and Security Agreement* with a Platinum Fund subsidiary, Credit Strategies, which (a) added SHIP and another Lender as "Term Lender[s]", and (b) permitted BAM Administrative, as agent for the "Revolving Lenders" to make revolving loans to Credit Strategies.  Through the Credit Strategies loan facility, between February 2, 2016, and December 19, 2016, the Revolving Lenders made approximately $19.8 million in revolving loans to Credit Strategies.

203.    Around this time, February 2016, 40|86 Advisors advised CNO that 85% of Beechwood's private loan holdings were associated with the Platinum Funds.  Shortly thereafter, the CNO Defendants finally decided to extricate themselves from certain of the Platinum Fund investments. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

204.    Around the same time, the CNO Defendants finally chose to exercise their audit rights, which permitted them the right to analyze the trusts investments for compliance with the Reinsurance Agreements themselves, for the reasonableness of the values ascribed to them, and for any conflicts that may be an issue.  Had the CNO Defendants done so earlier, the audit would have made abundantly clear, if it wasn't already, that the ties between Beechwood and the Platinum Funds ran deep.

205.    The CNO Defendants also chose not to terminate the Reinsurance Agreements, a step they only elected to take when the Platinum Funds, due to the very public indictment of Huberfeld, became a public relations liability.[7]

206.    It was not until the CNO Defendants (and SHIP) came to learn that their investments with Beechwood were underperforming that they took action to reduce their exposure to the Platinum Funds.

207.    When the CNO Defendants took that action by negotiating, structuring and consummating the fraudulent conveyance transaction in or about early 2016 (described in Section VI.G. below), they did so with Nordlicht, who had represented himself as having authority to, and in fact did, bind the PPCO Funds by virtue of his role as Chief Investment

---

[7]    BCLIC and WNIC finally exercised their right to terminate the Reinsurance Agreements on September 29, 2016, following the June 8, 2016 arrest of Murray Huberfeld.

In or about November 2016, SHIP directed Beechwood to transfer all cash and short-term investments out of the IMA accounts managed by Beechwood and to move those assets into SHIP's custodial accounts at Bank of New York Mellon.  SHIP also instructed Beechwood to transfer all limited partnership and other equity interests in each of the IMA accounts that were not registered solely in SHIP's name into SHIP's exclusive name and advised Beechwood that it was no longer authorized to act with respect to any asset in which SHIP possessed a direct or indirect interest, without express direction from SHIP.  *See* SHIP Complaint, ¶¶ 271-72.

Officer.  From Nordlicht's title alone each of the CNO Defendants knew he owed fiduciary duties to the PPCO Funds.  Indeed, by this time, the CNO Defendants actions were informed and influenced by their actual knowledge of Nordlicht's authority.  That is why the CNO Defendants negotiated the March 2016 fraudulent conveyance transaction with him, knowing that Nordlicht was willing to violate his duty of loyalty and care to the PPCO Funds in order to facilitate the CNO Defendants' goals.

### 3.      SHIP Provided Substantial Assistance to the Fraudsters

208.    The facts above establish that SHIP was highly motivated to transact with Beechwood.  Like the CNO Defendants, SHIP too was well aware of the deep ties binding Beechwood and Platinum.  Indeed, SHIP's own complaint annexes the January 15, 2015 IMA side-letter signed by none other than Platinum's Chief Investment Officer, Mark Nordlicht, as Exhibit F thereto.

209.    SHIP received monthly and quarterly holdings reports from Beechwood.  These holdings and valuation reports made clear that the assets being purchased by Beechwood had significant connections to the Platinum Funds.

210.    The fact that SHIP received these reports, which identified certain investments using Platinum's name or names which were easily associated with the Platinum Funds through basic due diligence, establishes that SHIP knew that Beechwood was investing trust assets with the Platinum Funds and/or their portfolio companies.

211.    Well aware of the Beechwood/ Platinum relationship and the fraud being perpetrated by them, SHIP soon actively participated in the fraud by consummating a non-commercial transaction with Beechwood in or about February 2015 (the "**SHIP/ Beechwood Surplus Note Transaction**").

212.    In or about February 2015, SHIP borrowed approximately $50.2 million from Beechwood Investments in consideration for the issuance of a surplus note (the "**SHIP Surplus Note**").

213.    Beechwood Investments' purchase of the SHIP Surplus Note at par was a highly questionable business decision for two reasons.  <u>First</u>, because SHIP was financially distressed, interest and principal payments on the SHIP Surplus Note (or other debt) could not be paid to Beechwood without the approval of the Commissioner of the Indiana Department of Insurance. Servicing debt ahead of policyholder claims was highly unlikely to be approved by the Commissioner because of SHIP's poor financial condition.  Ultimately, no interest or principal payments were ever approved by the Commissioner, nor is there any evidence the Commissioner was ever apprised of the loan.

214.    <u>Second</u>, the SHIP Surplus Note was inappropriately priced given SHIP's financial condition.  In 2009, before SHIP's credit ratings were discontinued entirely, SHIP was rated a CCC+ company with a deteriorating outlook.   SHIP's financial position had significantly deteriorated by the time the SHIP Surplus Note was issued.  Five-year CCC yields at this time were approximately 11%.  However, the SHIP Surplus Note only provided for a 6% coupon. Thus, the interest rate on the SHIP Surplus Note should have been higher at the time of its issuance.

215.    By December 31, 2015, for purposes of its own statutory financial statements, SHIP determined the fair value of the SHIP Surplus Note was $37.3 million.  Tellingly, by year-end 2017, SHIP valued the SHIP Surplus Note at $1.8 million.  *See* 2015 and 2017 SHIP Statutory Financial Statements.

216.     Contemporaneously, with the issuance of the SHIP Surplus Note, SHIP transferred approximately $50.2 million in cash from its account in BBIL to Beechwood Investments in consideration for the issuance of a new note (the "**Beechwood Exchange Note**"). Beechwood Investments pledged its equity interests in several funds, including the Platinum Funds, to secure the payments due under the Beechwood Exchange Note. To date, no payments have been made by Beechwood Investments to SHIP under the Beechwood Exchange Note.

217.     Taken together, the issuance of the SHIP Surplus Note in consideration for the issuance of the Beechwood Exchange Note was structured to increase SHIP's statutory surplus at a crucial time to SHIP's continued operations outside of rehabilitation and therefore SHIP's very survival. Beechwood in turn made no net cash investment to purchase the surplus note.

218.     Between 2008, when CNO spun off SHIP, and 2015, when the SHIP Surplus Note was issued, SHIP's statutory surplus fell from approximately $193 million to approximately $56 million. Because the SHIP Surplus Note was junior to SHIP's policyholders' claims, the borrowings immediately increased SHIP's regulatory surplus by $50 million. *See* 2015 SHIP Statutory Financial Statements. Without the $50 million injection of capital infused by Beechwood Investments, SHIP's statutory surplus would have been below zero by year end 2015.

219.     The SHIP/ Beechwood Surplus Note Transaction establishes that SHIP was not a passive investor being swindled by Beechwood. On the contrary, well aware of the Beechwood/ Platinum relationship, SHIP was willing to, and did, join the scheme. While now it plays the role of the injured creditor, in 2015 it became an active participant. Rather than terminate the relationship and cut its losses, it doubled down.

220.    When the SHIP Defendants negotiated, structured and consummated the fraudulent conveyance transactions in or about late December 2015 and early 2016 (described in Section VI.G. below), they did so with Nordlicht, who had represented himself as having authority to, and in fact did, bind the PPCO Funds by virtue of his role as Chief Investment Officer.   From Nordlicht's title alone each of the SHIP Defendants knew he owed fiduciary duties to the PPCO Funds.   Indeed, by this time, the SHIP Defendants actions were informed and influenced by their actual knowledge of Nordlicht's authority.   That is why the SHIP Defendants negotiated the December 2015 and March 2016 fraudulent conveyance transactions with him, knowing that Nordlicht would be willing to violate his duty of loyalty and care to the PPCO Funds in order to facilitate the SHIP Defendants' goals.

### G.    The December 2015 and March 2016 Fraudulent Conveyances

221.    As set forth above, since as early as 2014 the CNO Defendants and SHIP were aware that Beechwood was investing in the Platinum Funds and their portfolio companies. While the CNO Defendants and SHIP questioned certain of these investments, neither party took any action to terminate their relationship with Beechwood for several reasons:

- BCLIC and WNIC's ability to offload the risk that Beechwood had assumed was minimal to non-existent. Over 90% of all long-term care policy companies exited the industry between 2002 to 2012. Moreover, reinsurance was scarce except under very onerous terms. The terms of the Beechwood reinsurance transaction, however, were generous:  BCLIC and WNIC paid Beechwood approximately 7% of ceded reserves in the form of a negative ceding commission to offload the reinsurance risk. By contrast, in 2018, CNO appears to have paid almost four times as much in percentage terms (approximately 30%) in its long-term care reinsurance transaction with Wilton Re.

- While BCLIC and WNIC could be exposed to losses if the Beechwood investments eventually proved to be worthless, if the fiction of overvalued investments could be maintained by Beechwood, the reinsurance transaction permitted them to cap their reinsurance claims risk.  CNO management could then present to its shareholders, investors and rating

agencies that the company had successfully wound down its legacy runoff business.

- Like CNO, SHIP had no other alternatives in its quest to shore up its capital position to stay out of rehabilitation.  Indeed, even Beechwood declined to reinsure SHIP's LTC portfolio.

- SHIP no doubt anticipated ongoing capital support from Beechwood – indeed it received $50 million in February 2015 (within a month of executing the final IMA with Beechwood), without which it would have been dangerously close to insolvency. Since its spinoff from CNO (which had provided over $900 million over 10 years prior to the 2008 spinoff), SHIP did not have third party capital support even as it continued to face adverse developments in its LTC portfolio.

- Fuzion was focused on its own survival:  had the fraud been exposed it would have lost its largest customer in SHIP, and therefore, its above market compensation from SHIP for administering these policies.

222.    With the foregoing on the forefront of their minds, neither the CNO or SHIP Defendants sought to materially change their respective relationship with Beechwood, whether through termination of the relevant agreements or otherwise.  However, after determining that their investments in the Platinum Funds were nonperforming, leading to a risk of sustaining large losses, they substantially and substantively worked with Beechwood and PPCO Master Fund in consummating fraudulent conveyances which were specifically designed to alleviate the CNO and SHIP Defendants' concerns.  In doing so, they also actively aided and abetted the Platinum/ Beechwood fraud and their respective breaches of fiduciary duty.

223.    It was against this backdrop that between December 21, 2015 and March 21, 2016, PPCO Master Fund entered into a series of transactions (collectively, the "**PPCO Loan Transactions**") through which it borrowed a total of approximately $69.1 million from SHIP and nominally the Beechwood Reinsurance Trusts (which were funded using BCLIC's and WNIC's investments and in which BCLIC and WNIC were the sole beneficiaries) in order to purchase certain securities (collectively, the "**Purchased Securities**") from (i) Beechwood

(which held assets as nominee of SHIP), (ii) SHIP and (iii) the Beechwood Reinsurance Trusts (which held the assets of BCLIC and WNIC) worth only a fraction of that amount (collectively, the "**PPCO Loan Transactions and Securities Purchases**").

224.     In consideration for the so-called loans to PPCO Master Fund, PPCO Master Fund was compelled to grant BAM Administrative (as agent for (i) SHIP and (ii) for the Beechwood Reinsurance Trusts which held assets for the benefit of BCLIC and WNIC and the ultimate benefit of CNO) security interests in substantially all of its, and its subsidiaries' assets, including equity interests.

### 1.     The December 2015 Fraudulent Conveyance

225.     Pursuant to a December 23, 2015 Delayed Draw Demand Note, PPCO Master Fund issued a $15.5 million note to SHIP (through BAM Administrative, as SHIP's agent) (the "**SHIP Note**").

226.     The SHIP Note was secured pursuant to a December 23, 2015 Master Security Agreement (the "**December 2015 Security Agreement**") wherein BAM Administrative, as agent, was granted security interests in substantially all of the assets of PPCO Master Fund and the following direct and indirect subsidiaries:  ALS Capital Ventures LLC, Atlantic Growth Capital LLC, Alpha Credit Resources LLC, Bakken Development Opportunities I LLC, Beta Credit Services LLC, Burr Capital LLC, Platinum Partners Credit International LP, Centurion Structured Growth LLC, Credit Funding LLC, Credit Mining LLC, Credit International LLC, Credit Strategies LLC, Diamed Holdings LLC, Financial Ventures LLC, Hamilton Capital LLC, JH Funding LLC, Lakewood Group LLC, L2Leasing Holdings LLC, Maximilian Investors LLC, Maximilian Resources LLC, Northrock Financial LLC, Pea & Eigh Company LLC, Photon Management LLC, Platinum Long Term Growth VII, LLC, Platinum Credit Partners

International LLC, Principal Growth Strategies LLC, Pro Master Group LLC, Pro Player Funding LLC, PTLG VIII Iron Ore LLC, RE Credit LLC, Regis Capital LLC, RJ Funding LLC, Secure Holdings LLC, Voltage Energy Holdings Co. LLC, West Ventures LLC, and Wintercrest Advisors LLC (collectively, the "**MSA PPCO Subsidiaries**").

227.    In connection with the foregoing, each of the MSA PPCO Subsidiaries executed a December 23, 2015 Subsidiary Guarantee (the "**MSA Subsidiary Guarantee**") wherein each entity guaranteed the amounts due to SHIP under the SHIP Note.

228.    On or about December 28, 2015, BAM Administrative, as agent for SHIP, filed a UCC-1 financing statement against all of the assets of PPCO Master Fund (the "**BAM Asserted Lien**").

229.    While the loan documents discussed above were made to appear by Beechwood and SHIP as nothing more than arms-length commercial transactions, the flow of funds memo accompanying the foregoing establishes the true intent of the parties and the harm caused to the PPCO Funds.  The funds received by PPCO Master Fund were used as follows:

230.    On December 23, 2015, $9,978,750 of the funds loaned under the SHIP Note were disbursed by BAM Administrative (as agent for SHIP) to:

> (i)     Beechwood Bermuda (as SHIP's nominee) in the amount of $1,711,989.58 for PPCO Master Fund to purchase Desert Hawk debt held in SHIP's IMA account at Beechwood Bermuda;
>
> (ii)    Beechwood Bermuda (as SHIP's nominee) in the amount of $3,398,427.08 for PPCO Master Fund to purchase additional Desert Hawk debt held in SHIP's IMA account Beechwood Bermuda; and
>
> (iii)   Beechwood Re (as SHIP's nominee) in the amount of $4,088,333.34 for PPCO Master Fund to purchase certain Desert Hawk debt.

231.    Not coincidentally, shortly after PPCO Master Fund acquired the Desert Hawk debt, it received the following emails from Desert Hawk management:

(i)     On January 8, 2016, Levy received an email from the operator of Desert Hawk claiming that Desert Hawk was "an absolute living hell … It is not possible to run … without proper capitalization."  *See* January 8, 2016 Desert Hawk email.  *See Trott v. PMNY (NY) LLC*, No. 18-cv-10936, Dkt. No. 1-1, at Ex. 8 (S.D.N.Y.).

(ii)    On February 18, 2016, a Desert Hawk representative emailed Levy that the company could not complete its audit because of insufficient funding. *See* Feb. 18, 2016 Desert Hawk email filed in *Trott v. PMNY (NY) LLC*, No. 18-cv-10936, Dkt. No. 1-1, at Ex. 9 (S.D.N.Y.).

232.    In fact, it was clear at the time of the transaction that the Desert Hawk debt was not worth the value it was ascribed by Nordlicht and SHIP.  Whether the parties used a discounted cash flow approach, a comparable companies analysis or a precedent transactions analysis, they knew the Desert Hawk debt had an estimated fair market value that was well below the value misrepresented by them in the SHIP Note transaction.

233.    On December 30, 2015, $5 million of the funds loaned under the SHIP Note were disbursed by BAM Administrative (as agent for SHIP) for full repayment of all indebtedness owing by a Platinum Fund affiliate, LC Energy under the:

(i)     June 3, 2014 Secured Term Note issued by LC Energy originally to BRe WNIC 2013 LTC Primary in the original principal amount of $3,091,292.00;

(ii)    June 3, 2014 Secured Term Note issued by PPCO Master Fund originally to BRe WNIC 2013 LTC Sub in the original principal amount of $151,425.00;

(iii)   June 3, 2014 Secured Term Note by LC Energy originally to BRe BCLIC Primary in the original principal amount of $1,675,167.00; and

(iv)    June 3, 2014 Secured Term Note by LC Energy originally to BRe BCLIC Sub in the original principal amount of $82,116.00.

234.    The June 3, 2014 Secured Term Note was also known to be worth well below the value ascribed to it by CNO Defendants and Nordlicht.  Using a discounted cash flow approach with proper adjustments made to LC Energy's financial projections to reflect more reasonable operating assumptions and a discount rate (cost of capital) more reflective of a development-stage mining company, the LC Energy loan was not worth even close to par.  Only by (i) using

projections which (a) did not appear to take into account additional funding needs, (b) relied on unreasonable volume and pricing assumptions and (c) failed to adjust the company's reserve estimates down to reflect the uncertainty of extraction and (ii) applying an improper discount rate which failed to reflect the high cost of capital for development-stage mining companies were the parties able to pretend that the loan was worth the amount for which PPCO Master Fund paid. Thus, at the execution of these securities purchases, BCLIC and WNIC misrepresented that the purchase price was fair.  Indeed, this transaction clearly demonstrates the inter-relatedness of the CNO Defendants and SHIP, as SHIP money was used for the benefit of BCLIC and WNIC.

235.    SHIP (through BAM Administrative as its agent) subsequently loaned an additional $2 million to PPCO Master Fund pursuant to a January 20, 2016 Amended and Restated Delayed Draw Demand Note (the "**First Amended SHIP Note**"), increasing the outstanding amount loaned by SHIP to approximately $17.5 million.

236.    In conjunction with the First Amended SHIP Note, PPCO Master Fund and the MSA PPCO Subsidiaries entered into a January 20, 2016 Reaffirmation and Ratification Agreement (the "**Ratification Agreement**") pursuant to which the MSA PPCO Subsidiaries reaffirmed and ratified the MSA Subsidiary Guaranty.  The Ratification Agreement also confirmed that the obligations under the December 2015 Security Agreement and MSA Subsidiary Guarantee included the First Amended SHIP Note.

237.    The SHIP Defendants actively negotiated and consummated the foregoing transaction, which was never intended to provide fair consideration to PPCO Master Fund. Indeed, the SHIP Defendants:

- specified the two loans that PPCO Master Fund would be compelled to assume;

- negotiated the SHIP Note "loan amount," which PPCO Master Fund would pay back to SHIP in consideration for assigning the loans;

- negotiated the terms and conditions of the December 2015 Security Agreement;

- negotiated the terms and conditions of the SHIP Note;

- negotiated the MSA Subsidiary Guarantee, including the entities comprising the MSA PPCO Subsidiaries; and

- worked with Beechwood and the PPCO Funds to close the sale of the SHIP Note.

238.   The flow of funds accompanying the SHIP Note establishes that the December 23, 2015 transaction was nothing more than a mechanism through which to place the bad loans to Desert Hawk and LC Energy onto the PPCO Funds' books for the benefit of SHIP and BCLIC and WNIC (through the Reinsurance Trusts).   Adding insult to injury, the MSA PPCO Subsidiaries were compelled to guarantee repayment of the loans and to grant security interests in substantially all of their assets for a loan in which they were never intended to, and did not, receive any value.

239.   As set forth below, the PPCO Funds and its creditors, including the PPCO Feeder Funds, and the PPCO Blocker Fund, were the victims of actual fraud which is subject to avoidance under New York State law.   Alternatively, even if this Court were to find the badges of actual fraud missing, the unfair consideration received by PPCO Master Fund under these transactions, and the insolvency the transactions resulted in, constitute constructive fraud which is also avoidable by the PPCO Funds and its creditors, including the PPCO Feeder Funds, and the PPCO Blocker Fund, under New York State law.   In turn, the liens granted on the assets of PPCO Master Fund and the MSA PPCO Subsidiaries should be avoided as well.

## 2.    The March 2016 Fraudulent Conveyance

240.    On March 21, 2016, PPCO Master Fund, BAM Administrative, as agent, and various purchasers, including SHIP and the Beechwood Reinsurance Trusts, for the benefits of their sole beneficiaries, BCLIC and WNIC (collectively, the "**Noteholders**"), entered into an approximately $69.1 million Note Purchase Agreement (the "**March NPA**") which amended and restated the First Amended SHIP Note and authorized the sale of additional notes.  Specifically, the March NPA allocated the share of the notes (collectively, the "**March NPA Notes**") as follows:

| Noteholders | Note |
| --- | --- |
| SHIP | $42,963,949.04 ($123,190.55 consisting of accrued interest) |
| BRe BCLIC Primary | $10,000,000.00 |
| BRe BCLIC Sub | $500,000.00 |
| BRe WNIC 2013 LTC Primary | $14,989,677.78 |
| BRe WNIC 2013 LTC Sub | $700,000.00 |
| **TOTALS** | **$69,153,626.82** |

241.    In connection with the March NPA, PPCO Master Fund entered into a March 21, 2016 Amended and Restated Master Security Agreement (the "**Amended Security Agreement**") pursuant to which it granted security interests to BAM Administrative, as agent, in substantially all of its assets.

242.    While the MSA PPCO Subsidiaries executed both the December 2015 Security Agreement and the Ratification Agreement, no subsidiaries of PPCO Master Fund executed the

Amended Security Agreement.  In fact, the Amended Security Agreement expressly provided that it did not amend or restate the December 2015 Security Agreement.

243.    Moreover, Schedule C of the Amended Security Agreement purports to list all of the equity interests owned by "each Assignee" (without expressly defining the term "Assignee") and the percentage ownership of each "Assignee."  Schedule C lists twenty-nine subsidiaries of PPCO Master Fund but contains no information below the headings "Class," "Certificate No.," "Par Value" or "Number of Interests."

244.    Notwithstanding the foregoing, BAM Administrative, as agent, asserts liens against all of the assets of PPCO Master Fund's subsidiaries LC Energy Holdings LLC and LC Energy Operations LLC and PPCO Master Fund's related entities ALS Life Holdings LLC and ALS Capital Ventures LLC on account of UCC-1 financing statements it filed at various times (collectively with the BAM Asserted Lien and all other financing statements filed by BAM Administrative or on behalf of the Noteholders in connection with the PPCO Loan Transactions and Securities Purchases, the "**BAM Asserted Liens**").

245.    In connection with the March NPA, certain PPCO Fund subsidiaries and affiliates (collectively, the "**NPA Guarantors**") entered into a March 21, 2016 Subsidiary Guaranty (the "**NPA Guaranty**"), pursuant to which the NPA Guarantors guaranteed to the Noteholders the payment of all Obligations under the March NPA Notes.

246.    The funds "loaned" to PPCO Master Fund under the March NPAs made a round trip back to the Noteholders, and through the Beechwood Reinsurance Trusts and/or other intermediaries, to BCLIC and WNIC, through the following note issuances and payment directions:

(i)   $10 Million Secured Term Note dated March 21, 2016, pursuant to which BRe BCLIC Primary "loaned" PPCO Master Fund $10 million which was then directed to BAM Administrative, as Agent for each of BRe BCLIC Primary, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

(ii)   $500,000 Secured Term Note dated March 21, 2016 pursuant to which BRe BCLIC Sub "loaned" PPCO Master Fund $500,000 which was then directed to BAM Administrative, as Agent for each of BRe BCLIC SUB, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

(iii)   $14,989,677.78 Secured Term Note dated March 21, 2016 pursuant to which BRe WNIC 2013 LTC Primary "loaned" PPCO Master Fund $14,989,677.78 which was then directed to BAM Administrative, as Agent for each of BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

(iv)   $700,000 Secured Term Note dated March 21, 2016 pursuant to which BRe WNIC 2013 LTC SUB "loaned" PPCO Master Fund $700,000 which was then directed to BAM Administrative, as Agent for each of BRe WNIC 2013 LTC Sub, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

(v)   $42,963,949.04 Second Amended and Restated Secured Term Note dated March 21, 2016 (the "**Second A&R SHIP Note**") pursuant to which SHIP "loaned" PPCO Master Fund $26,590,877. 78 which was then directed to BAM Administrative, as Agent for SHIP, BRe WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

247.   The PPCO Master Fund thus paid the additional $52.5 million received under the March NPA Notes ($17.5 million had already been "loaned" under the First Amended SHIP Note) back to the Noteholders. In exchange, it took an assignment of certain debt under a March 21, 2016 Assignment Agreement ("**Northstar Debt Assignment Agreement**") with BAM Administrative, as agent for BReWNIC 2013 LTC Primary and SHIP, pursuant to which:

(i)   BRe WNIC 2013 LTC Primary assigned approximately $20 million of 12% Second Priority Senior Secured Notes (the "**Northstar Indenture Debt**") to PPCO Master Fund; and

(ii)  SHIP assigned approximately $11.4 million in Northstar Indenture Debt to PPCO Master Fund.

248.   The remaining $21.35 million received under the March NPA Notes was "loaned" by PPCO Master Fund to PPVA to allow it to purchase the remaining Northstar Indenture Debt from SHIP.   However, no cash changed hands as the cash "loaned" to PPVA was directed to SHIP.   As before, at the execution of these securities purchases, SHIP and CNO Defendants misrepresented that the purchase price was fair.

249.   This assignment transaction was consummated purely to rid BRe WNIC 2013 LTC Primary and SHIP, for the ultimate benefit of the CNO and SHIP Defendants of an investment which had little to no chance of performing.   In the end, the PPCO Funds and their portfolio companies were left with liens on substantially all of their assets while being saddled with an interest in a company – Northstar Offshore – on the verge of bankruptcy and a receivable from an equally financially precarious PPVA.

250.   Specifically, the Northstar Indenture Debt was valued at par in connection with the March NPA and Assignment Agreement No. 1, but that valuation substantially overstated the true value of those securities for several reasons.

251.   First, Northstar Offshore had unusually high levels of undeveloped reserves (approximately 70% of total proved reserves).   Therefore, any valuation of the reserves as a measure of the enterprise value of the company should have been adjusted for the probability that production from these reserves would never be realized.   For example, the Society of Petroleum Engineers in its 34th annual survey recommended significant reductions (50% and higher) to expected production volumes from undeveloped reserves and probable reserves.   The parties did not use this adjustment.

64

252.     Second, the assessment of the fair market value of the Northstar Indenture Debt did not take into consideration the dire financial condition of Northstar Offshore at this time, which was unable to meet the interest due under its loans and had millions of dollars of interest outstanding.

253.     Much like the December 2015 series of transactions, the March 2016 transactions were structured, negotiated and consummated with the substantial assistance of Beechwood, the CNO Defendants and the SHIP Defendants.

254.     The CNO and SHIP Defendants actively negotiated and consummated the foregoing transaction, which was never intended to provide fair consideration to PPCO Master Fund.  Indeed, the CNO and SHIP Defendants:

- specified that PPCO Master Fund would be compelled to assume the Northstar Indenture Debt;

- negotiated the aggregate amounts to be "loaned" by them under the March NPA;

- negotiated each of the March NPA Notes;

- negotiated the terms and conditions of the Amended Security Agreement;

- negotiated the Northstar Debt Assignment Agreement;

- negotiated the NPA Guaranty, including the entities comprising the NPA Guarantors; and

- worked with Beechwood and Nordlicht to close the sale of the March NPA.

255.     These transactions were never intended to, and did not, provide the PPCO Funds with fair consideration and so the Noteholders aided and abetted the fraud and Nordlicht's breach of his fiduciary duties in order to achieve their own goals.

256.     Indeed, by this time Nordlicht had completely abdicated his duty of loyalty to the PPCO Funds and was actively stripping the funds of their most valuable assets for his own gain. He and his cohorts stole from the PPCO Funds and rather than stop the fraud, the Noteholders actively engaged in a series of transactions which only served to further the fraud's continuance.

257.     As BCLIC and WNIC admit, in late 2016, BCLIC and WNIC recaptured the Beechwood Reinsurance Trusts' trust assets.   WNIC's and BCLIC's Proof of Claim in Receivership dated March 28, 2019 at ¶ 10.  Upon information and belief, those assets included portions of the sale of PPCO Master Fund's loan obligations.

258.     PPCO Master Fund and its creditors, including the PPCO Feeder Funds, and the PPCO Blocker Fund, were thus the victims of actual fraud which is subject to avoidance under New York State law.  Alternatively, even if this Court were to find the badges of actual fraud missing, the unfair consideration received by PPCO Master Fund under these transactions, and the insolvency the transactions resulted in, constitute constructive fraud which is also avoidable by the PPCO Funds and its creditors, including the PPCO Feeder Funds, and the PPCO Blocker Fund, under New York State law.  In turn, the liens granted on the assets of PPCO Master Fund and any of its subsidiaries should be avoided as well.

## VII.

## THE RICO ENTERPRISES

259.     The foregoing facts establish that over time the Defendants conspired with one another to operate and manage what constitutes a RICO enterprise under Federal Law.

260.     The RICO enterprise was initially comprised of Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood Holdings, BBIL, BBIL Holdings, Beechwood Bermuda, BAM Administrative, the Beechwood Reinsurance Trusts and the association-in-fact

of their co-conspirators, Feuer, Taylor, Nordlicht, Levy and others at or associated with the Platinum Funds (the "**Original RICO Members**").

261.     No later than December 2015, the CNO Defendants and the SHIP Defendants joined and associated with the Original RICO Members to further perpetuate the RICO enterprise's fraud (the "**RICO Enterprise**").

262.     From its inception in or about 2013 through at least March 2016, the RICO Enterprise was operated as a single unit under common control and/or management through which it sought to achieve a common (unlawful) purpose:  use Beechwood as a vehicle through which to conduct a variety of unlawful acts.  Initially, the Original RICO Members utilized Beechwood to assist the PPCO Portfolio Manager in charging management and incentive fees based on over-valued assets and charge substantial management fees on account of the Beechwood investments inuring to the benefit each of the Original Members of the RICO Enterprise.  Subsequently, when the CNO and SHIP Defendants joined the RICO Enterprise, Beechwood was used to facilitate actual and/or constructive fraudulent conveyances which inured to the benefit of each of the members of the RICO Enterprise through the garnering of unearned fees or reduction of liabilities.

263.     Prior to the CNO and SHIP Defendants joining the RICO Enterprise, the common control and/or management of the RICO Enterprise was established by (i) the organizational documents of the various Beechwood Entities, which collectively provide that Beechwood, despite its different business lines, would be run by Feuer and Taylor (at least on paper), (ii) the underlying ownership of the Beechwood entities, which demonstrate that a significant portion of Beechwood was owned by Nordlicht, Huberfeld, Bodner and Levy (in part through trusts) and

(iii) the significant evidence establishing that Levy and Nordlicht worked closely with one another to direct Beechwood's operations.

264.    Prior to the CNO and SHIP Defendants joining the RICO Enterprise, it functioned as a unit and conducted its affairs through a pattern of racketeering activity. Specifically, each of the members of the RICO Enterprise agreed and committed to participate in its fraudulent scheme and purposes through two or more predicate acts of racketeering activity. Further, based upon information currently available to the Receiver, since the inception of the fraudulent scheme by the Platinum insiders, along with Feuer and Taylor, the RICO Enterprise assisted Nordlicht and his cohorts in their breach of fiduciary duty to the Platinum Fund investors and creditors, assisted Nordlicht and his cohorts in perpetuating a fraud on the investors and creditors of the Platinum Funds, facilitated the PPCO Portfolio Manager in charging unearned management fees based on over-valued assets, assisted the Beechwood and Platinum insiders in charging substantial unearned management fees on account of the Beechwood investments and in connection with the foregoing, committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

265.    The use of the mails and wires of interstate commerce was integral to the members of the RICO Enterprise's perpetration of the foregoing acts.

266.    As established in this Amended Complaint, the direct and proximate result of the RICO's Enterprises' racketeering activities was to substantially damage the PPCO Fund, its investors and creditors by (a) reducing the value of PPCO Funds' assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit the Defendants but in fact further increased the damage to the PPCO Funds; (b) stealing funds from the PPCO Funds through excessive management fees; (c) by the need to hire consultants and

legal counsel to unwind Beechwood's improper investment into the PPCO Funds and related securities; and d) by the need to hire legal counsel to pursue the claims on behalf of Platinum investors.

267. The facts pled in Section VI.D. of this Amended Complaint establish that the CNO and SHIP Defendants affirmatively chose to actively participate in and facilitate the fraudulent scheme operated by Beechwood, its insiders and the Platinum insiders.

268. To do so, commencing no later than December 2015, the CNO Defendants and the SHIP Defendants joined the existing RICO Enterprise in order rid the CNO and SHIP Defendants of underperforming loans while procuring for Beechwood, for itself and as their agent, liens on substantially all of the PPCO Fund's assets, along with that of its subsidiaries.

269. When the CNO and the SHIP Defendants joined the RICO Enterprise, they worked closely with Beechwood's management to direct the RICO Enterprise. To that end, the RICO Enterprise continued to function as a unit and conducted its affairs through a pattern of racketeering activity. Specifically, each of the members of the RICO Enterprise agreed and committed to participate in its fraudulent scheme and purposes through two or more predicate acts of racketeering activity. For example, as set forth in more detail above, the RICO Enterprise assisted Nordlicht and his cohorts in their breach of fiduciary duty to the Platinum Fund investors and creditors, assisted Nordlicht and his cohorts in perpetuating a fraud on the investors and creditors of the Platinum Funds, actively participated in the structuring and consummating of the fraudulent conveyance transactions in or about December 2015 and March 2016 which saddled the PPCO Fund with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return and in connection with the foregoing, committed mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

270.   The use of the mails and wires of interstate commerce was integral to the members of the RICO Enterprise's perpetration of the foregoing acts.

271.   As established in this Amended Complaint, the direct and proximate result of the RICO's Enterprises' racketeering activities was to substantially damage the PPCO Fund, its investors and creditors.

## VIII.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of RICO (18 U.S.C. Section 1962(c))

BY
*All Plaintiffs*

AGAINST
*All Defendants*

272.   The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

273.   Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."

274.   Each of the PPCO Funds is a "person" as defined in 18 U.S.C. § 1961(3).

275.   The Receiver and the PPCO Funds are "person[s]" as defined in 18 U.S.C. § 1961(3).

276.   Each of the Defendants is a "person" as defined in 18 U.S.C. § 1961(3).

277.   Each of the Defendants was employed by, an owner of, or associated with an enterprise comprised of Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood

70

Holdings, BBIL, BBIL Holdings, Beechwood Bermuda, BAM Administrative, the Beechwood Reinsurance Trusts and the association-in-fact of their co-conspirators, Feuer, Taylor, Nordlicht, Levy and others at or associated with the Platinum Funds, the CNO Defendants and the SHIP Defendants.

278.    The RICO Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4):  it had an ascertainable structure, organization, and common purpose and existed apart from the predicate acts perpetrated by its members.

279.    At all relevant times, the RICO Enterprise engaged in, and its activities affected, interstate commerce.

280.    Each of the members of the RICO Enterprise participated, directly or indirectly, in its management, direction and/or operation.

281.    Each of the members of the RICO Enterprise conducted or participated in its affairs through a pattern of racketeering activity, as set forth in 18 U.S.C. § 1961(5).

282.    Each of the members of the RICO Enterprise knowingly perpetrated and agreed to perpetrate two or more acts of racketeering activity identified under 18 U.S.C. § 1961(1) in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to profit through Beechwood.

283.    The specific predicate acts of racketeering committed by the Defendants include, but are not limited to, using the mails and wires of interstate commerce to:

> (i)     transmit communications and documents which assisted Nordlicht and his cohorts in their breach of fiduciary duty to the Platinum Fund investors and creditors;
>
> (ii)    transmit communications and documents which assisted Nordlicht and his cohorts in perpetuating a fraud on the investors and creditors of the Platinum Funds;
>
> (iii)   actively participate in the structuring and consummation of the fraudulent conveyance transactions in or about December 2015 and March 2016

71

which saddled the PPCO Fund with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return; and

(iv) transmit communications and documents that facilitated the PPCO Loan Transactions and Securities Purchases through which PPCO Fund was saddled with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return.

284. These predicate acts of racketeering activity are all related, as the Defendants have perpetrated the predicate acts for the common purpose of furthering their fraudulent schemes, as identified and discussed in detail in this Amended Complaint.

285. Their predicate acts of racketeering activity have all had common: (a) results (the enrichment of the Beechwood and Platinum insiders and the transfer of nonperforming loans for the benefit of all Defendants at the expense of the PPCO Funds); (b) participants (Defendants and their co-conspirators); (c) victims (the PPCO Funds); (d) methods of commission (the false and fraudulent over-valuation of assets and the transfer of assets of the PPCO Funds to Beechwood, for the benefit of the CNO Defendants and the SHIP Defendants); and (e) other distinguishing characteristics (such as using Platinum-associated individuals as purported Beechwood managers).

286. The predicate acts of racketeering have also been continuous. The RICO Enterprise was formed in furtherance of their fraudulent schemes in or about August 2013 at the latest, when Beechwood was established, and continued through the CNO and SHIP Defendants joining the already existing RICO Enterprise in or about December 2015 in order to further the collective scheme.

287. The predicate acts of racketeering remained ongoing and open-ended, as the Defendants retain millions in funds or assets from and owing to many investors, which the Defendants misappropriated and misused over a period of several years. The predicate acts of racketeering activity were an integral part of the enterprises' regular way of doing business. The

Defendants thus have engaged in a "pattern" of racketeering activity, as that phrase is defined in 18 U.S.C. § 1961(5).

288.    Each of the Defendants has violated 18 U.S.C. § 1962(c) by conducting or participating in and directing the conduct of the enterprises' affairs through a pattern of racketeering activity.

289.    The PPCO Funds have been injured in their business and property by reason and a proximate result of each of Defendants' violations of 18 U.S.C. § 1962(c), in at least the following ways:  (a) by reducing the value of PPCO Funds' assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit the Defendants but in fact further increased the damage to the PPCO Funds;  (b) being compelled to pay millions of dollars in unearned management incentive fees; (c) being compelled to assume nonperforming loans in consideration for unfair or no consideration; (d) being compelled to accept the imposition of liens upon assets with no valid basis; (e) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into the PPCO Funds and related securities; and (f) by the need to hire legal counsel to pursue the claims on behalf of Platinum Investors.

290.    By virtue of the Defendants' violations of 18 U.S.C. §1962(c), the Receiver is entitled to recover on behalf of the PPCO Funds three times the damages sustained by reason of the Defendants' actions, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF

### Violation of RICO (18 U.S.C. § 1962(a))

BY
*All Plaintiffs*

AGAINST
*All Defendants*

291.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

292.    Under 18 U.S.C. § 1962(a), it is "unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity … to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."

293.    Each of the Defendants has received income derived, directly or indirectly, from the pattern of racketeering set forth above, including, but not limited to:  (a) the assets transferred from PPCO Master Fund to Beechwood for the benefit of (i) the SHIP Defendants; (ii) the Beechwood Reinsurance Trusts, for themselves and as agent of BCLIC and WNIC, (iii) and the ultimate benefit of the CNO Defendants, which assets were used to enrich the Defendants; (b) the unearned performance fees that Defendants collected as a result of the fraudulent valuations of investments provided by Beechwood and (c) the profits and transfers that Defendants received from the investments alleged herein.

294.    Defendants used the above-mentioned racketeering income in furtherance of the above-mentioned RICO enterprise.

295.    Although Defendants represented that they would invest assets conservatively, Defendants instead used SHIP, BCLIC, WNIC and other institutional funds to buy Beechwood-

74

Platinum Funds related entities out of distressed and highly risky investments, and in some instances subordinated investors interests to their own.  This enriched the Defendants themselves as well as former Platinum Funds' insiders, which further injured the PPCO Funds.

296.    The enterprise was engaged in and affected interstate and foreign commerce.

297.    Each of the Defendants' violation of 18 U.S.C. § 1962(a) has directly and proximately injured the PPCO Funds in their business and property in at least the following ways:   (a) by reducing the value of PPCO Funds' assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit the Defendants but in fact further increased the damage to the PPCO Funds;  (b) being compelled to pay millions in unearned management incentive fees; (c)  being compelled to assume nonperforming loans in consideration for unfair or no consideration; (d) being compelled to accept the imposition of liens upon assets with no valid basis; (e) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into the PPCO Funds and related securities; and (f) by the need to hire legal counsel to pursue the claims on behalf of Platinum Investors.

298.    By virtue of Defendants' violations of 18 U.S.C. § 1962(a), the Receiver is entitled to recover on behalf of the PPCO Funds three times the damages sustained by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

**THIRD CLAIM FOR RELIEF**

**Violation of RICO (18 U.S.C. Section 1962(d))**

BY
*All Plaintiffs*

AGAINST
*All Defendants*

299.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

300.    Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [§ 1962(a), (b), or (c)]."

301.    As described in detail in this Amended Complaint, the Defendants and their co-conspirators agreed and conspired with each other to violate 18 U.S.C. §§ 1962(a) and (c).

302.    The common and mutually beneficial purposes of the conspiracy included assisting Nordlicht and his cohorts in their breach of fiduciary duty to the Platinum Fund investors and creditors, assisting Nordlicht and his cohorts in perpetuating a fraud on the investors and creditors of the Platinum Funds and actively participating in the structuring and consummation of the fraudulent conveyance transactions in or about December 2015 and March 2016, which saddled PPCO Master Fund with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return.

303.    Each of the Defendants perpetrated and agreed to perpetrate two or more acts of racketeering activity under 18 U.S.C. § 1961(1) in furtherance of their fraudulent schemes or artifices to defraud, with a specific intent to defraud Platinum investors.

304.    Predicate acts of racketeering include, but are not limited to, using the mails and wires of interstate commerce to:

(i)    transmit communications and documents which assisted Nordlicht and his cohorts in their breach of fiduciary duty to the Platinum Fund investors and creditors;

(ii)    transmit communications and documents which assisted Nordlicht and his cohorts in perpetuating a fraud on the investors and creditors of the Platinum Funds;

(iii)    actively participate in the structuring and consummation of the fraudulent conveyance transactions in or about December 2015 and March 2016 which saddled the PPCO Fund with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return; and

(iv)    transmit communications and documents that facilitated the PPCO Loan Transactions and Securities Purchases through which PPCO Fund was saddled with liens on substantially all of its assets, and that of its subsidiaries, without receiving fair consideration in return.

305.    Each of the members of the RICO Enterprise's agreement to participate in the unlawful actions of the enterprise can reasonably be inferred from the close ties to the other co-conspirators and their mutually dependent, coordinated efforts to achieve the common purposes of the co-conspirators and each enterprise.  Specifically, the evidence establishes that the organizational documents of Beechwood collectively provided that Beechwood, despite its different business lines, would be run by Feuer and Taylor.  Further, the underlying ownership of the Beechwood entities demonstrates that a significant portion of Beechwood was owned by Nordlicht, Huberfeld, Bodner and Levy (in part through trusts) and Levy and Nordlicht worked closely with one another to direct Beechwood's operations.

306.    Subsequently, after the CNO Defendants and the SHIP Defendants joined the already existing RICO Enterprise, each of the members of the RICO Enterprise's agreement to participate in the unlawful actions of the enterprise can reasonably be inferred from the close ties to the other co-conspirators and their mutually dependent, coordinated efforts to achieve the common purposes of the co-conspirators and each enterprise.  Specifically, the evidence establishes that the CNO Defendants, the SHIP Defendants, Beechwood and certain Platinum

Fund insiders worked in concert with one another to structure, negotiate and consummate a series of fraudulent transactions and the improper imposition of liens on PPCO Funds' assets, designed to accomplish their common goal.

307.    The Platinum investors have been injured in their business and property by reason of the aforementioned conspiracy, and a proximate result of each of Defendants' violations of 18 U.S.C. §§ 1962(a) and (c), in at least the following ways:  (a) by reducing the value of PPCO Funds' assets through investments that were speculative, risky, or simply sham transactions, all of which were made to benefit the Defendants but in fact further increased the damage to the PPCO Funds;  (b) being compelled to pay millions in unearned management incentive fees; (c) being compelled to assume nonperforming loans in consideration for unfair or no consideration; (d) being compelled to accept the imposition of liens upon assets with no valid basis; (e) by the need to hire consultants and legal counsel to unwind Beechwood's improper investment into the PPCO Funds and related securities; and (f) by the need to hire legal counsel to pursue the claims on behalf of Platinum Investors.

308.    By virtue of the Defendants' violations of 18 U.S.C. §1962(d), the Receiver is entitled to recover on behalf of the Platinum Funds, for the ultimate benefit of the Platinum investors, three times the damages sustained by reason of the claims submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act, 15 U.S.C. Section 78j(b)
and Rule 10b-5 Promulgated Thereunder**
*(asserted in the alternative to the First through Third Claims for Relief)*

BY
*All Plaintiffs*

AGAINST
*All Defendants*

309.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

310.    At the time the PPCO Loan Transactions and Securities Purchases were executed, PPCO Master Fund officers and the PPCO Portfolio Manager were obligated to conclude that these transactions were at arm's length and in the best interests of the PPCO Funds.  However, at the time the PPCO Loan Transactions and Securities Purchases were consummated, PPCO Master Fund officers and the PPCO Portfolio Manager had completely abdicated those responsibilities.  Indeed, PPCO Master Fund officers and the PPCO Portfolio Manager were hopelessly conflicted and utterly failed to abide by their duties of care and loyalty to PPCO Master Fund.

311.    Thus, with no officer or other responsible person working for the PPCO Funds, the Beechwood, CNO and SHIP Defendants were able to, and in fact, did engage in and employ a plan, scheme and conspiracy to defraud PPCO Funds in connection with the purchase and sale of the Purchased Securties, and did materially misrepresent to the PPCO Funds that the true value of the Purchased Securities was their par value as set forth in the transaction documents for the PPCO Loan Transactions and Securities Purchases, and knowingly omitted or concealed that the true value of the Purchased Securities was only a fraction of par value.

312.    Each such scheme and misrepresentation, omission or act of concealment was made with the intent to deceive the PPCO Funds and with knowledge that the scheme, representation, omission or act of concealment was false or with willful blindness as to its truth or falsity and was made in connection with the purchase and sale of a security, namely the Purchased Securities.

313.    The PPCO Funds reasonably and justifiably relied on such misrepresentations and omissions or concealments to their detriment in entering into the transaction documents through which they incurred approximately $69.1 million in debt in consideration for assets worth only a fraction of that amount.

314.    Each such representation was reasonably relied on by the PPCO Funds in causing PPCO Master Fund to enter into the PPCO Loan Transactions and Securities Purchases and the purchase of the Purchased Securities thereunder.

315.    By committing the foregoing acts, the Beechwood, CNO and SHIP Defendants:

(i)     engaged in a plan, scheme, conspiracy and course of conduct pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit on the PPCO Funds;

(ii)    obtained money or property by means of various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(iii)   employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and did, deceive investors as alleged herein.

316.    The purchase by the PPCO Funds of the Purchased Securities at overly inflated value, mispresented by the Beechwood, CNO and SHIP Defendants as fair value, caused PPCO Master Fund damages in an amount not less than $69.1 million.

## FIFTH CLAIM FOR RELIEF

**Violations of Section 20 of the Exchange Act**
(*asserted in the alternative to the First through Third Claims for Relief*)

BY
*All Plaintiffs*

AGAINST
*Individual Defendants Feuer and Taylor*

317.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

318.    Individual Defendants Feuer and Taylor participated in the operation and management of the Beechwood Entities and conducted and participated, directly and/or indirectly, in the conduct of the business affairs of the Beechwood Entities.

319.    Because of their senior positions in the Beechwood Entities, the Individual Defendants knew of the plan, scheme, conspiracy and course of conduct to defraud the PPCO Funds in connection with the purchase and sale of the Purchased Securities.

320.    As officers of the Beechwood Entities, the Individual Defendants acted as controlling persons of Beechwood.  By reason of their senior management positions at the Beechwood Entities, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Beechwood Entities to engage in the unlawful acts and conduct complained of herein.  The Individual Defendants exercised control over the financial operations of Beechwood and possessed the power to control specific activities that comprise the primary violations about which the Receiver complains.

321.    By reason of the above conduct, Individual Defendants Feuer and Taylor are liable pursuant to Section 20(a) of the Exchange Act for violations committed by Beechwood in an amount not less than $69.1 million.

## SIXTH CLAIM FOR RELIEF

**Aiding and Abetting Breach of Fiduciary Duty**

BY
*All Plaintiffs*

AGAINST
*All Defendants*

322.     The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

323.     As established above, Nordlicht and the PPCO Portfolio Manager (a) were obligated and bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to the PPCO Funds; (b) were obligated to exercise due care and diligence to preserve, invest, value, manage, operate, and administer the PPCO Funds, their subsidiaries, their property and their assets; (c) owed the PPCO Funds duties of full and candid disclosure of all material facts relevant to the PPCO Funds, to deal fairly, honestly and in good faith with the PPCO Funds, and not to omit any material facts; (d) were obligated to ensure that they did not engage in any fraudulent, unsafe, unlawful or unsound investment, operational, administrative or management practices; (e) owed the PPCO Funds fiduciary duties of loyalty and good faith; and (f) were duty bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to the PPCO Funds.

324.     Nordlicht and the PPCO Portfolio Manager repeatedly breached their fiduciary obligations of due care and loyalty to the PPCO Funds.  In this regard, they managed the PPCO Funds in an unlawful manner and failed to manage the PPCO Funds in good faith by engaging in the fraudulent schemes described herein, including, *inter alia*:

> (i)     Systematically misrepresenting and overvaluing the PPCO Funds' net asset value for the purpose of, *inter alia*, paying certain select insiders of the PPCO Funds unearned fees, resulting in the payment of, among other

amounts, unearned management and professional fees believed to be tens, if not hundreds, of millions of unnecessary investments by the PPCO Funds in underwater investments.

(ii)     Causing PPCO Master Fund's entry into the fraudulent conveyances – the PPCO Loan Transactions and Securities Purchases – as well as compelling the MSA PPCO Subsidiaries to pledge substantially all of their assets to secure PPCO Master's Fund's loan obligations thereunder and to guaranty same for the sole benefit of Beechwood, BCLIC, WNIC, CNO, SHIP and Fuzion, to the detriment of the PPCO Funds.

(iii)     Causing PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the sole benefit of the PPVA Funds, which subsequently resulted in a $24 million damages settlement against the Receivership Estate by the bankruptcy trustee of Black Elk.

325.     As a direct and proximate result of Nordlicht's and the PPCO Portfolio Manager's breaches of their fiduciary duties, the PPCO Funds were injured and sustained damages.

326.     Nordlicht and the PPCO Portfolio Manager engaged in a consistent pattern of self-dealing and breaches of their duty of loyalty throughout the course of the schemes.

327.     As a direct and proximate result of Nordlicht's and the PPCO Portfolio Manager's self-dealing and breaches of their duty of loyalty to the PPCO Funds, the PPCO Funds were injured and sustained damages.

328.     The Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Johnson) had actual knowledge that Nordlicht and the PPCO Portfolio Manager owed and breached their fiduciary duties to the PPCO Funds and breached those duties, because (i) Nordlicht was hopelessly conflicted in each and every transaction he negotiated and consummated with them (through Beechwood) because he was both the Chief Investment Officer of the Platinum Funds while one of the majority stakeholders and decision-makers in Beechwood and (ii) the PPCO Portfolio Manager was directing the PPCO Funds to enter into the PPCO Loan Transactions and Securities Purchases

which were not intended to be in their best interests, but rather were structured solely to benefit the Defendants.

329.   The Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers, including Johnson) substantially assisted and participated in Nordlicht's and the PPCO Portfolio Manager's breaches of their fiduciary obligations to the PPCO Funds by, *inter alia*:

> (i)    Structuring and consummating the PPCO Loan Transactions and Securities Purchases, which were designed solely to rid CNO's subsidiaries, BCLIC and WNIC, and SHIP, of underperforming loans, which PPCO Master Funds purchased from them for well in excess of the value of those loans; and

> (ii)   Engaging in transactions that caused PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership Estate by the bankruptcy trustee of Black Elk.

330.   As a direct and proximate result of Nordlicht's and the PPCO Portfolio Manager's actions and substantial participation by the Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Johnson), the PPCO Funds were damaged.

331.   The actions of the Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Johnson) caused harm on which the primary liability of breach of fiduciary duties is predicated.

332.   By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial to this action, together with interest at the statutory rate.

333.    In addition, because the Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Johnson) acted in a manner that was willfully, grossly, recklessly and wantonly negligent, and without regard for the PPCO Funds' rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

### SEVENTH CLAIM FOR RELIEF

#### Aiding and Abetting Common Law Fraud

BY
*All Plaintiffs*

AGAINST
*All Defendants*

334.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

335.    By engaging in the fraudulent scheme described herein, Nordlicht and the PPCO Portfolio Manager caused, *inter alia*:

(i)    The systematic misrepresentation and overvaluation of the PPCO Funds' net asset value for the purpose of, *inter alia*, paying certain select insiders of the PPCO Funds unearned fees, resulting in the payment of, among other amounts, unearned management and professional fees believed to be at least tens, if not hundreds, of millions of unnecessary investments by the PPCO Funds in underwater investments;

(ii)    PPCO Master Funds entry into the PPCO Loan Transactions and Securities Purchases, as well as compelling the MSA PPCO Subsidiaries to pledge substantially all of their assets to secure PPCO Master's Fund's loan obligations thereunder and to guaranty same for the sole benefit of Beechwood, BCLIC, WNIC, CNO, SHIP and Fuzion, to the detriment of the PPCO Funds; and

(iii)    PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the sole benefit of the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership Estate by the bankruptcy trustee of Black Elk.

85

336.    The Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Eric Johnson) each provided substantial assistance in connection with the foregoing by, *inter alia*:

> (i)     Structuring and consummating the PPCO Loan Transactions and Securities Purchases, which were designed solely to rid CNO's subsidiaries, BCLIC and WNIC, from underperforming loans, which PPCO Master Fund purchased from them for well in excess of the value of those loans; and

> (ii)    Engaging in transactions that caused PPCO Master Fund to make a temporary purchase of an interest in Black Elk for the purpose of benefitting the PPVA Funds, which subsequently resulted in a $24 million damages claim against the Receivership Estate by the bankruptcy trustee of Black Elk.

337.    The Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Eric Johnson) had actual knowledge that the conduct by Nordlicht and the PPCO Portfolio Manager was fraudulent because (i) Nordlicht was hopelessly conflicted in each and every transaction he negotiated and consummated with them (through Beechwood) because he was both the Chief Investment Officer of the Platinum Funds while one of the majority stakeholders and decision-makers in Beechwood and (ii) the PPCO Portfolio Manager was directing the PPCO Funds to enter into the PPCO Loan Transactions and Securities Purchases, which were not intended to be in their best interests, but rather were structured solely to benefit the Defendants.

338.    As a direct and proximate result of the actions and substantial participation of the Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Eric Johnson), the PPCO Funds were damaged.

339.   By reason of the foregoing, the Plaintiffs are entitled to a judgment awarding them compensatory damages in an amount to be determined at the trial to this action, together with interest at the statutory rate.

340.   In addition, because the Beechwood Defendants, the SHIP Defendants and each of the CNO Defendants (through their common agents and officers including Eric Johnson) acted in a manner that was willfully, grossly, recklessly and wantonly negligent, and without regard for the PPCO Funds' rights and interests, the Plaintiffs are further entitled to punitive damages for the misconduct alleged herein.

## EIGHTH CLAIM FOR RELIEF

**Actual Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 275 and 278 (SHIP Note Issuance)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative and SHIP*

341.   The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

342.   In the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor of and/or granted liens to BAM Administrative, as agent for SHIP, and SHIP.

343.   PPCO Master Fund and the MSA PPCO Subsidiaries entered into each of the transactions in connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, made each transfer thereunder, incurred each obligation thereunder and granted each lien thereunder, while intending or

believing that the PPCO Funds would incur debts beyond their ability to pay as they matured.

344.    SHIP and its agent, BAM Administrative, did not give fair consideration to PPCO Master Fund or the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP in connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement.

345.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the SHIP Note, the December 2015 Security Agreement, the MSA Subsdiary Guaranty and Ratification Agreement were issued and/or entered into, creditors of PPCO Master Fund.

346.    Pursuant to New York Debtor & Creditor Law §§ 275 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the related transactions, including all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or to SHIP, in connection therewith, including the BAM Asserted Lien.

347.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to the issuance of the SHIP Note, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, granting recovery of the assets conveyed by PPCO Master Fund and the MSA PPCO

Subsidiaries and invalidating and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP, including the BAM Asserted Lien.

### NINTH CLAIM FOR RELIEF

**Actual Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 276 and 278 and for Relief Under N.Y. Debtor and Creditor Law Section 276-a (SHIP Note Issuance)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative and SHIP*

348.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

349.    In the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor or and/or granted liens to BAM Administrative, as agent for SHIP, and SHIP.

350.    PPCO Master Fund and the MSA PPCO Subsidiaries entered into each of the transactions in connection with the SHIP Note, including the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, made each transfer thereunder, incurred each obligation thereunder and granted each lien thereunder with an actual intent to hinder, delay and defraud their present and future creditors, in violation of New York Debtor & Creditor Law § 276.

351.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary

Guaranty and Ratification Agreement were issued and/or entered into, creditors of PPCO Master Fund.

352.     Pursuant to New York Debtor & Creditor Law §§ 276 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the related transactions, including all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or to SHIP, in connection therewith, including the BAM Asserted Lien.

353.     By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to the issuance of the SHIP Note, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, granting recovery of the assets conveyed by PPCO Master Fund and the MSA PPCO Subsidiaries and invalidating and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP, including the BAM Asserted Lien.

354.     By reason of the aforementioned fraudulent conveyances, under New York Debtor & Creditor Law § 276-a, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is also entitled to statutory interest, attorneys' fees and costs incurred in this action.

## TENTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 273 and 278 (SHIP Note Issuance)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative and SHIP*

355.   The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

356.   In the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor of and/or granted liens to BAM Administrative, as agent for SHIP, and SHIP.

357.   The SHIP Note and the related transactions, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, collectively rendered, or were issued, executed and the transactions thereunder carried out at a time when, PPCO Master Fund was insolvent.

358.   SHIP and its agent, BAM Administrative, did not give fair consideration to PPCO Master Fund or the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration for, the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP in connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement.

359.   Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary

Guaranty and Ratification Agreement were issued and/or entered into, creditors of PPCO Master Fund.

360.     Pursuant to New York Debtor & Creditor Law §§ 273 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the related transactions, including all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or to SHIP, in connection therewith, including the BAM Asserted Lien.

361.     By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to the issuance of the SHIP Note, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, granting recovery of the assets conveyed by PPCO Master Fund and the MSA PPCO Subsidiaries and invalidating and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP, including the BAM Asserted Lien.

## ELEVENTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 274 and 278 (SHIP Note Issuance)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative and SHIP*

362.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

363.    In the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor of and/or granted liens to BAM Administrative, as agent for SHIP, and SHIP.

364.    When each transaction in connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement was entered into, when each transfer thereunder was made, when each lien thereunder was granted, and when each obligation thereunder was incurred, PPCO Master Fund was engaged in, or was about to engage in, a business or transaction for which the property remaining in the hands of PPCO Master Fund was unreasonably small.

365.    SHIP and its agent, BAM Administrative, did not give fair consideration to PPCO Master Fund or the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP in connection with the SHIP Note, the December 2015 Security

Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement.

366.    Pursuant to New York Debtor & Creditor Law §§ 274 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the related transactions, including all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or to SHIP, in connection therewith, including the BAM Asserted Lien.

367.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to the issuance of the SHIP Note, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, granting recovery of the assets conveyed by PPCO Master Fund and the MSA PPCO Subsidiaries and invalidating and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP, including the BAM Asserted Lien.

## TWELFTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance of Partnership Property in Violation of N.Y. Debtor and Creditor Law Sections 277 and 278 (SHIP Note Issuance)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative and SHIP*

368.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

369.    In connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, PPCO Master Fund transferred partnership property, incurred partnership obligations, and granted liens on partnership property of PPCO Master Fund in favor of BAM Administrative, as agent for SHIP, and SHIP.

370.    SHIP and its agent, BAM Administrative, did not give fair consideration to PPCO Master Fund or the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP in connection with the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement.

371.    The SHIP Note and the related transactions, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, collectively rendered, or were issued, executed and the transactions thereunder carried out at a time when, PPCO Master Fund was insolvent.

372.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the SHIP Note, the December 2015 Security Agreement, the MSA Subsdiary Guaranty and Ratification Agreement were issued and/or entered into, creditors of PPCO Master Fund.

373.    Pursuant to New York Debtor & Creditor Law §§ 277 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the SHIP Note, the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement and the related transactions, including all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the MSA PPCO

Subsidiaries to BAM Administrative and/or to SHIP, in connection therewith, including the BAM Asserted Lien.

374.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to the issuance of the SHIP Note, including the December 2015 Security Agreement, the MSA Subsidiary Guarantee and the Ratification Agreement, granting recovery of the assets conveyed by PPCO Master Fund and the MSA PPCO Subsidiaries and invalidating and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative and/or SHIP, including the BAM Asserted Lien.

### THIRTEENTH CLAIM FOR RELIEF

**Actual Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law
Sections 275 and 278 (March NPA)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and
(iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC
2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

375.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

376.    In the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor and/or granted liens to BAM Administrative, as agent for the Noteholders.

377.    SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC did not give fair consideration to PPCO Master Fund and the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration from any of those entities, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries in connection with the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note, and the BAM Asserted Liens.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

380.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note were issued and/or entered into, creditors of PPCO Master Fund.

381.    Pursuant to New York Debtor & Creditor Law §§ 275 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any) to the Noteholders, including, without limitation, SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC, in connection therewith, including the BAM Asserted Liens.

382.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to, or made in connection with, the issuance of the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, granting recovery of the assets conveyed by PPCO Master Fund and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), invalidating, and avoiding the obligations undertaken and the liens granted

by PPCO Master Fund and/or the MSA PPCO Subsidiaries (if any) to BAM Administrative as agent for the Noteholders, including the BAM Asserted Liens.

## FOURTEENTH CLAIM FOR RELIEF

**Actual Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 276, 276-a and 278 (March NPA)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

383.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

384.    In the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor and/or granted liens to BAM Administrative, as agent for the Noteholders.

385.    At BCLIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of BRe BCLIC Primary and BRe BCLIC Sub, in late 2016 either (a) BCLIC received all assets, liens, and other rights previously held by BRe BCLIC Primary and BRe BCLIC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which BCLIC is the sole beneficiary received those assets, liens, rights or the proceeds.   Accordingly, BCLIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of

BCLIC, and BCLIC actively participated in those transfers.

386.    At WNIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub, in late 2016 either (a) WNIC received all assets, liens, and other rights previously held by BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which WNIC is the sole beneficiary received those assets, liens, rights or the proceeds.   Accordingly, WNIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of WNIC, and WNIC actively participated in those transfers.

387.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note were issued and/or entered into, creditors of PPCO Master Fund.

388.    Pursuant to New York Debtor & Creditor Law §§ 276 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any) to the Noteholders, including, without limitation, SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC, in connection therewith, including the BAM Asserted Liens.

389.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to, or made in connection with, the issuance of the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, granting recovery of the assets conveyed by PPCO Master Fund, the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), invalidating, and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries to BAM Administrative as agent for the Noteholders, including the BAM Asserted Liens.

390.    By reason of the aforementioned fraudulent conveyances, under New York Debtor & Creditor Law § 276-a, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds and (iii) the PPCO Blocker Fund, is also each entitled to statutory interest, attorneys' fees and costs incurred in this action.

## FIFTEENTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 273 and 278 (March NPA)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

391.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

392.    In the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the transactions

executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor and/or granted liens to BAM Administrative, as agent for the Noteholders.

393.    SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC did not give fair consideration to PPCO Master Fund and the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration from any of those entities, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries in connection with the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note, and the BAM Asserted Liens.

394.    At BCLIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of BRe BCLIC Primary and BRe BCLIC Sub, in late 2016 either (a) BCLIC received all assets, liens, and other rights previously held by BRe BCLIC Primary and BRe BCLIC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which BCLIC is the sole beneficiary received those assets, liens, rights or the proceeds.   Accordingly, BCLIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of BCLIC, and BCLIC actively participated in those transfers.

395.    At WNIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub, in late 2016 either (a) WNIC received all assets, liens, and other rights previously held by BRe WNIC 2013

LTC Primary and BRe WNIC 2013 LTC Sub under the March NPA, the NPA Guaranty, the

March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated

SHIP Note or the proceeds thereof, or (b) a trust in which WNIC is the sole beneficiary received

those assets, lien, rights or proceeds.  Accordingly, WNIC is a subsequent transferee of those

assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was

made for the benefit of WNIC, and WNIC actively participated in those transfers.

396.     Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all

times since before the March NPA, the NPA Guaranty, the March NPA Notes, the Amended

Security Agreement, and the Second Amended & Restated SHIP Note were issued and/or

entered into, creditors of PPCO Master Fund.

397.     Pursuant to New York Debtor & Creditor Law §§ 273 and 278, the Receiver, by

and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is

entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended

Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens,

and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund, the

NPA Guarantors and/or the MSA PPCO Subsidiaries (if any) to the Noteholders, including,

without limitation, SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe

WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC, in connection

therewith, including the BAM Asserted Liens.

398.     By reason of the aforementioned fraudulent conveyances, the Receiver, by and for

(i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled

to a judgment avoiding each transaction related to, or made in connection with, the issuance of

the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement,

the Second Amended & Restated SHIP Note and the BAM Asserted Liens, granting recovery of the assets conveyed by PPCO Master Fund, the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), invalidating, and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries (if any) to BAM Administrative as agent for the Noteholders, including the BAM Asserted Liens.

## SIXTEENTH CLAIM FOR RELIEF

### Constructive Fraudulent Conveyance in Violation of N.Y. Debtor and Creditor Law Sections 274 and 278 (March NPA)

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, (iii) the PPCO Blocker Fund and (iv) PPCO Onshore Feeder Fund*

AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

399.     The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

400.     In the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor and/or granted liens to BAM Administrative, as agent for the Noteholders.

401.     SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC did not give fair consideration to PPCO Master Fund and the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration from any of those entities, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the

MSA PPCO Subsidiaries in connection with the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note, and the BAM Asserted Liens.

402.    At BCLIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of BRe BCLIC Primary and BRe BCLIC Sub, in late 2016 either (a) BCLIC received all assets, liens, and other rights previously held by BRe BCLIC Primary and BRe BCLIC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which BCLIC is the sole beneficiary received those assets, liens, rights or proceeds. Accordingly, WNIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of BCLIC, and BCLIC actively participated in those transfers.

403.    At WNIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub, in late 2016 either (a) WNIC received all assets, liens, and other rights previously held by BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which WNIC is the sole beneficiary received those assets, liens, rights or proceeds. Accordingly, WNIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of WNIC, and WNIC actively participated in those transfers.

404.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the March NPA, the NPA Guaranty, the March NPA Notes, the Amended

Security Agreement, and the Second Amended & Restated SHIP Note were issued and/or entered into, creditors of PPCO Master Fund.

405.     Pursuant to New York Debtor & Creditor Law §§ 274 and 278, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), to the Noteholders, including, without limitation, SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC, in connection therewith, including the BAM Asserted Liens.

406.     By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to, or made in connection with, the issuance of the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, granting recovery of the assets conveyed by PPCO Master Fund, the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), invalidating, and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries (if any) to BAM Administrative as agent for the Noteholders, including the BAM Asserted Liens.

## SEVENTEENTH CLAIM FOR RELIEF

**Constructive Fraudulent Conveyance of Partnership Property in Violation of N.Y. Debtor and Creditor Law Sections 277 and 278 (March NPA)**

BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub*

407.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth hereat.

408.    In the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the transactions executed in connection therewith, PPCO Master Fund and the MSA PPCO Subsidiaries made transfers to, incurred obligations in favor and/or granted liens to BAM Administrative, as agent for the Noteholders.

409.    The March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note, and the BAM Asserted Liens and the related transactions collectively rendered, or were issued, executed and the transactions thereunder carried out at a time when, PPCO Master Fund was insolvent.

410.    SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC did not give fair consideration to PPCO Master Fund and the MSA PPCO Subsidiaries, and PPCO Master Fund and the MSA PPCO Subsidiaries did not receive fair consideration from any of those entities, for the assets, liens and obligations transferred, incurred and granted by PPCO Master Fund and the MSA PPCO Subsidiaries in connection with the March NPA, the NPA Guaranty, the March

NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note, and the BAM Asserted Liens.

411.     Pursuant to New York Debtor & Creditor Law §§ 277 and 278, (i) the Receiver on behalf of PPCO Master Fund, (ii) the PPCO Feeder Funds and (iii) the PPCO Blocker Fund are each entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note, and the issuance by PPCO Master Fund of the March NPA Notes and the NPA Guarantors of the NPA Guaranty and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund and the NPA Guarantors to SHIP, BAM Administrative, Bre BCLIC Primary, Bre BCLIC Sub, Bre WNIC 2013 LTC Primary, Bre WNIC 2013 LTC Sub, BCLIC and WNIC, in connection therewith, including the BAM Asserted Liens.

412.     At BCLIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of BRe BCLIC Primary and BRe BCLIC Sub, in late 2016 either (a) BCLIC received all assets, liens, and other rights previously held by BRe BCLIC Primary and BRe BCLIC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which BCLIC is the sole beneficiary received those assets, liens, rights or proceeds. Accordingly, BCLIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of BCLIC, and BCLIC actively participated in those transfers.

413.     At WNIC's written direction in a letter dated September 29, 2016 to Wilmington Trust, the trustee of WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub, in late 2016 either (a) WNIC received all assets, liens, and other rights previously held by BRe WNIC 2013

LTC Primary and BRe WNIC 2013 LTC Sub under the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note or the proceeds thereof, or (b) a trust in which WNIC is the sole beneficiary received those assets, lien, rights or proceeds. Accordingly, WNIC is a subsequent transferee of those assets, rights, liens, or proceeds, or any transfer of those assets, rights, liens or proceeds was made for the benefit of WNIC, and WNIC actively participated in those transfers.

414.    Each of the PPCO Feeder Funds and the PPCO Blocker Fund are, and were at all times since before the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, and the Second Amended & Restated SHIP Note were issued and/or entered into, creditors of PPCO Master Fund.

415.    Pursuant to New York Debtor & Creditor Law §§ 274 and 277, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to avoid the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement, the Second Amended & Restated SHIP Note and the BAM Asserted Liens, and all transfers made by, liens given by, and obligations incurred by PPCO Master Fund, and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), to the Noteholders, including, without limitation, SHIP, BAM Administrative, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, BRe WNIC 2013 LTC Sub, BCLIC and WNIC, in connection therewith, including the BAM Asserted Liens.

416.    By reason of the aforementioned fraudulent conveyances, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund, is entitled to a judgment avoiding each transaction related to, or made in connection with, the issuance of the March NPA, the NPA Guaranty, the March NPA Notes, the Amended Security Agreement,

the Second Amended & Restated SHIP Note and the BAM Asserted Liens, granting recovery of the assets conveyed by PPCO Master Fund, and/or the NPA Guarantors and/or the MSA PPCO Subsidiaries (if any), invalidating, and avoiding the obligations undertaken and the liens granted by PPCO Master Fund and/or the MSA PPCO Subsidiaries (if any) to BAM Administrative as agent for the Noteholders, including the BAM Asserted Liens.

## EIGHTEENTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

#### BY
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

#### AGAINST
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

417.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth herein.

418.    If this Court determines that any of the PPCO Loan Transactions and Securities Purchases are not voidable under New York law, the Receiver, by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker hereby requests that this Court find and hold that it would unjust for BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary and/or BRe WNIC 2013 LTC Sub to retain any benefits of those transactions to the detriment of the PPCO Funds or the investors and creditors of the PPCO Funds.

419.    Equity and good conscience should not permit any of BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary and/or BRe WNIC 2013 LTC Sub to receive or retain any benefits from the PPCO Loan Transactions and Securities Purchases because (i) neither PPCO Master Fund nor the MSA

110

PPCO Subsidiaries received reasonable consideration in exchange for the liens and transfers made by them; (ii) PPCO Master Fund was being run by an officer who had completely abdicated his duty of loyalty and care to the PPCO Master Fund and the MSA PPCO Subsidiaries; and (iii) the ultimate harm of these transactions has been suffered by the innocent investors and creditors of the Receivership Estates.

## NINETEENTH CLAIM FOR RELIEF

### DECLARATORY JUDGMENT

<u>BY</u>
*The Receiver by and for (i) PPCO Master Fund, (ii) the PPCO Feeder Funds, and (iii) the PPCO Blocker Fund*

<u>AGAINST</u>
*BAM Administrative, SHIP, BCLIC, WNIC, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary, and BRe WNIC 2013 LTC Sub*

420.    The Receiver repeats and realleges each and every allegation contained above as if fully set forth herein.

421.    BAM Administrative, on behalf of the Noteholders and their ultimate beneficiaries, asserts an all-asset lien on the assets of PPCO Master Fund and its subsidiaries or related entities, including the MSA PPCO Subsidiaries.

422.    While the MSA PPCO Subsidiaries executed both the December 2015 Security Agreement and the Ratification Agreement, no subsidiaries of PPCO Master Fund executed the Amended Security Agreement executed in connection with the March NPA.  In fact, the Amended Security Agreement expressly provided that it did not amend or restate the December 2015 Security Agreement.

423.    Moreover, Schedule C of the Amended Security Agreement purports to list all of the equity interests owned by "each Assignee" (without expressly defining the term "Assignee") and the percentage ownership of each "Assignee."  Schedule C lists certain subsidiaries of PPCO

Master Fund but contains no information below the headings "Class," "Certificate No.," "Par Value" or "Number of Interests."

424.    Notwithstanding the foregoing, BAM Administrative, as agent, asserts liens against all of the assets of PPCO Master Fund and the MSA PPCO Subsidiaries

425.    Based on the forgoing, an actual, present, and justiciable controversy exists between the Plaintiffs and BAM Administrative, and the Noteholders, concerning whether the BAM Asserted Liens attach to the assets of the MSA PPCO Subsidiaries.

426.    Because, *inter alia*, no MSA PPCO Subsidiaries executed the Amended Security Agreement, the Plaintiffs therefore request a declaratory judgment that the BAM Asserted Liens do not attach to the assets of the MSA PPCO Subsidiaries.

## IX.

## PRAYER FOR RELIEF

**WHEREFORE,** the Receiver, by and for each of the Plaintiffs, demands (i) judgment against the Defendants on the claims asserted against them in the amount of actual damages proven at trial, including all direct and/or consequential damages, treble damages pursuant to 18 U.S.C. § 1964 (RICO), punitive damages under state law, damages for diminution of value and restitution, plus all applicable interest, attorneys' fees, costs of suit, (ii) avoidance and recovery of the fraudulent conveyances specified herein and the avoidance of the associated alleged obligations and liens asserted on the PPCO Funds and their subsidiaries' assets by BAM Administrative, as agent, including the BAM Asserted Liens, and (iii) further relief as this Court deems just and proper.

## X.

## <u>DEMAND FOR TRIAL BY JURY</u>

427.    The Receiver demands a trial by jury on all issues so triable.


Dated: New York, New York
       March 29, 2019

                                  **OTTERBOURG P.C.**

                          By:    */s/*Erik B. Weinick_____
                                 Adam C. Silverstein
                                 (asilverstein@otterbourg.com)
                                 William W. Moran
                                 (wmoran@otterbourg.com)
                                 Erik B. Weinick
                                 (eweinick@otterbourg.com )
                                 Andrew S. Halpern
                                 (ahalpern@otterbourg.com)
                                 230 Park Avenue
                                 New York, New York 10169
                                 Tel.:  (212) 661-9100
                                 Fax:  (212) 682-6104
                                 *Attorneys for Plaintiffs*

# EXHIBIT A



# EXHIBIT B

**Glossary of Certain Terms Used in the Amended Complaint**

1.       "**40|86 Advisors**" means Defendant 40|86 Advisors, Inc., the financial advisor to CNO, BCLIC and WNIC.

2.       "**Amended Complaint**" means the Amended Complaint filed by Plaintiffs on March 29, 2019.

3.       "**Amended Security Agreement**" means the March 21, 2016 Amended and Restated Master Security Agreement entered into by PPCO Master Fund in connection with the March NPA, pursuant to which it granted security interests to BAM Administrative, as agent, in substantially all of its assets.

4.       "**BAM Administrative**" means Defendant BAM Administrative Services LLC.

5.       "**BAM Asserted Lien**" means the lien asserted by BAM Administrative, as agent for SHIP, against all assets of PPCO Master Fund arising out of the December 2015 Security Agreement.

6.       "**BAM Asserted Liens**" means, together with the BAM Asserted Lien, any and all of the liens asserted by BAM Administrative, as agent, against all of the assets of PPCO Master Fund and its subsidiaries, including, but not limited to, LC Energy Holdings LLC and LC Energy Operations LLC, ALS Life Holdings LLC and ALS Capital Ventures LLC, on account of UCC-1 financing statements it filed at various times.

7.       "**BAM I**" means Defendant B Asset Manager LP.

8.       "**BAM I IMA**" means the January 15, 2015 IMA with BAM I pursuant to which SHIP invested $110 million with BAM I.

9.       "**BAM II**" means Defendant B Asset Manager II LP.

10.       "**BBIL**" means Defendant Beechwood Bermuda International Ltd.

11.       "**BBIL Holdings**" means Defendant Beechwood Bermuda Investment Holdings, Ltd.

12.       "**BBIL IMA**" means the May 22, 2014 IMA pursuant to which SHIP deposited approximately $80 million into a custody account at Wilmington Trust for investment by Beechwood on SHIP's behalf.

13.       "**BCLIC**" means Defendant Bankers Conseco Life Insurance Company.

14.       "**BCLIC/ WNIC Complaint**" means the Complaint filed by BCLIC and WNIC in *Bankers Conseco Life Ins. Co., et. al.* v. *Moshe M. Feuer, et al.,* 16 Civ. 07646-ER (stayed).

15.     **"Beechwood"** means individually, or collectively, Defendants Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood Holdings, BBIL, BBIL Holdings, Beechwood Bermuda, BAM Administrative, and the Beechwood Reinsurance Trusts.

16.     **"Beechwood Bermuda"** means Defendant Beechwood Bermuda Ltd.

17.     **"Beechwood Defendants"** means the Beechwood Entities, Feuer and Taylor.

18.     **"Beechwood Entities"** means Defendants Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood Holdings, BBIL, BBIL Holdings, Beechwood Bermuda, BAM Administrative, and the Beechwood Reinsurance Trusts.

19.     **"Beechwood Exchange Note"** means the note issued in connection with the issuance of the SHIP Surplus Note, pursuant to which SHIP transferred $50.2 million from BBIL to Beechwood Investments in consideration for a new note.

20.     **"Beechwood Holdings"** means Defendant Beechwood Re Holdings, Inc.

21.     **"Beechwood Investments"** means Beechwood Investments LLC.

22.     **"Beechwood Re"** means Beechwood Re Ltd.

23.     **"Beechwood Reinsurance Trusts"** means BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub.

24.     **"BRe IMA"** means the June 13, 2014 IMA pursuant to which SHIP invested $80 million with Beechwood Re.

25.     **"CNO"** means Defendant CNO Financial Group, Inc.

26.     **"CNO Defendants"** means 40|86 Advisors, CNO, BCLIC and WNIC.

27.     **"Criminal Action"** means the December 19, 2016, eight count indictment  filed in the United States District Court for the Eastern District of New York against PMNY, Platinum Credit Management, Mark Nordlicht, David Levy, Daniel Small, Uri Landesman, Joseph Mann, Joseph Sanfilippo, and Jeffrey Shulse.

28.     **"December 2015 Security Agreement"** means the agreement pursuant to which the SHIP Note was secured by security interests in all assets of PPCO Master Fund and the MSA PPCO Subsidiaries.

29.     **"Eric Johnson"** was the Chief Investment Officer and President of 40|86 Advisors, Executive Vice President of WNIC and BCLIC and Chief Investment Officer of CNO Financial Group.

30.     **"First Amended SHIP Note"** means the $2 Million dollar loan from SHIP to PPCO Master fund pursuant to a January 20, 2016 Amended and Restated Delayed Draw Demand Note, which increased the outstanding amount loaned by SHIP to approximately $17.5 million.

31.     **"Fraud Complaints"** means the BCLIC, PPVA and SHIP Complaints.

32.     **"Fuzion"** means Fuzion Analytics, Inc.

33.     **"IMAs"** means the BBIL IMA, BRe IMA, and the BAM I IMA.

34.     **"Individual Beechwood Defendants"** means Feuer and Taylor.

35.     **"March NPA"** means the $69.1 million Note Purchase Agreement entered into on March 21, 2016.

36.     **"March NPA Notes"** means the notes issued by PPCO Master Fund to the Noteholders under the March NPA.

37.     **"MSA PPCO Subsidiaries"** means ALS Capital Ventures LLC, Atlantic Growth Capital LLC, Alpha Credit Resources LLC, Bakken Development Opportunities I LLC, Beta Credit Services LLC, Burr Capital LLC, Platinum Partners Credit International LP, Centurion Structured Growth LLC, Credit Funding LLC, Credit Mining LLC, Credit International LLC, Credit Strategies LLC, Diamed Holdings LLC, Financial Ventures LLC, Hamilton Capital LLC, JH Funding LLC, Lakewood Group LLC, L2Leasing Holdings LLC, Maximilian Investors LLC, Maximilian Resources LLC, Northrock Financial LLC, Pea & Eigh Company LLC, Photon Management LLC, Platinum Long Term Growth VII, LLC, Platinum Credit Partners International LLC, Principal Growth Strategies LLC, Pro Master Group LLC, Pro Player Funding LLC, PTLG VIII Iron Ore LLC, RE Credit LLC, Regis Capital LLC, RJ Funding LLC, Secure Holdings LLC, Voltage Energy Holdings Co. LLC, West Ventures LLC, and Wintercrest Advisors LLC.

38.     **"MSA Subsidiary Guarantee"** means December 23, 2015 Subsidiary Guaranty wherein the MSA PPCO Subsidiaries guaranteed the amounts due to SHIP under the SHIP Note.

39.     **"Northstar Debt Assignment Agreement"** means the March 21, 2016 Assignment Agreement between PPCO Master Fund and BAM Administrative, as agent for BRe WNIC 2013 LTC Primary and SHIP, pursuant to which BRe WNIC 2013 LTC Primary assigned approximately $20 million of 12% Second Priority Senior Secured Notes to PPCO Master Fund

and SHIP assigned approximately $11.4 million in Northstar Indenture Debt to PPCO Master Fund

40.     **"Northstar Indenture Debt"** means the debt evidenced by the 12% Second Priority Senior Secured Notes.

41.     **"Noteholders"** means the following parties who entered into the March 21, 2016 Note Purchase Agreement, SHIP, BRe BCLIC Primary, BRe BCLIC Sub, BRe WNIC 2013 LTC Primary and BRe WNIC 2013 LTC Sub.

42.     **"NPA Guarantors"** means those PPCO Fund subsidiaries and affiliates who executed the NPA Guaranty.

43.     **"NPA Guaranty"** means the March 21, 2016 Subsidiary Guaranty pursuant to which the NPA Guarantors guaranteed to the Noteholders the payment of all Obligations under the March NPA Notes.

44.     **"Original RICO Members"** means Beechwood Re, Beechwood Investments, BAM I, BAM II, Beechwood Holdings, BBIL, BBIL Holdings, Beechwood Bermuda, BAM Administrative, the Beechwood Reinsurance Trusts and the association-in-fact of their co-conspirators, Feuer, Taylor, Nordlicht, Levy and others at or associated with the Platinum Fund.

45.     **"Platinum Funds"** means, collectively, the PPCO, PPVA and PPLO family of funds.

46.     **"PPCO Blocker Fund"** means Receivership Entity Platinum Partners Credit Opportunities Fund (BL) LLC.

47.     **"PPCO Feeder Funds"** means PPCO Fund International A, PPCO Fund TE, PPCO Onshore Feeder Fund and PPCO Fund International.

48.     **"PPCO Fund International"** means Receivership Entity Platinum Partners Credit Opportunities Fund International Ltd.

49.     **"PPCO Fund International A"** means Receivership Entity Platinum Partners Credit Opportunities Fund International (A) Ltd.

50.     **"PPCO Fund TE"** means Receivership Entity Platinum Partners Credit Opportunities Fund (TE) LLC.

51.     **"PPCO Funds"** means the PPCO Family of Funds.

52.     **"PPCO Loan Transactions"** means the series of transactions entered into by PPCO Master Fund between December 21, 2015 and March 21, 2016 through which it borrowed

iv

a total of approximately $69.1 million from SHIP and nominally the Beechwood Reinsurance Trusts (which were funded using BCLIC'S and WNIC'S investments) in order to purchase certain securities.

53. **"PPCO Loan Transactions and Securities Purchases"** means the transactions taking place between December 2015 and March 2016 consisting of the SHIP Note, December 2015 Security Agreement, MSA Subsidiary Guarantee, the First Amended SHIP Note, the Ratification Agreement, the March NPA, the March NPA Notes, the Amended Security Agreement, the NPA Guaranty, the Second A&R SHIP Note and the Northstar Assignment Agreement.

54. **"PPCO Master Fund"** means Receivership Entity Platinum Partners Credit Opportunities Master Fund LP.

55. **"PPCO Onshore Feeder Fund"** means Receivership Entity Platinum Partners Credit Opportunities Fund LLC.

56. **"PPCO Portfolio Manager"** means Platinum Credit Management LP, portfolio manager for PPCO Master Fund, PPCO Onshore Feeder Fund, PPCO Fund International, PPCO Fund International A and PPCO Fund TE.

57. **"PPLO"** means Platinum Partners Liquid Opportunity Master Fund, L.P.

58. **"PMNY"** means Platinum Management (NY) LLC.

59. **"PPVA"** means Platinum Partners Value Arbitrage Fund, LP.

60. **"PPVA Complaint"** means the Amended Complaint filed by PPVA in *Trott et al. v. Platinum Management (NY) LLC, et al.*, 18 Civ. 10936-JSR.

61. **"PPVA Feeder Funds"** – means PPVA Intermediate Feeder Fund, PPVA Onshore Feeder Fund and PPVA International Feeder Fund.

62. **"PPVA Funds"** means the PPVA family of funds.

63. **"PPVA Intermediate Feeder Fund"** means Platinum Partners Value Arbitrage Intermediate Fund Ltd.

64. **"PPVA Offshore Feeder Fund"** means Platinum Partners Value Arbitrage Fund (International) Limited.

65. **"PPVA Onshore Feeder Fund"** means Platinum Partners Value Arbitrage Fund (USA) L.P.

66. **"PPVA Portfolio Manager"** means Platinum Management (NY) LLC.

67.     **"Purchased Securities"** means the securities purchased through the PPCO Loan Transactions.

68.     **"Ratification Agreement"** means the Reaffirmation and Ratification Agreement entered into on January 20, 2016, in which the MSA PPCO Subsidiaries, inter alia, reaffirmed and ratified the MSA Subsidiary Guaranty.

69.     **"Receiver"** means Melanie L. Cyganowski, as Receiver for the Receivership Entities.

70.     **"Receivership Action"** means the Civil Action commenced by the SEC, captioned *Securities and Exchange Commission v. PMNY LLC, et al.*, Case No. 16-06848.

71.     **"Receivership Court"** means the United States District Court for the Eastern District of New York.

72.     **"Receivership Entities"** means Platinum Credit Management, L.P., Platinum Partners Credit Opportunities Master Fund LP, Platinum Partners Credit Opportunities Fund (TE) LLC, Platinum Partners Credit Opportunities Fund LLC, Platinum Partners Credit Opportunities Fund (BL) LLC, Platinum Liquid Opportunity Management (NY) LLC, Platinum Partners Liquid Opportunity Fund (USA) L.P., Platinum Partners Liquid Opportunity Master Fund L.P., Platinum Partners Credit Opportunities Fund International Ltd and Platinum Partners Credit Opportunities Fund International (A) Ltd.

73.     **"Receivership Order"** means the Receivership Court's October 16, 2017 Second Amended Order Appointing Receiver.

74.     **"Reinsurance Agreements"** means the (i) Indemnity Reinsurance Agreement by and between Washington National Insurance Company and Beechwood Re Ltd, as amended by Amendment No.1 to Indemnity Reinsurance Agreement and (ii) New York Indemnity Reinsurance Agreement by and between Bankers Conseco Life Insurance Company and Beechwood Re Ltd. pursuant to which BCLIC and WNIC ceded a substantial portion of their legacy, runoff long-term care business to Beechwood Re.

75.     **"RICO Enterprise"** means the CNO Defendants, the SHIP Defendants along with the Original RICO Members.

76.     **"Second A&R SHIP Note"** means the Second Amended and Restated Secured Term Note dated March 21, 2016, pursuant to which SHIP "loaned" PPCO Master Fund $26,590,877.78 which was then directed to BAM Administrative, as Agent for SHIP, BRe

WNIC 2013 LTC Primary, Beechwood Bermuda International Limited and Beechwood Bermuda Investment Holdings, Ltd., for its segregated accounts.

77.     **"SHIP"** means Defendant Senior Health Insurance Company of Pennsylvania.

78.     **"SHIP Complaint"** means the Second Amended Complaint filed by SHIP in *Senior Health Insurance Co. of Pa. v. Beechwood Re Ltd., et al.,* 18 Civ. 10936-JSR.

79.     **"SHIP Defendants"** means Fuzion and SHIP.

80.     **"SHIP Note"** means the December 23, 2015 Delayed Draw Demand Note pursuant to which SHIP "loaned" $15.5 million note to PPCO Master Fund.

81.     **"SHIP Surplus Note"** means note evidencing SHIP's $50.2 million loan from Beechwood Investments in consideration for issuance of the SHIP Surplus Note.

82.     **"SHIP/ Beechwood Surplus Note Transaction"** means the transaction between SHIP and Beechwood around February 2015 pursuant to which the parties exchanged approximately $50 million in loans.

83.     **"WNIC"** means Defendant Washington National Insurance Company.