UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PLATINUM-BEECHWOOD LITIGATION | Master Docket No. 1:18-cv-06658-JSR |
| MELANIE L. CYGANOWSKI, AS EQUITY RECEIVER FOR PLATINUM PARTNERS CREDIT OPPORTUNITIES MASTER FUND, et al., <br><br> Plaintiff, <br><br> v. <br><br> BEECHWOOD RE LTD., et al., <br><br> Defendants. | Case No. 1:18-cv-12018-JSR |

**DEFENDANT SENIOR HEALTH INSURANCE COMPANY
OF PENNSYLVANIA'S REPLY MEMORANDUM OF LAW IN
<u>FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Aidan M. McCormack (AMM 3017)
R. Brian Seibert (RS 1978)
DLA Piper LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500

James D. Mathias (admitted *pro hac vice*)
Kathleen A. Birrane (admitted *pro hac vice*)
Ellen E. Dew (admitted *pro hac vice*)
DLA Piper LLP (US)
The Marbury Building
6225 Smith Avenue
Baltimore, Maryland 21209-3600
(410) 580-3000

*Attorneys for Defendant
Senior Health Insurance Company
of Pennsylvania*

# TABLE OF CONTENTS

**Page**

INTRODUCTORY STATEMENT ............................................................................................1

ARGUMENT ..................................................................................................................................4

I.      SHIP Is Entitled to Summary Judgment on the Receiver's
Fraudulent Conveyance Claims (Counts 8-17).................................................4

      A.      The Receiver Lacks Standing to Assert the Fraudulent Conveyance Claims......... 4

            1.      The Receiver Does Not Represent a Creditor of the
PPCO Subsidiaries. ....................................................................... 4

            2.      The Receiver Does Not Allege that PPCO-MF is a
Creditor of Itself Under New York Debtor & Creditor Law ...................... 7

            3.      PPCO-FF and PPCO-Blocker were not Present or Future
Creditors of PPCO-MF at the Time of the Conveyance ........................... 8

      B.      The Fraudulent Conveyance Claims Should Be Dismissed Because SHIP
Was a Transferee for Fair Consideration Without Knowledge of Any Fraud......... 9

            1.      SHIP Had No Knowledge of Any Alleged Fraud...................................... 9

            2.      The December 2015 and March 2016 Loan Transactions
Were Supported by Fair Consideration..................................................... 11

                  a.      The Receiver's Expert Concedes that the March 2016 Loan
Transaction Was Supported by Fair Equivalent Value................ 11

                  b.      SHIP Gave Fair Equivalent Value in Connection With the
December 2015 Loan Transactions. ............................................. 12

                  c.      SHIP Was a Good Faith Transferee.............................................. 13

      C.      The Receiver's Constructive Fraudulent Conveyance Claims Fail
Because No Evidence Exists that PPCO-MF was Insolvent or
Lacked Adequate Capital Either Before or as a Result of the
December 2015 and March 2016 Transactions or that it Intended
to Become Unable to Pay its Debts as a Result of Those
Transactions (Counts 8, 10-13, 15-17). ................................................. 16

1.   No Evidence Exists that at the Time of the Transactions
PPCO-MF was Either Insolvent or was Rendered
Insolvent as a Result of The Transactions (Counts 10, 12, 15, 17). ......... 16

2.   No Evidence Exists That PPCO-MF had Unreasonably
Small Capital at the Time of the Transactions (Counts 11, 16). ............... 19

3.   No Evidence Exists That PPCO-MF Intended or Believed
That It Would Incur Debts Beyond Its Ability to Pay (Counts 8, 13). ..... 20

D.   The Actual Fraudulent Conveyance Claims Also Separately Fail Because No
Evidence Exists That the December 2015 and March 2016 Transactions Were
Undertaken With an Intent to Defraud Creditors (Counts 9, 14). ......................... 21

II.   The Receiver's Unjust Enrichment Claim Should Be Dismissed (Count 18). .................22

III.   The Receiver's Declaratory Judgment Claim Should Be Dismissed (Count 19). .............24

CONCLUSION ....................................................................................................................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Akanmu*,
   502 B.R. 124 (Bankr. E.D.N.Y. 2013)................................................................23

*In re Bayou Grp., LLC*,
   439 B.R. 284 (S.D.N.Y. 2010).....................................................................8, 17

*Carney v. Montes*,
   2014 WL 671263 at *8 (D. Conn. Feb. 21, 2014) .......................................... 17, 21

*Chen v. New Trend Apparel, Inc.*,
   8 F.Supp.3d 406, 465 (S.D.N.Y. 2014)..............................................................4

*In re Old Carco LLC*,
   509 F. App'x 77, 78 (2d Cir. 2013) ...............................................................11

*In re St. Charles Preservation Investors, Ltd.*,
   112 B.R. 469, 473 (D.D.C. 1990) ...................................................................8

*Cobalt Multifamily Inv'rs I, LLC v. Arden*,
   857 F. Supp. 2d 349 (S.D.N.Y. 2011)................................................................6

*Colvin v. Keen*,
   900 F.3d 63 (2d Cir. 2018)..........................................................................4

*Crane Co. v. American Standard, Inc.*,
   603 F.2d 244 (2d Cir. 1979 ..........................................................................5

*Darling v. Darling*,
   869 N.Y.S.2d 307 (N.Y. Sup. Ct. 2008) ...........................................................9

*Eberhard v. Marcu*,
   530 F.3d 122 (2d Cir. 2008)........................................................................5,

*In re Fairfield Sentry Limited*,
   596 B.R. 275, 303 (Bankr. S.D.N.Y. 2018)........................................................8

*Knopf v. Phillips*,
   16-cv-6601 (DLC), 2017 WL 6561163 (S.D.N.Y. Dec. 22, 2017),
   *vacated in part on other grounds*, 2018 WL 1320267 (S.D.N.Y. Feb. 1, 2018)...................11

*Lippe v. Bairnco Corp.*,
   249 F. Supp. 2d 357 (S.D.N.Y. 2003)......................................................11, 17, 21

*Lowendahl v. Baltimore & Ohio R. Co.*,
247 A.D. 144, 287 N.Y.S. 62 (1st Dep't) ...............................................................................21

*MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*,
910 F. Supp. 913 (S.D.N.Y. 1995) .........................................................................................20

*In re Norstan Apparel Shops, Inc.*,
367 B.R. 68 (Bankr. E.D.N.Y. 2007).....................................................................................20

*In re Platinum-Beechwood Litig.*,
No. 18-cv-6658 (JSR), 2019 WL 4934967 (S.D.N.Y. Oct. 7, 2019)....................................4, 6

*Patterson v. Cty. Of Oneida, N.Y.*,
375 F.3d 206 (2d Cir. 2004).....................................................................................................3

*Ray v. Ray*,
No. 18 Civ. 7035 (GBD), 2019 WL 1649981 (S.D.N.Y. Mar. 28, 2019) ........................17, 18

*In re The Reserve Fund Securities and Derivative Litigation*,
673 F.Supp.2d 182, 198, n. 46 (S.D.N.Y. 2009).......................................................................8

*Shelly v. Doe*,
249 A.D.2d 756, 671 N.Y.S.2d 803 (3d Dep't 1998) .......................................................17, 18

*Southwick Clothing LLC v. GFT (USA) Corp.*,
2004 WL 2914093 (S.D.N.Y. Dec. 15, 2004) ..........................................................................7

*SPV Osus Ltd. v. UniCredit Bank Austria*,
No. 18-cv-3497 (AJN), 2019 WL 1438163 (S.D.N.Y. Mar. 30, 2019)..................................24

*State Island Sav. Bank v. Reddington*,
260 A.D.2d 365, 687 N.Y.S.2d 707 (2d Dep't 1999)............................................................17

*Zdanok v. Glidden Co.*,
327 F.2d 944, 952 (2d Cir. 1964).............................................................................................4

## INTRODUCTORY STATEMENT

The Receiver's Opposition (Dkt. 508, "Opp.") is an exercise in diversion and mischaracterization.   Instead of relying on verified material facts supported by admissible evidence and responding to the merits, she attempts to falsely paint SHIP and its management as so personally desperate to keep SHIP out of receivership that, despite the absence of any actual evidence of SHIP's knowledge or involvement, this Court should somehow magically infer that SHIP was the mastermind and driving force behind the December 2015 and March 2016 transactions.   That exercise in character assassination in lieu of probative evidence necessarily fails.   Not only are the Receiver's attacks on SHIP unsubstantiated, contrived, and indicative of utter ignorance of state insurance regulatory law, they are ultimately irrelevant.   The Receiver's emphasis and reliance on them only underscores the obvious; she cannot put forth admissible factual evidence sufficient to create a genuine issue of material fact.[1]

As an example, the Receiver, to some unarticulated end, asserts that SHIP engaged in a circular transaction related to a surplus note that SHIP issued to Beechwood, essentially lending money to itself, and then hoodwinked its regulator into accepting that transaction.   It makes this ludicrous assertion despite the fact that SHIP met with its regulatory to discuss the transactions.[2] SHIP then wrote a lengthy confirmatory letter to its regulator confirming the transactions.   This letter specifically and expressly acknowledged the potential interpretation of the transaction as a circular transaction that would impact their accounting treatment under the special statutory accounting rules that apply only to insurance companies, and explained why the transaction related to the Surplus Note was not circular.   CMF Resp. at ¶ 138.   The Pennsylvania

---

[1] We note that the Receiver sought additional pages for an "omnibus" opposition and used almost all of those pages to exclusively attack SHIP.

[2] SHIP's Response to the Receiver's Rule 56.1 Counterstatement ("CMF Resp.") ¶ 138.

Department of Insurance approved the Surplus Note transaction and accepted SHIP's accounting treatment of the Surplus Note and the related transaction in the annual statement filed every year thereafter with the certification of SHIP's independent third-party auditor.  *Id.*

Duplicity by SHIP is not found in this record.  It is, however, woven into the fabric of the Receiver's case against SHIP, which is now, and has always been, based on irresponsible, baseless accusations untethered to reality.  Forced finally to "put up or shut up," the Receiver essentially makes it up.  For example, the entire "lack of capital" conclusion is based on a balance-sheet test conducted by the Receiver's expert, David Prager.  Prager was instructed by counsel to include a hypothetical $200 million-plus in "tort claims that would have been made had PPCO investors been aware of Nordlicht's false valuation."  (Opp. at 10 n. 7).  The Receiver defines the "Rescission Claims" in her Opposition with a citation to her Counterstatement of Material Facts (Dkt. 505, "CMF") paragraphs 226-227.  Prager did not calculate the "rescission claims," and he testified that he "received the -- the total amount from an employee of -- of the receivership at my request and at the request of counsel."  CMF ¶ 226 (Prager Tr. at 190:15-17).  In a true example of circularity, those two paragraphs cite only to Prager's report.  The Receiver provides no basis of fact for how the "rescission claims" were calculated, for whom they are purportedly asserted, or when and how they purportedly accrued.  Prager just accepted them as instructed by his client.  Thus, the Court is asked to find insolvency based only on a calculation created by counsel with no evidentiary support and fed as a mandatory assumption to their expert.  Not only does such a baseless assertion fail to generate a genuine issue of material fact sufficient to deny summary judgment, it exposes the inherent unreliability of the Receiver's conclusory assertions and compels the careful checking of her every factual averment and source citation.

It is telling that the Receiver relies heavily on the Trey Rogers declaration, which is replete with assertions that are not based on personal knowledge and are made without citation to evidence (Dkt. 509, "Rogers Decl.").   One confusing contention illustrates well the pervasive mischaracterizations and bald assertions made throughout the CMF and the Rogers Declaration. The Receiver alleges that PPCO-MF had outstanding and unpaid redemption requests placed by investors "no later than September 30, 2015."  Opp. at 58.   The citation for this assertion is paragraph 46 of the CMF, which cites only to the Rogers Declaration at paragraph 20.  Paragraph 20 of the Rogers Declaration addresses only the PPCO-MF Limited Partnership Agreement, and it appears the citation in the CMF was intended to be to paragraph 21 of the Rogers Declaration.

Paragraph 21 of the Rogers Declaration is a copy of paragraph 46 of the CMF, in which Rogers merely asserts that "PPCO's books and records reflect that" PPCO-MF allegedly owed unpaid capital withdrawals to PPCO-Blocker and PPCO Fund.   Rogers Decl. ¶ 21.   Rogers' declaration is made on "knowledge, information and belief,"[3] and does not cite to any evidence to support the statement.   Rogers does not tell SHIP and this Court which investor allegedly made each redemption request, when and how each allegedly was made, nor the alleged amounts for each request.   Instead, SHIP and this Court are told only that certain alleged requests were made "no later than September 30, 2015."  *Id.*   Not a single redemption request from any investors could be identified on a date certain.  This lack of evidentiary support is insufficient.

---

[3] *Patterson v. Cty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'"  The Rule's requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'") (internal citations omitted).

These are just two examples of the characterizations that are not borne out by the factual record. When all the hyperbole is stripped back, the record demonstrates that the Receiver has no evidence that SHIP had any actual knowledge of the December 2015 and March 2016 transactions at issue and had no direction or control over Beechwood's involvement in those transactions. The evidence demonstrates that SHIP paid full value for a promise to repay, and the transactions were orchestrated by Nordlicht to restructure PPCO's debt to preserve assets, not to defraud creditors. Therefore, summary judgment should be granted in favor of SHIP.

## ARGUMENT

**I.    SHIP is Entitled to Summary Judgment on the Receiver's Fraudulent Conveyance Claims (Counts 8-17).**

### A.    The Receiver Lacks Standing to Assert the Fraudulent Conveyance Claims.

#### 1.    The Receiver Does Not Represent a Creditor of the PPCO Subsidiaries.

The Receiver does not dispute that under New York Debtor & Creditor Law ("NYDCL") "it is an essential element of a claim for fraudulent conveyance that the plaintiff be a creditor whose claim has been impeded by the transfer in question." *Chen v. New Trend Apparel, Inc.*, 8 F.Supp.3d 406, 465 (S.D.N.Y. 2014). Despite this explicit requirement, the Receiver has failed to establish that she represents a creditor of the PPCO Subsidiaries. Instead, the Receiver only relies on this Court's October 7, 2019 decision, which concluded that the Receiver sufficiently *pled* standing to bring such claims. *See* Opp. at 35-36 (relying on *In re Platinum-Beechwood Litigation*, 2019 WL 4934967 at *34-35 (S.D.N.Y. Oct. 7, 2019)). The Court's earlier determination, however, does not control in light of the undisputed record developed through discovery that shows that the Receiver lacks standing.[4]

---

[4] The Court is not bound by its earlier decision. *See, e.g., Colvin v. Keen*, 900 F.3d 63, 68 (2d Cir. 2018) (noting that the law of the case "doctrine 'does not rigidly bind a court to its former

Regarding standing, the Court noted that the "fraudulent conveyance claims are brought pursuant to the Receivership Order, which granted the Receiver the right to sue for and collect all 'Receivership Property,' including any security interests conveyed by the PPCO Subsidiaries[.]" *Id*. at \*34.[5]   To the extent the Court concluded that the Receivership Order itself conferred standing, the NYDCL's requirement that fraudulent conveyance claims be brought by a creditor would be eliminated.   The Receivership Order, however, cannot change the elements of a cause of action under New York state law.   In *Eberhard v. Marcu,* 530 F.3d 122, 134 (2d Cir. 2008), the Second Circuit specifically addressed this issue when it held that the receiver lacked standing under the NYDCL because he did not represent a creditor.   The Second Circuit concluded:

> [F]ederal law does not give a receiver, or a district court, the authority to re-write or ignore state law.   The district court's judgment was premised on a state fraudulent conveyance statute, governed by state law. The fact that the person asserting the claim is a federally appointed receiver *does not federalize the law employed to attack the transaction*. *Id.* (emphasis added).

The Court's October 7, 2019 ruling appears to have been more in the nature of a determination that the Receivership Order provided standing for the Receiver to seek turnover of receivership property, which is different from whether a receiver represents a creditor of the transferor.   Indeed, the Court stated that "[p]ursuant to the Receivership Order, the Receiver has

---

decisions, but is only addressed to its good sense'") (*quoting Zdanok v. Glidden Co.*, 327 F.2d 944, 952-53 (2d Cir. 1964)); *Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 248-249 (2d Cir. 1979) ("A conclusion that the plaintiff lacks standing to bring an action may further the goal of conserving judicial resources by eliminating the need for further proceedings on the merits. The possible 'unseemliness' of an appearance of inconsistency in the particular action is outweighed by the benefit which the judicial system derives from a clear and correct delineation of who may invoke the resources of that system. Such a delineation reduces the strain on the resources of the courts and thereby frees additional time to be devoted to those whose grievances are properly before us.").

[5] In addition, the Receivership Order cannot create property rights where none exist under state law.   At best, PPCO-MF has an ownership interest in the PPCO Subsidiaries, not in the PPCO Subsidiaries' assets or property, which property includes the security interests that the PPCO Subsidiaries provided to SHIP.

the 'right to sue for and collect … from third parties all Receivership Property." *In re Platinum-Beechwood Litigation*, 2019 WL 4934967 at *34. The Receiver, however, did not bring a proceeding against SHIP for turnover of receivership property pursuant to New York law, and the Receiver is not a trustee in a bankruptcy pursuant to 11 U.S.C. § 543 (authorizing turnover of all the debtor's property to a trustee). The Receiver brought fraudulent conveyance claims under the NYDCL. As such, the Receiver is bound by the elements of this cause of action – including the "essential element" that the fraudulent conveyance claims be brought on behalf of a creditor. The Receiver has not met this requirement. Neither the Receivership Order nor this Court's earlier decision changes this underlying requirement of the NYDCL.

The Receiver is not saved by the Court's October 7, 2019 decision that the Receiver had standing under a "zombie" creditor exception purportedly established by *Eberhard*. *See In re Platinum-Beechwood Litigation*, 2019 WL 4934967 at *35. Under this exception, the Court determined that the creditor requirement of the NYDCL is satisfied because "the corporation is itself acting as a creditor." *Id.* (quoting *Cobalt Multifamily Inv'rs I, LLC v. Arden*, 46 F.Supp. 3d 357, 362 (S.D.N.Y. 2014)).[6] Even if the "zombie" creditor exception applied, however, and the PPCO Subsidiaries were creditors of themselves under the NYDCL, the Receiver would still lack standing to bring these claims because the "Receiver is not a receiver of the PPCO Subsidiaries." *Id.* at *34. Instead, the Receiver is a receiver of PPCO-MF, and PPCO-MF is not a creditor of the PPCO Subsidiaries. It is merely the owner of the PPCO Subsidiaries. It is not transformed into a creditor of the PPCO Subsidiaries by holding an ownership interest in them. Simply put,

---

[6] SHIP disputes that the Second Circuit established a "zombie" creditor exception to the standing requirements in *Eberhard*. Regardless, should the Court find that the "zombie" creditor exception exists, this exception does not apply here.

this is another instance of a receiver who has "asserted a claim on behalf of … creditors without representing any of them. [She] lacks standing to do so." *Eberhard*, 530 F.3d at 134.

2.   **The Receiver Does Not Allege that PPCO-MF is a Creditor of Itself Under New York Debtor & Creditor Law.**

Because only creditors have standing to set aside a fraudulent conveyance, the Receiver must represent a creditor of PPCO-MF in order to bring claims for recovery of allegedly fraudulent transfers made by PPCO-MF. The Receiver does not dispute this well-established law. Instead, citing *Eberhard*, the Receiver *only now* asserts that PPCO-MF qualifies as a creditor of itself under NYDCL pursuant to the "zombie" creditor exception.[7] *See* Opp. at 28.

Even assuming that PPCO-MF qualifies as a "zombie" corporation, the exception is inapplicable here. The Receiver did not bring any fraudulent conveyance claims under this theory of relief. There are *no* factual allegations in the First Amended Complaint ("FAC") that PPCO-MF is a creditor of itself with respect to any of the transfers the Receiver seeks to unwind. Instead, the FAC consistently pleads that "[e]ach of the [PPCO-FF] and the [PPCO-Blocker] are … creditors of [PPCO-MF]." *See* FAC at ¶¶ 345 (Count 8); 351 (Count 9); 359 (Count 10); 372 (Count 12); 380 (Count 13); 387 (Count 14); 396 (Count 15); 404 (Count 16); and 414 (Count 17).[8] The Court should not consider the Receiver's new assertions and new legal theory in the Opposition that PPCO-MF is also a qualifying creditor under the NYDCL. *See, e.g., Southwick Clothing LLC v. GFT (USA) Corp.*, 2004 WL 2914093 at *6 (S.D.N.Y. Dec. 15, 2004) ("A complaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition

---

[7] Under this exception, some courts have held that "when transfers are made by corporations that are completely controlled by the wrongdoer, 'the transfers were, in essence, coerced.'" *Carney v. Montes*, 2014 WL 671263 at *8 (D. Conn. Feb. 21, 2014) (quoting *Eberhard*, 530 F.3d at 132). "The corporation then becomes the creditor in the coerced transaction and a receiver for the coerced corporation has standing to claw back the transfers." *Id.*

[8] Count 14 does not contain any allegation regarding creditor status.

papers, and hence new allegations and claims should not be considered in resolving the motion.").

### 3. PPCO-FF and PPCO-Blocker were not Present or Future Creditors of PPCO-MF at the Time of the Conveyance.

The Receiver does not dispute that equity interests are insufficient to confer creditor status under the NYDCL. *See generally* Opp. at 31-34. Instead, the Receiver argues that PPCO-FF and PPCO-Blocker were creditors of PPCO-MF at the time of the allegedly fraudulent conveyances because they had a contractual right of redemption under the Third Amended and Restated Limited Partnership Agreement (the "LPA") and allegedly exercised such rights prior to the date of the conveyances.[9] *See* Opp. at 30-31. Alternatively, the Receiver alleges that, even if the requests were made after the transfers, PPCO-Blocker and PPCO-FF were "future creditors" of PPCO-MF as of the date of the allegedly fraudulent transfers. *See* Opp. at 30, n. 19.[10]

The Receiver does not offer any admissible evidence that PPCO-FF or PPCO-Blocker *ever* actually made a redemption request to PPCO-MF. The Receiver makes the bald and conclusory assertion that PPCO-MF "knew" that redemption requests "had been placed by

---

[9] If PPCO-Blocker and PPCO-FF never made a redemption request, they did not have a legally enforceable right to payment, and therefore have never been creditors of PPCO-MF. *See, e.g., In re St. Charles Preservation Investors, Ltd.*, 112 B.R. 469, 473 (D.D.C. 1990) (finding that limited partners were creditors where they had a "legally enforceable right to the payment of money" and the partnership agreement provided that guaranteed payments were due prior to the petition date); *In re Fairfield Sentry Limited*, 596 B.R. 275, 303 (Bankr. S.D.N.Y. 2018) ("the Defendants became creditors when they requested redemptions"). The cases cited by the Receiver do not hold otherwise. *See In re Bayou Group*, 372 B.R. 661, 665-66 (Bankr. S.D.N.Y. 2007) (specifically limiting its standing decision to the non-redeeming investors' status as tort claimants); *In re The Reserve Fund Securities and Derivative Litigation*, 673 F.Supp.2d 182, 198, n. 46 (S.D.N.Y. 2009) (making the general statement that "given that the Primary Fund is in liquidation, all of its current shareholders are 'creditors' seeking the return of their investments").

[10] The Receiver argues that she can bring fraudulent conveyance claims under NYDCL §§ 275 and 276 on behalf of these "future creditors." *See* Opp. at 30, n. 19. The Receiver admits that "future creditors" cannot bring fraudulent conveyance claims under NYDCL §§ 273 or 277.

investors" with PPCO-FF and the PPCO-Blocker "no later than September 30, 2015[.]"  Rogers Decl. at ¶ 21(c).  The Receiver does not identify the exact date a single request or provide any document that substantiates any redemption request and does not differentiate between (a) redemption requests from individual investors to PPCO-FF or PPCO-Blocker and (b) redemption requests from PPCO-FF and PPCO-Blocker to PPCO-MF.  Indeed, the Receiver fails to produce documentary evidence of even one such request, relying instead on the conclusory declaration of Rogers, which itself offers no evidentiary support and is not based on personal knowledge.[11]

The only admissible evidence before the Court is the deposition testimony of Rogers, who characterized PPCO-Blocker and PPCO-FF's interest in PPCO-MF as "equity" interests. SMF Resp. ¶ 9.  As set forth on page 15 of SHIP's Memorandum of Law in Support of Summary Judgment [Dkt. 498] ("SHIP's MSJ"), equity holders are not creditors under the NYDCL.  The Receiver bears the burden to show that the creditor element of a fraudulent conveyance claim is met, and the Receiver has failed to carry this burden.  *See, e.g., Darling v. Darling*, 869 N.Y.S.2d 307, 357 (N.Y. Sup. Ct. 2008) ("Generally, the burden of proof on the elements of a fraudulent conveyance … is on the party challenging the conveyance.").

**B.      The Fraudulent Conveyance Claims Should be Dismissed Because SHIP was a Transferee for Fair Consideration Without Knowledge of Any Fraud.**

**1.      SHIP Had No Knowledge of Any Alleged Fraud.**

The flawed central theory of the Receiver's case against SHIP – that SHIP "actively negotiated and consummated" the December 2015 and March 2016 transactions – has gone up in flames.  The Receiver never had a good faith basis to make such claims and discovery proves it.

---

[11]  The Receiver half-heartedly suggests that PPCO-Blocker and PPCO-FFs could be creditors of PPCO-MF because PPCO-MF owed them fiduciary duties, "and factual issues exist as to whether or not [PPCO-MF] breached those duties," but offers no support for this statement, no admissible evidence, and no real explanation for this theory.  Opp. at 34.

In tacit recognition of this, the Receiver was compelled to rely instead in her summary judgment motion on a theory that Beechwood's unidentified knowledge may be *imputed* to SHIP.

The Receiver's Opposition does not address SHIP's actual knowledge at all, and the Receiver, despite her ad hominum attacks, essentially concedes that SHIP had no actual knowledge of the December 2015 and March 2016 transactions, thus abandoning the core allegation of the FAC against SHIP.[12]  Instead, the Receiver simply states in conclusory fashion – and without any citation to any evidence – that material issues of fact exist as to whether "SHIP *and BAM*" gave fair equivalent value and whether "SHIP *and BAM* were in 'good faith.'" The Receiver cannot make that statement in good faith with just "SHIP" alone.  She must include "SHIP and BAM" – presumably through a flawed imputation argument – because she has no evidence that SHIP, by itself, had any actual knowledge of the December 2015 and March 2016 transactions.  The undisputed evidence conclusively establishes that SHIP did not even know that the transactions were taking place, and the Receiver does not address any of the facts cited by SHIP as evidence of this lack of knowledge.  *See* SHIP's MSJ at 18-20.  This cannot satisfy the actual knowledge standard under NYDCL § 278(1).

---

[12] The Receiver devotes many pages of her omnibus Opposition to an unfocused effort to dirty up the reputation of SHIP's former CEO Brian Wegner and to suggest that the Surplus Note transaction was somehow improper merely because the Receiver characterizes it as "circular." *See, e.g.,* Opp. at 11-19.  This slapdash exercise is untethered to any legal claim and cannot demonstrate that SHIP knew that Platinum owned and controlled, or even was involved directly in, Beechwood, and it proves nothing with regard to the December 2015 and March 2016 transactions that are the focus of the Receiver's claims against SHIP.  Space limitations do not permit SHIP to expose point-by-point here why and how the Receiver's assertions about Wegner and the Surplus Note are factually inaccurate and legally immaterial, but each factual allegation is addressed thoroughly in SHIP's Response to the Receiver's Rule 56.1 Counterstatement.

### 2. The December 2015 and March 2016 Loan Transactions Were Supported by Fair Consideration.

Contrary to the Receiver's claim, SHIP has not "misrepresented" the test for fair equivalent value and SHIP has not argued for a "precise percentage range" in order to calculate whether fair consideration exists. SHIP simply relies on settled New York law, which does not require a dollar-for-dollar exchange in order for there to be "fair consideration," NYDCL § 272. The Receiver only addresses (and misrepresents) SHIP's cited authorities in a footnote, trying to argue that some exception exists for non-arm's-length transactions. Opp. at 46, n. 27.

Neither *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003) nor *Knopf v. Phillips*, 2017 WL 6561163 (S.D.N.Y. Dec. 22, 2017) involved arm's-length transactions and the court still concluded that the non-dollar-for-dollar transactions were equivalent value as a matter of law. There was no holding that an "arm's-length transaction" differentiator is recognized in the law. In any event, what remains unaddressed by the Receiver, and therefore conceded, is that a dollar-for-dollar equivalence is not required. *See In re Old Carco LLC*, 509 F. App'x 77, 78 (2d Cir. 2013) (as cited by SHIP and not addressed by the Receiver, the Second Circuit held that a court "need not strive for mathematical precision," and should focus on a "significant disparity … [that] will have significantly harmed the innocent creditors ….").

### a. The Receiver's Expert Concedes that the March 2016 Loan Transaction Was Supported by Fair Equivalent Value.

As an initial matter, the Receiver's belated attempt to collapse the three separate transactions into one single transaction should be rejected by this Court. The Receiver's FAC rightly discusses the December 2015 and the March 2016 transactions separately and defines them collectively as the "PPCO Loan Transactions." FAC ¶ 223. She also defines them separately in her motion for summary judgment. (Memo of Law, Dkt. 493 at 1). Now suddenly, she tries to make a pivot by referencing only a single "multi-tranche transaction" defined as the

"PPCO Loan Transaction."   Opp. at 9-10.   Nowhere in the transaction documents are they identified as different "tranches" of the same transaction.

With respect to the March 2016 transaction, the Receiver's own expert's opinion conclusively establishes as a matter of law that SHIP provided fair value in the March 2016 transaction.  ██████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████  Opp. at 45.   This less than 10% difference cannot establish that fair value was not received.   The Receiver merely states, without any citation to the record, that "[a]t a minimum, issues of fact are presented as to whether [PPCO-MF] received 'fair consideration' for the March portion of the transactions" without explaining why.   *Id.*   In the absence of evidence that shows a lack of fair value, like in *Lippe*, *Knopf*, and *Old Carco*, this Court should conclude as a matter of law that PPCO-MF received fair value in the March 2016 transaction.

> **b.**     **SHIP Gave Fair Equivalent Value in Connection With the December 2015 Loan Transactions.**

The Receiver also fails to raise a genuine issue of material fact with respect to the fair value of consideration received in the December 2015 transactions because the Receiver admits that SHIP did not hold the Desert Hawk notes in December 2015 when PPCO purchased them, Opp. at 21, 48, and admits that PPCO-MF was liable for the debt of LC Energy at the time of the transaction, Opp. at 45, n. 26, thereby receiving a significant benefit.

The December 2015 transactions include two separate transactions with SHIP.   In one,

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████.   Therefore, with respect to SHIP and PPCO-MF, there was an exchange of fair value.

In the second, ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████ had already matured on

December 2, 2015 and was past due.  PPCO-MF *fully guaranteed* this pre-existing debt.  *See*

Receiver's Response to SHIP's Statement of Material Facts at ¶ 57, Dkt. 507.  The fact that this

███████████████████████████████ was not accompanied by a security guarantee on any

PPCO-MF assets is irrelevant.  ████████████████████████████████, and just

because there was no security guarantee, PPCO-MF could not just refuse to pay it.  PPCO-MF

received a benefit of 100% fair equivalent value in reducing that outstanding obligation at ████

█████████████████████████, and pushing out the maturity date three years, even after the

prior debt was overdue by almost a month.  The Receiver's expert agreed at his deposition that

such a scenario would provide a benefit to PPCO-MF.  CMF Resp. ¶ 222 (Prager Dep. Tr. at

171:7-172:7) ("I would have to – to review what the cross-defaults would have been.  Assuming

there were no cross-defaults on PPCO's other liability or other contracts, it's not clear to me that

there would be anything bad from LC Energy failing to service its debt.").  In fact, PPCO-MF

fully guaranteed the LC Energy debt, and therefore received a significant benefit in the

transaction.

The Receiver dedicates only one sentence to say that the Desert Hawk notes had zero

value and the discharge of the LC Energy debt had zero value – without citation to any record

evidence.  This is not sufficient to raise a *genuine* issue of material fact precluding summary

judgment, particularly where SHIP exchanged cash for a promise to repay.

### c.    SHIP Was a Good Faith Transferee.

The Receiver does not adduce a single piece of evidence demonstrating that SHIP knew

about the December 2015 and March 2016 transactions at the time they were executed, because

none exists.  Instead, the Receiver tries to paint a picture of bad faith by using irrelevant and out-of-context facts that fail to raise an issue of genuine material fact.

The Receiver presents no evidence that any act that constitutes bad faith under the NYDCL applies to SHIP here.  The fact is that SHIP provided its cash and assets in exchange for promises to repay (which were empty promises).  The Receiver fails to put forth any evidence demonstrating how the transactions benefited SHIP in any way, and the record citations the Receiver does put forward are all irrelevant and out of context.

The Receiver argues that SHIP sought to get out of "unrated assets" and into "rated assets."  There is no evidence that this was the reason for these transactions, nor that as a result SHIP had rated debt.  The evidence instead establishes that (i) Beechwood was required to follow the investment guidelines for SHIP, which, among others, limited the amount of limited partnership interests it could hold and (ii) due to regulatory concerns, Beechwood needed to reduce the concentration in Platinum-related assets.  CMF Resp. ¶ 8 (Narain Dep. Tr. at 582:10-588:15).  There is no evidence this had anything to do with the December 2015 and March 2016 transactions.

The Receiver also argues that Narain testified that he "understood that the direction to reduce concentration in Platinum-related assets came from SHIP,"  Receiver Opp. at 50, and that this proves SHIP knew about and directed the December 2015 and March 2016 transactions.  Not so.  Narain was hired *after* the December 2015 transactions in question were executed.  The Receiver conveniently leaves out the testimony from Narain that confirms he had no personal knowledge of any request from SHIP to reduce concentration in Platinum-related assets.  *Id.*  Narain also testified that his only knowledge of a request from SHIP to reduce investments in Platinum-related assets was with respect to regulatory limits in certain types of investments.  *Id.*

The Receiver further argues that "Narain testified that his understanding was that the general idea of SHIP moving away from Platinum assets *was SHIP's*," and cites to its CMF at paragraph 154.  Opp. at 52 (emphasis added).  The cited testimony, however, shows that assertion to be plainly false and misleading.  Narain testified that when he started at Beechwood, he did not receive any instruction to divest from Platinum-related assets.  Instead, there was only a directive to "invest the money wisely," and "reduce the concentration that -- perceived a real concentration between -- in entities related to Platinum."  CMF Resp. ¶¶ 8, 154 (Narain Dep. Tr. at 485:19-486:4).  When asked who explained that directive with respect to SHIP, Narain admitted it was *only* Mark Feuer or Scott Taylor; it was not SHIP, as the Receiver tries to invent. *Id.* (Narain Dep. Tr. at 487:5-24).

The Receiver also tries to conjure SHIP's knowledge and involvement from an out-of-context question by counsel for the Receiver after a break in the deposition (*id.* (Narain Dep. Tr. at 533:17-534:5)), but the Receiver fails to include Narain's follow up testimony after questioning by SHIP's counsel, which confirms that any idea concerning the December 2015 and March 2016 transactions did *not* come from SHIP.  Narain testified that he personally never had any conversations with anyone from SHIP about moving away from Platinum investments until "late in the summer, like maybe July, August [of 2016]," (*id.* (Narain Dep. Tr. at 582:10-583:25)), and that he never had any conversations with SHIP directing him to "divest any investments from their accounts that were related to Platinum," prior to Murray Huberfeld's arrest in June 2016.  *Id.*

The Receiver also claims that Christian Thomas, a Beechwood 30(b)(6) witness, adopted Narain's testimony "concerning discussions in January 2016 to divest SHIP's Platinum assets." *Id.*  The cited testimony demonstrates the Receiver's loose interpretation.  When asked if he was

aware of what Narain testified to, Thomas testified: "I don't recall that specifically.   I looked through a lot of testimony, so I just don't recall that specifically." *Id.* (Thomas Dep. Tr. at 376:3-10).   The Receiver does not put forth a single shred of evidence specifically identifying SHIP's knowledge of the December 2015 and March 2016 transactions *at the time they were executed*.

      **C.**      **The Receiver's Constructive Fraudulent Conveyance Claims Fail Because No Evidence Exists that PPCO-MF was Insolvent or Lacked Adequate Capital Either Before or as a Result of the December 2015 and March 2016 Transactions or that it Intended to Become Unable to Pay its Debts as a Result of Those Transactions (Counts 8, 10-13, 15-17).**

For the reasons set forth above, the Receiver's constructive fraudulent conveyance claims fail because no evidence demonstrates that the December 2015 and March 2016 transactions were not supported by fair consideration.   The Receiver's constructive fraudulent conveyance claims also fail for the separate and independent reason that there is no evidence that PPCO-MF was insolvent or lacked adequate consideration before or as a result of the transactions or that it intended to become unable to pay its debts as a result of those transactions.

      **1.**      **No Evidence Exists that at the Time of The Transactions PPCO-MF was Either Insolvent or was Rendered Insolvent as a Result of The Transactions (Counts 10, 12, 15, 17).**

The Receiver's claims for constructive fraudulent conveyance under NYDCL §§ 273 and 277 fail because the Receiver has presented no evidence that at the time of the December 2015 and March 2016 transactions PPCO-MF either was insolvent or was rendered insolvent as a result of the transactions.   The Receiver, recognizing her shortfall, attempts to shift the burden of proof, claiming that SHIP must present evidence of PPCO-MF's solvency.   The Receiver's position, however, is premised on the claim that it has established that the December 2015 and March 2016 transactions were made without fair consideration.   For the reasons explained above, it has not.   The Receiver bears the burden of presenting evidence of PPCO-MF's insolvency.

The report of the Receiver's expert, Mr. Prager, (the "Prager Report") establishes that PPCO-MF was solvent at the time of the December 2015 and March 2016 transactions. The Receiver's argument to the contrary rests entirely on the assumption – that the Receiver directed Mr. Prager to make – that PPCO-MF's liabilities should include "Rescission Claims" that non-insider investors "*could have asserted*" against PPCO-MF.[13]  SMF Resp. ¶ 92 (emphasis added). Under New York law, however, the "mere existence of a contingent debt, without more, is insufficient to support a finding that such a debt represented a 'probably liability' with the meaning of Debtor and Creditor Law § 271." *State Island Sav. Bank v. Reddington*, 260 A.D.2d 365, 366 (2d Dep't 1999).  For a liability to be "probable" under the statute, "some evidence must be proffered as to the probability, at the time of the challenged conveyance, that a contingent liability will be imposed and, if so, in what amount." *Id.*

Here, the Receiver has provided no evidence that the so-called "Rescission Claims" are "probable liabilities" within the meaning of the NYDCL ¶ 271(1).  First, New York courts have held that a contingent liability based on a tort claim is not sufficiently probable *at least* until an action has been commenced; before then, such labilities are purely speculative.  *Shelly v. Doe*, 249 A.D.2d 756, 757 (3d Dep't 1998); *Ray v. Ray*, No. 18 Civ. 7035 (GBD), 2019 WL 1649981, at *6 (S.D.N.Y. Mar. 28, 2019); see also *Lippe v. Bairnco*, 249 F. Supp. 2d 357, 380 (S.D.N.Y.

---

[13] Mr. Prager does not state anywhere in the Prager Report that so-called "Rescission Claims" should be considered in performing a balance sheet test, and the Receiver has presented no evidence that doing so is appropriate.  As noted by SHIP's expert, Timothy Hart, in his rebuttal report, FASB Codification "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"  SMF Resp. ¶ 35 (Hart Rebuttal Rept. at ¶ 31).  The so-called Rescission Claims had not – and to date have not – occurred and any losses were not reasonably estimable.  As such, they should not be considered as part of any balance sheet-driven analysis of solvency or capital adequacy.  *See id.*

2003).   As the Receiver concedes, no "Rescission Claims" had been asserted by any investor against PPCO-MF as of December 2015 and March 2016.[14]  SMF Resp. ¶ 96.

Second, the Receiver has failed to provide any evidence to support her calculation of the so-called "Rescission Claims."  The Receiver provided a spreadsheet setting forth the names of the alleged "████████" and the net amount of their investments.  The Receiver, however, has presented no evidence regarding how those alleged investors qualify as "████████" with viable "████████" or any backup documentation concerning the amounts these "████ ████" allegedly invested with PPCO-MF.

Further, SHIP has also presented additional evidence of PPCO-MF's solvency at the time of the transactions.  Joseph SanFilippo unequivocally testified that he was PPCO-MF's chief financial officer ("CFO") at the time of the transactions and that PPCO-MF was solvent and

---

[14] *In re Bayour Grp., LLC*, 439 B.R. 284 (S.D.N.Y.), the only case cited by the Receiver in support of her position that such claims can be considered, does not dispense with the requirement that an action must be commenced for a tort claim to be deemed a "probable liability."  In *In Re Bayour*, the plaintiffs, non-redeeming investors, sued hedge funds and their founders for violations of the Securities Act and for fraud and breach of fiduciary duty following the founders' guilty plea to criminal charges of committing investor adviser fraud.  *Id.* at 292. The non-redeeming investors subsequently sued redeeming investors and claimed, among other things, constructive fraudulent conveyance in connection with their redemptions.  *Id.* at 320.  The parties agreed that the non-redeeming investors were fraudulently induced to purchase their investments in the funds.  *Id.* at 335.  Under those circumstances, where the non-redeeming investors had already asserted claims against the hedge fund and the parties agreed that liability against the hedge fund and founders had already been established, the Court concluded that the non-redeeming investors claims could be considered for purposes of determining insolvency.  In contrast, no "Rescission Claims" have been asserted by any investor against PPCO-MF.  SMF Resp. ¶ 96.  The Receiver's attempts to distinguish *Shelly v. Doe* and *Ray v. Ray* are based on misrepresentations of the Court's holdings.  In *Shelly v. Doe*, the Court did not hold or make any statement that it was difficult to quantify the probability and amount of damages in connection with respondent's sexual assault claims.  Opp. at 54.  Likewise in *Ray v. Ray*, the Court did not hold that a previously instituted action pending appeal was not probable "because the action had been dismissed, and plaintiff's two prior actions for fraudulent conveyance were unsuccessful against the defendant."  *Id.*

capable of paying its debts as of December 2015 and March 2016.[15]  SMF Resp. ¶ 102.  His testimony concerning PPCO-MF's solvency is consistent with the representations and warranties made by PPCO-MF in the transaction documents.[16]  *Id.* ¶¶ 103-08.

The Receiver's hypothetical "█████████████" are not "probable" liabilities that can be considered for purposes of assessing PPCO-MF's solvency at the time of the December 2015 and March 2016 transactions.  The Receiver admits that "██████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████████"  *Id.* ¶ 97.  In addition, SHIP has also presented affirmative evidence of PPCO-MF's solvency.

### 2.   No Evidence Exists that PPCO-MF had Unreasonably Small Capital at the Time of the Transactions (Counts 11, 16).

The Receiver's constructive fraudulent conveyance claims under NYDCL § 274 should be dismissed because the Receiver has presented no evidence that the December 2015 and March 2016 transactions left PPCO-MF with "unreasonably small capital."  The Receiver again attempts to shift the burden of proof, claiming that SHIP must present evidence of PPCO-MF's insolvency.  For the reasons explained above, the Receiver, not SHIP, bears the burden of presenting evidence that the transactions left PPCO-MF with "unreasonably small capital."

---

[15] The Receiver argues that Mr. SanFilippo's sworn testimony should be ignored because he "was not employed by PPCO, he is not an expert, and his testimony is contradicted by the Receiver's expert."  Opp. at 56.  The Receiver, however, has not presented any evidence to contradict Mr. SanFilippo's testimony – and his submissions to this Court through briefing – that he was the CFO of PPCO-MF at the time of the transactions.  Dkt. Nos. 411 at ¶ 3(a), 414.  The fact that Mr. SanFilippo has not been presented as an "expert" is irrelevant.  Mr. SanFilippo testified that, as CFO, he prepared PPCO-MF's financial statements and was responsible for accounting and reporting for PPCO-MF.  SMF Resp. ¶¶ 101-02 (SanFilippo Tr. at 367:21-369:7).  As such, there is no question that Mr. SanFilippo's testimony as to PPCO-MF's solvency at the time is relevant.

[16] The Receiver points to no authority for her position that the representations and warranties in the transaction documents are somehow irrelevant.  In any event, it is the Receiver's burden to prove insolvency, not SHIP's burden to prove solvency.

To determine whether a transaction left the transferor with "unreasonably small capital," New York courts consider factors that include "the company's debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry, as well as whether the company's projections were reasonable and prudent when made." *In re Norstan Apparel Shops, Inc.*, 367 B.R. 68, 79 (Bankr. E.D.N.Y. 2007) (internal citations omitted).

The Prager Report, the only evidence on which the Receiver relies, does not contain factual information concerning those factors. The Receiver claims that the Prager Report includes an "███████████████████████" but does not explain how that analysis bears on any of the factors. Opp. at 56. It does not. Likewise, the Receiver claims that the Prager Report "████████████" highlights PPCO-MF's debt-to-equity ratio. *Id.* The Prager Report's "████████████" however, relies on the so-called "████████████" and the analysis therefore fails. In any event, the Prager Report establishes that PPCO-MF was well capitalized in December 2015 and March 2016, with hundreds of millions of dollars in assets on its balance sheet. SMF Resp. ¶ 94.[17]

### 3.    No Evidence Exists that PPCO-MF Intended or Believed That it Would Incur Debts Beyond its Ability to Pay (Counts 8, 13).

The Receiver's constructive fraud claims under NYCDL § 275 should be dismissed because the Receiver has produced no evidence that PPCO-MF intended or believed that it would incur debts beyond its ability to pay at the time of the December 2015 and March 2016 transactions. Under New York law, this test requires the Receiver to establish that "the transferor subjectively intended to become incapable of paying its debts." *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 943 (S.D.N.Y. 1995).

---

[17] *In re Tuller's, Inc.*, 480 F.2d 49, 52 (2d Cir. 1973) and *In re Café Crème, Ltd.*, 244 B.R. 221 (Bankr. S.D.N.Y. 2000) do not, as the Receiver claims, hold that when a transferor grants a security interest on all assets, they are automatically left with "unreasonably small capital."

The sole paragraph in the Rogers Declaration that the Receiver cites in support of her position does not establish that PPCO-MF subjectively intended to become incapable of paying its debts.  Opp. at 58.  This paragraph does no more than claim that, at the time of the transactions, PPCO-MF knew of the existence of redemption requests that could have been owing in the future if not withdrawn.  Rogers Decl. [Dkt. No. 509] at ¶ 21(c).  This allegation, which is not supported by personal knowledge or any documentation evidencing these alleged "redemption requests," is irrelevant to whether PPCO-MF subjectively intended to become incapable of paying its debts.  In addition, as set forth on page 33 of SHIP's MSJ, the only relevant evidence shows that the transactions were designed to ensure the very opposite – that PPCO-MF could continue paying its debts into the future.

> **D.    The Actual Fraudulent Conveyance Claims Also Separately Fail Because No Evidence Exists that the December 2015 and March 2016 Transactions Were Undertaken With an Intent to Defraud Creditors (Counts 9, 14).**

"The existence of actual intent to defraud is never presumed, and intent to defraud cannot be found 'based merely on suspicion, conjecture, or doubtful inference.'"  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 375 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004) (citing *Lowendahl v. Baltimore & Ohio R. Co.,* 247 A.D. 144, 287 N.Y.S. 62, 76 (1st Dep't), *aff'd,* 272 N.Y. 360, 6 N.E.2d 56 (1936)).  Although the Court previously determined that PPCO-MF had sufficiently *pled* the existence of badges of fraud, PPCO-MF's reliance on that determination at the summary judgment stage falls flat.  PPCO-MF is now required to *prove* the existence of any badges of fraud, which it cannot do.

As discussed above in point I.B., PPCO-MF has failed to demonstrate a lack of fair consideration in the December 2015, January 2016, and March 2016 transactions.  Indeed, PPCO-MF received $2 million in cash from SHIP in the January 2016 transaction.  The Receiver also fails utterly to identify any knowledge of this purported badge of fraud on SHIP's part.

The Receiver does not even address the December 2015 or the March 2016 transactions with regard to the badge of fraud concerning the retention of possession, benefit, or use of the property in question.  Instead, the Receiver relies on the overarching fact that the Platinum principals owned the majority of Beechwood through their family trusts, claiming they must have retained some benefit in the December 2015 and March 2016 transactions.  But this is mere speculation that does not raise a *genuine* issue of material fact.

As to the financial condition of the parties before and after the transaction in question, as discussed in point I.C., PPCO-MF was solvent both before and after the December 2015 and March 2016 transactions.  With respect to the badge of fraud regarding the existence of a pattern or series of transactions, the Receiver simply restates that PPCO-MF received assets with no value.  The Receiver claims that PPCO-MF was facing redemption requests in September 2015 that were to be paid on "███████████" [sic], without citation to any evidence.  The Receiver makes the conclusory statement that a lien on PPCO-MF's assets harmed PPCO-MF, but cites to no evidence to support this baseless claim.

Finally, the Receiver fails to identify anything specific with respect to the December 2015 and March 2016 transactions that was unusual.  Instead, she simply points to the fact that Nordlicht executed all the documents on behalf of the Platinum entities (no surprise there) and again reiterates her flawed lack-of-fair-value argument.  This is not sufficient to make these transactions unusual or not done in the ordinary course of business.

## II.     The Receiver's Unjust Enrichment Claim Should be Dismissed (Count 18).

The Receiver's unjust enrichment claim should be dismissed because she has presented no evidence establishing that, as a result of the December 2015 and March 2016 transactions: (1) SHIP was enriched, (2) at PPCO-MF's expense, and (3) equity and good conscience militate against permitting SHIP to retain what the Receiver seeks.  The claim should also be dismissed

because the Receiver has presented no evidence establishing a sufficient relationship between SHIP and the Receivership Entities and the claim is barred by the doctrine of *in pari delicto*.

First, the Receiver has presented no evidence that SHIP was enriched by the December 2015 and March 2016 transactions. The Receiver claims that SHIP benefited from the transactions by improving its position in "rated assets," the facts establish the opposite. With respect to the December 2015 transaction, ███████████████████████ in cash in exchange for a promise to pay, a security interest, and a guarantee. SMF Resp. ¶58. As for the March 2016 transaction, ██████████████████████████ (purchased with cash) in exchange for a promise to pay. *Id.* ¶ 70. To date, however, PPCO-MF has not repaid one penny of those funds, SHIP has been prevented from enforcing the security interest, and the guarantee has not been satisfied. *Id.* ¶ 87. The undisputed evidence, therefore, demonstrates that SHIP was far from enriched by the transactions – it has been severely harmed.

Second, the Receiver presents no evidence that PPCO-MF did not benefit from the transactions. Under New York law, the transferee is not liable on an unjust enrichment claim "[a]s long as the transferor received a benefit." *In re Akanmu*, 502 B.R. 306, 318 (Bankr. E.D.N.Y. 2018). While the Receiver claims that it received no benefit from the transactions, the undisputed facts establish otherwise. As SHIP's MSJ details, PPCO-MF received substantial benefits, including the extinguishment of a subsidiary's high interest debt, the acquisition of participation interests in the secured debt of Desert Hawk, the release of the Agera Pledge, and a valuable increase in the value of the loan between PPCO-MF and PPVA.

Third, no injustice exists requiring restitution. The undisputed evidence demonstrates that SHIP was harmed by the transactions. SHIP has never been repaid by PPCO-MF as

promised.  In contrast, if SHIP were required to pay restitution to the Receiver, who represents the entities that caused direct and grievous harm to SHIP, an injustice would be compounded.

Fourth, the Receiver presents no evidence establishing a sufficient relationship between SHIP and the Receivership Entities to support its unjust enrichment claim.  A claim for unjust enrichment cannot lie if the parties "simply had no dealings with each other."  *SPV Osus Ltd. v. UniCredit Bank Austria*, No. 18-cv-3497 (AJN), 2019 WL 1438163, at *14 (S.D.N.Y. Mar. 30, 2019) (citations omitted).  There is no dispute that SHIP and the Receivership entities had no dealings with each other.  Beechwood executed the transactions on SHIP's behalf without SHIP's knowledge.  As set forth in SHIP's opposition to the Receiver's partial motion for summary judgment, the evidence demonstrates that Beechwood was, and Platinum understood Beechwood to be, acting on its own behalf in negotiating the December 2015 and March 2016 transactions.  Beechwood's dealings with the Receiver, therefore, should not be considered.

Fifth, the unjust enrichment claim also should be dismissed under the doctrine of *in pari delicto*.  The Receiver's claim that this Court has ruled that the doctrine applies "only to the extent that a portion of a given claim is premised on overvaluation of PPCO's assets" is a misstatement of the Court's ruling.  Opp. at 65.  And, in any event, SHIP did not move to dismiss the Receiver's unjust enrichment claim so the Court has never ruled on the issue as to the Receiver's claim against SHIP.  There is no dispute that the Receivership Entities, through their principals at Platinum, were participants in the fraudulent scheme at the time of the December 2015 and March 2016 transactions.  Under these circumstances, the Receiver's unjust enrichment claim is precluded under the doctrine of *in pari delicto*.

### III.    The Receiver's Declaratory Judgment Claim Should be Dismissed (Count 19).

The Receiver's final count seeks a declaration that SHIP's liens under the December 2015 Master Security Agreement and March 2016 A&R MSA do not attach to the PPCO

Subsidiaries' assets.  The Receiver claims SHIP is not entitled to summary judgment because there is no evidence that "such liens were granted pursuant to proper corporate authority" and there is ambiguity in the documents.  Opp. at 66.  The December 2015 Master Security Agreement and March 2016 A&R MSA, however, are unambiguous on their face, and the evidence demonstrates that Mark Nordlicht had authority to execute both agreements.

The December 2015 Master Security Agreement (later reaffirmed and ratified in January 2016) unambiguously granted BAM Administrative, as agent for SHIP, a continuing interest in all of the property then owned or at any time thereafter acquired by PPCO-MF or the PPCO Subsidiaries.  Likewise, the March 2016 A&R MSA unambiguously reaffirmed those prior security interests, expressly providing that any liens and security interests continued to remain "███████████████"  SMF Resp. ¶ 77.  The PPCO Subsidiaries also expressly agreed, in the Subsidiary Agreement, executed by Mark Nordlicht on their behalf, that each of them "████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"  *Id.* ¶ 79.

The agreements are binding because Mark Nordlicht possessed authority to, and did, execute the December 2015 Master Security Agreement on behalf of PPCO-MF and each of the PPCO Subsidiaries and the March 2016 A&R on behalf of PPCO-MF.  SMF Resp. ¶¶ 16, 44, 80; Dkt No. 781-3 at 7.  The Receiver's claim that the liens granted under the documents may not have been granted pursuant to corporate authority is unsupported by any evidence and thus does not raise any questions of fact.  Accordingly, the Court should dismiss the Receiver's declaratory judgment claim and affirmatively rule that the liens and guarantees are valid and binding.

## CONCLUSION

SHIP respectfully submits that summary judgment should be granted in its favor and Counts 8-19 of the FAC against SHIP should be dismissed with prejudice.

Dated:  New York, New York                    DLA PIPER LLP (US)
        March 17, 2020


                                    By:   /s/ *Aidan M. McCormack*
                                          Aidan M. McCormack (AMM 3017)
                                          R. Brian Seibert (RS 1978)

                                          1251 Avenue of the Americas
                                          New York, New York 10020
                                          (212) 335-4500

                                          James D. Mathias (admitted *pro hac vice*)
                                          Kathleen A. Birrane (admitted *pro hac vice*)
                                          Ellen E. Dew (admitted *pro hac vice*)
                                          DLA Piper LLP (US)
                                          The Marbury Building
                                          6225 Smith Avenue
                                          Baltimore, Maryland 21209-3600
                                          (410) 580-3000

                                          *Attorneys for Defendant*
                                          *Senior Health Insurance Company*
                                          *of Pennsylvania*

172904952